UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANTHONY MILLER,

                                        Plaintiff,

                    -against-                                    **22-cv-6069 (FPG)(MJP)**

THE CITY OF ROCHESTER, MARYROSE M.
WENGERT AND EARL G. WENGERT, AS CO-
EXECUTORS OF THE ESTATE OF NOLAN WENGERT
(deceased), DARYL HOGG, JAYSON PRINZI, DANIEL
WATSON, and "JOHN DOE" RPD OFFICERS 1-10,

                                        Defendants.

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

RELEVANT LAW .......................................................................................................... 7

ARGUMENT .................................................................................................................... 7

   I.   THE THIRD CLAIM FOR RELIEF FOR DENIAL OF FAIR TRIAL AND EVIDENCE FABRICATION MUST PROCEED TO TRIAL ................................................... 7

      A.   Suggestive Showup Procedures Alone Violate Due Process ........................... 8

         1.   The Inherently Suggestive Show-Up Identification of Mr. Miller ............................. 9

         2.   Judicial Findings Confirm the Deficiencies of the Showup .................................... 10

      B.   Police Misconduct and Fabrication of the Identification Require Denial of Summary Judgment ................................................................................................................ 11

         1.   Wengert's Fabrication of the "Changed Clothes" Narrative ................................... 12

         2.   The Court of Claims Findings on Fabrication and Misconduct ................................. 12

         3.   Summary Judgment Must Be Denied ........................................................................ 13

      C.   Probable Cause to Arrest is a Does Not Preclude a Fair Trial Claim. .......................... 13

      D.   Qualified Immunity Is Unavailable on the Evidence Fabrication Claim ....................... 14

   II.   THE MALICIOUS PROSECUION CLAIMS MUST PROCEED TO TRAIL .............. 14

      A.   No Reasonable Officer Could Have Believed the Showup Identification Provided Probable Cause to Arrest or Prosecute Mr. Miller ................................................... 15

         1.   Probable Cause to Arrest is a Lower Standard than Probable Cause to Initiate and Continue a Prosecution. ............................................................................................ 15

         2.   The Showup Identification Did Not Provide Probable Cause to Arrest or Prosecute Mr. Miller ................................................................................................................ 16

         3.   Johnson v City Of Rochester Demonstrates That No Reasonable Officer Could Have Believed The Prosecution Would Succeed. ............................................................. 16

         4.   Defendants Ignored Plainly Exculpatory Evidence Which Showed They Lacked Probable Cause to Arrest or Prosecute Mr. Miller ................................................... 17

         5.   Even If There Was Probable Cause To Initiate The Prosecution, Probable Cause Dissipated When Wengert Discovered The Stolen iPhone In The Possession Of Another Individual ....................................................................................................... 18

6.     The Presumption Of Probable Cause Is Overcome By The Evidence Of Bad Faith Police Misconduct.............................................................................................. 19

B.    Defendants Argument That There Was No Favorable Termination is Frivolous......... 20

III.    THE FAILURE TO INTERVENE CLAIMS MUST PROCEED TO TRAIL............. 20

A.    Hogg and Watson's Participation in the Unlawful Stop ............................................... 21

B.    Failure to Disclose Facts About Response to Bradburn Street and the Assault on Cromes ................................................................................................................................ 21

C.    Failure to Prevent the Constitutionally Infirm Show-Up Identification ...................... 22

D.    The Jury Must Decide Whether the Officers Had Realistic Opportunities to Intervene 22

IV.    THE SIXTH CLAIM FOR VIOLATION OF DUE PROCESS RIGHTS UNDER ARTICLE I, § 6 OF THE NEW YORK STATE CONSTITUTION MUST PROCEED TO TRAIL 23

V.    QUALIFIED IMMUNITY MUST BE DENIED ............................................................ 23

VI.    THE DEFENDANTS' ARGUMENT THAT NEW YORK C.P.L.R. § 4915 APPLIES IN THIS FEDERAL CIVIL RIGHTS ACTION IS FRIVOLOUS .......................................... 24

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson* v. *Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ................................................................ 21

*Bailey* v. City of New York, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015) ...................................... 8

*Bermudez* v. *City of New York*, 790 F.3d 368, 374-76 (2d Cir. 2015)........................................ 20

*Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)................................................... 15, 17

*Brandon* v. City of New York, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010)................................. 8

Breton v. City of New York, 404 F. Supp. 3d 799, 811 (S.D.N.Y. 2019).................................. 18

Brown v. State, 89 N.Y.2d 172, 194 (1996) ............................................................................... 23

Buari v. City of New York, 530 F. Supp. 3d 356, 409 (S.D.N.Y. 2021)..................................... 23

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) .................................................................... 7

*Coggins* v. *Buonora*, 776 F.3d 108, 114 (2d Cir. 2015) ............................................................ 14

*Colon* v. *City of New York*, 60 N.Y.2d 78, 82-83 (1983)............................................................ 19

*Curley* v. *Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ........................................................ 15

*DaCosta* v. *Tranchina*, 2017 WL 5176409, at *19 (E.D.N.Y. Dec. 12, 2017) ........................... 19

*Franco* v. *Gunsalus*, No. 22-339, 2023 WL 3590102, at *4 (2d Cir. May 23, 2023) ................. 15

*Frost* v. *New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020)...................................... 14

*Garnett* v. *Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) .................................. 14

*Gregory* v. *City of Louisville*, 444 F.3d 725, 745–46 (6th Cir. 2006) ....................................... 16

*Harlow* v. *Fitzgerald*, 457 U.S. 800, 815 (1982) ...................................................................... 14

*Hayes* v. *New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)..................................... 7

*Ismael* v. *Charles*, No. 18 Civ. 3597, 2020 WL 4003291, at *12 (S.D.N.Y. July 15, 2020) ....... 21

*Johnson* v. *City of Rochester*, No. 21-CV-6683DGL, 2023 WL 8237560 (W.D.N.Y. Nov. 28, 2023) ....................................................................................................................................... 16

*Jovanovic* v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012) .................................. 8, 14

*Kanderskaya* v. *Kelly*, 11 F. Supp. 3d 431, 437 (S.D.N.Y. 2014)............................................... 18

*Kee* v. *City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) ................................................. 15

*Lowth* v. *Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996)............................................. 18

*Malley* v. *Briggs*, 475 U.S. 335, 341 (1986) ............................................................................ 14

*Manganiello* v. *City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) ................................. 14

*Miller* v *State*, Claim No. 135854 (Oct. 1, 2024) ................................................................. 2, 18

*Neil* v. *Biggers*, 409 U.S. 188 (1972)................................................................................... 8, 16

*Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017) .................. 7

*Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).......................................................... 18

*People* v. *De Bour*, 40 N.Y.2d 210 (1976) .............................................................................. 17

*People* v. *Miller*, 134 N.Y.S.3d 605, 609–10 (4 Dept 2020) ........................................... 1, 17, 18

