UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANTHONY MILLER,

                    Plaintiff,

-against-

THE CITY OF ROCHESTER, MARYROSE M. WENGERT AND EARL G. WENGERT, AS CO-EXECUTORS OF THE ESTATE OF NOLAN WENGERT (deceased), DARYL HOGG, JAYSON PRINZI, DANIEL WATSON, and "JOHN DOE" RPD OFFICERS 1-10,

                    Defendants.

**22-cv-6069 (FPG)(MJP)**

**PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS PURSUANT TO RULE 56.1**

**PLAINTIFF'S LOCAL RULE 56.1 COUNTERSTATEMENT OF UNDISPUTED FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Plaintiff, ANTHONY MILLER, submits the below response to Defendants' Statement of Undisputed Facts, and the further additional paragraphs of material facts as to which it is contended there exists a genuine issue to be tried.

1. Admit

2. Admit. But note that the "unofficial transcript" is inadmissible.

3. Admit. But note that the "unofficial transcript" is inadmissible.

4. Deny the time that the description was provided over the radio was exactly "8:04"; admit that a description was provided describing the robber as "a male black in a gray hoodie about 19 years old and a thin build." Also note that the "unofficial transcript" prepared by defendants' counsel is inadmissible.

5. Deny the exact time the "first car" arrived at 19 Roslyn Street was "8:06"; admit that the first police officer to arrive at 19 Roslyn Street was Defendant Jason Prinzi.

6.  Admit that the job card shows this description was broadcast over the radio by Prinzi at approximately 8:08 p.m.; deny the timeline, as this dispatch was made two minutes after Hogg and Watson had already stopped and frisked Mr. Miller and Mr. Hinds. (Exhibit 14, Watson Dep 73:8-74:3)

7.  Deny. The radio recording and evidence shows that it was Officer Prinzi, not "another Officer," who directed others to check the area of Millbank and Bradburn Streets. Specifically, Prinzi responded over the radio, directing others to check the area of Millbank and Bradburn Streets, stating it "could be one of the See Set kids, as the description matches my call from earlier." (Exhibit 12, Radio Recordings at 2:12-2:22; Exhibit 3, Hogg Dep 70:12-72:6; Exhibit 13, Prinzi Dep 82:22-86:13)

8.  Deny that Hogg arrived at "8:08", instead he arrived at 8:06 p.m. (Exhibit 14, Watson Dep 72:8-19); admit that Hogg responded to Prinzi's request by stating "I'm in that area right now." (Exhibit 12, Radio Recordings at 2:23-2:24; Exhibit 3, Hogg Dep 73:15-74:5). Further, Hogg arrived on scene at Millbank and Bradburn at approximately 8:06 p.m., not 26 Bradburn Street, and upon arrival immediately stopped and detained Mr. Miller and Mr. Hinds, frisked Hinds, and asked "Where's the guns at?" and "What happened over here earlier with Brooklyn?" (Exhibit 1, COC Tr. 164:19-165:20; Exhibit 3, Hogg Dep 89:14-16; Exhibit 14, Watson Dep 72:8-19).

9.  Admit.

10. Admit that the CAD report states Hogg arrived at West High Terrace with Anthony Miller and Aaron Hinds for the show up ID at 8:32 p.m.

11. Deny. After the show-up identification, Officer Watson informed Mr. Miller that he had not been identified (Exhibit 1, COC Tr. 169:11-13; Exhibit 19, Recording of Sept 19,

2013 Jail Call between Mr. Miller and Mr. Hinds). Officers also told Mr. Hinds he was

not identified (Exhibit 19, Recording of Sept 19, 2013 Jail Call between Mr. Miller and

Mr. Hinds). Despite being told they were not identified, Mr. Miller and Mr. Hinds were

detained in police cars for another 30-45 minutes (Exhibit 11, Job Card; Exhibit 1, COC

Tr. 170:22-24). Mr. Miller repeatedly asked why he was still being detained; officers said

they were seeking a "second victim" for an identification, though no second victim was

ever produced (Exhibit 20, 50h transcript 64:12-65:11; Exhibit 1, COC Tr 170:25-171:5).

12. Admit that Mr. Miller was on Bradburn Street at 8:06 p.m. when Hogg unlawfully

stopped him.

13. Admit.

14. Admit paragraph 14, but clarify that in his Incident Report, Wengert noted that before the

showup was conducted, he saw Mr. Miller and recalled him from a prior case in 2010

where he had previously charged Mr. Miller with "cell phone snatch and grab" thefts

(Exhibit 17, Wengert Incident Report). Before the showup was conducted, Wengert

claimed that Mr. Miller matched the "precise physical description" given by the victim

but had different clothing, and Wengert speculated that Mr. Miller had changed clothes

(Exhibit 17, Wengert Incident Report).

15. Admit, but clarify that while Moseley ultimately provided a sworn statement identifying

Mr. Miller, the evidence shows that this identification came only after Wengert suggested

Miller had changed clothes. Officer Watson initially informed Mr. Miller that Moseley

had not identified him during the show-up identification (Exhibit 1, COC Tr. 169:11-13;

Exhibit 19, Recording of Sept 19, 2013 Jail Call between Mr. Miller and Mr. Hinds).

Before the showup, Wengert claimed that Mr. Miller matched the "precise physical

description" given by the victim but had different clothing, and Wengert speculated that Mr. Miller had changed clothes (Exhibit 17, Wengert Incident Report). Wengert did not believe Mr. Miller's clothing belonged to him and suggested the clothes were too large and that Mr. Miller had changed into Mr. Hinds' clothing (Exhibit 17, Incident Report; Exhibit 18, PC Hearing Tr 58:2-59:2; Exhibit 7, Criminal Tr 276:23-277:15).

16. Admit that Hinds was eventually told he was identified by the victim, but clarify that initially, officers told Mr. Hinds he was not identified (Exhibit 19, Recording of Sept 19, 2013 Jail Call between Mr. Miller and Mr. Hinds).