*Posr* v. *Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999).................................. 16

*Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997) ..................................... 1, 8, 13, 14

*Rodriguez* v. *City of New York*, 623 F. Supp. 3d 225 (S.D.N.Y. 2022)....................................... 2

*Rohman* v. *New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)............................... 15

*Rosario* v. *Ercole*, No. 12-CV-6395, 2021 WL 199342, at *7 (E.D.N.Y. Jan. 20, 2021)............. 9

*Rosenfeld* v. *Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996)............................................................. 1, 25

*Sarnicola* v. *County of Westchester*, the court noted that "229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002) ................................................................................................................................... 24

*Savino* v. *City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) ....................................................... 19

*SCR Joint Venture L.P.* v. *Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)................................... 7

S*ec. Ins. Co. of Hartford* v. *Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)..... 7

Singletary v. Allen, 588 F. Supp. 3d 359, 368 (W.D.N.Y. 2022).................................................. 23

*Sloley* v. *VanBramer*, 945 F.3d 30, 47 (2d Cir. 2019) ................................................................. 22

*Thagard* v. *Lauber, 317 F. Supp. 3d 669* (W.D.N.Y. 2018)........................................... 1, 8, 12, 16

*Thompson* v. *Clark*, 142 S.Ct. 1332, 1335 (2022) ................................................................. 15, 20

*Triolo* v. *Nassau County*, 20 F.4th 776, 785 (2d Cir. 2022) ....................................................... 24

*Vazquez* v. *City of New York*, 2014 WL 4388497, at *4, *8 (S.D.N.Y. Sept. 5, 2014) ............ 9, 11

*Zahrey* v. *City of New York*, 2009 WL 54495, at *10–12 (S.D.N.Y. Jan. 7, 2009)............ 9, 12, 19

**Statutes**

28 U.S.C. § 1331 ........................................................................................................................ 25

CPLR § 4519 .......................................................................................................................... 1, 25

Fed. R. Civ. P. 56(c) .................................................................................................................... 6

Federal Rule of Evidence 601 .................................................................................................... 25

## PRELIMINARY STATEMENT

Defendants' motion for summary judgment should be denied in its entirety. They provide no factual or legal basis to dismiss any of Anthony Miller's claims or to grant qualified immunity to any Defendant. Instead, Defendants ignore overwhelming direct and circumstantial evidence of serious police misconduct and advance wholly frivolous arguments—for example, their reliance on the New York State "Dead Man's Statute," CPLR § 4519. This state statute is plainly inapplicable in this federal-question case. See *Rosenfeld* v. *Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996).

Mr. Miller has presented substantial admissible evidence of egregious and intentional police misconduct, which must be accepted as true on this motion. The misconduct centers on the constitutionally infirm showup identification—the only evidence connecting Mr. Miller to the robbery—which was tainted by the unduly suggestive nature of the showup identification procedures and Investigator Nolan Wengert's confirmation bias and fabricated "changed clothes" narrative. Such faulty identification procedures not only violate the constitutional right to a fair trial but also fail to establish probable cause for arrest or prosecution. See *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997); *Thagard* v. *Lauber, 317 F. Supp. 3d 669* (W.D.N.Y. 2018).

Both the Appellate Division, Fourth Department, and the Court of Claims (per Judge Odorisi) determined that the showup identification procedures were unduly suggestive, unreliable, and violated Mr. Miller's due process rights. The Fourth Department overturned Mr. Miller's conviction, finding the stop unlawful, the show up unduly suggestive and unreliable, and noting "considerable objective evidence" of his innocence. Exhibit 15, *People* v. *Miller*, 134 N.Y.S.3d 605, 609–10 (4 Dept 2020). Judge Odorisi went further, "disregarding" the identification, categorically rejecting Defendants' theory as "not logical" and finding that Mr. Miller's conviction

1

resulted from substantial police misconduct, including an identification procedure infected with Wengert's confirmation bias. Exhibit 6, *Miller* v. *State*, Claim No. 135854 (Oct. 1, 2024).

All Defendants directly participated in these constitutional violations, with Hogg, Watson, and Prinzi bearing additional liability for failing to intervene despite their knowledge of the tainted identification and exculpatory evidence. Moreover, Mr. Miller's state constitutional due process claim is distinct and non-duplicative, as it seeks to hold the City liable under *respondeat superior*—a basis for liability unavailable under § 1983. See *Rodriguez* v. *City of New York*, 623 F. Supp. 3d 225 (S.D.N.Y. 2022).

Defendants' continued reliance on the unconstitutionally suggestive identification procedure, together with their disregard of the substantial undisputed evidence of misconduct, underscores both the viability of Mr. Miller's claims and the impropriety of qualified immunity. Summary judgment is thus unwarranted, and Defendants' motion should be denied in its entirety.[1]

## STATEMENT OF FACTS

On September 25, 2013, at approximately 3:00 p.m., Anthony Miller's friend, Brooklyn Cromes, was assaulted outside his home at 38 Bradburn Street. Defendants Rochester Police Department (RPD) Officers Jason Prinzi and Daryl Hogg responded to the 911 dispatch, first going to Bradburn Street and then going to Strong Memorial Hospital to interview Mr. Cromes about the assault. They remained with Mr. Cromes at the hospital until approximately 5:09 p.m. (¶¶ 24-26)[2].

On September 25, 2013, Anthony Miller spent the day at home after attending a job interview, helping his sisters get to and from school. Around 6:00 p.m., he learned that his friend Brooklyn Cromes had been assaulted and hospitalized (¶¶27-28). Unable to secure a ride, Mr.

---

[1] Defendants move to dismiss a non-existent "false arrest" claim, but do not move to dismiss Mr. Miller's prolonged detention claim, the Second Claim for Relief in the Complaint. However, Plaintiff agrees to voluntarily dismiss the prolonged detention claim, as it would have accrued before Plaintiff's conviction.
[2] All "¶" citations refer to Plaintiff's Rule 56.1 Counterstatement of Facts, unless otherwise noted.

Miller walked 4.6 miles from his home on Birr Street to Bradburn Street, arriving around 7:30 p.m. (¶¶30-33). Upon arrival, Mr. Miller placed his deactivated cell phone (which only worked via WiFi) on the steps of 22 Bradburn Street to connect to the WiFi network. He then crossed the street to visit his friend Aaron Hinds at 31 Bradburn Street (¶¶34-35). Mr. Miller and Mr. Hinds subsequently returned to 22 Bradburn Street to use the WiFi network, making several documented phone calls between 7:38 and 7:42 p.m. to check on Mr. Cromes (¶¶36-37).