17. Admit.

18. Admit.

19. Deny. The Grand Jury indictment occurred on September 30, 2013. (Exhibit 23, Grand Jury Transcript).

20. Admit.

21. Admit, and clarify that Wengert died of a drug overdose. (Exhibit 1, COC Tr. 176:2-177:20; Exhibit 20, 50h Tr 117:22-120:14).

22. Admit.

23. Admit.

## ADDITIONAL PARAGRAPHS OF MATERIAL FACTS AS TO WHICH IT IS CONTENDED THERE EXISTS A GENUINE ISSUE TO BE TRIED

### I.    THE DAY OF THE INCIDENT – SEPTEMBER 25, 2013

A.  **Brooklyn Cromes is Assaulted on Bradburn Street at Approximately 3:00 p.m., and Defendants Prinzi and Hogg Respond and Interrogate Cromes**

24. On September 25, 2013 at approximately 3:00 p.m., Mr. Miller's friend, Brooklyn Cromes ("Mr. Cromes"), was assaulted in front of his home at 38 Bradburn Street. (Exhibit 1, COC Tr. 37:11-39:6.)

25. At approximately 3:05 p.m., Defendant RPD officers Jason Prinzi and Daryl Hogg were dispatched to 38 Bradburn Street, arriving there at approximately 3:45 p.m. (Exhibit 2, Cromes Job Card; Exhibit 3, Hogg Dep 30:24-36:16.)

26. After learning that Mr. Cromes had been taken to Strong Memorial Hospital, Prinzi and Hogg went to the hospital at approximately 4:41 p.m. and spoke with Mr. Cromes about the incident until approximately 5:09 p.m. (Exhibit 1, COC Tr. 43:17-46:9; Exhibit 2, Cromes Job Card; Exhibit 3 Hogg Dep 36:25-40:3)

B. **Mr. Miller Learns of Brooklyn Cromes' Assault and Walks From His Home on Birr Street to Bradburn Street**

27. On September 25, 2013, Mr. Miller woke up, put his little sisters on the bus to school, walked to a job interview on St. Paul Street, then returned home and remained there until he got his sisters off the bus at approximately 5:00 p.m. (Exhibit 1, COC Tr. 155:16-156:14; Exhibit 29, Miller Dep. 28:7-15.)

28. Around 6:00 p.m., Mr. Miller learned that his friend Brooklyn Cromes had been assaulted and was in the hospital. (Exhibit 1, COC Tr. 155:20-156:21; Exhibit 29, Miller Dep. 30:19.)

29. At the time, Mr. Miller had a "deactivated" cell phone that did not have an active cellular plan and only worked if it was connected to a WiFi network. (Exhibit 1, COC Tr. 115:19-116:7; Exhibit 29, Miller Dep. 57:21-23.)

30. When none of his friends picked up, Mr. Miller called his friend, Aaron Hinds, at approximately 6:26 p.m. (Exhibit 1, COC Tr. 158:2-24; Exhibit 4, Hinds T Mobile Records; Exhibit 29, Miller Dep. 30:23-25 ["I attempted to call a friend for a ride. I didn't have a vehicle at the time. I attempted Shequan Williams. He wasn't able to give me a ride. Then, I called another friend, Aaron Hinds."])

31. When none of his friends picked up, Mr. Miller put on black sweatpants with a Red Bull logo, a red hooded sweatshirt, tan Timberland boots, grabbed an MP3 player, and left his house at approximately 6:30 p.m. (Exhibit 1, COC Tr. 158:25-160:9; Exhibit 29, Miller Dep. 37:11-17.)

32. Shortly after Mr. Miller left the house, at 6:38 p.m., Mr. Hinds returned the missed call and spoke with Mr. Miller's brother, Jamal Clark, who informed Mr. Hinds that Mr. Miller had already left. (Exhibit 1, COC Tr. 63:24-65:22; 159:11-23; 116:16-117:20; Exhibit 5, Hinds AT&T Cell Phone Tower Ping Records; Exhibit 6, Judge Odorisi Decision, p. 2)

33. Mr. Miller walked 4.6 miles from his home at 607 Birr Street to Bradburn Street, arriving at approximately 7:15-7:30 p.m. (Exhibit 1, COC Tr. 160:15-161:16; Exhibit 6, Judge Odorisi Decision, p. 2)

34. Upon arrival, Mr. Miller turned on his deactivated cell phone (which only worked via WiFi) and left it on the steps of his friends James and Javris Harris' house at 22 Bradburn Street, then crossed the street to knock on Mr. Hinds' door at 31 Bradburn Street. (Exhibit 1, COC Tr. 161:17-162:8)

35. Mr. Hinds answered the door, and the two spoke on his front porch about Mr. Cromes' assault; Mr. Miller never went inside Hinds' home (Exhibit 6, Judge Odorisi Decision, p. 2)

36. 13. Mr. Miller went back across the street to use the Harris' WiFi network to make calls on his deactivated cell phone. (Exhibit 1, COC Tr. 162:6-163:12; Exhibit 29, Miller Dep. 57:21-23.)

37. Mr. Hinds soon joined Mr. Miller in front of the Harris' house, and Mr. Miller borrowed Hinds' phone to make three calls at 7:38 p.m., 7:41 p.m., and 7:42 p.m. - one call to Brooklyn Cromes at 7:38 p.m., followed by a call to Mike Mason or Shaquan Williams at 7:41 p.m., and another call to Cromes at 7:42 p.m. (Exhibit 1, COC Tr. 163:8-23; Exhibit 6, Judge Odorisi Decision, p. 2; Hinds Dep. 70:16-19, 72:22-23, 73:1-6, 73:11-13)

38. After the last call at 7:42 p.m., Mr. Miller and Mr. Hinds remained outside in front of 22 Bradburn Street until, at 8:06 p.m., they were approached by Defendant Hogg, who immediately frisked them and stated "where are the guns at?" and "what happened over here earlier with Brooklyn?" (Exhibit 1, COC Tr. 164:19-165:20)

## C.  C. **Robbery of Jack Moseley and the 911 Call**

39. On September 25, 2013 at approximately 8:00 p.m., Jack Moseley was robbed at gunpoint on the front steps of 19 Roslyn Street, Rochester, New York, where he was living at a residential center for alcoholics and drug addicts. (Exhibit 7, Criminal Trial Tr. 176:7-183:19.)