At approximately 8:00 p.m., while Mr. Miller and Mr. Hinds remained outside 22 Bradburn Street, Jack Moseley was robbed at gunpoint outside 19 Roslyn Street (¶¶38-39). The robbery lasted only 30-45 seconds, and the victim's ability to observe details was hindered by stress and poor lighting conditions (¶¶40-44). An eyewitness, Stan Lewis, called 911 and described the robber as a "thin guy in a gray hoodie" approximately 19-20 years old (¶¶45-46).

At 8:04 p.m., Officer Prinzi radioed that the suspect description matched their earlier call at Bradburn Street involving Mr. Cromes and directed officers to go there (¶¶48-49). Just two minutes later, at 8:06 p.m., Hogg approached Mr. Miller and Mr. Hinds, immediately frisking Hinds and asking "where are the guns at?" and "what happened over here earlier with Brooklyn?" (¶¶52-54). Officer Watson arrived a minute later and frisked and detained Miller. (¶¶53, 55).

The location where officers stopped Mr. Miller was a half mile from the robbery scene, and there was no evidence that Mr. Miller or Mr. Hinds had run that distance in just five minutes (¶58). Mr. Miller showed no signs of exertion, and his boots were not even laced (¶58). The officers found no stolen items or weapons on either man (¶57). And critically, Mr. Miller did not match the description of the robber as he was wearing different clothing. (¶67) After they were detained, a police canine tracked the suspect's scent down Genesee Street, losing it more than two blocks south of where the gunman would have needed to turn to reach Bradburn Street (¶¶33-34).

Despite the lack of evidence connecting them to the robbery, officers detained Mr. Miller and Mr. Hinds for a showup identification (¶63). Before the showup, Investigator Wengert arrived and noted in his report that he recognized Mr. Miller from an arrest three years earlier for cell phone robberies. (¶¶65-66) Wengert speculated—before the showup occurred—that Mr. Miller had likely changed his clothing since it didn't match the robbery suspect's description (¶¶66-67).

The showup identification was conducted in two stages. Moseley was in an unmarked police car with Wengert across from 19 Roslyn Street. Despite the poor lighting conditions, Hogg escorted Mr. Hinds from Genesee Street to 19 Roslyn Street, turned him around, and walked him back. Hogg then repeated the same procedure with Mr. Miller. After the showup, around 8:30 p.m., officers placed Mr. Miller in Watson's patrol car and Mr. Hinds in Hogg's vehicle (¶¶68-72).

Following the showup, Watson informed Mr. Miller that he had not been identified, and officers similarly told Mr. Hinds he wasn't identified (¶¶73-74). Nevertheless, they were detained for another 30-45 minutes until Wengert claimed the victim had identified both men—albeit with Mr. Miller in supposedly changed clothes (¶¶75-77).

Despite officers claiming the victim had identified Mr. Hinds as participating in the robbery as a lookout on a bicycle, he was informed he was not under arrest (¶79). When Wengert asked to search his house at 31 Bradburn Street, Mr. Hinds agreed (¶80). The search yielded none of the stolen items or any evidence tying Mr. Miller or Mr. Hinds to the robbery (¶81). Meanwhile, Mr. Miller was transported to the Public Safety Building and placed in an interrogation room (¶83). During his interview with Wengert, Mr. Miller explained that he had walked from his home on Birr Street to check on Mr. Cromes, and that he had used his deactivated phone via WiFi and borrowed Mr. Hinds' phone while standing in front of 22 Bradburn Street (¶¶85-86). Mr. Miller even asked Wengert to check the City street cameras and his text messages to confirm his story,

but Wengert refused (¶87). Instead, Wengert insisted that Mr. Miller's clothing was too big, suggesting he had changed into Mr. Hinds' clothing (¶88). Wengert claimed the victim had identified him and arrested Mr. Miller for the robbery. (¶91)

Two days later, while Mr. Miller was in jail, Wengert tracked the stolen iPhone to another person's possession near the crime scene. When Wengert activated the phone's alarm, the group in possession of the phone fled (¶¶93-94). Wengert suppressed this exculpatory evidence for almost a year until the eve of the first scheduled trial (¶116). Notably, he withheld it from the prosecutor before the Grand Jury and the Probable Cause hearings. (¶¶96-116).

The criminal trial relied solely on Moseley's identification and police testimony, with no other evidence linking Mr. Miller to the robbery (¶118). On appeal, the Fourth Department reversed Mr. Miller's conviction and dismissed the indictment as against the weight of the evidence (¶144). The court emphasized that eyewitness identifications have been understood for more than 50 years to be untrustworthy and are the single greatest cause of wrongful convictions (¶145). The court assailed the showup's reliability due to its inherently suggestive nature, the stress associated with the gun's presence, the brief duration of the incident, and the dim lighting conditions (¶146).

The Fourth Department detailed the "considerable objective evidence" supporting Mr. Miller's innocence that the police disregarded, including: his location half a mile from the crime scene just six minutes after it occurred; his different clothing from the gunman's description; the absence of stolen items or a firearm; no signs of having run the distance; his unlaced boots; the failed search of Mr. Hinds' residence; the police dog tracking the suspect's scent in a different direction; and evidence that someone else possessed the stolen phone (¶147). The court also admonished the trial court for its "erroneous suppression ruling," emphasizing that Hogg's initial

stop was unlawful and that "the law does not allow the police to stop and frisk any young black man within a half-mile radius of an armed robbery based solely upon a general description" (¶149).

Following a trial in August 2024, the Court of Claims found by clear and convincing evidence that Mr. Miller was innocent of the robbery charges (¶152). Judge Odorisi found Mr. Miller "highly credible," noting his demeanor on the stand and willingness to accept responsibility for past legal violations while steadfastly maintaining his innocence regarding this robbery (¶153). The court determined that the showup identification was constitutionally infirm, tainted by procedural flaws and suggestive conditions (¶154).

Judge Odorisi specifically found that Watson initially informed Mr. Miller that Moseley had not identified him during the showup, and it was only approximately 45 minutes later that Wengert claimed Moseley had identified Mr. Miller in "changed clothes"—a narrative the court found unsupported and implausible (¶¶155). The court credited Mr. Miller's testimony that he had worn the same clothing all evening, which did not match the suspect's description (¶156).

A demonstration video presented at trial showed that running the half-mile distance from the crime scene to where Mr. Miller was stopped and changing clothes took approximately six and a half minutes, leaving the runner winded, sweating, and breathing hard—making it implausible that Mr. Miller could have completed the same run, changed clothes, and remained calm when stopped by police (¶160). The court found the police theory that Mr. Miller would commit a robbery and then remain outside in plain view of officers "not logical" (¶159).

Judge Odorisi concluded that Wengert's prior arrests of Mr. Miller on unrelated charges contributed to confirmation bias, leading Wengert and other officers to target Mr. Miller without credible evidence (¶161-62). The court determined that Mr. Miller's wrongful conviction resulted from significant police misconduct, including unreliable identification procedures, Wengert's

confirmation bias, and the suppression of exculpatory evidence (¶161-65). The State was ordered to pay Mr. Miller $3,048,000 in damages, and notably did not appeal the decision (¶166).