40. The interaction lasted approximately 30 to 45 seconds. (Exhibit 7, Criminal Trial Tr. 204:13-19.)

41. Moseley detailed the weapon as a small, black pistol, noting its weight and the presence of the assailant's finger on the trigger. (Exhibit 7, Criminal Trial Tr. 203:11-204:12.)

42. During the brief encounter, the perpetrator took Moseley's phone, keys, cash, and cigarettes before fleeing toward Genesee Street. (Exhibit 7, Criminal Trial Tr. 176:7-183:19.)

43. Moseley was terrified, which heightened his stress and reduced his ability to focus on details regarding the perpetrator's appearance. (Exhibit 8, Prinzi Incident Report; Exhibit 9, Expert Report of Dr. Charles Goodsell p. 12; Exhibit 1 COC Trial Tr. 317-18 [Goodsell testifying that stress negatively impacts memory encoding and recalling details about a perpetrator's appearance]).)

44. Lighting conditions were dim—it was dusk with limited street lighting, making visibility difficult. (Exhibit 7, Criminal Trial Tr. 179:10-17; Exhibit 9, Exhibit Goodsell Report p. 12)

45. Stan Lewis, who was sitting in a chair in the driveway of 19 Roslyn, witnessed the robbery and called 911 and provided the description of the robber. (Exhibit 10, 911 call recording; Exhibit 7, Criminal Trial Tr. 198:25-199:3, 205:13-21.)

46. Mr. Lewis described the robber as "black," a "thin guy in a gray hoodie," about "19-20" years old. (Exhibit 10, 911 call; Exhibit 7, Criminal Trial Tr. 198:25-199:3.)

D. **Defendants Prinzi, Hogg, and Watson Respond to the 911 Dispatch—And Hogg and Watson Unlawfully Stop and Frisk Mr. Miller and Mr. Hinds**

47. RPD officers Jason Prinzi and Daryl Hogg responded to the 911 dispatch for the robbery. (Exhibit 11, Miller Job Card; Exhibit 3, Hogg Dep 48:13-19.)

48. At approximately 8:04 p.m., 911 dispatch broadcasted a description of the suspect as wearing a "gray hoodie, jeans and boots, southbound on Genesee towards Sawyer." (Exhibit 11, Miller Job Card; Exhibit 12, Radio Recordings)

49. Prinzi responded over the radio, directing others to check the area of Millbank and Bradburn Streets, and stated it "could be one of the See Set kids, as the description matches my call from earlier." (Exhibit 12, Radio Recordings at 2:12-2:22; Exhibit 3, Hogg Dep 70:12-72:6; Exhibit 13, Prinzi Dep 82:22-86:13)

50. Hogg responded over the radio, stating, "I'm in that area now." (Exhibit 12, Radio Recordings at 2:23-2:24; Exhibit 3, Hogg Dep 73:15-74:5)

51. Immediately thereafter, RPD Officer Daniel Watson responded over the radio, "likewise." (Exhibit 12, Radio Recordings at 2:28-2:30; Exhibit 14, Watson Dep 74:21-75:5.).

52. Hogg arrived on scene at Millbank and Bradburn at approximately 8:06 p.m. (Exhibit 14, Watson Dep 72:8-19)

53. Watson arrived on scene at Millbank and Bradburn at approximately 8:07 p.m., and Hogg was already there. (Exhibit 14, Watson Dep 69:20-72:19)

54. Upon arrival at Millbank and Bradburn, Hogg immediately stopped and detained Mr. Miller and Mr. Hinds, frisked Hinds, and asked, "What happened over here earlier with Brooklyn? Where's the guns at?" (Exhibit 1, COC Tr. 164:19-165:20; Exhibit 3, Hogg Dep 89:14-16) When he stopped Mr. Miller, he was wearing a red hooded sweatshirt, black pants with a Rebull Logo, and tan boots. (Exhibit 17, Wengert IR).

55. Watson arrived and frisked Mr. Miller. (Exhibit 14, COC Tr. 166:11-166:15.)

56. At 8:08 p.m.—two minutes after Hogg had stopped and frisked Mr. Miller and Mr. Hinds—the job card documents that Prinzi called over the radio that the robber "was with another male black red/gray hoodie on a bike in area together" (Exhibit 14, Watson Dep 73:8-74:3)

57. No gun or any items stolen from Jack Moseley were recovered from Mr. Miller or Mr. Hinds. (Exhibit 1, COC Tr. 165:14-166:15; Exhibit 15, People v. Miller, 134 N.Y.S.3d 605, 609 (4th Dept 2020))

58. There was no objective evidence that Mr. Miller or Mr. Hinds had been running the half-mile distance from 19 Roslyn Street to 22 Bradburn Street in just five minutes; Mr. Miller showed no signs of exertion, and his boots were not even laced. (Exhibit 1, COC Tr. 165:7-9; Exhibit 15, People v. Miller, 134 N.Y.S.3d 605, 609 (4th Dept 2020); Exhibit 29, Miller Dep. 38:17-19, 64:16-20; Exhibit 1 COC Trial Tr. 367-68 [DeGuzman testifying that even with laced boots and being in good physical shape, the run left him hot, sweaty and breathing heavily])

59. Despite the lack of evidence connecting them to the robbery, Hogg and Watson detained Mr. Miller and Mr. Hinds in the back of separate police cars.

60. Hogg and Watson lacked any lawful basis to stop, frisk and detain Mr. Miller and Mr. Hinds. (Exhibit 15, People v. Miller, 134 N.Y.S.3d 605, 609 (4th Dept 2020))

E. **The Canine Track Led to a Different Location**

61. Immediately after the incident, while Mr. Miller and Mr. Hinds were detained in separate police cars, a police dog tracked the scent of the fleeing gunman down Genesee Street, losing the scent at 873 Genesee Street—more than two blocks south of Sawyer Street, where the gunman would have needed to turn to get to Bradburn Street. (Exhibit 16,

Canine Tracking Sheet; Exhibit 7, Criminal Trial Tr. 318:25-319:25; Exhibit 15, People v. Miller, 134 N.Y.S.3d 605, 609–10 (4th Dept 2020).)