**RELEVANT LAW**

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P.* v. *Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." S*ec. Ins. Co. of Hartford* v. *Old Dominion Freight Line, Inc*., 391 F.3d 77, 83 (2d Cir. 2004). "[W]hen a defendant moves for summary judgment, it is the defendant who must show entitlement to judgment, notwithstanding that, at trial, the plaintiff will have the burden of proving every element of its claim." *Nick's Garage, Inc*. *v. Progressive Cas. Ins. Co*., 875 F.3d 107, 115 (2d Cir. 2017). "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Hayes* v. *New York City Dep't of Corr*., 84 F.3d 614, 619 (2d Cir. 1996).

**ARGUMENT**

I.    **THE THIRD CLAIM FOR RELIEF FOR DENIAL OF FAIR TRIAL AND EVIDENCE FABRICATION MUST PROCEED TO TRIAL**

Defendants fundamentally misunderstand and mischaracterize Mr. Miller's denial of fair trial claim. Mr. Miller's claims for both denial of a fair trial and malicious prosecution stem from

the unduly suggestive and tainted showup identification, which was the only evidence linking him to the robbery. Under Second Circuit and Western District precedent, including *Ricciuti* v. N.Y.C. Transit Auth., 124 F.3d 123 (2d Cir. 1997) and *Thagard* v. Lauber, 317 F. Supp. 3d 669 (W.D.N.Y. 2018), such faulty identification procedures violate the constitutional right to a fair trial and fail to establish probable cause for arrest or prosecution (discussed *infra*, Point II).

A fair trial claim is distinct from a malicious prosecution claim, though both may coexist when based on the same fabricated evidence. *Bailey* v. City of New York, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015); *Brandon* v. City of New York, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010). To state a due process claim based on fabrication of evidence, a plaintiff must show: "(1) an investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Bailey*, 79 F. Supp. 3d at 446 (quoting *Jovanovic* v. City of New York, 486 F. App'x 149, 152 (2d Cir. 2012)); see also *Ricciuti*, 124 F.3d at 130.

Despite Defendants' assertion that "there is no admissible evidence that information was fabricated, much less forwarded to prosecutors which likely influenced the jury's verdict" (ECF No. 60-1 at 10–11), ample admissible evidence exchanged in discovery—and expressly recognized by Judge Odorisi in the Court of Claims trial—demonstrates that the core of Mr. Miller's fair trial claim rests on the fabricated and unduly suggestive showup identification. Defendants' attempt to redirect focus onto the purported suppression of the Find My iPhone report is thus a *red herring*, as the material facts overwhelmingly show the fabricated showup identification was forwarded to prosecutors and underpinned Mr. Miller's wrongful prosecution and conviction.

### A.  Suggestive Showup Procedures Alone Violate Due Process

The showup identification of Mr. Miller was unconstitutionally suggestive and violated his right to due process. As the Supreme Court stated in *Neil* v. *Biggers*, 409 U.S. 188 (1972), "[i]t is

the likelihood of misidentification which violates a defendant's right to due process." *Id.* at 198. Showups are particularly disfavored because they "inherently suggest that the police believe the suspect is guilty," and they "increase the likelihood of misidentification." *Rosario* v. *Ercole*, No. 12-CV-6395, 2021 WL 199342, at *7 (E.D.N.Y. Jan. 20, 2021) (internal citation omitted). The admission of such unreliable testimony at trial violates a defendant's due process rights. *Id.*

Courts consistently hold that law enforcement practices that improperly influence a witness's identification render the resulting identification constitutionally deficient. *Vazquez* v. *City of New York*, 2014 WL 4388497, at *4, *8 (S.D.N.Y. Sept. 5, 2014) (denying summary judgment where officers provided key details to a witness and improperly influenced testimony). Similarly, fabricating evidence in bad faith, including influencing witness identifications, violates due process. *Zahrey* v. *City of New York*, 2009 WL 55495, at *10–12 (S.D.N.Y. Jan. 7, 2009).

### 1. The Inherently Suggestive Show-Up Identification of Mr. Miller

The police conducted a showup identification of Mr. Miller in a manner that improperly signaled to the victim, Jack Moseley, that Miller was the prime suspect. Moseley's observations were compromised by stress and dim lighting during a brief 30-45 second encounter (¶¶39-43). Eyewitness Stan Lewis initially described the robber as a "thin guy in a gray hoodie," about "19-20" years old (¶46), which did not match Miller's attire of black sweatpants with a Red Bull logo, a red hooded sweatshirt, and tan Timberland boots (¶¶31, 54).

Before the showup, Officer Wengert saw Mr. Miller in the back of the police car (¶65) and recognized him from a three-year-old arrest for cell phone robberies. Wengert also speculated—before the showup—that Mr. Miller had changed clothes because what he was wearing did not match Moseley's description (¶¶66-67). The showup proceeded in two parts, with Mr. Hinds presented first and Mr. Miller second (¶68). According to identification expert Dr. Charles Goodsell, Ph.D., this sequence strongly suggested both individuals were involved, increasing the

likelihood of a false identification because the victim, having identified one suspect, would be more inclined to identify the other. (Exhibit 9, Goodsell Report pp 13-14)

Dr. Goodsell identified further flaws: the procedure occurred at night in poor lighting, with Moseley sitting in an unmarked car alongside Wengert (Id.; ¶69). Hogg walked Mr. Hinds and then Mr. Miller from Genesee Street to 19 Roslyn Street, turned them around, and walked them back (¶¶70-71). Showups, Dr. Goodsell explains, are inherently suggestive and should be restricted to emergency situations; they offer no protection against witnesses who feel pressured to pick the suspect in police custody. (Exhibit 9 pp 10-13)

The conditions—poor lighting, high stress from a weapon-involved crime, a cross-racial identification, and the brief 30-45 second duration—impaired the victim's ability to encode details of the perpetrator's face. (Exhibit 9, Goodsell Report, pp. 11-15). Moreover, Wengert's prior knowledge of Mr. Miller introduced confirmation bias, as research shows officers who believe a suspect is guilty can inadvertently influence witnesses. (Id. pp 14-15).

After the showup, Watson told Mr. Miller he was not identified, and officers likewise informed Mr. Hinds he was not identified (¶¶73-74). Yet both remained detained for 30-45 minutes until Wengert emerged claiming the victim had identified them both—Hinds as a lookout and Miller as the robber in changed clothes (¶¶75-77). Dr. Goodsell concludes that, under these circumstances—where numerous factors known to impair memory were present, best practices were ignored, and confirmation bias may have played a role—the showup identification was especially unreliable. (Exhibit 9 pp 17-18). A reasonable jury could reach the same conclusion and find the showup violated Mr. Miller's due process rights.