62. The police dog track never left Genesee Street, ending at 873 Genesee Street, several blocks south of Bradburn Street. (Id.)

F. **Defendants conduct the Show Up Identification with the Victim, Jack Moseley, but not the Eyewitness, Stan Lewis**

63. Hogg and Watson transported Mr. Miller and Mr. Hinds to West High Terrace and Genesee Street for a show-up identification, initially holding them in separate vehicles a couple of blocks from the robbery location. (Exhibit 11, Miller Job Card; Exhibit 14, Watson Dep 80:6-16)

64. The showup identification was conducted with the victim, Jack Moseley, but it was not conducted with the eyewitness, Stan Lewis, without any credible explanation. (Exhibit 7, Criminal Tr 331:1-9; Exhibit 17, Wengert Incident Report).

65. Before the show-up, Wengert arrived on scene looked at Mr. Miller and Mr. Hinds in the back of the vehicles. (Exhibit 17, Wengert Incident Report; Exhibit 1, COC Tr. 91:18-92:3, 167:19-23.)

66. In his Incident Report, Wengert noted that he knew Mr. Miller from prior cases, recalling that in 2010 he had previously charged Mr. Miller with "cell phone snatch and grab" thefts. (Exhibit 17 Wengert Incident Report.)

67. Wengert claimed that Mr. Miller matched the "precise physical description" given by the victim but had different clothing, and Wengert speculated that Mr. Miller had changed clothes. (Exhibit 17 Wengert Incident Report.)

68. The show-up identification was conducted in two parts, with Mr. Hinds presented first and Mr. Miller second. (Exhibit 7, Criminal Tr 227:16-228:16, 255:24-256:10; Exhibit 18, PC Hearing Tr 41:24-44:11; Exhibit 1, COC Tr 168:23-169:10)

69. Moseley was sitting in an unmarked car with Wengert on Roslyn Street, across from the robbery location. It was dark outside, and the street was poorly lit. (Exhibit 1, COC Tr. 169:25-170:7; Exhibit 7, Criminal Tr 227:16-228:16; Exhibit 18, PC Hearing Tr 41:24-44:11)

70. Mr. Hinds was escorted by Officer Hogg from Genesee Street to 19 Roslyn Street, turned around, and walked back. (Exhibit 18, PC Hearing Tr 44:4-11; Exhibit 7, Criminal Tr 256:11-22)

71. The same procedure was then repeated for Mr. Miller, who was also escorted by Officer Hogg. (Exhibit 18, PC Hearing Tr 44:4-15)

72. The show-up concluded at approximately 8:30 p.m., and Mr. Miller was placed in the back of Watson's car, and Mr. Hinds was placed in the back of Hogg's car. (Exhibit 18, PC Hearing Tr 24:1-5)

73. After the show-up, Officer Watson informed Mr. Miller that he had not been identified. (Exhibit 1, COC Tr. 169:11-13; Exhibit 19, Recording of Sept 19, 2013 Jail Call between Mr. Miller and Mr. Hinds)

74. Officers also told Mr. Hinds he was not identified. (Exhibit 19, Recording of Sept 19, 2013 Jail Call between Mr. Miller and Mr. Hinds)

75. Despite being told they were not identified, Mr. Miller and Mr. Hinds were detained in police cars for another 30-45 minutes. (Exhibit 11, Job Card; Exhibit 1, COC Tr. 170:22-24.)

76. Mr. Miller repeatedly asked why he was still being detained; officers said they were seeking a "second victim" for an identification, though no second victim was ever produced. (Exhibit 20, 50h transcript 64:12-65:11; Exhibit 1, COC Tr 170:25-171:5)

77. Eventually, Mr. Miller was informed that Wengert wanted to speak to him, placed in handcuffs, and transported to the Public Safety Building. (Exhibit 1, COC Tr 171:13-17; Exhibit 20, 50h Tr 66:17-67:2) Allegedly, the victim had identified Mr. Miller, claiming that he was the robber and simply must have "changed clothes." (Exhibit 17, Wengert Incident Report).

78. Hogg transported Mr. Miller to the PSB. (Exhibit 18, PC Hearing Tr 24:1-14; Exhibit 20, 50h Tr 67:3-16)

79. Despite officers claiming the victim had identified Mr. Hinds as having participated in the robbery as a lookout on a bicycle, he was informed he was not under arrest. (Exhibit 17, Wengert IR p. 2)

G. **Mr. Hinds Is Released and Permits Wengert to Search His Home**

80. Wengert asked Mr. Hinds if he could search his house at 31 Bradburn Street; Mr. Hinds agreed. (Exhibit 1, COC Tr. 68:24-69:3; Exhibit 21, Hinds Dep 58:7-25; Exhibit 33, Consent to Search form)

81. Wengert and other RPD officers searched Hinds' home, finding none of the stolen items or any evidence tying Mr. Miller or Mr. Hinds to the robbery. (Exhibit 17, Wengert Incident Report; Exhibit 21, Hinds Dep 61:15-20.)

82. Mr. Hinds told Wengert that Mr. Miller had arrived about 15 minutes before they were stopped by police, that Mr. Miller never entered his house, and that he never changed clothes. (Exhibit 17, Wengert Incident Report.)

H. **Mr. Miller Is Interrogated by Wengert at the Public Safety Building and Arrested**

83. Meanwhile, Mr. Miller was transported to the Public Safety Building and placed in an interrogation room. (Exhibit 1, COC Tr. 174:9-13; Exhibit 17, Wengert Incident Report.)

84. After approximately one hour, Wengert entered and advised Mr. Miller of his Miranda rights, which Mr. Miller waived and agreed to voluntarily speak with Wengert. (Exhibit 1, COC Tr. 174:9-13, Exhibit 17, Wengert Incident Report)

85. Mr. Miller told Wengert he had walked from his home on Birr Street to Bradburn Street to check on Mr. Cromes, who had been assaulted earlier that day. (Exhibit 17, Wengert Incident Report.)