### 2. Judicial Findings Confirm the Deficiencies of the Showup

Both the Fourth Department and the Court of Claims independently recognized the constitutional deficiencies in the showup identification. The Fourth Department detailed that

eyewitness identifications are the single greatest cause of wrongful convictions and found this showup particularly unreliable due to its inherently suggestive nature, the stress associated with the gun's presence, the brief duration of the incident, and the dim lighting conditions (¶¶145-146). The court emphasized the "considerable objective evidence" supporting Mr. Miller's innocence, including his different clothing from the gunman's description, the absence of stolen items or weapons, and the police dog tracking the suspect's scent in a different direction (¶147).

The Court of Claims similarly found the showup identification constitutionally infirm and tainted by procedural flaws and suggestive conditions (¶156). Dr. Charles Goodsell testified that the procedure was corrupted by police confirmation bias and explained how the suggestive nature of the police presence likely influenced the victim's identification (¶157). Judge Odorisi determined that the "change clothes" narrative was implausible, suggesting that it was fed to Mosely by Wengert, and "disregarded" the identification (¶158). The court found that Wengert's prior arrests of Mr. Miller contributed to confirmation bias, which led officers to target Mr. Miller without credible evidence (¶162). These findings, combined with the objective evidence of innocence, led Judge Odorisi to conclude that Mr. Miller's wrongful conviction resulted from significant police misconduct, including the use of unreliable identification procedures (¶163).

### B. Police Misconduct and Fabrication of the Identification Require Denial of Summary Judgment

The evidence shows that Wengert manipulated the identification, introduced the "changed clothes" narrative to Moseley, and fabricated evidence against Mr. Miller. Courts consistently hold that such misconduct supports a denial of summary judgment on a denial of fair trial claim.

In *Vazquez* v. *City of New York*, summary judgment was denied where officers influenced a witness's testimony by providing critical details and manipulating their statements. 2014 WL 4388497, at *4, *8 (S.D.N.Y. Sept. 5, 2014). Similarly, in *Zahrey* v. *City of New York*, investigators

coerced and manipulated a witness, resulting in unreliable evidence that violated due process. 2009 WL 54495, at *10–12 (S.D.N.Y. Jan. 7, 2009). In *Thagard* v. *Lauber*, 317 F. Supp. 3d 669 (W.D.N.Y. 2018), police used coercive tactics to secure a false identification and withheld evidence of their misconduct from prosecutors. The court denied summary judgment on the due process and malicious prosecution claims, emphasizing that "manipulation of evidence that influences a jury's decision and results in a deprivation of liberty violates due process." *Id*. at 678.

### 1. Wengert's Fabrication of the "Changed Clothes" Narrative

Overwhelming direct and circumstantial evidence shows that Wengert fabricated the "changed clothes" narrative to justify Mr. Miller's arrest despite clear evidence of his innocence. The initial description from eyewitness Stan Lewis described the robber as a "thin guy in a gray hoodie" about "19-20" years old (¶46). However, when stopped, Mr. Miller was wearing entirely different clothing - black sweatpants with a Red Bull logo, a red hooded sweatshirt (¶31).

Before the showup even occurred, Wengert noted in his report that he immediately recognized Mr. Miller from prior arrests and speculated that he had likely changed his clothing since his clothes did not match the description (¶¶66-67). This unsupported theory ignored the physical impossibility of Mr. Miller having run a half mile, changed clothes, and disposed of evidence in just five minutes while wearing unlaced boots, with no signs of exertion (¶58). Despite initially being told neither suspect was identified in the showup (¶¶73-74), Wengert later claimed Moseley had identified Mr. Miller as the robber who had "changed clothes" (¶77). This fabricated narrative became the foundation for Mr. Miller's wrongful arrest and prosecution.

### 2. The Court of Claims Findings on Fabrication and Misconduct

The Court of Claims found clear evidence that Investigator Wengert fabricated evidence and manipulated the identification procedure. Before the showup even occurred, Wengert noted in his report that he recognized Mr. Miller from prior arrests and speculated that he had likely

changed his clothing since his clothes did not match the description (¶¶66-67). This unsupported "changed clothes" theory ignored substantial evidence of Mr. Miller's innocence, including the physical impossibility that he could have run half a mile, changed clothes, and disposed of evidence in just five minutes while wearing unlaced boots, with no signs of exertion (¶58).

Dr. Charles Goodsell testified as an expert that the showup procedure was fundamentally flawed and tainted by Wengert's confirmation bias. Despite officers initially telling both suspects they were not identified (¶¶73-74), Wengert later claimed—approximately 45 minutes after the showup—that Moseley had identified Mr. Miller as the robber who had "changed clothes" (¶77). Two days later, while Mr. Miller was in custody, Wengert tracked the stolen iPhone to a group of people near the crime scene but suppressed this exculpatory evidence for almost a year (¶¶93-95).

The Court of Claims found this pattern of misconduct deeply troubling, concluding that Wengert's prior arrests of Mr. Miller contributed to confirmation bias that led officers to target him without credible evidence (¶162). The court ultimately determined that Mr. Miller's wrongful conviction resulted from significant police misconduct, including unreliable identification procedures and the deliberate suppression of exculpatory evidence (¶163-165).

### 3.  Summary Judgment Must Be Denied

As in *Thagard*, the manipulation of evidence in this case violated Mr. Miller's constitutional right to a fair trial. The fabrication of the "changed clothes" narrative and the influence it had on the victim's identification, coupled with Wengert's suppression of exculpatory evidence, tainted the entire prosecution. A reasonable jury could conclude that Wengert's misconduct caused Mr. Miller's wrongful conviction and violated his due process rights.

### C.  Probable Cause to Arrest is a Does Not Preclude a Fair Trial Claim.

The evidence fabrication claim remains viable even if probable cause existed for Anthony Miller's arrest (which it did not). *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)

("[n]o arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee."); *Jovanovic* v. *City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (holding that "probable cause is not a defense" to a fair trial claim based on evidence fabrication); *Garnett* v. *Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) (explaining that because probable cause is no defense to a denial of the right to a fair trial claim, such claims address types of police misconduct not covered by false arrest or malicious prosecution claims).

### D.  Qualified Immunity Is Unavailable on the Evidence Fabrication Claim

Because the fabrication of evidence is an intentional violation of Mr. Miller's constitutional rights, Defendants are not entitled to qualified immunity on this claim. The Supreme Court has long held that qualified immunity is unavailable to state actors who knew or reasonably should have known that their actions would violate the plaintiff's constitutional rights. *See Malley* v. *Briggs*, 475 U.S. 335, 341 (1986); *Harlow* v. *Fitzgerald*, 457 U.S. 800, 815 (1982). The Second Circuit echoed this principle in *Ricciuti*, rejecting qualified immunity where officers intentionally fabricated evidence against the plaintiff. 124 F.3d at 130; see also *Coggins* v. *Buonora*, 776 F.3d 108, 114 (2d Cir. 2015) (re-affirming *Ricciuti*); *Garnett* v. *Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016) (same).