86. Mr. Miller explained he stood with Mr. Hinds in front of 22 Bradburn Street for about a half hour before being stopped, and that he had used his deactivated phone via WiFi and borrowed Mr. Hinds' phone. (Exhibit 17, Wengert Incident Report.)

87. Mr. Miller asked Wengert to check the City street cameras or his text messages to confirm his story, but Wengert refused. (Exhibit 1, COC Tr. 174:7-15.)

88. Wengert did not believe Mr. Miller's clothing belonged to him and suggested the clothes were too large and that Mr. Miller had changed into Mr. Hinds' clothing. (Exhibit 17, Incident Report; Exhibit 18, PC Hearing Tr 58:2-59:2; Exhibit 7, Criminal Tr 276:23-277:15)

89. Mr. Miller asserted that the clothing, including the Rebull track pants, were his and that he had a matching top for the Red Bull sweatsuit at home. (Exhibit 1, COC Tr. 175:7-19.)

90. Wengert said he did not believe Mr. Miller could have walked from Birr Street to Bradburn in unlaced Timberland boots. (Exhibit 17, Wengert Incident Report.)

91. Wengert informed Mr. Miller that the victim had identified him as the robber and that he
    was under arrest. (Exhibit 17, Wengert Incident Report.)

92. Wengert appeared to be under the influence of drugs during the interrogation, based on
    Mr. Miller's prior interactions with both Wengert and drug addicts, and the fact that
    Wengert later died of a drug overdose in 2017. (Exhibit 1, COC Tr. 176:2-177:20;
    Exhibit 20, 50h Tr 117:22-120:14).

I.  **After Mr. Miller Is Arrested, Wengert Uses the Find My iPhone Application to
    Track the Phone to Someone Else's Possession—but Suppresses this Information for
    Over a Year**

93. Between the robbery on September 25, 2013 and September 27, 2013, Mr. Moseley
    received three emails from Apple regarding the Find My iPhone application on his stolen
    phone, which he gave to Wengert. (Exhibit 7, Criminal Trial Tr. 198:8-19.)

94. On September 27, 2013, two days after Mr. Miller was arrested, while he was in jail,
    Investigator Wengert used the "Find My iPhone" application to track the victim's stolen
    iPhone to an area near the scene of the crime where a group of people had congregated.
    (Exhibit 22, Find My iPhone report; People v. Miller, 134 N.Y.S.3d 605, 609–10 (4th
    Dept 2020); Exhibit 18, PC Hearing Transcript; Exhibit 7, Criminal Tr 306:11-312:13)

95. Wengert activated the alarm function on the phone, causing the group to flee. The phone
    was then powered down and never recovered. (Exhibit 7, Criminal Tr 306:11-312:13)

J.  **The Grand Jury Proceedings**

96. The Grand Jury presentation occurred on September 30, 2013, at which only Jack
    Moseley and Investigator Wengert testified. (Exhibit 23, Grand Jury Transcript.)

97. Moseley testified that the robber and the lookout were "about the same height," but the one on the bike had a "bigger build" and was "probably about seventy-five pounds heavier." (Id. at 10:22-11:6.)

98. Moseley also stated it looked like the robber had put on the other male's clothes, which appeared too big for him. (Id. at 11:7-19.)

99. Anthony Miller is 5'5" tall, while Mr. Hinds is 6'3" tall. (Exhibit 20, 50h Transcript 45:11-15; Exhibit 21, Hinds Dep 15:1-8.)

100.    Wengert testified about the location where Mr. Miller and Mr. Hinds were stopped, calling it approximately "six to seven blocks" from the robbery. (Exhibit 23, Grand Jury Transcript.)

101.    Wengert did not inform the grand jury about any exculpatory evidence, such as the canine track, the fact that Mr. Miller and Mr. Hinds were stopped a half mile from the robbery just five minutes after it happened, the fact that he did not have any of the fruits of the robbery or a gun on him when stopped, that he was wearing different clothing than the victim and Stan Lewis told the 911 dispatcher, or the fact that the police did not conduct a show up identification with Stan Lewis even though he provided the original description of the robber to the 911 dispatcher. (Id.)

102.    Most importantly, Wengert did not inform the prosecutor or the grand jury that he had tracked the iPhone to another person's possession on September 27, 2013—while Mr. Miller was in custody. (Exhibit Sept. 9, 2014 transcript at 2-8.)

K.  **The Probable Cause Hearing**

103.    A probable cause hearing was held before Hon. Thomas E. Moran on February 14, 2014. (Exhibit PC Hearing Transcript.)

104.     Defendants Hogg and Wengert testified at the hearing. (Id.)

105.     Hogg claimed the initial 911 dispatch described "two male blacks … going southbound on Genesee Street," mentioning "a red hoodie, a gray hoodie," and a suspect "approximately five seven, five eight, medium build." (Id. at 8:20-9:2.)

106.     Hogg testified that he decided to check Millbank Street and Bradburn Street—just one of several side streets off Genesee—where he found and stopped Mr. Miller and Mr. Hinds six minutes after the original 911 call. (Id. at 9:12-20; 12:10-21.)

107.     The location of the stop was approximately a half mile from the robbery. (People v. Miller, 134 N.Y.S.3d 605, 610 (4th Dept 2020).)

108.     Hogg testified that, at the stop, "one was wearing a red hoodie and one was wearing a gray hoodie," matching the dispatch's five-seven, five-eight, medium-build description. (PC Hearing Tr. 15:8-15.)

109.     Wengert claimed that upon speaking with Moseley at 19 Roslyn, Moseley described the male on the bike as "a very large frame male black, about six four, with a heavy build." (Id. at 35:12-21.)

110.     Before the show-up, Mr. Miller allegedly told Wengert he walked from 607 Birr Street to Bradburn Street and stood outside until the police arrived. (Id. at 41:13-22.)

111.     Wengert did not believe Mr. Miller's story because his boots were unlaced and jacket unzipped, and Wengert felt it was too far to walk. (Id.)