## II.    THE MALICIOUS PROSECUION CLAIMS MUST PROCEED TO TRAIL

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Frost* v. *New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (citing *Manganiello* v. *City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010)). Under New York and federal law, a plaintiff must allege: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination

of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Franco* v. *Gunsalus*, No. 22-339, 2023 WL 3590102, at *4 (2d Cir. May 23, 2023) (quoting *Kee* v. *City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021)). "To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Thompson* v. *Clark*, 142 S.Ct. 1332, 1335 (2022). In addition, when pressing a malicious prosecution claim under § 1983, the plaintiff must show also "that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman* v. *New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

In their motion for summary judgment, Defendants argue that the malicious prosecution claim fails because (1) the showup identification provided probable cause to arrest Mr. Miller; and (2) there was no favorable termination because the disposition did not "indicate the innocence of the accused." ECF 60-1 p. 4. As detailed below, both arguments fail.

### A. No Reasonable Officer Could Have Believed the Showup Identification Provided Probable Cause to Arrest or Prosecute Mr. Miller

#### 1. Probable Cause to Arrest is a Lower Standard than Probable Cause to Initiate and Continue a Prosecution.

Defendants' motion for summary judgment relies on the erroneous assumption that probable cause to arrest automatically establishes probable cause to prosecute. However, the Second Circuit has long distinguished between the two. Indeed, while "[t]o make an arrest, an officer need not believe that 'the arrestee will be successfully prosecuted,'" *Curley* v. *Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001), a malicious prosecution claim requires proof that "the prosecution could succeed." *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). Thus, "probable cause to prosecute should not be conflated with probable cause to arrest." *Kee* v. *City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (quoting *Posr* v. *Court Officer Shield No. 207*, 180

F.3d 409, 417 (2d Cir. 1999)). Even if Defendants had probable cause to arrest Mr. Miller (which they did not), that showing alone would not defeat his malicious prosecution claim.

### 2. The Showup Identification Did Not Provide Probable Cause to Arrest or Prosecute Mr. Miller

The flawed show-up identification egregiously violated constitutional norms, making it unreasonable for any officer to believe it provided probable cause to arrest or prosecute Mr. Miller. Under *Neil* v. *Biggers*, 409 U.S. 188, 199–200 (1972), identification procedures must not be "so unnecessarily suggestive" as to risk misidentification. Courts have consistently held that such procedures violate due process. See *Gregory* v. *City of Louisville*, 444 F.3d 725, 745–46 (6th Cir. 2006); *Thagard* v. *Lauber*, 317 F. Supp. 3d 669, 680–82 (W.D.N.Y. 2018).

Dr. Charles Goodsell, Plaintiff's eyewitness identification expert, concluded that the identification was unduly suggestive and unreliable, violated best practices due to its lack of safeguards, suggestive conditions, and Wengert's confirmation bias, which introduced the fabricated "changed clothes" narrative (Exhibit 9; ¶¶155-156, 162-165). This narrative ignored exculpatory evidence and influenced the victim's identification.

The Court of Claims and Fourth Department both found the show-up unconstitutional. Judge Odorisi disregarded the identification as unreliable due to procedural flaws, Wengert's bias, and the fabricated narrative (¶¶159-163). The Fourth Department emphasized the identification's unreliability, citing the victim's stress, poor lighting, and brief encounter (¶¶145-147).

Defendants' reliance on this flawed identification and their disregard for exculpatory facts (¶¶147-149) violated clearly established law. Summary judgment must therefore be denied.

### 3. Johnson v City Of Rochester Demonstrates That No Reasonable Officer Could Have Believed The Prosecution Would Succeed.

The reasoning in *Johnson* v. *City of Rochester*, No. 21-CV-6683DGL, 2023 WL 8237560 (W.D.N.Y. Nov. 28, 2023), shows why no reasonable officer could have believed the prosecution

against Mr. Miller would succeed. In *Johnson*, the plaintiff was stopped by Officer Laureano based on a purported traffic infraction, but video evidence and testimony revealed that the stop lacked a lawful basis, and so the criminal court, Judge Charles A. Schiano, granted suppression of a later discovered firearm. Judge Larimer denied the City's motion for summary judgment and denied Laureano's request for qualified immunity. In his decision, Judge Larimer emphasized that when an officer initiates a stop without probable cause, any subsequent prosecution is tainted and cannot reasonably be expected to succeed. The court relied on the principle articulated in *Boyd* v. *City of New York*, 336 F.3d 72 (2d Cir. 2003), that probable cause to prosecute requires facts and circumstances sufficient to warrant a reasonable belief that the prosecution could succeed.

Similarly, in this case, the Fourth Department found that Hogg stopped Mr. Miller solely because he was a young Black man in a hooded sweatshirt near the scene of a robbery, a generalized description that fails to meet constitutional standards under *People* v. *De Bour*, 40 N.Y.2d 210 (1976). As in *Johnson*, where the court found that Laureano's stop tainted the prosecution from the outset, the Fourth Department here emphasized that the stop of Mr. Miller was unlawful, stating: "The law does not allow the police to stop and frisk any young Black man within a half-mile radius of an armed robbery based solely upon a general description." *People* v. *Miller*, 191 A.D.3d 111, 118 (4 Dept 2020). Because this stop was unconstitutional, the chain of events leading to Miller's prosecution was fatally flawed.

*Johnson* shows that an officer's subjective justification cannot overcome the lack of lawful basis to initiate a stop. In both cases, the initial stop was unlawful, leading to prosecutions that no reasonable officer could believe would succeed. Thus, the prosecution against Mr. Miller, like in *Johnson*, lacked probable cause from the outset and was doomed to fail.

### 4. Defendants Ignored Plainly Exculpatory Evidence Which Showed They Lacked Probable Cause to Arrest or Prosecute Mr. Miller

17

The Second Circuit has long held that officers may not disregard plainly exculpatory evidence when assessing probable cause and must investigate further when there is reason to doubt the complainant's truthfulness. See *Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006); *Kanderskaya* v. *Kelly*, 11 F. Supp. 3d 431, 437 (S.D.N.Y. 2014). Yet, as the Fourth Department and Court of Claims both detailed, Defendants here ignored extensive exculpatory evidence, including critical facts undermining the identification of Mr. Miller and pointing to his innocence. See Exhibit 15, *People* v. *Miller*, 191 A.D.3d 111, 118 (4 Dept 2020); Exhibit 6, *Miller* v. *State*, Claim No. 135854 at 10-15 (Oct. 1, 2024). By willfully disregarding plainly exculpatory evidence in violation of well-established Fourth Amendment principles prohibiting the "blind eye" approach to investigation, *see Breton* v. *City of New York*, 404 F. Supp. 3d 799, 811 (S.D.N.Y. 2019), Defendants conclusively demonstrated a lack of probable cause to arrest or prosecute Mr. Miller.