112.     Wengert admitted that no photo arrays had been shown to Mr. Moseley. (Id. at 46:19-20.)

113.    Wengert acknowledged times on the job card were inaccurate and that he had

been at 19 Roslyn Street for "a couple of minutes" before being added to the job card.

(Id. at 56:9-18.)

114.    Wengert agreed that Mr. Miller's "oversized" clothes and unlaced boots were

typical attire for young Black men in Rochester. (Id. at 58:9-59:23.)

115.    Judge Moran erroneously denied Mr. Miller's motion to suppress the showup

identification as fruits of the unlawful stop. (Exhibit 24, Transcript of January 6, 2024

Motion Argument; Exhibit 20, People v. Miller, 134 N.Y.S.3d 605, 610 (4th Dept 2020)

("[W]e would be remiss in failing to admonish [Judge Moran] for [his] erroneous

suppression ruling under the circumstances presented here. The court erroneously opined

that it could not "dissect the minuscule, little things" that occurred during this street

encounter and concluded that the officer was justified in "first, making an inquiry,

second, detaining [defendant], and, thirdly, bringing him before the victim for the

purposes of identification ..." Not only was the court's interpretation of the facts contrary

to the unequivocal testimony of the officer, which established that defendant was frisked

before any inquiry was conducted, the court's explication of the applicable law was

incorrect.")

L.  **The Criminal Trial**

116.    The criminal trial was scheduled to begin on September 9, 2014 but was delayed

two months because Wengert suppressed the September 28, 2013 police report regarding

the Find My iPhone application until the eve of trial on September 8, 2014. (Exhibit 25,

Sept. 9, 2014 Transcript.)

117.     The jury trial ultimately began on November 19, 2014 before Monroe County

Supreme Court Justice Thomas E. Moran. (Exhibit 7, Criminal Tr)

118.     Mr. Moseley's alleged identification of Mr. Miller as the perpetrator was the only

evidence linking Mr. Miller to the robbery. (Id.)

119.     The prosecution also presented testimony from Hogg and Wengert. (Id. at 212-

244 [Hogg] and 244-331 [Wengert]).

120.     Hogg testified that he searched only one of several side streets in the area,

Millbank Street, where he stopped and arrested Mr. Miller and Mr. Hinds—the first

young Black men in a hooded sweatshirts he saw. (Id. at 215:6-24, 218:17-219:2, 219:3-

17)

121.     Hogg falsely testified that "The initial radio call came out that there was two

suspects, both male blacks, one wearing a red hoodie, the other one with a gray hoodie,

gave a description of one approximately five foot-eight, maybe five foot-nine, medium

build." (Id. at 218:1-5).

122.     Hogg testified that after he stopped them, he immediately grabbed and frisked Mr.

Hinds, but did not locate any weapons. (Id at 220:5-14).

123.     Hogg testified that Watson arrived while he was frisking Mr. Hinds, and that

Watson immediately frisked Mr. Miller, and that he located an MP3 player on him, but

did not locate any of the fruits of the crime or a weapon. (Id. at 221:15-222:24)

124.     Hogg falsely testified that Mr. Miller had told him they went to 22 Bradburn

Street to retrieve his MP3 player from their friends who lived there, James and Jarvin

Harris. (Id. 221:20-221:7)

125.     Hogg detailed that he drove Mr. Hinds to the showup procedure and Watson drove Mr. Miller.

126.     Hogg testified that he participated in the showup procedures for both Mr. Miller and Mr. Hinds—taking them out of the cars and escorting them as they walked from Genesee Street to the front of 19 Roslyn Street to be displayed to the victim. (Id. at 227:22-228:16)

127.     Hogg falsely testified that he did not receive any information from Prinzi between the original 911 dispatch and his arrival at Millbank and Bradburn Streets. (Id. 241:20-23)

128.     After the showup, Hogg placed Mr. Miller in handcuffs and transported him to the Public Safety Building, Fourth Floor, to be interrogated by investigator Wengert. (Id. 229:2-9)

129.     Wengert testified that on September 25, 2013, shortly after 8:00 p.m., he responded to a 911 dispatch and a radio call from Hogg regarding a robbery that had occurred at 19 Roslyn Street. (Id. 245:21-246:6)

130.     Wengert admitted that after he arrived at the scene, he had communications with Hogg via radio about Mr. Miller and Mr. Hinds, and their appearance. (Id. 247:3-9).

131.     Wengert falsely claimed that before the showup identification, that he spoke with Mr. Miller in the back of the police car. (Id. 249:5-254:6)

132.     Wengert testified that Mr. Hinds consented to a search of his home. (Id. at 264:19-24)

133.     Wengert falsely claimed that he did a "very, very cursory search of the inside of that house." (Id at 264:22-25)

134.    Wengert admitted that he did not arrest Mr. Hinds because he "didn't think [he] had enough information to really link him as a criminal actor in that incident." (Id. 268:5-15)

135.    Wengert admitted that he directed officers to check a City camera located at the intersection of Genesee Street and Sawyer, which they did, and it did not have any footage related to this incident. (Id 269:4-24)

136.    Notably, for the robber to get from 19 Roslyn Street to 22 Bradburn Street, they would have had to turn off Genesee Street onto Sawyer Street, then turn onto Millbank Street, then turn onto Bradburn Street. (Exhibit 26, Google Maps Route; Exhibit 1, 365:8-15; Exhibit 27, Deguzman Affirmation; Exhibit 28, DeGuzman Demonstrative Running Video).