### 5. Even If There Was Probable Cause To Initiate The Prosecution, Probable Cause Dissipated When Wengert Discovered The Stolen iPhone In The Possession Of Another Individual

The Court of Appeals for the Second Circuit has explained that,

> [u]nder New York law, even when probable cause is present at the time of arrest, *evidence could later surface which would eliminate that probable cause* … In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact. … The New York Court of Appeals has noted that the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause."

*Lowth* v. *Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996) (citations and quotation marks omitted)

Here, assuming there was probable cause to initiate the prosecution (which there was not), it dissipated when Wengert used the Find My iPhone application to track the stolen phone to the possession of another individual two days after the robbery, while Mr. Miller was incarcerated at

the Monroe County Jail (¶¶93-95). Wengert suppressed this report and did not inform the prosecutor about its existence for over a year (¶¶116-117, 140), showing he knew it undermined the prosecution and that there was not probable cause to continue the prosecution of Mr. Miller.

### 6. The Presumption Of Probable Cause Is Overcome By The Evidence Of Bad Faith Police Misconduct

The presumption of probable cause afforded by a grand jury indictment can be overcome by evidence of "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino* v. *City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *Colon* v. *City of New York*, 60 N.Y.2d 78, 82-83 (1983). In this case, substantial evidence of bad-faith rebuts this presumption—from Hogg's initial stop, to the showup procedures, and suppression of evidence.

First, Wengert improperly influenced the victim's identification by suggesting that Mr. Miller had "changed clothes" to align with the victim's inconsistent description (¶¶67, 87-88). Courts have held that presenting dubious identifications without disclosing their limitations undermines probable cause. See *DaCosta* v. *Tranchina*, 2017 WL 5176409, at *19 (E.D.N.Y. Dec. 12, 2017). Wengert's report, written before the show-up, reflects his pre-determined theory of guilt, confirming that he shaped the identification to fit this narrative (¶¶66-67).

Second, Wengert's reliance on an unduly suggestive show-up, despite exculpatory evidence, further demonstrates bad faith. In *DaCosta*, the court emphasized that flawed identification procedures and disregard for exculpatory evidence can support a finding of bad faith.

Third, Wengert suppressed critical exculpatory evidence, including the Find My iPhone report tracking the stolen phone to another individual (¶¶93-95, 116-117). Suppressing such evidence, as in *Zahrey* v. *City of New York*, 2009 WL 54495, at *10 (S.D.N.Y. Jan. 7, 2009), constitutes bad faith and undermines the presumption of probable cause. Additionally, Wengert's deliberate suppression of the Find My iPhone report not only demonstrates bad faith but also

19

defeats any argument that the prosecutor's decisions served as an intervening cause that could shield the officers from liability. While defendants may argue that prosecutorial discretion breaks the chain of causation, this defense fails where officers withhold material information from prosecutors, preventing them from making a truly independent determination. See *Bermudez* v. *City of New York*, 790 F.3d 368, 374-76 (2d Cir. 2015).

Finally, Wengert's investigative approach—ignoring alternative leads like dog-tracking evidence (¶¶61-62) and clear exculpatory facts such as the lack of stolen items (¶57)—demonstrates intentional efforts to manufacture probable cause. These actions are consistent with the bad-faith suppression and fabrication described in *Zahrey*, 2009 WL 54495, at *12.

Wengert's manipulation of the identification, suppression of exculpatory evidence, and pattern of bad-faith conduct overcome the presumption of probable cause.

### B. Defendants Argument That There Was No Favorable Termination is Frivolous.

"To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Thompson* v. *Clark*, 142 S.Ct. 1332, 1335 (2022).

## III.    THE FAILURE TO INTERVENE CLAIMS MUST PROCEED TO TRAIL

Defendants seek summary judgment on the failure to intervene claims, arguing that Mr. Miller has not produced evidence showing a violation of his constitutional rights or that these officers had a realistic opportunity to intervene. However, the facts and legal standards demonstrate that there are triable issues of fact as to whether these officers could have intervened to prevent the constitutional violations committed against Mr. Miller.

A police officer is liable for failing to intervene when: (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position

would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene. *See Anderson* v. *Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *accord Ismael* v. *Charles*, No. 18 Civ. 3597, 2020 WL 4003291, at *12 (S.D.N.Y. July 15, 2020). Here, a reasonable jury could find that Officers Hogg, Watson, and Prinzi failed to intervene to prevent the unlawful stop, the fabricated show-up identification, and the initiation and continuation of the malicious prosecution of Mr. Miller.

### A. Hogg and Watson's Participation in the Unlawful Stop

Hogg initiated the unlawful stop of Mr. Miller, which the Fourth Department explicitly held lacked reasonable suspicion and violated Mr. Miller's Fourth Amendment rights (¶¶54-55, 149). Both Hogg and Watson directly participated in the stop, frisking Mr. Miller and Mr. Hinds without any lawful justification (¶¶54-55). They found no stolen items, no weapons, and no evidence linking Mr. Miller to the robbery (¶57). Hogg and Watson also observed that Mr. Miller showed no signs of exertion or flight, further undermining any claim that he had fled from the robbery scene (¶58). Despite the absence of any objective basis to suspect Mr. Miller, Hogg and Watson detained him in a police vehicle and transported him for a show-up identification (¶59).

Hogg and Watson both had the opportunity to disclose the truth about the stop, including its unlawful basis and the exculpatory evidence they observed, which would have prevented Mr. Miller's prosecution. Instead, Hogg repeatedly lied about the stop during the probable cause hearing and at trial, claiming that it was supported by reasonable suspicion (¶¶120-121, 127-128). These lies directly contributed to the malicious prosecution of Mr. Miller.

### B. Failure to Disclose Facts About Response to Bradburn Street and the Assault on Cromes

Hogg and Prinzi both knew that the response to Bradburn Street after the robbery was initiated because of their earlier response to the assault on Mr. Cromes (¶¶24-26). This fact

explained why Mr. Miller and Mr. Hinds were at Bradburn Street, providing further evidence of Mr. Miller's innocence (¶¶27-38). Despite this, Hogg and Prinzi failed to disclose this information, either at the time of the stop or later during the investigation and prosecution. Hogg specifically lied about this at trial, falsely testifying that he did not receive any information from Prinzi between the original 911 dispatch and his arrival at Millbank and Bradburn Streets (¶127). This failure to disclose allowed the false narrative connecting Mr. Miller to the robbery to proceed unchecked.