137.    Wengert also described how the police dog tracked the fleeing suspect's scent down Genesee Street, losing the scent at 873 Genesee Street, which is near Barton Street—more than two blocks south of Sawyer Street, where the gunman would have needed to turn to get to Bradburn Street. (Id. at 319:19-320:14)

138.    Wengert testified that during the interview, "He explained to me that he had walked from his house over at 607 Birr Street down to Mr. Hinds' house on Bradburn, he got there about two hours before he had been stopped by the police, he hung outside the house, and then he was using his deactivated cell phone, he was just using the wireless feature of it to access the wireless Internet at 22 Bradburn Street outside 22 Bradburn Street." (Id. 275:5-11)

139.    Wengert testified that he did not believe Mr. Miller's story because it was too far for anyone to walk, particularly in Timberland boots. (Id. 275:16-276:16)

140.     Wengert testified that Mr. Moseley had provided information for tracking the missing iPhone. On September 27, 2013, the GPS placed the phone near Genesee and West High Terrace. When the alarm sounded, the crowd scattered. Wengert admitted Mr. Miller was in jail on September 27, 2013 and thus could not have had the stolen phone. (Id. 306:11-312:13)

141.     The phone's last GPS "hit" was on Stratford Street, after which it ceased transmitting. (Id.)

142.     Mr. Miller was convicted of all charges on November 21, 2014. (Id. at 413-414)

143.     On advice of counsel, Mr. Miller did not present his own witnesses at trial, so the jury heard only testimony from the victim and RPD officers, including Hogg, Prinzi, and Wengert. (Id.)

## M. **The Criminal Appeal**

144.     On November 13, 2020—seventeen days after oral argument—the Appellate Division, Fourth Department reversed Mr. Miller's conviction and dismissed the indictment as against the weight of the evidence. (People v. Miller, 134 N.Y.S.3d 605, 609–10 (4th Dept 2020).)

145.     The Fourth Department assailed the showup identification. First, the Court detailed that eyewitness identifications have been understood for more than 50 years to be untrustworthy, are the single greatest cause of wrongful convictions, and insufficient to uphold a conviction where it is uncorroborated by any additional evidence. (Id. at 608-09).

146.     The Court then went on to detail why the showup identification in this case was particularly unreliable: (1) showups are inherently suggestive; (2) the additional stress

associated with a gun being displayed and the weapon focus by the victim; (3) short

duration of the incident; and (4) the dim lighting at the time of the incident. (Id. at 609)

147.    The Fourth Department then went on to detail the "considerable objective

evidence supporting [Mr. Miller's] innocence" that the police disregarded:

> "there is considerable objective evidence supporting defendant's innocence.
> Defendant was found standing in a driveway half a mile from the crime
> scene only seven minutes after it occurred, wearing clothing different from
> the clothing worn by the gunman. He was not in possession of the fruits of
> the crime or of a firearm. There was no testimony that he was out of breath
> or that he displayed other signs of having recently run a distance. To the
> contrary, his boots were not even laced. The possibility that he changed
> clothes and hid the items in his companion's residence across the street was
> questionable in the first instance given the timing of the events, and was
> severely undercut by the fact that the police obtained permission to search
> the residence and did so without finding anything linking defendant to the
> crime. Furthermore, the police investigation established that a person other
> than defendant possessed the fruits of the robbery, particularly the victim's
> cell phone, and that person's act in fleeing from the police when the phone
> alarm sounded was indicative of consciousness of guilt (*see People v. Davis*,
> 174 A.D.3d 1538, 1540, 108 N.Y.S.3d 84 [4th Dept. 2019], *lv denied* 34
> N.Y.3d 980, 113 N.Y.S.3d 656, 137 N.E.3d 26 [2019]; *People v. Zuhlke*, 67
> A.D.3d 1341, 1341, 890 N.Y.S.2d 231 [4th Dept. 2009], *lv denied* 14
> N.Y.3d 774, 898 N.Y.S.2d 106, 925 N.E.2d 111 [2010]). Other objective
> evidence, particularly the dog tracking, established that the gunman never
> turned west off of Genesee Street toward the place where defendant was
> found, but continued to run down Genesee Street in a southerly direction."

Id. at 609-10.

148.    The court concluded that the police dog tracking, the phone's subsequent GPS

hits, and the absence of objective evidence of flight all undercut the identification. (Id.)

149.    The Court also went on to detail that because the initial stop was unlawful, and so

Mr. Miller should never have been arrested or prosecuted in the first place:

"Finally, although defendant's contention that Supreme Court erred in refusing to suppress the showup identification is academic in light of our determination, we would be remiss in failing to admonish the court for its erroneous suppression ruling under the circumstances presented here. The court erroneously opined that it could not "dissect the minuscule, little things" that occurred during this street encounter and concluded that the officer was justified in "first, making an inquiry, second, detaining [defendant], and, thirdly, bringing him before the victim for the purposes of identification ..." Not only was the court's interpretation of the facts contrary to the unequivocal testimony of the officer, which established that defendant was frisked before any inquiry was conducted, the court's explication of the applicable law was incorrect. It has been well established for more than four decades that, "in evaluating the legality of police conduct, we 'must determine whether the action taken was justified in its inception and at every subsequent stage of the encounter' " (*People v. Burnett*, 126 A.D.3d 1491, 1492, 6 N.Y.S.3d 375 [4th Dept. 2015]; *see People v. De Bour*, 40 N.Y.2d 210, 215, 386 N.Y.S.2d 375, 352 N.E.2d 562 [1976]). Insofar as relevant here, a stop and frisk must be founded on a "reasonable suspicion that the particular person has committed or is about to commit a crime" (*People v. Benjamin*, 51 N.Y.2d 267, 270, 434 N.Y.S.2d 144, 414 N.E.2d 645 [1980]; *see Burnett*, 126 A.D.3d at 1493, 6 N.Y.S.3d 375). Although the general description of defendant for the most part "matched the description provided by the 911 dispatcher [i.e., he was a young black man of average height in a hooded sweatshirt], the court failed to give adequate consideration to the difference between the location where the **\*118** dispatcher stated that the suspect[ ] had been observed running from the crime scene ... and the location where the officer stopped defendant" (*People v. Spinks*, 163 A.D.3d 1452, 1453, 79 N.Y.S.3d 455 [4th Dept. 2018]; *cf. People v. Carson*, 122 A.D.3d 1391, 1392, 997 N.Y.S.2d 881 [4th Dept. 2014], *lv denied* 25 N.Y.3d 1161, 15 N.Y.S.3d 293, 36 N.E.3d 96 [2015]). The testimony of the officer who initiated this street encounter established that he explored only "one of" several side streets in a residential neighborhood and seized the first young black man in a hooded sweatshirt who he found. It must be plainly stated—the law does not allow the police to stop and frisk any young black man within a half-mile radius of an armed robbery based solely upon a general description."