### C.  Failure to Prevent the Constitutionally Infirm Show-Up Identification

Hogg, Watson, and Wengert conducted a show-up identification that was constitutionally infirm from the outset (¶¶68-71). They knew the identification lacked safeguards, was conducted under poor lighting, and was inherently suggestive due to the victim's proximity to police (¶69). Both Hogg and Watson initially informed Mr. Miller and Mr. Hinds that Moseley had not identified them during the show-up (¶¶73-74). However, after Wengert concocted the "changed clothes" narrative and fed it to Moseley (¶¶67, 77), they allowed Mr. Miller to be falsely identified and arrested. Despite being told they were not identified, Mr. Miller and Mr. Hinds were detained in police cars for another 30-45 minutes (¶75). At that point, Hogg and Watson could have intervened to disclose the victim's initial failure to identify Mr. Miller and to prevent his arrest and prosecution, but instead Hogg transported Mr. Miller to the PSB (¶¶77-78).

### D.  The Jury Must Decide Whether the Officers Had Realistic Opportunities to Intervene

"Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Sloley* v. *VanBramer*, 945 F.3d 30, 47 (2d Cir. 2019) (citation omitted). Here, Hogg, Watson, and Prinzi were actively involved in every stage of the investigation and prosecution of Mr. Miller. They conducted the unlawful stop (¶¶54-55), observed exculpatory evidence including

the lack of stolen items or weapons (¶57), Mr. Miller's calm demeanor and unlaced boots contradicting any flight (¶58), and conducted the constitutionally infirm show-up (¶¶68-71). Hogg and Watson initially acknowledged that Mr. Miller was not identified (¶¶73-74), yet failed to intervene when Wengert later claimed an identification had occurred (¶77). Throughout the prosecution, they failed to disclose critical facts that undermined the case, with Hogg even providing false testimony about these events (¶¶120-128). A reasonable jury could conclude that these officers had realistic opportunities to intervene at multiple points but failed to act.

## IV. THE SIXTH CLAIM FOR VIOLATION OF DUE PROCESS RIGHTS UNDER ARTICLE I, § 6 OF THE NEW YORK STATE CONSTITUTION MUST PROCEED TO TRAIL

While a plaintiff may not assert a claim under the New York State Constitution when adequate alternative remedies exist, that is not the case here. Section 1983 does not provide an adequate remedy for state constitutional claims based on respondeat superior, as it does not authorize vicarious liability. See *Singletary* v. *Allen*, 588 F. Supp. 3d 359, 368 (W.D.N.Y. 2022); *Buari* v. *City of New York*, 530 F. Supp. 3d 356, 409 (S.D.N.Y. 2021).

Courts have allowed Article I, § 6 claims to proceed when they are distinct from federal claims and premised on respondeat superior, as such claims lack an adequate remedy under § 1983. See *Rodriguez* v. *City of New York*, 623 F. Supp. 3d 225, 258-59 (S.D.N.Y. 2022). Here, Plaintiff's Article I, § 6 claim addresses a constitutional deprivation based on the City's vicarious liability for its employees, making it distinct from other claims. Thus, the City's motion must be denied.

## V. QUALIFIED IMMUNITY MUST BE DENIED

As discussed at Point I. D., *supra*, qualified immunity is unavailable on Mr. Miller's denial of fair trial / evidence fabrication claim. Similarly, for all the reasons discussed in Point II, no reasonable officer could have believed there was probable cause to prosecute Mr. Miller, and so qualified immunity must be denied with respect to the malicious prosecution claim.

Further, "New York State does not recognize the doctrine of qualified immunity in connection with constitutional torts committed by State officers." *Sarnicola* v. *County of Westchester*, the court noted that "229 F. Supp. 2d 259, 270 (S.D.N.Y. 2002)

The Second Circuit has reiterated that municipal employers are not entitled to qualified immunity under state law, even when their officers may be individually immune. *Triolo* v. *Nassau County*, 20 F.4th 776, 785 (2d Cir. 2022). The court emphasized: "Municipal immunity does not extend to vicarious liability claims under state law when an officer acted within the scope of their employment, even if that officer is immune from personal liability." *Id*.

Thus, municipal liability under respondeat superior remains a distinct avenue for holding the City accountable for the constitutional violations of its employees. As explained in *Triolo*: "The County remains vicariously liable under New York law for compensatory damages because municipalities are not entitled to qualified immunity." *Id*.

The absence of qualified immunity for state constitutional claims and for the claims brought directly against the City demonstrates that even if the individual officers are entitled to qualified immunity, the City is still liable to Mr. Miller.

## VI.    THE DEFENDANTS' ARGUMENT THAT NEW YORK C.P.L.R. § 4915 APPLIES IN THIS FEDERAL CIVIL RIGHTS ACTION IS FRIVOLOUS

The Dead Man's Statute (CPLR § 4519) does not apply in this case. This is a federal civil rights action under 42 U.S.C. § 1983, brought pursuant to federal question jurisdiction under 28 U.S.C. § 1331, not diversity jurisdiction. Federal Rule of Evidence 601 states that "[e]very person is competent to be a witness unless these rules provide otherwise." While Rule 601 defers to state competency laws in diversity cases, it does not do so in federal question cases like this one.

Courts consistently hold that the Dead Man's Statute does not apply to federal question cases. In *DiLegge* v. *Gleason*, 131 F. Supp. 2d 520, 525 (S.D.N.Y. 2001), the court found that

CPLR § 4519 has no application in federal court actions governed by federal law. The Second Circuit in *Rosenfeld* v. *Basquiat*, 78 F.3d 84, 88 (2d Cir. 1996), has similarly acknowledged that the Dead Man's Statute applies only in diversity cases where state law governs.

Even if the Dead Man's Statute were applicable (it is not), it would only bar testimony about direct communications with Wengert and the victim. It would not preclude the substantial evidence of misconduct that comes from other sources, including testimony by the other Defendants and witnesses, testimony about communications with other Defendants, GPS tracking data, police reports, physical evidence about Mr. Miller's condition when stopped, demonstration videos, and documentary evidence of delayed disclosure of exculpatory information. The existence of this extensive documentary and circumstantial evidence, which does not depend on any communications with the deceased, provides ample support for Mr. Miller's claims regardless of the statute's applicability. However, because this is a federal question case, the CPLR § 4519 is inapplicable, and Plaintiff's evidence is governed solely by the Federal Rules of Evidence.

## **CONCLUSION**

Overwhelming evidence—from fabricated proof and manipulative identification procedures to suppressed exculpatory material—demonstrates that Mr. Miller's lengthy wrongful imprisonment resulted from egregious police misconduct. Both the Fourth Department and the Court of Claims have condemned these unconstitutional acts, and Defendants' motion, resting on inapplicable arguments and disregarding settled law, cannot survive. No reasonable officer could have believed such conduct was lawful, defeating any claim to qualified immunity. Accordingly, summary judgment must be denied in its entirety, and the case should proceed to trial.

Dated: January 9, 2024          Roth & Roth, LLP
      New York, New York

                          ~//s//~
                          Elliot Dolby Shields