(Id. at 610)

N. **The Court of Claims Trial**

150.    Mr. Miller filed two lawsuits: one in the Court of Claims against the State of New

York and this instant federal action. Discovery in the two cases proceeded jointly.

(Exhibit 6, COC Decision.)

151.    The Court of Claims action proceeded to trial before Judge J. Scott Odorisi on

August 1-2, 2024. (Exhibit 1, COC Transcripts; Exhibit 6, COC Decision.)

152.    On October 2, 2024, Judge Odorisi issued a decision in Mr. Miller's favor, finding by clear and convincing evidence that Mr. Miller was innocent of the robbery charges. (Exhibit 6, COC Decision at pp. 1-2.)

153.    Judge Odorisi found Mr. Miller "highly credible," citing his demeanor on the stand and his willingness to accept responsibility for past legal violations while steadfastly maintaining his innocence regarding the robbery. (Id. at pp. 4, 14.)

154.    The Court determined that the show-up identification used to implicate Mr. Miller was unreliable and unduly suggestive. The identification procedure lacked safeguards, was conducted in poor lighting, and involved stress-inducing factors such as the presence of a weapon and the brief duration of the encounter. Dr. Charles Goodsell testified that the procedure was tainted by police confirmation bias and emphasized how the suggestive nature of the police presence likely influenced the victim, Jack Moseley, to identify Mr. Miller as the suspect. (Id. at pp. 10-11, 15.)

155.    Judge Odorisi concluded that Officer Watson initially informed Mr. Miller that Moseley did not identify him during the show-up identification. However, Investigator Wengert later claimed—approximately 45 minutes after the show-up concluded—that Moseley had identified Mr. Miller, allegedly in "changed clothes." The Court found this narrative unsupported and implausible. (Exhibit 1, COC Tr. 169:11-13; Exhibit 20, 50h Tr. 64:25-65:16; Exhibit 6, COC Decision pp. 4, 14.)

156.    The Court credited Mr. Miller's testimony that he had been wearing the same clothing all evening, clothing that did not match the description of the suspect in the initial 911 call. Mr. Miller showed no signs of having run half a mile in unlaced boots, as

would have been required to connect him to the crime scene. (Exhibit 6, COC Decision at pp. 4, 11, 14.)

157.    A police dog tracked the scent of the fleeing suspect away from Bradburn Street to a location consistent with another individual's flight path, directly undermining any claim that Mr. Miller fled from the robbery to the location where he was detained. (Id. at p 14.)

158.    Two days after Mr. Miller was incarcerated, Investigator Wengert used the Find My iPhone application to locate the stolen phone near the crime scene in the possession of a group of people. These individuals fled when the phone alarm was activated. (Id. at pp. 5, 14.)

159.    Judge Odorisi concluded that the police theory that Mr. Miller would commit a robbery and then remain outside in plain view of officers "not logical". (Id. p 14) The testimony established that Mr. Miller and Mr. Hinds were present on Bradburn Street when the robbery took place. A search of Mr. Hinds' home yielded no evidence tying either individual to the robbery. (Id. at pp. 4-5, 14.)

160.    A demonstration video presented at trial showed Reynaldo DeGuzman running from the crime scene at 19 Roslyn Street to 22 Bradburn Street—a distance of half a mile—in approximately six and a half minutes. DeGuzman was winded, sweating, and breathing hard after the run; Judge Odorisi concluded that the video showed it was implausible that Mr. Miller could have completed the same run, changed clothes, and remained calm when stopped by police. (Id. at p. 10, 14.)

161.    Judge Odorisi concluded that Investigator Wengert suppressed exculpatory evidence by failing to disclose the results of the Find My iPhone tracking to the

prosecution until the eve of trial. The Court found that this evidence—which indicated someone else had possession of the stolen phone—was critical to proving Mr. Miller's innocence. (Id. at p. 4, 14.)

162.     Judge Odorisi concluded that Investigator Wengert's prior arrests of Mr. Miller on unrelated charges contributed to confirmation bias. (Id. at pp. 14-15). He also found Mr. Miller's testimony credible that Wengert, Hogg, and Prinzi would all harass him when he visited his friends on Bradburn Street – including an incident in March 2013, just a few months before this arrest; he found that this led Wengert and other officers to target Mr. Miller without credible evidence. (Id. at 4, 14-15; see also Exhibits 30-32, police reports documenting prior stops and arrests of Mr. Miller and Mr. Hinds).

163.     The Court disregarded Moseley's show-up identification of Mr. Miller, as it was tainted by procedural flaws, suggestive conditions, and confirmation bias. Dr. Goodsell's testimony emphasized how the identification lacked safeguards, including proper lighting, and was conducted in a highly suggestive manner. (Id. at pp. 10-11, 15.)

164.     Ultimately, the Court found that Mr. Miller's trial evidence clearly and convincingly disproved his involvement in the robbery, and the State failed to produce any credible evidence to rebut his claims. (Id. at pp. 15-19.)

165.     Judge Odorisi concluded that Mr. Miller's wrongful conviction and subsequent imprisonment resulted from significant police misconduct, including unreliable identification procedures, Wengert's confirmation bias, and the suppression of exculpatory evidence. (Id. at pp. 14-15, 19.)

166.     The Court awarded Mr. Miller $3,048,000 in damages for his wrongful conviction and imprisonment, and the State did not appeal the decision. (Id. at pp. 19-20.)

Dated: New York, New York                    Respectfully Submitted,
      January 9, 2025                         ROTH & ROTH LLP

                                   By: _____~/s/~_____
                                       Elliot Dolby Shields, Esq.
                                       *Counsel for Plaintiff*
                                       192 Lexington Ave, Suite 802 New York,
                                       New York 10016
                                       Ph: (212) 425-1020

To:    All parties (via ECF)