```
 1   STATE OF NEW YORK    :   COURT OF CLAIMS
                                   :
 2   ANTHONY MILLER,               :       CLAIM NO.
                         CLAIMANT :       135854
 3                                 :
                                   :       OAG NO.
 4                                 :       21-005334-L1
                - VS -             :
 5                                 :
                                   :
 6                                 :
     THE STATE OF NEW YORK,        :
 7                        DEFENDANT :       BENCH TRIAL

 8                               Rochester District
                                 Of Court of Claims
 9                               Rochester, NY  14614

10                               August 1, 2024

11
     P R E S I D I N G:
12                       HONORABLE J. SCOTT ODORISI
                         JUSTICE OF THE COURT OF CLAIMS
13


14
     A P P E A R A N C E S:
15


16     ROTH & ROTH, LLP
       192 LEXINGTON AVE.
17     NEW YORK, NY  10016
            BY: ELLIOT SHIELDS, ESQ.
18


19     LETITIA JAMES, ESQ.
       ATTORNEY GENERAL OF THE STATE OF NY
20     ALBANY EXECUTIVE OFFICE
       THE CAPITOL
21     ALBANY, NY  12224
            BY: TAMARA CHRISTIE, ESQ.
22          Assistant Attorney General

23
     DIGITALLY RECORDED PROCEEDING      Official Court Copy
24
     TRANSCRIBED BY:              LORI A. HENDERSON
25                                Henderson Court Transcription
```

```
 1                    I N D E X

 2

 3   WITNESS                   DX    CX    RDX    RCX

 4   BROOKLYN CROMES           20    55    57     ---

 5   AARON HINDS               59   105    ---    ---

 6   JAMAL CLARK              113   126    ---    ---

 7   NICOLE MILLER            127   139    ---    ---

 8   ANTHONY MILLER           143   245    ---    ---

 9   TRICIA PETERSON, Ph.D    257   285    302    ---

10   CHARLES GOODSELL         305   343    355    ---

11   REYNALDO DeGUZMAN        363   373    ---    ---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      E X H I B I T S

 2   NUMBER            DESCRIPTION                      ID   EV

 3   CLAIMANT 7        SENTENCING TRANSCRIPT            --   203
     CLAIMANT 10       CERTIFICATE OF CONVICTION        --   203
 4   CLAIMANT 11       PDR - 2010 ARREST                --   203
     CLAIMANT 16       HINDS CONSENT TO SEARCH          --   203
 5   CLAIMANT 20       INTERVIEW FORM                   --   203
     CLAIMANT 21       HOGG TRIAL TESTIMONY             --   203
 6   CLAIMANT 23       HOGG DEPOSITION TRANSCRIPT       --   203
     CLAIMANT 24       CAD REPORT                       --   203
 7   CLAIMANT 25       RADIO CALL RECORDING             --   203
     CLAIMANT 26       PRINZI INCIDENT REPORT           --   203
 8   CLAIMANT 27       PRINZI DEPOSITION TRANSCRIPT     --   203
     CLAIMANT 29       WENGERT IAR                      --   203
 9   CLAIMANT 30       WENGERT - IAR - FIND MY iPHONE   --   203
     CLAIMANT 31       WENGERT TRIAL TESTIMONY          --   203
10   CLAIMANT 34       MOSELEY SUPPORTING DEPOSITION    --   203
     CLAIMANT 35       MOSELEY TRIAL TESTIMONY          --   203
11   CLAIMANT 38       9/9/14 HEARING TRANSCRIPT        --   203
     CLAIMANT 51       RADIO CALLS                      --   203
12   CLAIMANT 52       911 CALL                         --   203
     CLAIMANT 53       PHOTO - 19 ROSLYN                --   203
13   CLAIMANT 54       PHOTO - SIDEWALK 19 ROSLYN       --   203
     CLAIMANT 55       PHOTO - CORNER OF ROSLYN/GENESEE --   203
14   CLAIMANT 56       PHOTO - BRADBURN STREET          --   203
     CLAIMANT 57       PHOTO - 22 BRADBURN STREET       --   203
15   CLAIMANT 58       PHOTO - 22 BRADBURN STREET       --   203
     CLAIMANT 59       SUNRISE/SUNSET 2013 ROCHESTER    --   203
16   CLAIMANT 64       DR. CHARLES GOODSELL CV          --   362
     CLAIMANT 66       DR. TRICIA PETERSON CV           --   362
17   CLAIMANT 67       UNIFORM SENTENCE & COMMITMENT RPT --  203
     CLAIMANT 68       STATE CUSTODY PRINTOUT           --   203
18   CLAIMANT 70       DOCCS MEDICAL RECORDS            --   203
     CLAIMANT 71       STRONG MEMORIAL MEDICAL RECORDS  --   203
19   CLAIMANT 72       ROCHESTER REGIONAL MEDICAL RECORDS -- 203
     CLAIMANT 73       INDICTMENT                       --   204
20   CLAIMANT 75       JURY VERDICT                     --   204
     CLAIMANT 76       FOURTH DEPARTMENT DECISION       --   204
21   CLAIMANT 77       CERTIFICATE OF INCARCERATION     --   204
     DEFENDANT B       MOSELEY TRIAL TESTIMONY          --   202
22   DEFENDANT C       WENGERT TRIAL TESTIMONY          --   202
     DEFENDANT E       MILLER EBT EXHIBITS B-E          --   202
23   DEFENDANT H       HOGG EBT TRANSCRIPT              --   202
     DEFENDANT I       PRINZI EBT TRANSCRIPT            --   202
24   DEFENDANT K       HOGG TRIAL TRANSCRIPT            --   204
     DEFENDANT L       CERTIFICATE OF CONVICTION        --   204
25
```

1              THE CLERK:  Today is August 1, 2024.  We have

2    Miller versus State of New York, claim number 135854.

3    Honorable J. Scott Odorisi presiding.  Test mic.

4              THE COURT:  This is set for a bench trial today.

5    Are the parties ready to proceed?

6              MR. SHIELDS:  Yes, sir.

7              MS. CHRISTIE:  Yes, Your Honor.

8              THE COURT:  Is there anything you want to talk

9    about before we get started?

10             MR. SHIELDS:  Yes, Your Honor.  We would just

11   request that -- for our client to be able to take notes,

12   that he be able to be unshackled.  Just the hands.

13             THE COURT:  Let me just have the attorneys

14   approach for a moment.

15    (A discussion was held at the bench with The Court and

16   counsel.)

17             THE COURT:  Welcome.  This matter is proceeding

18   today, as I indicated earlier, and you indicated the

19   parties are ready to proceed.  Any other issues or

20   comments that you want to talk about before we get

21   started?

22             MR. SHIELDS:  We just have one question, Your

23   Honor, since Mr. Thompson and I are unfamiliar with The

24   Court's exhibit system.  So, our question is, when we want

25   to display an exhibit for one of the witnesses, is that

```
 1                MR. SHIELDS:  The relevance is that Anthony --
 2        as stated by the Fourth Department, Anthony was the first
 3        young black man he was racially profiled and stopped on
 4        that night, and this is something that Mr. Miller, Mr.
 5        Cromes, and their friends were constantly dealing with,
 6        being racially profiled and stopped by the police in their
 7        neighborhood for no reason.
 8                THE COURT:  I'm going to sustain the objection.
 9   EXAMINATION BY MR. SHIELDS:
10        Q    So, I want to direct your attention to September
11   25th, 2013.  Do you remember that day?
12        A    Yes.
13        Q    Okay.  And you were living on Bradburn at that time?
14        A    Yes.
15        Q    And you were living with your parents?
16        A    Yes.
17        Q    Okay.  And what happened that day that you can
18   remember it now, almost eleven years later?
19        A    I can just remember me and my mother is coming from
20   -- I don't know where we was coming from, but I remember we
21   were coming off Bradburn, and it was some guys in the street in
22   a car.  They wouldn't get out the way, so I was, like, telling
23   them to move out the way for my mom.  And somebody said
24   something about the car, I said something back.  They end up
25   leaving me, and my mom went in the house and I went in the
```

1  front yard with my front steps to sit down.  And I say about

2  twenty, fifteen minutes later, the same guys came back and,

3  long story short, a fight broke out.  I ended up getting

4  assaulted and my mom and dad took me to the hospital.

5      Q    Okay.  Can we just back up?  And before the incident

6  earlier that day, what were you doing?

7      A    I was with my mom all day.  I just know I was with

8  her.

9      Q    Okay.  And, so, can you take us through the

10 interaction that you had with the guys, again, when you first

11 came back in the car?

12     A    You talking when we first pulled on the street,

13 right?

14     Q    Correct.  The first time that you interacted with --

15     A    Yeah, um, pretty much they was in the car, they

16 wouldn't move.  It took them about three minutes to move.  And

17 we was, like, going back and forth arguing at the car, and my

18 mom was telling me, like, just be quiet, let them go.  And they

19 end up leaving, and once I went in the house, I came back

20 outside and sat on the porch.  And twenty minutes later they

21 came back, started stuff in front of my house.

22     Q    So they saw you and they came back, and they

23 approached you?

24     A    Yes.

25     Q    And that's when you got assaulted?

1    A    Yes.  It was words, argument, and then when I got

2    assaulted.

3        Q    And were you hit in the head with a gun?

4        A    Yes.

5        Q    And you said your parents drove you to the hospital?

6        A    Yes.

7        Q    Do you remember if 9-1-1 was called?

8        A    Yes, they definitely called.

9        Q    Do you remember who called 9-1-1?

10        A    My mother.

11        Q    Okay.  Do you remember when that 9-1-1 call was made?

12        A    Honestly, I can't remember where or what time, when

13    she called, honestly.

14        Q    Okay.  Is there anything that could help refresh your

15    recollection?

16        A    Um, if you had, like, 9-1-1 record calls, I could

17    probably show you.

18            MR. SHIELDS:  Okay.  Judge, I would like to put

19        up what's been marked as Exhibit 1.  Okay.  If we could

20        scroll down, I think it's the third page.  A little

21        further.  Okay, that's good right there.

22    EXAMINATION BY MR. SHIELDS:

23        Q    And Mr. Cromes, can you see the document that's been

24    marked as Exhibit 1 for identification on your screen?

25        A    Yes.

1      Q    Okay.  And do you see the numbers along the left side
2  of the screen?
3      A    Yes.
4      Q    And then above that, do you see the name Loretta
5  Cromes?  Is that your mother?
6      A    Yes.
7      Q    And do you recognize the address 400 Elmwood Avenue?
8      A    Yes.  That would be the hospital.
9      Q    Okay and do you remember what hospital?
10     A    Strong.
11     Q    Okay.  Is that the hospital that you were taken to?
12     A    Yes.
13     Q    And how about that phone number, do you recognize the
14  phone number?
15     A    It looks like the Strong Hospital number.
16     Q    Okay.  And why do you -- how do you know that that's
17  the Strong Hospital number?
18     A    'Cause I think I remember -- nobody's cell phones was
19  working in the hospital.  I know the cell phones don't work in
20  the hospital.  You get no service.  So, I'm pretty sure my
21  mother called, you know, the police that day -- that night when
22  I was in the hospital.
23     Q    Using a phone from the hospital?
24     A    Yes.
25     Q    Okay.  And below that, do you see an entry at 1634?

1    Do you see that on the left-hand side of the screen?

2         A    Yes.

3         Q    And then can you read the text to the right of that

4    entry?

5                   MS. CHRISTIE:  Excuse me, Mr. Cromes.  Judge, I

6         just object.  He asked if it would refresh his

7         recollection, but he's having him read from it and it's

8         not in evidence, and I object to it being in evidence.

9                   THE COURT:  All right.  If you could refresh

10        your client -- or the witness's recollection, and then

11        we'll take it down.

12                  MR. SHIELDS:  Okay.

13   EXAMINATION BY MR. SHIELDS:

14        Q    And, sir, does looking at this document refresh your

15   recollection of the time and where you were when your mother

16   called the police?

17        A    Yes.

18        Q    Okay.

19                  THE COURT:  You can take it down now.

20                  MR. SHIELDS:  Okay.

21   EXAMINATION BY MR. SHIELDS:

22        Q    And, so, just to be clear, can you tell us when your

23   mother called the police?

24        A    I believe it was around -- I don't remember a time.

25   I think -- guessing, I would say like around 7, maybe 6.

1    Q    Okay.  It would have been the time that was displayed

2  on that document?

3    A    Yes.

4         MR. SHIELDS:  Could we just put that back up for

5    one second?  Okay.

6  EXAMINATION BY MR. SHIELDS:

7    Q    So, that would have been 1634, is that right?  In

8  looking at the document?

9    A    Yes.

10    Q    So that would be 4:34 p.m., military time?

11    A    I believe so.  I can't really remember the time,

12  honestly.

13    Q    All right.  And do you remember what your mother told

14  the 9-1-1 dispatcher?

15         MS. CHRISTIE:  Objection; hearsay.

16         THE COURT:  Sustained.

17  EXAMINATION BY MR. SHIELDS:

18    Q    And if you can recall, did the document displayed as

19  Exhibit 1, did that entry accurately reflect the information of

20  what happened to you in the assault?

21    A    Yes.

22    Q    All right.  Do you remember arriving at the hospital?

23    A    Yes.

24    Q    And do you remember about what time you arrived at

25  the hospital?

1      A    I really can't remember, honestly.  Guessing, I would
2  say 3 something.
3      Q    Okay.  And is there -- and what did they do for you
4  at the hospital?
5      A    I remember them giving me staples in my head.
6      Q    Okay.  Anything else?
7      A    That was pretty much about it.
8      Q    Do you remember how long you were at the hospital
9  for?
10     A    A couple hours.
11     Q    Do you remember what time you left the hospital?
12     A    I believe, like, around 8 --8 something, or maybe 9;
13  8:30 or 9.
14     Q    Was it light or dark outside when you left the
15  hospital?
16     A    It was dark.
17     Q    While you were at the hospital, did police officers
18  come to the hospital?
19     A    Yes.
20     Q    Do you remember the names of the officers who arrived
21  at the hospital?
22     A    I believe it was Prinzi, Hoss (phonetic).
23              MS. CHRISTIE:  I'm sorry, I didn't hear that.
24              THE WITNESS:  Prinzi and Hoss.
25  EXAMINATION BY MR. SHIELDS:

```
 1        Q     Prinzi and Hogg?
 2        A     Prinzi and Hogg.  I'm sorry.
 3        Q     How long after you arrived at the hospital did the
 4   police arrive?
 5        A     I say they arrived maybe 30 minutes.  Took them about
 6   30 to 20 minutes to get there.
 7        Q     And did you speak with the officers at the hospital?
 8        A     Yes.
 9        Q     What's the sum and substance of your conversation
10   with the officers?
11                  MS. CHRISTIE:  Objection; hearsay.
12                  THE COURT:  What's the basis?
13                  MR. SHIELDS:  Hearsay?  I mean -- it goes to why
14        the officers later went to Bradburn Street, so it's
15        relevant.  And I don't believe that it's hearsay.  It's a
16        conversation that Mr. Cromes had with the officers.  How
17        can that be hearsay?
18                  MS. CHRISTIE:  Unless they had premonitions,
19        they wouldn't know, when they were at the hospital with
20        Mr. Cromes, that some event was going to happen later
21        which would cause them to return to the area of Bradburn
22        Street.  So, I don't know how that conversation could
23        explain why they did what they did later.
24                  THE COURT:  Can you repeat the question?  Do you
25        recall what the specifics question was?
```

1           MR. SHIELDS:  The question was, can you describe

2      the sum and substance of your conversation with the

3      officers.

4           THE COURT:  What's the purpose of that, the

5      purpose of that question?

6           MR. SHIELDS:  The purpose of the question is

7      they accused Mr. Cromes of lying to them, and then later

8      when the officers detained Anthony, when they first

9      stopped him, they said, what happened over here earlier

10     with Brooklyn.  So the basis is later they were still

11     trying to investigate what happened with Brooklyn because

12     they thought he was lying to them at the hospital.

13          THE COURT:  All right.  I'll overrule the

14     objection.

15   EXAMINATION BY MR. SHIELDS:

16     Q    So, Mr. Cromes, can you please describe the sum and

17   substance of your conversation with the officers at the

18   hospital?

19     A    Yes.  I pretty much remember them asking me what

20   happened.  I told them what happened.  He asked me do I know

21   these guys.  I told him I don't know who these guys is, I never

22   seen 'em a day in my life.  And I just remember them being

23   aggressive and just being negative, telling me if I find out

24   you're lying, we going to have an F-ing problem.  I just

25   remember -- I remember he kept telling me that.

CROMES - DIRECT - SHIELDS                          46

```
 1       Q    Do you remember which officer that was?

 2       A    I really don't remember, honestly.

 3             MS. CHRISTIE:  I'm sorry I didn't hear that, Mr.

 4       Cromes.

 5             THE WITNESS:  I don't remember that, honestly.

 6  EXAMINATION BY MR. SHIELDS:

 7       Q    Was it one or both of the officers that were speaking

 8  to you at the hospital?

 9       A    It was one.

10       Q    Okay.  Okay.  Now, when did you first learn that

11  Anthony had been arrested?

12       A    My friend, Aaron, told me once I left the hospital.

13  I went home and I went across the street to talk to Aaron and,

14  um, he pretty much told me that the police came up Bradburn,

15  put Anthony in the back seat, asked him questions and they

16  searched my friend Aaron's house.  He told me they didn't find

17  nothing, and he pretty much told me they took Anthony into

18  custody, you know, that night.

19       Q    When's the next time you spoke with Anthony?

20       A    Maybe a month or two later while he was in jail.

21  'Cause he was in jail for a while.

22       Q    And did Anthony eventually get released from jail?

23       A    Yes.

24       Q    And did you see him after he was released from jail?

25       A    Yes.
```

 1  police?

 2      A    No.

 3      Q    Have you ever been harassed by the police?

 4           MS. CHRISTIE:  Objection.

 5           THE COURT:  Sustained.

 6  EXAMINATION BY MR. SHIELDS:

 7      Q    On September 23rd -- I'm sorry, on September 25th,

 8  2013, you had an interaction with the police, correct?

 9      A    Yeah.

10      Q    Prior to that day, had you ever had any interactions

11  with those same police officers?

12      A    No.

13      Q    So I want to direct your attention to September 25th,

14  2013.  On that day did Anthony Miller come to your house?

15      A    Yes, it's on --

16           THE COURT:  Can you speak up, sir?

17           THE WITNESS:  September 25th?

18  EXAMINATION BY MR. SHIELDS:

19      Q    September 25th, 2013.

20      A    Yeah.

21      Q    Do you remember approximately what time Anthony

22  Miller arrived at your house on that day?

23      A    Around 6:20--6-6--between 6 and 6:30 in the evening.

24      Q    Okay.  Before coming to your house on September 25th,

25  2013, did Anthony Miller call you?

 1      A    Yes.

 2      Q    Do you remember what time that call was?

 3      A    Around 3, 3:15.

 4      Q    Did you pick up that call?

 5      A    No.

 6      Q    Do you know what phone Anthony used to make that

 7   call?

 8      A    No.

 9      Q    Did you later call Anthony back?

10      A    Yes.

11      Q    Did you speak with anyone when you called Anthony

12   back?

13      A    His brother.

14              MS. CHRISTIE:  I'm sorry, I didn't hear that.

15              THE WITNESS:  His brother.

16              MS. CHRISTIE:  Okay.

17   EXAMINATION BY MR. SHIELDS:

18      Q    And what's his brother's name?

19      A    Jamal.

20      Q    Do you remember what -- do you remember anything

21   about that conversation?

22              MS. CHRISTIE:  Objection.  Well, withdrawn.

23              THE COURT:  You can answer.

24              THE WITNESS:  Um, he said --

25              MS. CHRISTIE:  Objection to the hearsay.

 1                    THE WITNESS:  Anthony left the house.

 2                    THE COURT:  One second, sir.  So the question

 3         was, do you remember anything from that conversation.  Yes

 4         or no, and then we'll get to the next question.

 5                    THE WITNESS:  Yes.

 6    EXAMINATION BY MR. SHIELDS:

 7         Q    And what do you remember about that conversation?

 8         A    His brother said he --

 9                    MS. CHRISTIE:  Objection to the hearsay.

10                    THE WITNESS:  His brother wasn't home.

11                    THE COURT:  Mr. -- all right, Mr. Hinds, you

12         can't talk about what someone told you.  So, I'll sustain

13         the objection.  You can ask it a different way.

14                    MR. SHIELDS:  Okay.

15    EXAMINATION BY MR. SHIELDS:

16         Q    Did you say anything to Jamal?

17         A    Yes.

18         Q    What did you say to Jamal?

19         A    Jamal asked me -- I asked Jamal if Anthony was there

20    and he left the house.

21         Q    So Anthony wasn't there when you called back?

22         A    No.

23         Q    And do you remember what time you called Anthony

24    back?

25         A    No.

1    A    Gray hoodie, sweatpants.  Like, sandals and white

2    socks.

3        Q    And then what happened after they searched you?

4        A    They put us in the back of the cop car.

5        Q    What happened after you were detained in the cop car?

6        A    They took us to the corner of Roslyn and Genesee.

7        Q    Before they took you to the corner of Roslyn and

8    Genesee, did you have any conversations with the officers?

9        A    No.

10       Q    What happened when you got over to Roslyn and

11   Genesee?

12       A    We in the cop car for a little bit.  They basically

13   told us what happened.  There was a robbery and they wanted us

14   to -- wanted the witness -- not the witness, but the victim to

15   identify us.

16       Q    Okay.  Do you remember how long you were in the cop

17   car for before they did the show-up procedure?

18       A    How long I was in the cop car before the Roslyn,

19   or --

20       Q    That's a good question.  Sorry.  My question was bad.

21   So, let's break that down.  Before you were transported to

22   Genesee Street, how long were you in the cop car on Bradburn?

23       A    At least about forty-five minutes.

24       Q    Okay.  And you didn't have any conversations with the

25   cops during that time?

1    A    No.

2    Q    Okay.  Did they tell you why you were being

3  transported to Genesee Street before you were transported over

4  there?

5    A    No.

6    Q    Okay.  And then what happened after you got to

7  Genesee Street?

8    A    They told us about the incident that happened and we

9  were going to go -- victims were going to identify us, or try

10 to see if we was at the scene, or something, we did it -- did

11 the crime.

12   Q    Do you remember what officers told you that?

13   A    The officers that drove us there, but I don't

14 remember their name.

15   Q    Okay.  So the officers that drove you there that

16 stopped you over on Bradburn?

17   A    Bradburn, yes.

18   Q    And how long were you in the car on Genesee Street

19 before the show-up procedure?

20   A    Roughly 25 to 30 minutes, about.

21   Q    And did you speak with Wengert or any other officers

22 before the show-up procedure?

23   A    Supposably Detective Wengert and the other

24 detectives.

25   Q    That was before the show-up procedure --

1      A    Before --

2      Q    -- before they took you out of the car?

3      A    Yes.

4      Q    And what did they explain to you, if anything?

5              MS. CHRISTIE:  Objection to the hearsay.

6              THE COURT:  I'll sustain.  If you could rephrase

7      the question.

8  EXAMINATION BY MR. SHIELDS:

9      Q    After speaking with them, was it your understanding

10  that you were going to do a show-up procedure with the victim?

11     A    Yes.

12     Q    Okay.  And then did that happen?

13     A    Yes.

14     Q    Okay.  And then what happened -- can you describe the

15  show-up procedure?  Like what would -- what did they make you

16  do?

17     A    Get out the car on Genesee Street, walked to the

18  corner of Roslyn and Genesee, I say, like, roughly twenty feet.

19  Made us spin around, three hundred and sixty degree angle, and

20  walk back toward the cop car.

21     Q    And where was the cop car?

22     A    On Genesee Street.

23     Q    Okay.  So you got out, you walked about twenty feet

24  to the corner, spun around and walked back?

25     A    Twenty feet to the -- no.  On Genesee Street, then

1      Q    All right.  Did you speak with Anthony before he left

2  the house?

3      A    Yes.  For a second, I believe.

4      Q    Okay.  Do you remember anything about that

5  conversation?

6      A    Not really.

7      Q    Okay.

8      A    Might have asked me for something.  I can't remember.

9      Q    Do you remember anything you said to him?

10     A    No.

11     Q    After that conversation, did Anthony leave the house?

12     A    Yes.

13     Q    Do you remember anything Anthony did before he left

14  the house?

15     A    No.  He was kind of in a rush, so, no.

16     Q    Okay.  So you remember that he seemed like he was in

17  a rush?

18     A    Yes, sir.

19     Q    Now, in September 2013 did Anthony have a phone; a

20  cell phone?

21     A    Yes.

22     Q    Okay.  What do you remember about that phone, if

23  anything?

24     A    Like a WiFi phone.  Like one of those phones you

25  could call people on WiFi and text people on WiFi.

1    Q    So do you mean that it didn't have, like, a cell

2    phone plan with a provider?

3    A    Right.

4    Q    Okay.  So if you wanted to contact Anthony, you could

5    call or text him on that phone, but only if he was connected to

6    WiFi?

7    A    Correct.

8    Q    How about at home, did you have a landline telephone?

9    A    No.

10    Q    Okay.  So if somebody wanted to call your family,

11    like how would they do that?

12    A    Probably call my mom phone.

13    Q    When you say, "call your mom's phone," do you mean

14    your mother's cell phone?

15    A    Yes.

16    Q    After Anthony left the house, do you remember him

17    receiving a telephone call?

18    A    Yes.

19    Q    Okay.  And what do you remember about that call?

20              MS. CHRISTIE:  Objection; hearsay.

21              THE COURT:  Overruled.

22    EXAMINATION BY MR. SHIELDS:

23    Q    So you can answer the question.

24    A    Oh, I'm sorry.  It was his friend calling, asking to

25    speak to him.  I told him he already had left the house.

A. MILLER - DIRECT - SHIELDS                    155

```
 1   router.  So it would tend to drop calls sometimes.

 2        Q    So, "unreliable" means it would drop calls --

 3        A    Yes.

 4        Q    -- from the WiFi network?

 5        A    Yes.

 6        Q    And was it common for you to call your friend using

 7   your mom's phone?

 8        A    Yes.

 9        Q    So when you would call your friends with your mom's

10   phone, they would know it was you that was calling?

11        A    Yes.

12        Q    What was your mother's cell phone number?

13        A    585-969-8114.

14        Q    And does she have the same number today?

15        A    Yes.

16        Q    All right.  I want to direct your attention to

17   September 25th, 2013.  You were arrested that day on Bradburn

18   Street shortly after 8 p.m., is that right?

19        A    Yes.

20        Q    Can you tell us what you were doing that day before

21   the arrest?

22        A    That day, specifically, kind of a typical morning.  I

23   woke up, put my little sisters on the bus.  But I also had a

24   job interview that morning, as well.  So, like I said, woke up,

25   put them on a bus, went to my job interview, walked back home,
```

1    spoke with my father for a little bit, did some more job

2    applications until my little sisters got out of school.  So I

3    got 'em back from the bus, took 'em back home, and I was

4    playing a game and I got a phone call from Armeko Austin

5    telling me that Brooklyn, you know, was assaulted and in the

6    hospital.

7        Q    When you said you were playing a game when you got

8    that call --

9        A    Yes.

10        Q    -- what do you mean?  What kind of game?

11        A    I was playing Call of Duty, I believe.  On

12    PlayStation 4 at the time.

13        Q    What time would you get your sisters off the bus?

14        A    Around 4 or 5-ish.

15        Q    And how long were you playing Call of Duty before you

16    got a call from Armeko Austin?

17        A    I can't recall exactly, but probably like an hour or

18    so, probably.

19        Q    Do you know what time you got the call from Armeko?

20        A    It had to be a little after six, I believe.  A little

21    after six.

22        Q    And how did he call you?

23        A    He called me on my textPlus number.

24        Q    Okay.  Let me back up to earlier that day.  Can you

25    tell me about the job interview that you had?

A. MILLER - DIRECT - SHIELDS                157

```
 1        A    Yes, it was at a plastic company, a molding company

 2   off of St. Paul.

 3        Q    Okay.  And you said that you walked there?

 4        A    Yes.

 5        Q    And how far away from your home was the location on

 6   St. Paul?

 7        A    I can't tell you in miles, but probably took me

 8   thirty -- thirty minutes.  Thirty at the most to get there.

 9        Q    And you walked there and back?

10        A    Yes.

11        Q    What did you wear to the interview?

12        A    I had a button-down shirt, some khakis, a vest, and I

13   wore my Timberland boots.

14        Q    Do you remember what, factually, you talked about

15   with Armeko when he called you?

16        A    Yeah.  He just told me that Brooklyn -- he got jumped

17   in front of his home and he was currently in the hospital.  But

18   he didn't really know too much after that.

19        Q    Did you ask Armeko for a ride?

20        A    No.

21        Q    Why not?

22        A    'Cause he was at work and he didn't have a vehicle at

23   the time.

24        Q    Okay.  Who else was home when you got that call?

25        A    My mother, my brother, and my two little sisters was
```

A. MILLER - DIRECT - SHIELDS                                158

1   home.

2        Q     What did you do after Armeko called you?

3        A     I believe I tried to call -- I tried to call Aaron

4   and he didn't pick up, I don't believe, and I tried to call my

5   friend, Shaquan Williams, but he couldn't give me a ride

6   because I believe he said his mother had the vehicle at the

7   time.

8        Q     Okay.  Do you know what time you called Aaron?

9        A     I believe it was 6:26.

10       Q     Okay.  And how do you know it was 6:26?

11       A     Just from my -- you know, me researching my case and,

12   you know, getting all these documents.  I remember it.

13       Q     So you read -- there's a document that said the phone

14   call was made at 6:26 p.m.?

15       A     Yes, the phone records.

16       Q     Do you remember which phone records those were?

17       A     T-Mobile records.  Aaron phone records.

18            MR. SHIELDS:  Judge, could I just put up Exhibit

19       14?  Never mind.  I'm sorry.

20            THE COURT:  Thank you.

21   EXAMINATION BY MR. SHIELDS:

22       Q     And how did you call Shaquan Williams and Aaron

23   Hinds?

24       A     Off my mother phone.

25       Q     What did you do after you called Aaron Hinds?

1    A    Yeah, after nobody picked up, I recall I asked my

2  brother if I could borrow a pair of his sweatpants.  He said

3  no, so I threw on my -- you know, my Red Bull sweatpants, my

4  red hoodie.  Got my MP3 player and raced out the door.

5    Q    Do you know what time you left the house?

6    A    Very soon after the phone call, after I tried

7  calling.  So...

8    Q    Okay.  Like, can you estimate how many minutes

9  afterwards?

10   A    No more than three.  Three, four minutes.

11   Q    How do you know it was no more than three or four

12 minutes?

13   A    Personal recollection and also the phone records that

14 show that.

15   Q    Okay.  What in the phone records show that you were

16 gone within three to four minutes?

17   A    'Cause I know Aaron -- he called back, but I was

18 gone.  I already left my house.

19   Q    Do you know what time Aaron called back?

20   A    I believe at 6:38.

21   Q    Okay.  So by the time Aaron called back, you were

22 gone?

23   A    Yes.

24   Q    Did you say anything to anyone else in the house

25 before you left?

```
 1      A    No.  I don't believe so, no.

 2      Q    And what were wearing when you left the house?

 3      A    Red hoodie, my Red Bull Adidas sweatpants, tan

 4   Timberlands.

 5      Q    What else did you bring with you?

 6      A    My phone and MP3 player.

 7      Q    And the MP3 player is to listen to music, is that

 8   right?

 9      A    Yeah, as I walk.

10      Q    Do you remember what you listened to on the walk?

11      A    Probably whatever was popular at the time.  Drake.

12   Something like that.

13      Q    Hip hop music?

14      A    Yeah.

15      Q    Do you remember the route that you took from 607 Birr

16   Street to Bradburn?

17      A    Not directly, just generally the direction.  That's

18   it.

19      Q    Can you generally describe how you would have gotten

20   there?

21      A    Well, where I was at Dewey Avenue, I just know, you

22   know, the west side of the city, just go right towards, you

23   know, Lyell and just remain in that same direction.  Only have

24   to probably turn maybe twice to get to where I was going, so...

25      Q    How long did it take you to get from your home to
```

1  Bradburn Street?

2      A    Probably no more than a hour, ten minutes; fifteen

3  minutes.

4      Q    How do you know how long it took to get there?

5      A    Because when I arrived I use Aaron phone.

6      Q    Okay.  So, do you remember what time you used Aaron's

7  phone after you arrived?

8      A    I believe it was at -- it was at 7:38.  I believe I

9  used it a few times, so I believe the first call was at 7:38

10  when I used it.

11     Q    Okay.  Do you remember what time the second and third

12  calls were?

13     A    I believe 7:41 and probably 7:42.

14     Q    So sometime before 7:38 you arrived at Aaron's,

15  house?

16     A    Yes.

17     Q    All right.  Let's back up for a second.  What's the

18  first thing you did when you got to Bradburn Street.

19     A    First thing?  Oh, yeah, the first thing I did, I

20  turned my phone on and placed it on James and Jarvis steps for

21  to connect to the WiFi, and I walked across the street to knock

22  on Aaron door.

23     Q    During the walk from Birr Street over to Bradburn

24  Street, did you use your phone at all?

25     A    No.

1      Q    Okay.  It was off the whole time?

2      A    Yeah.

3      Q    You got over there, you say you turned it on, you put

4    it on their steps or something?

5      A    Yes, James and Jarvis house.

6      Q    Then what did you do after that?

7      A    I walked directly across the street to Aaron house,

8    knocked on the door, waited for him to come outside.

9      Q    Okay.  What happened after you knocked on Aaron's

10   door?

11     A    He came outside shortly after that and we spoke for a

12   little while.

13     Q    Where did you speak?

14     A    On the porch.

15     Q    What did you speak about?

16     A    The situation with Brooklyn Cromes.

17     Q    And what about the situation did you talk about?

18     A    What happened, who possibly done it, and what

19   hospital he was at, I believe.

20     Q    Did you know what hospital he was at?

21     A    Not at the time, no.

22     Q    Were you able to ever find that out before you were

23   arrested?

24     A    No.

25     Q    Did you go inside of Aaron's house?

A. MILLER - DIRECT - SHIELDS                    163

```
 1        A    No.

 2        Q    Why not?

 3        A    His parents were strict.  They didn't -- you know,

 4   they barely like people being on the porch.  So, go inside his

 5   house was out the question at that time.

 6        Q    How long did you speak on his porch for?

 7        A    No more than four or five minutes.  Not long at all.

 8        Q    And what happened next?

 9        A    Walked across the street to get my phone.  Then I

10   attempted to call my cousin, I believe, off my phone with the

11   WiFi.  We did talk.  We spoke for a little bit.  Aaron, he met

12   me and I used his phone, as well.

13        Q    What's your cousin's name?

14        A    Mario.

15        Q    And who did you call using Aaron's phone?

16        A    I call Brooklyn.  I call Shaquan Williams, and I

17   believe I tried to call Brooklyn again, because he didn't pick

18   up the first time.

19        Q    And those are the calls that you gave the times for

20   earlier?

21        A    Yes.

22        Q    Okay.  What were those times again?

23        A    I believe it was 7:38, 7:41 and 7:42.

24        Q    Did you ever knock on the door at 22 Bradburn?

25        A    Never.  No.
```

A. MILLER - DIRECT - SHIELDS                    164

1        Q    How long after you crossed the street was it before

2    Aaron joined you?

3        A    No more than a minute.

4        Q    When you made those calls to Brooklyn, Shaquan and

5    then Brooklyn, did any of them pick up?

6        A    No.

7        Q    What happened after you made those three phone calls?

8        A    Seem like very shortly after that, that's when the

9    police arrive.

10       Q    Okay.  Did you speak with anyone else on your phone

11   before the police arrived?

12       A    Mario.  Yeah, I spoke to Mario, I believe.

13       Q    Your cousin?

14       A    Yeah.

15       Q    Why did you call Mario?

16       A    'Cause when I speaking to Aaron, I believe from

17   somebody else they heard that he might know the individuals

18   that was involved that assaulted Brooklyn.

19       Q    Between the time that you made the last call from

20   Aaron's phone at 7:42 p.m. -- between that time and when the

21   police stopped you, were you in front of 22 Bradburn Street?

22       A    Yes.

23       Q    Okay.  Did you do anything else, try to make calls

24   and talk to Aaron?

25       A    Nothing else.  We stood there the whole time.

A. MILLER - DIRECT - SHIELDS                    165

```
 1        Q    You never left and went anywhere else?

 2        A    No.

 3        Q    Did Mario know the guys?

 4        A    No.

 5        Q    And what happened after you made that call to Mario?

 6        A    Very shortly after that the RPD approached us.

 7        Q    When RPD approached you, were you sweaty or breathing

 8   heavy?

 9        A    No.

10        Q    You hadn't just run anywhere?

11        A    No.

12        Q    You'd just been standing in front of 22 Bradburn?

13        A    Yes.

14        Q    Tell us about what happened when the police stopped

15   you?

16        A    Well, the first car, you know, they pulled up.  I

17   believe it was Officer Hogg.  He jumped out immediately, pat-

18   frisked Aaron, told us to show us our hands, and in the midst

19   of that, he asked us where was the guns at and what happened to

20   Brooklyn earlier.

21        Q    Do you know why he was asking about what happened

22   with Brooklyn earlier?

23        A    Do I know why?

24             MS. CHRISTIE:  Objection.  I'll withdraw.

25             THE COURT:  You may answer.
```

1                    THE WITNESS:  No.

2    EXAMINATION BY MR. SHIELDS:

3        Q    What did you say, if anything?

4        A    I told him I didn't know.

5        Q    Why did you say you don't know?

6        A    Because I didn't really have no answer at the time to

7    give him, to be honest.

8        Q    Were you wearing the same clothes when you were

9    stopped as when you had left your house?

10       A    Yes.

11       Q    What happened next after Hogg stopped you guys and

12   pat-frisked Aaron?

13       A    Another officer arrived.  I believe his name was

14   Officer Watson.  He arrived, did the same thing with me.  Took

15   my phone, MP3 player, put me in the back of his car.

16       Q    And what happened after they put you in the back of

17   the cars?

18       A    We sat there for quite a while.  I remember I asked

19   him what was going on, and he said, you know, a robbery took

20   place.  But he said we seen, you know, a pretty significant --

21                    MS. CHRISTIE:  Objection; hearsay.

22                    THE COURT:  Sustained.

23                    MR. SHIELDS:  So, we just can't talk about what

24       they said.

25   EXAMINATION BY MR. SHIELDS:

1      Q    How -- were you and Aaron put in separate cars?

2      A    Yes.

3      Q    And how long were you in cars on Bradburn Street

4  before you were taken anywhere else?

5      A    Probably forty minutes.  Close to a hour.

6      Q    Where did you go after -- where did -- or were you

7  taken somewhere?

8      A    Yes.

9      Q    After that hour or so?

10     A    Yes.

11     Q    Where were you taken?

12     A    I believe we was taken Westside and Genesee Street,

13  at the corner.

14     Q    Before you were taken there, did you know why you

15  were being taken there?

16     A    Yes.

17     Q    Why were you being taken there?

18     A    For a possible show-up identification.

19     Q    Okay.  And what happened when you arrived at Genesee

20  Street before the show-up?

21     A    I remember sitting in back of the car and

22  Investigator Wengert, he approached, opened the door, looked me

23  up and down and closed the door.  Left.

24     Q    You didn't have any conversation with him?

25     A    No.

```
 1      Q    And then what happened next?
 2      A    Shortly after that they took us to Roslyn and Genesee
 3 Street.
 4      Q    Okay.  So first you were taken to Genesee and
 5 Westside Terrace?
 6      A    Yes.  Yes.
 7      Q    How far is that from Genesee and Roslyn?
 8      A    I believe two blocks.
 9      Q    So they drove over about two more blocks?
10      A    Yes.
11      Q    Okay.  Then what happened once you arrived at Roslyn
12 and Genesee?
13      A    I was told they was about to do a show-up
14 identification.
15      Q    Did they explain what that meant before they did it?
16      A    No.  I don't -- they gave me instructions before,
17 right when we stepped out.  But at the time they said a show-up
18 identification.  I never heard of it or knew what it was, so he
19 just say he want to take part in a show-up.
20      Q    Did you know why they were making you take part in a
21 show-up?
22      A    Not at that time, no.  Not really.
23      Q    Can you tell us about what happened with the show-up?
24      A    They took me out the car, you know, gave me some
25 directions.  You know, told me to do a 360 once I got to the
```

1    house, and then they walked me back to the car.

2        Q    Did they do that with Aaron, also?

3        A    Yes, from what I seen.

4        Q    And who went first?

5        A    Aaron went first.

6        Q    And did they do the same thing, same procedure you

7    described with Aaron?

8        A    Yes.

9        Q    And could you see Aaron's show-up?

10       A    Yes.

11       Q    What happened after the show-up?

12       A    After the show-up, I spoke to Officer Watson.  I was

13   told I wasn't identified.

14               MS. CHRISTIE:  Objection to the hearsay.

15               THE COURT:  Your response to that?

16               MR. SHIELDS:  I mean, I think it goes to the

17       heart of his case, so I think it's relevant.

18               THE COURT:  I'm going to sustain the objection.

19   EXAMINATION BY MR. SHIELDS:

20       Q    Now, can you tell me, do you have any idea what time

21   it was when the show-up took place?

22       A    Closer to 9:00, I believe.

23       Q    So it was dark outside?

24       A    Yes.

25       Q    Can you describe the lighting conditions in the area

1   where the show-up was conducted?

2       A    It was kind of dark.  Dimly lit.  It wasn't too

3   light.

4       Q    Do you remember seeing, for example, any street

5   lights?

6       A    Yeah, it was street lights, but it's hard to explain.

7   They wasn't -- it wasn't well lit.  It was still dark.

8       Q    Do you remember the location of the street lights?

9       A    Not exactly, no.

10      Q    After the show-up, did you learn whether you were

11  identified or not?

12      A    I was told I wasn't.  You know, but still was put in

13  cuffs and taken to PSB, so...

14      Q    So initially you were told you weren't identified?

15      A    Yes.

16      Q    And was that -- was that immediately after the

17  show-up?

18      A    Yes, I think so.

19      Q    Where were you when that happened?

20      A    I believe I was getting back into the police car.

21  They was putting me back inside.

22      Q    How long did you sit in the police car after the

23  show-up before you were taken anywhere else?

24      A    Probably another forty minutes.

25      Q    Okay.  And what happened while -- and did anything

1    happen while you were sitting in the police car before you were

2    taken somewhere else?

3        A    I frequently, you know, banged on the window seeking

4    a answer as to why was I still being detained when I was told I

5    wasn't identified.  So, that's it.

6        Q    Okay.  And did you ever ask to, like, be taken home

7    or anything?

8        A    They asked me if that's where I wanted to go after

9    they initially -- I was told I wasn't identified.

10            MS. CHRISTIE:  Objection to the hearsay.

11            THE COURT:  I'll sustain.

12   EXAMINATION BY MR. SHIELDS:

13       Q    And so what happened -- what happened after -- after

14   that?

15       A    I was told Wengert -- I was taken to PSB after that.

16       Q    Where did you go when you were taken to PSB?

17       A    To the interview room.

18       Q    What happened when you got to the interview?

19       A    I feel like I sat there for probably about a hour and

20   then Investigator Wengert showed up.

21       Q    You sat there for a while first, and then Wengert

22   showed up?

23       A    Yes.

24       Q    Okay.  And what happened after Wengert showed up?

25       A    He came in and he, you know, said he --

 1                 MS. CHRISTIE:  Objection.

 2                 THE WITNESS:  We spoke.

 3                 THE COURT:  I'll sustain the objection.

 4                 MR. SHIELDS:  Judge, I think that our client

 5        should be able to talk about what Wengert said to him

 6        since Wengert passed away and is unavailable to be

 7        cross-examined or asked questions about the substance of

 8        his conversation.  This was the heart of Anthony's case.

 9                 THE COURT:  Well, are you offering what was said

10        for the truth?

11                 MR. SHIELDS:  Not -- no, Your Honor, because

12        we're -- it goes to, largely, Wengert's credibility when

13        he stopped him and the reason for stopping him and

14        arresting him.

15                 THE COURT:  All right.  What I'm going to do,

16        it's an appropriate time for a short ten-minute recess

17        anyway.  I'll reserve and I'll come back with that.

18                 All right, we'll take a ten-minute recess.

19        *(The Court recessed the proceedings at 3:29 p.m.; resumed at*

20        *3:41 p.m.)*

21                 THE COURT:  Before we left there was an

22        objection to what Officer Wengert was saying in the

23        interrogation room at the PSB.  The Court is going to

24        sustain the objection.  The fact that Officer Wengert is

25        now dead makes it even a little bit more difficult and

A. MILLER - DIRECT - SHIELDS                         173

1        more problematic to get that in.  So you can proceed.

2                  MR. SHIELDS:  Thank you, Your Honor.

3    EXAMINATION BY MR. SHIELDS:

4        Q    Do you remember anything that you said to

5    Investigator Wengert during the time when he had you in the

6    interrogation room after you were brought to PSB?

7        A    I told him the reason why I was over on Bradburn.  I

8    told him about how the phone could exclude me, you know, from

9    the crime.  And I also told him to check the city cameras

10   'cause I'm quite sure I was on the camera due to the fact I

11   walked, you know, the distance I walked.

12       Q    Did he check your phone?

13       A    No.

14       Q    Did he check the city cameras?

15       A    No.

16       Q    Did you tell him anything else?

17       A    The only thing I could think of, stuff that, you

18   know, would clear me of the crime at the time.

19       Q    Did you know when you were in the interrogation room

20   what you were being accused of?

21       A    Yes.  He told me, yes.

22       Q    So you knew that you were being accused of having

23   committed an armed robbery?

24       A    Yes.

25       Q    Did you know that Aaron was allegedly involved in the

A. MILLER - DIRECT - SHIELDS                    174

1  armed robbery, as well?

2      A    No.

3      Q    Do you know if the victim identified Aaron?

4      A    No.

5      Q    The victim didn't or you don't know?

6      A    I don't know.

7      Q    You didn't --

8      A    I didn't know at that time, yeah.

9      Q    Did you waive your *Miranda* rights and agree to talk

10 to him?

11     A    Yes.

12     Q    And why'd you do that?

13     A    I had nothing to hide.

14     Q    Did Wengert believe what you told him?

15             MS. CHRISTIE:  I'm sorry, could you repeat it?

16             MR. SHIELDS:  Did he believe -- did Wengert

17         believe what you told him.

18             MS. CHRISTIE:  Objection; state of mind.

19             THE COURT:  Sustained.

20 EXAMINATION BY MR. SHIELDS:

21     Q    What happened after you explained to Wengert the

22 reasons that you were on Bradburn Street?

23     A    I forgot what led to it, but basically an argument

24 ensued, curse words was exchanged, and the interview was ended.

25     Q    Did you say anything to him to end the interview?

A. MILLER - DIRECT - SHIELDS                    175

1        A    I told him I see him at trial.

2        Q    Do you remember any conversation about the clothes

3    you were wearing?

4        A    Oh, yes.  He referenced to how they seemed too big.

5                THE COURT:  All right.  Sustained.

6    EXAMINATION BY MR. SHIELDS:

7        Q    Did you tell Wengert anything about the clothes that

8    you were wearing?

9        A    Yes.

10       Q    What did you tell him about the clothes that you were

11   wearing?

12       A    That I had the top half of the sweat suit at my

13   house.

14       Q    Meaning that those were your clothes and not someone

15   else's clothes?

16       A    Yes.

17       Q    Had you been accused of wearing someone else's

18   clothes?

19       A    Yes.

20       Q    Did you tell Wengert the route that you took to walk

21   over?

22       A    Yes.

23       Q    And then you told him to check the city cameras?

24       A    Yes.

25       Q    But he didn't do that?

1        A    No.

2        Q    Did you notice anything odd about Wengert before the

3   interview ended?

4        A    Yes.  Just as far as communication, body language.

5   You know, and his face didn't seem right.  He seemed kind of

6   odd and off to me.

7        Q    Can you tell me more about how he seemed odd and off?

8        A    He seemed to be under the influence of something.

9        Q    You mean like under the influence of drugs?

10       A    Yes.

11       Q    And what makes you think that he was under the

12   influence of drugs?

13       A    Due to my experience with dealing with people who use

14   drugs?

15       Q    Okay.  As we sit here today, do you think that he was

16   on drugs at the time he was interrogating you?

17       A    Yes.

18                 MS. CHRISTIE:  Objection.

19                 THE COURT:  Basis?

20                 MS. CHRISTIE:  Foundation.

21                 THE COURT:  I'll overrule.

22   EXAMINATION BY MR. SHIELDS:

23       Q    So you can answer.

24       A    Yes.

25       Q    Okay.  And what makes you -- as we sit here today,

1    what makes you think that he was on drugs during the

2    interrogation?  Anything else other than you already talked

3    about?

4         A    I was informed that he died of a drug overdose.

5              MS. CHRISTIE:  Objection.

6              THE COURT:  Sustained.

7    EXAMINATION BY MR. SHIELDS:

8         Q    Any other physical characteristics during the

9    interview that would have indicated to you that maybe he was --

10        A    Glossy eyes, repeating his -- you know, repeating his

11   self over and over, and not in the way as he's trying to catch

12   me in a lie or reiterate his self, but it seemed like he

13   honestly was forgetting he asked the question, you know,

14   previously.  So, just his whole body language, eye contact.

15   And I dealt with him on numerous occasions before, so I was

16   familiar with him.

17        Q    So he was acting differently during the night of the

18   interview than he was when you had interacted with him on

19   previous occasions?

20        A    Yes.

21        Q    What happened after the interview ended?

22        A    After the interview ended, I was booked in the county

23   jail.

24        Q    What happened when you got to the jail?

25        A    They processed me.  I made a few calls.  That was

GOODSELL - DIRECT - SHIELDS                            312

1      Q    And have you ever been qualified as an expert in a
2  civil case in New York?
3      A    I don't believe so.
4      Q    And have you been qualified as an expert in the -- in
5  the Court of Claims in New York?
6      A    I don't believe so.
7      Q    In the New York criminal court, what was the
8  specialty on which you were qualified as an expert, if you
9  remember?
10     A    I'm always presented as an expert in eyewitness
11  memory and eyewitness identification.
12            MS. CHRISTIE:  Thank you, Doctor.  Judge, I
13       defer to you.
14            THE COURT:  The Court will qualify Dr. Goodsell
15       as an expert in the two areas you mentioned.
16            MR. SHIELDS:  Thank you, Your Honor.
17  DIRECT EXAMINATION BY MR. SHIELDS:
18     Q    Doctor Goodsell, can you describe, what is your role
19  in a trial, either a criminal case or a case like this where
20  you're hired as an expert in the areas of eyewitness memory and
21  identification?
22     A    In every case I've dealt with, I view my role as an
23  educator.  So I'm here to talk about what I know about
24  eyewitness memory and identification issues.  There's a whole
25  body of research that shows that memory doesn't work like the

1    average person thinks.

2        There's the -- when I'm teaching about it in class, I get

3    the video camera analogy.  Most people have that video camera

4    analogy that we experience something, record it in, and play it

5    back later.  Unfortunately, that's not how memory works, and so

6    I'm often in court to describe how the differences between what

7    people think memory works and how it actually works.

8        Q    And can you describe some of your research

9    experiments that relate to eyewitness memory and

10   identification?

11       A    Certainly.  So as I just mentioned, we use the

12   scientific method, like any other field, to test a testable

13   hypothesis.  And, so, a typical experiment in my lab would look

14   like bringing in a participant and exposing them to some sort

15   of mock crime, whether it's staged or a video, and then at some

16   later point asking them to make an identification.  So within

17   that context, we can look at things like the instructions we

18   give a witness, or how much time goes by, or the composition of

19   a lineup.  And, so, all of these variables are things that, as

20   a scientist, I'm interested in.

21       Q    Okay.  And when you testify in cases involving

22   eyewitness identification issues, is there a common theme or

23   issue that you always talk about?

24       A    Certainly.  So in any case where there is

25   identification evidence, you want -- I prefer to start talking

1    about memory because an identification is a decision that comes

2    from memory.  So understanding how memory works is key before

3    moving on and talking about any other factors that might

4    influence identification.

5        Q    Okay.  And how does memory work?

6        A    So, as I mentioned, it does not work like a video

7    camera, unfortunately.  Memory is a complex and constructive

8    process, and we talk about in my class the three phases of

9    memory:  Encoding, storage, and retrieval; and within those

10   three stages, which I'm sure we'll get into, we can talk about

11   how memory works at each one of those phases.  Would you like

12   me to elaborate on those?

13       Q    Yes.  That would be great.  Thank you.

14       A    So the first stage of memory is called encoding, and

15   that refers to how we get information into the system.  And,

16   so, there's all sorts of factors that could affect how well

17   we're going to get information into the system.  Basically,

18   around how well we're paying attention to something.  I give

19   the example of the Bills are on and I'm watching them, and my

20   wife is talking to me.  I'm probably not allocating much

21   attention to her because I'm mostly focused on Josh Allen and

22   his amazing throws, or whatever.  And, so, what's actually

23   getting encoded into memory, in that example, is limited

24   because I'm not allocating my attention towards my wife, I'm

25   allocating attention towards the game.  So, the encoding phase

1    revolves around the amount of attention we can give.

2        Next is storage.  And, so, storage refers to the fact that

3    any memory you have has to be held onto in order to regain

4    access to it in the future.  And, so, when we talk about

5    storage, we should point out that memory does not get better

6    with time, it gets worse with time.  And how we regain access

7    to that memory is key in that last stage, which is the

8    retrieval stage.

9        And, so, any time I ask you to tell me about anything in

10   your past, you're going to have to retrieve something up from

11   memory.  As I mentioned earlier, it's a constructive process,

12   so you're going to call up whatever you can from memory,

13   combine that with elements that you might expect to have

14   happened, new information you might have come across, or you

15   might have forgotten some stuff, and your brain is going to

16   combine all that together.  And that's going to be your

17   experience of what it is that you're trying to remember from

18   the past.

19       So that's -- in brief, that's the three stages of memory.

20       Q    What factors affect the accuracy of encoding?

21       A    Okay, so, go back to the first stage of memory;

22   encoding.  How well are we getting something in.  So, factors

23   such as am I intending to remember this thing later.  All

24   right?  If I'm allocating attention to something that I want to

25   remember later, that's better than if I'm not realizing that

1    the thing I'm observing or experiencing is something I need to

2    remember later on.

3          Any physical factors:  lighting, distance, angle.  All of

4    those affect the quality of the image, or the sound, or

5    whatever is trying to get into the system.  So if you have a

6    reduced quality of stimuli coming in, you can't remember

7    something better than what you put in.  So anything that

8    affects your ability to attend to something.  Is there multiple

9    things I'm trying to look at, the amount of time that goes by,

10   the more time I have to study something, obviously the more

11   effort I can use to put that into memory.  So any factor that

12   will affect my ability to attend affects the encoding stage.

13        Q    What if the instant involved multiple people?

14        A    Sure.  So, within the context of you have "x" amount

15   of time to observe something, and if there are more than one

16   thing -- if there is more than one thing that I need to

17   remember later, you can't allocate your attention across

18   multiple things at once.  So if I'm trying to remember what you

19   look like, Judge, and what you look like, I'm going to have to

20   shift my attention back and forth between the two of you.  And

21   if I'm looking at you, I'm not looking at you.

22        Q    How about stress?

23        A    So, there is a large body of research showing that

24   stress can negatively impact our ability to encode information.

25   There's a really neat study that I like to talk about in my

1  classes involving a researcher that got access to Army POW

2  trainings.  These soldiers are out in the field and they're put

3  into a mock POW situation and they're interrogated.  And he was

4  -- he was able to gain access to these soldiers and test their

5  ability to recognize their interrogator two days later.  And so

6  they had these two conditions:  One where the interrogator was

7  being very confrontive and yelling, a high stress situation;

8  and another situation where it was a low stress situation.  And

9  the results of that study show that people were less able to

10  accurately identify their interrogator two days later in the

11  high stress condition compared to the low stress condition.

12  So, we know stress can have a negative impact on our ability to

13  encode stuff into memory.

14      Q    How about if there were weapons present?

15      A    So there's a phenomena called weapons focus in my

16  field.  And it's, simply put, that if you're looking at me

17  right now and trying to remember what my face looks like, but I

18  pull out a gun -- and I will just put my finger up here.  If

19  you're looking at the gun, you're not looking at my face.  And

20  so there's -- there's a large body of research that shows that

21  people allocate their attention towards a weapon if a weapon is

22  brought out.  And again, as I mentioned earlier, if you're

23  looking at something aside from the face of the person you're

24  trying to remember later, you're not encoding that information,

25  you're looking at the gun.  And so that's known as weapon

1   focus.

2       Q     Thank you.  Can you explain in more detail the

3   storage phase of the brain?

4       A     So storage is simply the fact that we have to

5   maintain that information that we encoded into memory over

6   time.  And, so, what I tell my students to think about in the

7   storage phase is two aspects.  One is that memory is not fixed,

8   it can change.  And two, is that memory tends to fade with

9   time.  And, so, the longer you go from encoding something in to

10  recalling it later, the more opportunity there is for that

11  memory to change, specifically, in that last stage, which is

12  the retrieval sustain.

13      Q     Okay.  And what factors affect the accuracy of stored

14  memories?

15      A     So, it's mostly the passage of time which provides

16  the opportunity for memory to change, and then that change is

17  something we would describe that happens in the retrieval

18  phase, which is the last phase.

19      Q     Okay.  And can you tell us more about the retrieval

20  phase?

21      A     Certainly.  So, again, any time you call up some

22  memory, what you're going to call up is some combination of

23  things you allocated your attention to and encoded into memory,

24  along with expectations, assumptions, and/or new information

25  you might have come across over time.

1          I always tell my students, you know, we are cognitive

2    misers, which is just a fancy way of saying, like, why should

3    our brains work harder than it needs to.  We need to work

4    efficiently.  If we spend lots of time thinking about every

5    single aspect of everything in our environment, we would become

6    overwhelmed.  We don't have the cognitive resources for that.

7          So that's where that analogy of the video camera really

8    breaks down, because a video camera records an event, puts it

9    onto a tape or a hard drive, or something like that, and then

10   accesses it directly later.  Our brains don't work that way.

11   We encode fragments of our experiences and then combine it with

12   expectations, assumptions, knowledge of how the world works.

13         And, so, if that's what's going on, each time you ask me

14   about something, there's an opportunity for what I'm going to

15   tell you to change because I might have come across new

16   information.  I might have forgotten something.  I might have

17   told a story about said memory, and then that experience can

18   then be encoded in the memory again.

19         That's one aspect that really blows the mind of my

20   students.  If I say -- if I ask you right now to tell me about

21   the first time you drove a car, or whatever it is, you're going

22   to tell me some story.  And the act of telling me that story is

23   now a new memory that you can encode into memory and rely on in

24   the future if you're asked about driving a car for the first

25   time, for example.

1    And, so, that's what I mean by every time you recall a

2    memory you have the opportunity to change it in some way.

3        Q    Thank you.  Can you give us a real-world example of

4    how some of these factors affect memory?

5        A    Sure.  Sure.  So, if you were sitting in my cognition

6    class right now, I would say something like, let's pretend

7    you're trying to remember a birthday party from when you were a

8    kid.  Your tenth birthday party, or something like that.  And

9    you think back and you can see a cake and all these red

10   balloons.  And you can see all your friends there, and you can

11   see some of the toys that you really wanted to get.

12       And, so, let's say when you were ten you walked into the

13   birthday party.  Well, you didn't need to allocate a ton of

14   attention to the balloons, or the cake, or how to sing happy

15   birthday, because you knew all those things.  But you probably

16   really paid attention to those presents because they were

17   really important to you.  So you allocated a lot of attention

18   to it.

19       And so fast forward.  Let's say you had a conversation

20   with a friend about that birthday party and they -- they're

21   saying oh, yeah, we had so much fun at that birthday party and,

22   you know, we popped all those blue balloons at the party.  And

23   our friend Jeff was there.  And, so, today you're telling me

24   about popping blue balloons and your friend Jeff.  And now

25   let's say I open up a photo album and show you that there

1   weren't any balloons there and your friend, Jeff, wasn't there.

2   And, so, how could something like that happen?  Well, again,

3   having a conversation with your friend and then suggesting the

4   color of the balloons, or if there was balloons, you can

5   incorporate that into your memory.  Maybe you recalled your

6   friend, Jeff, there because you think back and, well, Jeff was

7   my best friend when I was young.  He certainly must have been

8   at my party.  Your brain will just -- will fill that

9   information in.  And, so, those assumptions that our brain

10  makes, again, these aren't necessarily conscious decisions.

11  You're not thinking Jeff had to be there, therefore, I'm

12  putting it in my memory.  Your brain is just going to stuff

13  that together.  And, so, I basically use this as an example to

14  say, yeah, you're going to remember those presents.  You're

15  probably going to describe them well because maybe you paid

16  attention to it.  Maybe you're going to remember a friend that

17  wasn't there because they were a friend, and I just made that

18  assumption.  Maybe you make an incorrect assumption about the

19  balloons because your friend suggested that.  But that's

20  basically how memory works.  We stitch everything together.

21  It's called a constructive process.

22       Q    And are you familiar with the fallibility of

23  eyewitness memories in criminal cases?

24       A    I am.

25       Q    What do we know about whether there are faulty

1    eyewitness identifications?

2        A    So, the statistics I would give if you were in my

3    psychology and law class is you can look at the innocence

4    project who's -- it's an organization that looks to exonerate

5    individuals claiming innocence where there is incontrovertible

6    DNA evidence.  And if you look at just those cases, I believe

7    there's approximately 350 exonerations, and in roughly 70

8    percent of them, faulty eyewitness memory or ID played a role

9    in that wrongful conviction.  And so here are cases where we

10   know -- we know what happens because we had the DNA to go back

11   and see that an error was made.

12       Q    If the police conduct a show-up, what procedural

13   safeguards should be employed?

14       A    So the American Psychology of Law Society recently

15   published a white paper outlining best practices for

16   identification procedures.  They specifically point out that --

17           MS. CHRISTIE:  I'm just going to object, Judge,

18       to the procedures of the police.  I realize he's here for

19       identification issues, but the procedures for the police

20       are not relevant in an 8-b case.

21           THE COURT:  Response?

22           MR. SHIELDS:  The response is that here the only

23       evidence whatsoever connecting Mr. Miller to the crime was

24       the show-up identification where he was identified,

25       allegedly, by the victim.  So it's relevant here.

1         THE COURT:  All right I'm going to overrule and

2    allow the doctor to give some testimony.  Give you some

3    leeway.

4    EXAMINATION BY MR. SHIELDS:

5         Q    I'm sorry, Doctor.  I think that you were describing

6    the procedural safeguards from the white paper?

7         A    Certainly.  So, that white paper specifically

8    mentions show-ups and how show-ups should be avoided because

9    there's a large body of research showing that show-ups are

10   inferior to a lineup.  And when I say lineup, I mean either a

11   physical lineup or a photo array.  They are -- I'll use that

12   word, I mean either of them.  And if you want me to clarify one

13   or the other, just stop me.  But lineups offer an advantage

14   over show-ups because in a lineup you can have known innocent

15   fillers, and in a show-up you only have the suspect.  So if you

16   have a witness who is inclined to choose, for any reason,

17   they're always going to choose the suspect, as opposed in a

18   lineup.  Let's say I have zero memory and I choose, for

19   whatever reason, well, there's a five out of six -- if there

20   are six people in the lineup, there's a five out of six chance

21   that I'm going to pick a known innocent filler and demonstrate

22   that I'm probably just highly unlikely to choose.  The paper

23   goes on to point out that if a show-up is conducted, then all

24   of the applicable safeguards that you could use in a lineup

25   should be used in a show-up.  So specifically, everything to

1    reduce the potential for biased cues.

2        So, what I mean by that is the instruction given to the

3    witness can bias him or her to choose or not to choose.  So

4    there's a large body of research showing you can influence a

5    witness to choose by saying things even as innocuous as take

6    your time, or I'm sure you'll do a good job.  There's research

7    showing that that changes the pattern of choosing with a

8    witness.  Any cues to suggest that choosing should be happening

9    in a show-up:  getting the suspect out of the police car,

10   having them in handcuffs, having them stand next to a police

11   car, having them stand with a police officer, these all have

12   the potential to influence the witness to choose.  Because

13   again, the witness could assume well, the police have picked

14   this person up for a reason.  That's why they're in handcuffs.

15   That's why they're here.  Contrast that with a lineup where you

16   can present photos in an unbiased way, not suggesting -- not

17   suggesting where the suspect is or even that there is a

18   suspect.

19       So, number one, reduce the potential cues for bias.

20   Number two is the witness should be alerted that the

21   perpetrator may or may not be present in the lineup.  And, so,

22   research shows that if you give a witness that instruction, it

23   increases the likelihood that they would say not here if the

24   guilty member was not actually being presented to them.

25       And so, again, a suggestive procedure where a witness

GOODSELL - DIRECT - SHIELDS                    325

1  feels inclined to choose in a show-up, they're always going to

2  show the suspect because there's only one person.  Without that

3  instruction that, you know, the perpetrator may or may not be

4  present here, well, if you have a situation where you're more

5  likely to choose and there's only one choice, again, you're

6  always going to choose the suspect.

7       So, in all cases, regardless whether it's a show-up, a

8  lineup, a witness should be told that the perpetrator may or

9  may not be present.  So that's the second one.

10      The third one -- the third recommendation was that all

11 these procedures should be videotaped and, so, no matter what

12 type of identification procedure is conducted, if it's video

13 recorded, then an expert like me or The Court can evaluate what

14 actually happened as opposed to relying on the recollections of

15 people after the fact.

16      And then lastly, the recommendation is to secure a

17 confident statement immediately after the identification.  So

18 there's a large body of research that shows if a lineup is

19 conducted in a fair manner; that is, all the members of the

20 photo array or the lineup match the description that the

21 witness gives, if unbiased instructions are given, perpetrator

22 may or may not be present, if it is conducted in a double blind

23 fashion -- which is a fancy term from basic science meaning

24 neither the witness nor the person administering the lineup

25 knows who the suspect is, that's what we call double blind --

1    if you conduct an identification procedure in that manner and

2    the witness makes a decision, if you get an assessment of their

3    confidence immediately after, well, then that assessment is --

4    is related to accuracy.  So, if they say they're highly

5    certain, then they're likely to be highly accurate in that

6    situation.

7         Unfortunately, in show-ups and then in situations where

8    the best practices are not followed, that relationship breaks

9    down.  So confidence and accuracy is less related.  And it's

10   even -- it's even further broken down as you get further away

11   in time.  So, for example, there's a phenomenon in my field

12   called the post-identification feedback effect.  I actually

13   published a paper on this.  It's a pretty cool study where we

14   show people a surveillance footage of somebody walking by, and

15   then we tell our participants this man goes on to shoot a store

16   security guard, and now you're a witness to them.  We have the

17   original police lineup.  We just want to see if you can pick

18   them out.  And so we show -- it's actually true, we show the

19   original police lineup, except we've removed the guilty person

20   from the lineup.  And, so, the witness doesn't know this.

21   Everyone chooses because we said hey, he's in here.  You got to

22   choose.  So everyone chooses, everyone's wrong.  That's part of

23   the study.  They don't know this.  Then they were randomly

24   assigned to get feedback.  So if you're in the feedback

25   condition and you choose number three, we tell that person good

1    job, that's the suspect.  If you're in the no feedback

2    condition and they choose number three, we don't say anything.

3    Then we asked a bunch of questions related to that experience:

4    How certain were you when you made your decision?  How good of

5    a view did you have?  How willing would you be to testify

6    against somebody in this situation.  And what we found is the

7    people that got the feedback said they were more certain, they

8    were more willing to testify.  They had a better view.

9         So what's happening here is when we make confidence

10   judgements, it is a retrospective judgment.  We're looking back

11   in time, accumulating the evidence, and saying, well, I must be

12   this sure.  The problem in -- the problem with eyewitnesses is

13   if you don't get the confidence right at the moment they make

14   the decision, other factors can influence that.  So a witness

15   can see evidence that's being accumulated, they can have

16   discussions with the police, or the prosecutor, or whomever,

17   and they can rely on that to make an assumption about whether

18   they were right or wrong at the time of the ID.  And, so, there

19   are -- there are documented cases of witnesses who express low

20   confidence at the time of the identification, but by the time

21   they come out at trial, they are 100 percent certain, or some

22   version of that, and that's known as the post-identification

23   feedback effect.

24        So, fair procedure, confidence assessment right at the

25   time of the identification.

1          Q    Based on your reviews of the evidence in this case,

2    were any of those procedural safeguards implemented for the

3    show-up identification conducted with Anthony Miller?

4          A    I do not see any of those safeguards implemented.

5          Q    All right.  Let's talk about other factors that

6    generally lead to errors.  Are there any specific factors that

7    lead to errors in eyewitness identifications?

8          A    So, in a case where I'm evaluating whether potential

9    errors could have happened, I'm looking at those three stages,

10   whether -- is there anything present that could have affected

11   the encoding, the storage, or the retrieval.  Is that what

12   you're asking me about, or are you asking about the procedure,

13   itself?

14         Q    Yes.  Actually, I think we talked about this already,

15   right?  The factors that could affect encoding.  That would be

16   things like were they paying close attention, right?  We talked

17   about earlier?

18         A    Certainly.  Anything that could distract your ability

19   to allocate attention.  So we talked about if it was dark, if

20   the encounter was brief, if there was a weapon present, if it

21   was stressful, and if it was a cross race situation.  I'm not

22   -- actually, now that I say that, I don't know if we discussed

23   cross race.

24         Q    Sure.  Can you talk about cross race a little bit?

25         A    Certainly.  I'm sorry.  Just like if you were sitting

1    in one of my classes, I might come up with another idea to talk

2    about.  So the cross race effect is a well-documented effect in

3    my field showing that identification performance is reduced

4    when the individual trying to be identified is different than

5    -- is a different race, excuse me, than the person who is

6    trying to remember.

7         So, one time I had a Judge on the stand ask me if this was

8    kind of a prejudice type of a situation, and I said, well, you

9    could certainly decide that I'm prejudiced against a particular

10   type of person and consciously choose not to pay attention to

11   them, but that's not what I'm talking about here.  The way the

12   research describes this is you grow up around -- typically you

13   grow up around people of your own race.  And just like when

14   you're hearing your parents talk for the first time, you're

15   learning the sounds of your language.  You're also learning

16   what features are going to help you tell the difference between

17   person A and person B, and so you grow up learning those

18   particular features, again, typically of people of your own

19   race.  And therefore, much later on when you're trying to tell

20   the difference between two people of a different race, you

21   might be relying on the wrong features, on the wrong things.

22   And so it's not a prejudice thing, it's just a skills thing.

23        Q    And so let's turn to the issues in this case.  Have

24   you familiarized yourself with the facts of this case?

25        A    I have.

1      Q     Did you review the materials listed in Appendix H of

2   your report?

3      A     Yeah.  You provided me with a Drop Box that had all

4   the materials that are listed in the appendix.

5      Q     Okay.  And were there certain documents that you

6   focused on that were listed in that appendix?

7                  MR. SHIELDS:  If we could just put that up?  I

8         think that would be Exhibit 63.  And the last two pages.

9   EXAMINATION BY MR. SHIELDS:

10     Q     Okay.  And Doctor, is that an accurate list of the

11  materials that you were provided with?

12     A     It is.

13     Q     Okay.  And so from your review of this evidence, were

14  there any factors present that could have had an adverse impact

15  on the accuracy of the eyewitness identification in this case?

16     A     There were.

17     Q     Can you describe those, please?

18     A     So, we know the crime took place in the evening under

19  less than ideal lighting situation.  The encounter was brief.

20  There was a weapon brandished, and the individual was a

21  different race than the victim.  All of those factors I just

22  mentioned were -- that could affect the encoding phase were

23  present at the robbery in this case.

24     Q     Okay.  Do you remember about what time the crime took

25  place?

1      A    I remember it -- I believe it was in the 8:00 hour.

2    I could be wrong.  I remember it being after sunset because I

3    had to look up whether it was dark that night.

4      Q    Okay.

5              MS. CHRISTIE:  Judge, I'm just going to object

6         to his qualifications on that ground.  I think we need to

7         know what the weather was so we can know what the cloud

8         conditions were and the lighting conditions that would

9         affect, you know the lighting conditions at any given time

10        of day, depending upon the brightness of the sun and

11        coverage by the clouds.

12             THE COURT:  I'll allow you to get into that on

13        your cross.  I'll overrule.

14   EXAMINATION BY MR. SHIELDS:

15     Q    Based on your review of the evidence, did -- was

16   there any testimony about it being dark outside at the time?

17     A    I believe there was testimony in one of the

18   depositions, but I'd have to go back and look.  I don't

19   remember.

20     Q    Do you remember any testimony about there being

21   street lights on?

22     A    I do remember reference to street lights, yes.

23     Q    Okay.  So it wasn't daylight, right?

24     A    Correct.

25     Q    Okay.  And when you're talking about encoding, can

1    you encode a better quality image with more lighting?

2        A    Yes.  So any situation, it's -- it's -- I don't view

3    it as my job to say there was enough light or there wasn't

4    enough light to encode something.  I view it as these are

5    factors that we know affect your ability to encode.  When it is

6    brighter, you have a better image on the retina.  Therefore,

7    you can encode something better.  And, so, as you saw in my

8    report, I simply pointed out that it was in the evening.  Light

9    was reduced relative to it being full sun.

10       Q    When you referenced the encounter being rather brief,

11   do you remember the testimony about the length of the

12   encounter?

13       A    If memory serves me, somewhere I came across twenty

14   to thirty seconds as being the exchange.  I believe I wrote

15   that in my report.

16       Q    Okay.  And so when -- in your research and in your

17   work, is about a thirty-second time period, is that -- compared

18   to other observations and the ability to encode, how does that

19   compare?  How does that length of time compare?

20       A    Certainly.  So, it would be nice if there was some

21   magic line where we said well, given this much time or more,

22   memory's great.  Unfortunately, that's not how it works.  I

23   would simply point out that within thirty seconds is not a lot

24   of time to allocate your attention across an individual, and a

25   weapon, and everything else around the scene.  Also with the

1    factors of it being stressful, cross race, the weapon.  So,

2    again, I'm not -- I can't say that thirty seconds is an exact

3    time that means a particular performance, but I can say

4    relative to forty seconds, fifty second, et cetera, it is

5    worse.

6        Q    Okay.  Now, when you add all of the factors together,

7    does that have an impact on the ability to encode?  For example

8    if it was only a stressful situation that involved a cross

9    racial identification, would that person be able to encode

10   better than a stressful situation with a cross race

11   identification that also involved a gun?

12       A    So any -- any additional factor that -- that we know

13   can negatively impact your memory performance or your

14   identification performance could compound if there are these

15   additional factors present, yes.

16       Q    How about distance of the observation?  How does that

17   affect one's ability to encode?

18       A    Yeah, it's a common discussion -- topic of discussion

19   in my class when we talk about distance, and the fact that I

20   think a lot of my student don't realize how little distance you

21   need to be away from something before the quality of the image

22   really drops.  When you see estimates of individuals across the

23   street, or ten, or twenty feet away, that's -- that's actually

24   a pretty far distance in terms of being able to encode

25   fine-grain details.

GOODSELL - DIRECT - SHIELDS                334

1      Q    And how is distance a factor -- well, let me withdraw

2   that.  In this case there were two identifications made, right?

3   That you reviewed?

4      A    That's correct.

5      Q    Okay.  What can you say about the alleged bike rider

6   at the scene in terms of distance affecting memory accuracy?

7      A    Well, if I'm understanding the situation correctly,

8   this bike rider was across the street from where the victim

9   was.  So, that is a fairly large distance to try to encode

10  fine-grain details, especially within the shortened amount of

11  time that we just discussed.

12     Q    So you discussed the difference between a show-up and

13  a lineup, briefly, earlier.  Can you tell us, are there any

14  factors that make show-up -- let me withdraw that.  In your

15  field, are show-up identifications considered inherently

16  suggestive?

17     A    Yes, they are.

18     Q    Okay.  Can you explain that?

19     A    Well, as I was alluding to earlier, a show-up

20  contains only one individual.  Therefore, the show-up always

21  has the suspect and any choice of the suspect is a positive

22  identification.  As I was discussing earlier, in a lineup or a

23  photo array, someone who is simply guessing, for example, would

24  be highly likely to put that choice on one of those known

25  innocent fillers, and therefore, the police would know that

1    that person is probably guessing.  In a show-up you don't have

2    that information.  There is no protection against someone who

3    is guessing or simply highly inclined to choose.  It's

4    suggestive in nature because, again, these -- these are often

5    conducted with the police present, and the police know who the

6    suspect is.  And in situations, that could be viewed as

7    suggestive in a way to make me want to choose.

8         Q    And can you explain the concept of confirmation bias?

9         A    Certainly.  So, if you were in my cognitive

10   psychology course, we talk about all sorts of heuristics that

11   we rely on.  I mentioned earlier that we're cognitive misers.

12   We've evolved to try to use -- try to use our mental capacity

13   as efficiently as possible.  So, again, why spend time over

14   thinking every single element in our environment, every single

15   decision.  We need to be quick and efficient with our thinking

16   and our decisionmaking.  So, we rely on these heuristics and

17   biases, one of which is the confirmation bias.

18        Confirmation bias says that we tend to favor information

19   that supports our preexisting hypothesis.  The example I might

20   give in a class is we've probably all had a friend that was in

21   a relationship with someone that we could clearly see it wasn't

22   a good match.  Yet when we talked of that individual about that

23   relationship, all they do is tell you about how great the

24   person is, or some good times that they have had.  And, so,

25   they're highlighting what they want to focus on, which in this

1  example they want to be in that relationship and probably

2  ignoring other evidence, like the fact that maybe they argue,

3  or they don't share similar interests, or whatever the example

4  might be.  And so, again, confirmation bias is that we seek out

5  information to confirm our preexisting belief, and we downplay

6  or ignore information that goes contrary to that.

7       In fact, in good science we have to be very cognizant of

8  the confirmation bias, because if you're only focusing on

9  information that supports your hypothesis, you might be

10 ignoring information that could potentially falsify it.  That's

11 why, in a scientific test, your hypothesis needs to be

12 falsifiable.  You need to be able to prove that this thing can

13 be proven wrong, or it's not a true test in a scientific term.

14      Q    And how can confirmation bias affect a criminal

15 investigation?

16      A    So, confirmation bias in a criminal investigation can

17 come up with anyone involved developing a hypothesis about a

18 suspect and focusing on -- only on information that supports

19 that hypothesis, and downplaying or ignoring information that

20 doesn't support that hypothesis.

21      Q    Is there research that supports that?

22      A    Yes, forensic confirmation bias.

23      Q    And did you see any evidence that confirmation bias

24 could have occurred in this case?

25      A    Well, yeah.  I certainly can't say whether it was

1  happening, but the potential was there.  So, for example, we

2  know that the suspect was apprehended approximately a half a

3  mile away, roughly.  I believe it was five minutes after the

4  event occurred, which would have required the individual to

5  have to run a half a mile in unlaced Timberland boots, I

6  believe the description was.  And the identification the

7  individual said -- who made the positive ID said that the

8  suspect had changed their clothes.  So this is a situation

9  where a half a mile run, disposing of whatever was robbed and

10 the weapon, and changing clothes, and not looking winded.  I

11 didn't see any evidence in the report that would have supported

12 the facts of the case.  And so, if -- if the hypothesis was

13 that a particular suspect was the guilty person and this

14 evidence was present that didn't go along with that, then that

15 could be an example of this potential confirmation bias.

16      Q    How about -- you mentioned the clothing.  Is there

17 something called a clothing bias?

18      A    So, there are documented cases of wrongful conviction

19 where individuals were identified because they had a particular

20 item of clothing that was described by a witness or a victim.

21      Q    Okay.  And in this case was the mismatch in the

22 clothing that the victim told 9-1-1 and the clothing that Mr.

23 Miller was found wearing when he was stopped, is that mismatch

24 in the description problematic?

25      A    So, if -- clothing is a commonly-provided descriptor

GOODSELL - DIRECT - SHIELDS                          338

1    and -- and if it is distinctive in the sense that it is

2    something memorable, then you would expect those to match

3    between the description and the identification.

4         Q    Can you talk about what are some of the best practice

5    recommendations for conducting eyewitness identifications?

6              MS. CHRISTIE:  Objection to the best practices

7         for the police.

8              THE COURT:  Response?

9              MR. SHIELDS:  This is his field of study, best

10        practices.  He'd be the person that would help police

11        departments develop best practices.

12             MS. CHRISTIE:  This case isn't against the RPD.

13        The police are not the defendants, so it's just not -- the

14        case law is pretty clear, it's not the actions of the

15        police that are supposed to be addressed in this trial.

16             THE COURT:  All right.  I'm going to sustain the

17        objection.  You can move on.

18             MR. SHIELDS:  Okay.

19   EXAMINATION BY MR. SHIELDS:

20        Q    How did the procedures in this case deviate from best

21   practices?

22             MS. CHRISTIE:  Same objection.

23             THE COURT:  I'll sustain the objection.

24   EXAMINATION BY MR. SHIELDS:

25        Q    Can you describe the show-up identifications that

GOODSELL - DIRECT - SHIELDS                         339

1   were conducted in this case?

2       A    So my understanding is the individual who was later

3   identified to be on the bicycle across the street was presented

4   first.  And then the individual who was identified as the

5   perpetrator of the crime was identified second.  My

6   understanding is they were presented from approximately twenty

7   feet away, on the street near the scene of the crime.

8       Q    Do you remember what time that occurred?

9       A    I don't remember the exact time, but I would -- the

10  lighting conditions would have been similar because it wasn't

11  that far into the future when they conducted the show-up.  And,

12  so, in the same -- in the same vain, when I talked about

13  lighting and distances being an issue at encoding, it can also

14  be an issue at identification if you're trying to make an

15  identification of someone from a far distance at night.  All

16  those factors are at play, as well.

17      Q    How did the order of presentation -- how could that

18  have affected the identification, in this case, of Anthony

19  Miller?

20      A    Certainly.  So, we've talked about the suggestive

21  nature of show-ups being that it's a single suspect.  The

22  police are presenting this person.  It's reasonable to assume

23  that, as a victim, or a witness, it's reasonable to assume that

24  the police brought you the right person.  And in this

25  situation, the first identification is of the alleged bike

1  rider.  And so when I first reviewed that, I said well, that's

2  probably going to increase the likelihood that the next

3  individual presented would also be positively identified

4  because, again, you can link the two in your own mind.  So

5  potential for the increased bias was there because of already

6  making a positive ID and then showing another suspect right

7  afterwards.

8       Q    Are there any other issues that you identified in

9  terms of the show-up that was conducted in this case that we

10  haven't discussed?

11      A    I believe we reviewed -- I didn't see any evidence

12  that a warning of the perpetrator may or may not be present.

13  The problem of it being conducted at a distance at night with

14  the alleged perpetrator being the second identification.  I

15  believe -- I'm trying to remember -- I'm trying to remember if

16  that's everything we've covered.  I believe that's it.

17      Q    Do you remember anything about the investigator who

18  conducted the show-up identification?  Was there anything from

19  the evidence that stood out about the investigator, himself?

20      A    There was a statement I read where the investigator

21  pointed out that he had had a prior encounter with the

22  individual who was identified.  And so I can't -- I certainly

23  can't speak to whether that played a role in confirmation bias,

24  but I would leave that up to The Courts to make their own

25  determination about that.

1     Q    So that's a factor that could potentially indicate

2     confirmation bias?

3     A    It could play a role, yes.

4     Q    And Doctor, based on your review of the evidence and

5     your expertise in the field, what is your expert opinion

6     regarding the reliability of the eyewitness identifications in

7     this case?

8     A    Well, as we've discussed, there were several factors

9     that would lead me to question the reliability of the

10    identification in this case.

11    Q    Okay.  And do you believe that the identification

12    procedures used in this case were flawed?

13              MS. CHRISTIE:  Objection; Identification

14        procedures (inaudible.)

15              THE COURT:  I'll overrule.

16    EXAMINATION BY MR. SHIELDS:

17    Q    You can answer.

18    A    Well, I can certainly speak to a large body of

19    research that shows that show-ups are inferior to lineups.  And

20    when I use the phrase "inferior," the research shows that the

21    ability to accurately discriminate a guilty from an innocent

22    suspect is higher in lineups than it is in show-ups.

23    Q    Okay.  And what is your overall conclusion about the

24    identification of Anthony Miller as the perpetrator of the

25    robbery in this case?

 1                    MS. CHRISTIE:  Objection.  That's for The Court

 2        to decide.

 3                    THE COURT:  I'll sustain.

 4    EXAMINATION BY MR. SHIELDS:

 5        Q    What is your overall conclusion about the reliability

 6    of the identification of Anthony Miller as the perpetrator of

 7    the robbery in this case?

 8                    MS. CHRISTIE:  Same objection.

 9                    THE COURT:  I'll overrule on that.

10    EXAMINATION BY MR. SHIELDS:

11        Q    So you can answer.

12        A    Oh.  So again, my role is not to say whether anyone

13    is right or wrong, but there were several factors present in

14    this identification that would lead me to question the

15    reliability of the identification.

16        Q    And do you hold the opinions you gave here today to a

17    reasonable degree of certainty in the field of psychology?

18        A    I do.

19                    MR. SHIELDS:  Thank you.  No further questions.

20                    THE WITNESS:  You're welcome.

21                    THE COURT:  Thank you.

22                    MS. CHRISTIE:  Judge, can we take a five-minute

23        break?

24                    THE COURT:  All right.  We'll take a five-minute

25        recess.  We'll come back at -- (inaudible).

 1    *(The Court recessed the proceedings at 2:40 p.m.; resumed*

 2    *2:50 p.m.)*

 3                    THE COURT:  We'll start with the cross at this

 4        point.  Doctor, I just want to remind you, you're still

 5        under oath.

 6                    THE WITNESS:  Thank you.

 7    CROSS-EXAMINATION BY MS. CHRISTIE:

 8        Q    Good afternoon, Doctor.

 9        A    Good afternoon.

10        Q    So, you indicated in response to questioning by Mr.

11    Shields that you're an experimental psychologist, correct?

12        A    That's correct.

13        Q    And that means that you're not a clinical

14    psychologist, right?

15        A    That's correct, I'm not.

16        Q    You don't provide counseling to people?

17        A    I do not.

18        Q    And because you're not a clinical psychologist, is it

19    fair to say that you're not board certified?

20        A    I am not board certified.

21        Q    That's because you don't need it because you don't

22    provide counseling?

23        A    Correct.

24        Q    When you did your analysis, did you assume -- let me

25    rephrase that.  Is it fair to say that you did not assume that

GOODSELL - CROSS - CHRISTIE                          344

1    Mr. Miller was wrongfully identified as the robbery suspect, is

2    that correct?

3         A    That is correct.

4         Q    And is it fair to say that you did not assume that he

5    -- that Mr. Miller was wrongfully convicted of the robbery?

6         A    This case, with any case, I look at just the factors

7    that are relevant to my expertise.  So I don't make any

8    assumptions about guilt or innocence.

9         Q    And when you testified in response to questioning by

10   Mr. Shields that you conducted experiments, that's what you do

11   as an experimental psychologist, correct?

12        A    Correct.  Part of my job.

13        Q    And when you do those experiments, they are -- when

14   you do experiments surrounding crime scenarios, they're mock

15   crimes, correct?

16        A    Correct.

17        Q    So you have mock victims?

18        A    Yes.

19        Q    Right.  And mock suspects?

20        A    Yes.

21        Q    And mock criminal situations?

22        A    Correct.

23        Q    When you bring people in for those, are they

24   students, are they volunteers, or something else?

25        A    In the lab it's typically students.  We also run

1   online research where it's -- it could be anyone volunteering.

2        Q    And people could be volunteering, and maybe students

3   get credit for it, or do they get paid for it, or something

4   else?

5        A    In some cases they're doing it for course credit.  In

6   other cases they might be getting paid, yes.

7        Q    But you're not doing experiments that deal with real

8   crimes?

9        A    We are not conducting real crimes in my lab.

10       Q    And the experiments that you're conducting are in a

11  controlled setting, maybe at the university?

12       A    That's correct.

13       Q    Or somewhere else?

14       A    Yes.

15       Q    And are you controlling the variables for those

16  experiments?

17       A    So, what do you mean by controlling the variables?

18       Q    Well, do you determine the nature of the crime and

19  what the person -- what the mock victim witnesses and what the

20  mock suspect does?

21       A    Yes.

22       Q    Now, you were not at the location, of course, of the

23  robbery on September 25th, 2013?

24       A    I was definitely not.

25       Q    So you're not a witness in any way to this?

```
 1          A    I am not.

 2          Q    In preparation for your analysis and report, you did

 3     not interview Jack Moseley, the victim of the robbery?

 4          A    I did not.

 5          Q    And you did not interview Investigator Wengert?

 6          A    I did not.

 7          Q    In fact, is it true that you didn't interview any of

 8     the Rochester Police Department officers involved with that

 9     investigation and arrest?

10          A    That is true.

11          Q    And is it also true that you never interviewed Mr.

12     Anthony Miller?

13          A    That's true.

14          Q    You testified in response to questioning by Mr.

15     Shields that some of the factors that can affect memory,

16     particularly in an identification situations.  And I believe

17     you said one of the factors is how good of a view the person

18     had?

19          A    That's true.

20          Q    And one of the factors is did the person making the

21     identification realize at the time of the event that there was

22     a crime occurring?

23          A    Yes.

24          Q    That's one of the factors?

25          A    The intent behind making a memory.  So, for example,
```

GOODSELL - CROSS - CHRISTIE                    347

1    if I came -- if I came to you and said, you know, what did the

2    cashier at Wegman's look like last week when you were there,

3    you could say something like well, I had no reason to pay

4    attention to that person, so how would I know.

5        Q    Right.  So if something happens and you say to

6    yourself this is an important event, I need to make note of

7    this.  That would be something that would affect the memory,

8    potentially?

9        A    Yes.

10       Q    So if somebody has a gun to somebody's head, they

11   might -- well, probably realize that a crime is occurring, is

12   that correct?

13       A    I would assume so, yes.

14       Q    Is it fair to say that stress affects all people

15   differently?

16       A    That's fair.

17       Q    And you did not interview Mr. Jack Moseley, the

18   victim of the robbery on September 25th, 2013?

19       A    I did not.

20       Q    And, so, is it fair to say you don't know how the

21   stress of the situation would have affected him specifically?

22       A    That's fair to say, yes.

23       Q    You indicated in response to questioning by Mr.

24   Shields that -- you mentioned a gun earlier.  That the presence

25   of a gun can make it difficult for a person to observe specific

1    parts of the event.  Is that true?

2        A    That's true.

3        Q    Things such as the color of somebody's shirt?

4        A    Yes.

5        Q    And things such as the material of somebody's pants?

6        A    Yes.

7        Q    In reviewing this case, Dr. Goodsell, did you review

8    the supporting deposition of Jack Moseley?  And I can -- if you

9    don't remember and you need me to, I think I can show it to

10   you.  I think it's an exhibit.

11       A    I don't remember.  There was a lot of stuff for me --

12       Q    Let me --

13                  MR. SHIELDS:  34.

14                  MS. CHRISTIE:  Okay.  If we could put 34 up on

15       screen?  I think it's actually in evidence.

16                  MR. SHIELDS:  It is.

17                  MS. CHRISTIE:  Okay.  Thank you.  Can you scroll

18       down a little bit, Jen?  I just want to -- yes, this is

19       the one.

20   EXAMINATION BY MS. CHRISTIE:

21       Q    Doctor, if you could just take a moment and review

22   this to yourself and just let me know when you have had a

23   chance to review it?

24       A    I've read everything that's on the screen.

25                  MS. CHRISTIE:  Ms. Purdy, if you could just

GOODSELL - CROSS - CHRISTIE                    349

1          scroll the screen just so you maybe see -- so you see

2          everything up until the signature, Doctor.

3                    THE WITNESS:  Okay.

4    EXAMINATION BY MS. CHRISTIE:

5          Q    Have you had a chance to review Exhibit 34 which is

6    in evidence?

7          A    Yes.

8          Q    Had you read that prior to preparing your report?

9          A    I believe I have.

10         Q    And you indicated in response to questioning by Mr.

11   Shields that you expressed the importance of having the person

12   who's conducting the show-up saying, "The person who committed

13   the crime may or may not be present," correct?

14         A    Correct.

15         Q    And I believe you indicated in response to

16   questioning by Mr. Shields that that part of the procedure

17   wasn't used here.  Do you remember that testimony?

18         A    I do.

19         Q    Do you see in the deposition, and it was documented,

20   that statement was made?

21         A    I do see that he says -- I -- "asked me if I would

22   take a look at two guys that may or may not have been involved

23   in the incident."

24         Q    Thank you, Doctor.  Doctor Goodsell, were you aware

25   that Mr. Miller was not in handcuffs at the time of the

GOODSELL - CROSS - CHRISTIE                          350

1  show-up?

2      A    Sitting here right now I can't tell you whether he

3  was or wasn't.

4      Q    Based upon what you read, do you have any reason to

5  believe that -- I'll strike that.  Based upon what you read, is

6  it fair to say that the victim, Jack Moseley, was close to the

7  individual who robbed him at the time that the robber placed a

8  gun to his head?

9              MR. SHIELDS:  Objection.

10             THE WITNESS:  Proximity in distance?

11             MS. CHRISTIE:  Yes, sir.

12             THE COURT:  The basis for your objection?

13             MR. SHIELDS:  What does she mean by close?

14             THE COURT:  All right.  Objecting to form.  If

15      you could rephrase?

16             MS. CHRISTIE:  Sure.

17 EXAMINATION BY MS. CHRISTIE:

18     Q    Did you learn information -- did you read information

19 that gave you data regarding the distance between the person

20 who robbed Jack Moseley and Jack Moseley at the time of the

21 incident?

22     A    I interpreted it as close in the sense that I believe

23 he said he placed the gun on his head and robbed him.  So that

24 would --

25     Q    So the person had to be close enough to him to be

GOODSELL - CROSS - CHRISTIE                    351

1    able to reach to put the gun to his head?

2        A    Yes.

3        Q    And does that closeness factor increase the

4    likelihood that the identification that victim makes would be

5    accurate?

6        A    Relative to an encoding situation with a -- the

7    further distance, yes.

8        Q    Understood.  And from your review of the materials in

9    this case, I believe you indicated earlier, is it fair to say,

10   that Jack Moseley knew that a crime was going on at the time?

11       A    It would be reasonable to assume that.

12       Q    And does that factor increase the likelihood of a

13   correct identification by that victim?

14       A    It makes the intent to encode greater relative to not

15   knowing that a crime was going on.

16       Q    So everything -- everything is relative to other

17   hypothetical scenarios, correct?

18       A    Certainly.

19       Q    And is it fair to say, based upon everything that you

20   read, that Jack Moseley recognized the need to remember the

21   information at a later date while the crime was occurring?

22       A    Well, I certainly can't speak to his mental state or

23   anything beyond the fact that we know he called 9-1-1 and made

24   a report.

25       Q    And does that fact make it more likely, compared to

 1    other scenarios, that Mr. Moseley would be able to accurately

 2    identify the person who robbed him?

 3        A    Is the question:  Is the fact that he called 9-1-1

 4    make it more likely that he could accurately identify someone?

 5        Q    The fact that he knew he needed to remember the

 6    information.

 7        A    In a hypothetical, if you know you need to remember

 8    something later, you're more likely to encode it than if you

 9    are unaware that you need to remember something later.

10        Q    Thank you.

11        A    You're welcome.

12        Q    Doctor Goodsell, from everything you reviewed in

13    order to prepare your analysis in this case, is it fair to say

14    that the show-up procedure occurred within fifty minutes of the

15    time the robbery occurred?  Fifty.  Five-zero.

16        A    I believe it was within an hour, yes.

17        Q    And does the short duration of time between the time

18    the robbery was committed and the time of the show-up increase

19    the likelihood of a correct identification?

20            MR. SHIELDS:  Objection.  Objection to the form

21        characterizing fifty minutes as a short amount of time.

22            THE COURT:  I'll sustain.  Rephrase.

23            MS. CHRISTIE:  What was that?

24            THE COURT:  He objected as to form, as to the

25        characterization of fifty minutes being a short period of

1      time.

2                  MS. CHRISTIE:  Oh.  Okay.

3    EXAMINATION BY MS. CHRISTIE:

4      Q    The particular length of time, in this case, between

5    the time of the robbery and the time of the show-up ID, does

6    that increase the likelihood of a correct identification by Mr.

7    Moseley?

8      A    Relative to what?

9      Q    Relative to something longer?

10     A    So we know memory tends to fade with time, so you

11   want to test memory when it's fresh.  So in a relative sense,

12   you want less time going by.

13     Q    If a crime victim identifies an assailant or a

14   suspect -- a crime victim accuses -- identifies a suspect as

15   having a chin strap beard and the person who committed that

16   crime has a chin strap beard, does that mean the victim

17   properly encoded and properly retrieved the memory?

18                  MR. SHIELDS:  Objection.  There's no evidence

19         that he identified him as having a chin strap beard.

20         That's not what he told 9-1-1.

21                  MS. CHRISTIE:  It's in the supporting deposition

22         which is in evidence.

23                  THE COURT:  It is contained --

24                  MR. SHIELDS:  -- by Wengert.

25                  THE COURT:  I'm sorry?

 1              MR. SHIELDS:  The deposition was written by

 2        Investigator Wengert.

 3              THE COURT:  I will allow you to answer the

 4        question.  Overruled.

 5              THE WITNESS:  Could you restate it?

 6    EXAMINATION BY MS. CHRISTIE:

 7        Q    I think so.  Let me just say -- rather than have it

 8    read back, let me just think for a second.  If a crime victim

 9    identifies a suspect as having a chin strap beard and the

10    person who committed the crime has a chin strap beard, does

11    that mean that the victim properly encoded the memory and

12    properly retrieved the memory?

13              MR. SHIELDS:  Objection.  Objection; form.

14              THE COURT:  I'll overrule.

15              THE WITNESS:  It's a complex question, so I'm

16        thinking about it.  You would expect a description to

17        match the person being identified, and to the degree that

18        the description matched the person identified, I would

19        want to take that into account.  Does that answer what you

20        were asking me?

21    EXAMINATION BY MS. CHRISTIE:

22        Q    I think so.  Let me ask another -- let me ask another

23    similar question.  If a robbery victim identified a suspect as

24    being five-seven and the person who committed the crime was

25    five-six, does that mean that victim properly encoded and

1  retrieved the memory regarding the height?

2      A    In this situation you're saying the victim says a

3  person is five-seven and the suspect is five-six.  What does

4  that say?  It says, well, the suspect matches the description

5  to some degree.  I can't say whether that's accurate or not

6  because there are lot of five-six people out there.

7      Q    Okay.  I guess what I'm asking you -- well, let me

8  ask you this one.  If the victim identifies a suspect as having

9  tan Timberland boots and the person who committed the crime of

10 that victim had tan Timberland boots, does that mean the victim

11 properly encoded and retrieved that memory?

12                  MR. SHIELDS:  Objection.

13                  THE COURT:  Overruled.

14                  THE WITNESS:  So, any description given by a

15         victim where a suspect has the feature or qualities that

16         matched the description is -- would be reason to suspect

17         that individual.  I can't speak to the accuracy, though.

18                  MS. CHRISTIE:  Okay.  I understand.  Doctor, I

19         have no further questions.

20                  THE COURT:  Thank you.  Any redirect?

21                  MR. SHIELDS:  Thank you.

22 REDIRECT EXAMINATION BY MR. SHIELDS:

23     Q    Dr. Goodsell, is it fair to say that the first --

24 well, let me withdraw that.  What was the first description

25 provided by the victim in this case of the perpetrator?

1        A    It was the 9-1-1 call.

2        Q    And that was the closest in time to the event

3    occurring?

4        A    That's correct.

5        Q    And what was the description provided in the 9-1-1

6    call.

7                   MS. CHRISTIE:  Objection, assumes facts not in

8            evidence.

9                   MR. SHIELDS:  What?

10                  MS. CHRISTIE:  Assumes facts not in evidence.

11                  MR. SHIELDS:  The 9-1-1 call is in evidence.

12                  THE COURT:  Overruled.

13                  THE WITNESS:  It was a description describing, I

14           believe, a black man wearing a hoodie.

15   EXAMINATION BY MR. SHIELDS:

16       Q    Do you remember the color of the hoodie?

17       A    I believe it was gray.

18       Q    And do you remember the sort of pants he was wearing?

19       A    I don't at this moment.

20       Q    But is it fair to say because it's the closest in

21   time that that would be the most accurate description?

22       A    With any case that I look at, I want to look at what

23   assessment of memory do we have nearest the event.  So you want

24   to test memory when it's fresh.  Just like I've described,

25   memory can change over time.  You want to look at the

1  additional -- the initial interview, the initial 9-1-1 call.

2  Those initial statements are the freshest test of memory.

3       Q    Okay.  And was there any description of a chin strap

4  beard in that initial 9-1-1 call?

5       A    I don't believe there was.

6       Q    And do you remember when the chin strap beard first

7  came into any of the evidence in this case?

8       A    I mean, it was after the 9-1-1 call, after -- I don't

9  recall if it was after the identification or not, but I believe

10  it was.  I could be wrong about that.

11       Q    Do you remember if it was after Investigator Nolan

12  Wengert spoke with the victim?

13       A    I believe it was.

14       Q    Does that -- the fact that it was later in time make

15  that a less reliable description?

16       A    Well, any opportunity where an individual could come

17  across additional information is a potential for that memory to

18  change.  So it's unclear to me where the source of the chin

19  strap beard came from.  All I know is that it didn't appear

20  till later, after the 9-1-1 call.

21       Q    So it could have possibly been suggested to him?

22            MS. CHRISTIE:  Objection; speculation.

23            THE COURT:  I'll overrule.

24            THE WITNESS:  It's possible.

25  EXAMINATION BY MR. SHIELDS:

1      Q    Okay.  Just a couple other follow-ups on a few

2   questions from Ms. Christie.  Can you explain why you did not

3   interview anybody as part of your analysis of this case?

4      A    Excuse me.  So I should point out that there is no

5   diagnostic test that I could conduct that would ever show me

6   whether a witness is accurate or inaccurate.  There is no

7   assessment that would tell me that the person's memory is a

8   true or a false memory.  And so my role is to look at the

9   evidence and identify factors that I know affect eyewitness

10  memory and eyewitness identification.  So speaking to anybody

11  involved is never necessary.

12     Q    So it's not something you ever do in any case?

13     A    It isn't something I've done so far, no.

14     Q    Okay.  So Ms. Christie -- is Exhibit 34 still on your

15  screen?  So Ms. Christie asked you about Exhibit 34.  Is it

16  still on the screen?  And she asked you whether it included the

17  words, "may or may not," correct?  Do you remember that

18  question from her?

19     A    I do remember the question, yes.

20     Q    And that's a different instruction than the police

21  having told the victim here that the individual being presented

22  may not have been involved in the crime, is that correct?

23     A    I simply read back what it says here.  "Two guys that

24  may or may not have been involved in the incident," so...

25     Q    So would it have been a better, less suggestive

GOODSELL - REDIRECT - SHIELDS                    359

1    instruction if they had said to him instead, we're going to

2    present you two guys who may not have been involved in the

3    crime?

4                    MS. CHRISTIE:  Objection to the reference of the

5        police procedure.

6                    THE COURT:  Response?

7                    MR. SHIELDS:  This is in response to the

8        questions that Ms. Christie asked.

9                    THE COURT:  I'll overrule.

10                   THE WITNESS:  Can you restate the question,

11       please?

12   EXAMINATION BY MR. SHIELDS:

13       Q    Oh, sure.  It would be a different question if the

14   police had said to the victim:  We're going to present to you

15   two individuals.  They might not have been involved in the

16   crime?

17       A    It's reasonable to assume that might have been

18   interpreted differently.

19       Q    Okay.  Would that have been a less suggestive way to

20   instruct the victim?

21       A    I believe the standard instructions, "may or may not

22   be the perpetrator" are standard, so...

23       Q    Okay.  Now, do you remember reviewing the trial

24   testimony of Jack Moseley?

25       A    I did read through it, yes.

1      Q    Do you remember him testifying that he was focused on

2    the gun at the time of the robbery?

3      A    I believe I referenced that in the report, yes.

4      Q    Okay.  And when someone's focused on the gun, would

5    that make the identification of their face less accurate?

6      A    The amount of time we spend allocating your attention

7    on a gun is time you are not allocating towards remembering

8    features of the face or how it looks.  And so yes, it could

9    negatively affect your ability to accurately recall that person

10   later.

11     Q    Is identification of someone's facial features later,

12   the recall, is that more difficult than identification of the

13   clothing that somebody was wearing?

14     A    Oh, that's an interesting question.

15     Q    Give you a research experiment.

16     A    Yeah, that's a great question.  I'd have to answer

17   you the way I would in a classroom if you were a student.

18   That's a really good question.  You should look up --  no.  I

19   don't -- I don't know.  That's a great question.

20          MR. SHIELDS:  Okay.  Thank you.  I have no

21      further questions for you.

22          MS. CHRISTIE:  Nothing further.

23          THE COURT:  Okay.  You're all set, Doctor.

24      Thank you.  All right, your final witness?

25          MR. SHIELDS:  Thank you, Your Honor.  We call

1    Reynaldo DeGuzman.

2              MS. CHRISTIE:  Judge, before we call him, I just

3    kind of -- I wanted to bring an issue to the Court's

4    attention.

5              THE COURT:  Sure.

6              MS. CHRISTIE:  So, I think The Court reserved --

7    in the motion to -- in the motion in limine regarding the

8    videos, The Court said the videos could come in with

9    proper foundation.  But the case cited by The Court was

10   Goldner - Kemper -- versus Kemper Insurance Company in

11   which an expert conducted experiments.  Here we don't have

12   any expert who conducted the experiments.  It seems to be

13   one that was set up by Mr. Shields, conducted by Mr.

14   Shields, with some person who participated.  But there's

15   nothing by the experts.  So I would ask that the video --

16   renew my request to preclude the video, and thereby

17   eliminate the need for Mr. DeGuzman to testify.

18             THE COURT:  All right.  First of all, there's

19   two videos, correct?  Which one are you looking to admit?

20             MR. SHIELDS:  82, Your Honor.

21             THE COURT:  And your response, for the record,

22   regarding Ms. Christie's renewed motion?

23             MR. SHIELDS:  I think that the distinction is

24   irrelevant.  And here it's demonstrative evidence that's

25   relevant to The Court's -- to the finder of fact's

1    determination and understanding of issues in this case.

2    So I don't think the distinction is dispositive.

3              The fact that it was an expert had nothing to do

4    with the outcome of that case that she cited.

5              THE COURT:  All right.  I'm going to reserve,

6    but I'll allow Mr. DeGuzman to testify.  Regarding the

7    curriculum vitae of Dr. Goodsell, who just testified, I

8    reserved on that.  Any objection to admitting that?

9              MS. CHRISTIE:  You qualified him.  I have no

10    objection to the CV coming in.

11              THE COURT:  All right we'll mark that as

12    received.

13              MR. SHIELDS:  Thank you.  And Dr. Peterson, as

14    well?

15              MS. CHRISTIE:  She was qualified.  I have no

16    objection to that either.

17              THE COURT:  We'll mark that as received, also.

18    (CLAIMANT'S EXHIBIT 66 WAS RECEIVED IN EVIDENCE; CLAIMANT'S

19    EXHIBIT 64 WAS RECEIVED IN EVIDENCE.)

20              MR. SHIELDS:  Thank you, Your Honor.

21              THE COURT:  We're ready.

22              COURT DEPUTY:  Stand right here and face the

23    clerk and raise your right hand.

24    R E Y N A L D O   D e G U Z M A N,

25              Called herein as a witness on behalf of the

DeGUZMAN - DIRECT - SHIELDS                    363

1       Claimant, being first duly sworn, testified as follows:

2                   THE CLERK:  State your name for the record.

3                   THE WITNESS:  Reynaldo DeGuzman.

4                   THE COURT:  Can you spell your last name, sir?

5                   THE WITNESS:  D-E capital G-U-Z-M-A-N.

6                   THE COURT:  Okay.  Thank you.  Just make sure

7       you speak into the microphone.

8                   THE WITNESS:  Okay.

9                   THE COURT:  All right.  Your witness.

10  DIRECT-EXAMINATION BY MR. SHIELDS:

11      Q    Good afternoon, Mr. DeGuzman.

12      A    Good afternoon.

13      Q    And can you just please tell us, what's your

14  occupation?

15      A    I'm a filmmaker and a cinematographer here in

16  Rochester.

17      Q    And how long have you been engaged in that

18  occupation?

19      A    For five years.

20      Q    And can you describe your current physical fitness

21  routine?

22      A    I try to run fifteen to twenty miles --

23                  MS. CHRISTIE:  Objection to relevance, Judge.

24                  MR. SHIELDS:  This goes directly to the

25      relevance of how quickly he was able to run the route in

1          the video.

2                    THE COURT:  I assume Mr. DeGuzman is the person

3          in the video?

4                    MR. SHIELDS:  Yes, Your Honor.

5                    THE COURT:  All right.  I'll allow it.

6    EXAMINATION BY MR. SHIELDS:

7          Q    So, I'm sorry, can you just describe your current

8    physical fitness routine?

9          A    Sure.  I run fifteen to twenty miles every week on a

10   trail, and I mainly box four sessions every week, and lift here

11   and there.

12         Q    Okay.  And do you regularly participate in, like, any

13   races or timed events?

14         A    No.  No.  I don't enjoy working out with people.

15         Q    Okay.  And can you just explain for The Court how you

16   got involved in this case?

17         A    I was contacted by you in order to run a route.  I

18   wasn't given much other information other than the clothes I

19   had to wear, which I found quite particular given the heat of

20   the summer.  And I agreed to do it and we did it, I believe, in

21   the beginning of summer, in May.

22         Q    Okay.  And do you remember any specific instructions

23   about how to perform the run?

24         A    I was told to run pretty hard.  No warmup time.  Just

25   given the starting coordinate and given the route.  And yeah,

1    we only ran one time.

2        Q    Did you receive any compensation for your

3    participation in the run?

4        A    I did.  I was paid $200.

5        Q    And do you remember the date that you performed the

6    run?

7        A    We ran May 3rd.  May 3rd of this year.

8        Q    And do you remember the beginning and the end, like,

9    the route?

10        A    Yes.  I think we started on Roslyn, took a right onto

11    Genesee, a right on Sawyer, a left onto Millbank, and we ended

12    up taking a right onto Bradburn.  Bradburn Street.

13        Q    Okay.  And was the run you performed in the video

14    recorded in a single continuous shot, or were there multiple

15    takes?

16        A    It was just a single -- single run, thankfully.

17        Q    All right.  How many times did you run the route

18    before the final video was recorded, if any?

19        A    It was just a single take.

20        Q    And did you discuss the conditions under which the

21    robbery allegedly took place?

22        A    I was given a brief overview.

23        Q    Okay.  And were you aware of the -- like the time the

24    robbery was -- supposedly occurred?

25        A    Yes, I was.

1    Q    Okay.  And did -- what time of day did the run occur?

2    A    It was in the morning, 10 or 11 a.m.

3    Q    And how come the run wasn't performed at night?

4    A    I simply didn't have the availability.

5    Q    And do you remember how long the run took?

6    A    You know, I don't.  It would probably be helpful and

7    embarrassing to see the video again, but we ran at a pretty

8    quick clip.  I believe it was a sub seven minute -- it would

9    have been a sub seven minute mile.  So three minutes,

10    something, half mile.

11            MR. SHIELDS:  Okay.  Judge could we --

12    EXAMINATION BY MR. SHIELDS:

13    Q    Would watching the video refresh your recollection of

14    how long the run took?

15    A    It would.

16            MR. SHIELDS:  Judge, could we play the video

17        that's marked as Exhibit 82 for identification?

18            THE COURT:  Yes.

19    EXAMINATION BY MR. SHIELDS:

20    Q    And Mr. DeGuzman, do you recognize that video?

21    A    I do.

22    Q    And was that you depicted conducting the run in the

23    video?

24    A    That was me.

25    Q    And is this a true and accurate depiction of the run

1   you performed on May 3rd, 2024?

2        A    Yes.

3        Q    And did the video accurately capture the conditions

4   of your run, including your physical state after the run?

5        A    Yes.

6        Q    After the run was performed, were you out of breath?

7        A    I was.

8        Q    Were you out of breath during the run?

9        A    No.  No, I felt -- I mean it looked like I was

10  struggling a bit more than I remembered, but no, I felt -- I

11  felt all right.  It was just towards the end, I think, the

12  melee of changing clothes kind of caught up to me, I think.

13       Q    And after the run were you sweating?

14       A    A lot, yes.

15       Q    And was that depicted in the video?

16       A    Yes.

17       Q    Could you see the sweat on your brow, on your face?

18       A    Yes.

19       Q    And could you see yourself breathing heavily in the

20  video?

21       A    I could.

22            MS. CHRISTIE:  Objection to the leading, and

23       objection to the relevance of what this person experienced

24       running, unless he was the person that committed the

25       robbery.

1              THE COURT:  All right.  I'll overrule.

2   EXAMINATION BY MR. SHIELDS:

3       Q    And what did you do after you arrived in front of 38

4   Bradburn Street -- or 31 Bradburn Street?

5       A    I had to switch my hoodie, take off my boots.  I took

6   off my jeans, I switched into a pair of tracksuit pants, put

7   the boots back on and then walked over to the other house on

8   Bradburn.

9       Q    Just going back to the questions.  Did you pay

10  attention to the time in the video that you started to run?

11      A    I did.

12      Q    What time was that into the video?

13      A    I started running about fifty-five seconds in and

14  ended four minutes and nineteen seconds, I think.

15      Q    Okay.  And so that would be about three and a half

16  minutes, is that right?

17      A    Yep.  Right under.

18      Q    And do you know how long the run was from 19 Roslyn

19  to 31 Bradburn?

20      A    It was a half mile.

21      Q    Okay.  And so there had been about a seven-minute

22  mile pace?

23      A    Yep.  Just under.

24      Q    And then did you pay attention to how long it took

25  you to change clothes?

1    A    I did.  Struggled with it a bit.

2    Q    About how long did it take you to change clothes?

3    A    It looked like two minutes.

4    Q    Okay.  So you got to the car at about 4:19 you said?

5    A    Yep.

6    Q    And then did you see what time you started to walk

7    across the street?

8    A    I didn't pay as good of attention.  I was more

9    interested in my time.

10   Q    So -- but that was an accurate depiction of how long

11   it took you to change clothes, right?

12   A    Absolutely.

13   Q    And then -- and then after you changed clothes, what

14   did you do next?

15   A    I had to walk across the street over to -- well, put

16   the clothes away, and then I had to walk across the street,

17   obviously, to the other house.

18   Q    And when you were conducting the run, like, how hard

19   were you running?

20            MS. CHRISTIE:  Objection.

21            THE COURT:  I'll overrule.

22            THE WITNESS:  I was running about eighty

23       percent, I would say.  Definitely not full out, but I was

24       giving a good effort.

25   EXAMINATION BY MR. SHIELDS:

1    Q    Okay.  And if you had been going full out, do you

2  think you could have run full out between those two locations?

3    A    I could have.

4    Q    And if you had run full out, how much more quickly do

5  you think you could have arrived?

6                MS. CHRISTIE:  Objection; speculation.

7                THE COURT:  I'll overrule.

8                THE WITNESS:  A bit arrogant, but I think I

9        could have got under three minutes.

10 EXAMINATION BY MR. SHIELDS:

11   Q    Okay.  If you'd gotten there in under three minutes,

12 would you have been breathing more heavily and sweating more?

13               MS. CHRISTIE:  Objection; speculation.

14               THE COURT:  Overruled.

15               THE WITNESS:  I would have been absolutely

16       heaving.  Yeah.

17 EXAMINATION BY MR. SHIELDS:

18   Q    And can you tell us what you were wearing during the

19 run?

20   A    I was wearing a pair of boots -- Nike boots, some

21 jeans with a belt, and I was wearing a black -- thick black

22 hoodie.

23   Q    Was it difficult to run at that pace wearing those

24 things?

25   A    It was unpleasant.

```
 1      Q    And were your boots laced or unlaced?

 2      A    They were laced.

 3      Q    If your boots had been unlaced, do you think you

 4 could have done the run as quickly?

 5                MS. CHRISTIE:  Objection; speculation.

 6                THE COURT:  Overruled.

 7                THE WITNESS:  I wouldn't have been able to run

 8      as quickly.  I still would have been able to run though.

 9 EXAMINATION BY MR. SHIELDS:

10      Q    And after completing the run, did you take any breaks

11 before changing clothes or proceeding over to 22 Bradburn?

12      A    No.  No breaks.

13      Q    And what clothing did you change into?

14      A    I changed into a running blue hoodie.  I changed into

15 a pair of tracksuit pants and the same pair of boots.

16      Q    And how are you feeling after you arrived over at 22

17 Bradburn Street?

18      A    Hot, sweaty, annoyed.

19      Q    And how did you first become aware of Anthony

20 Miller's case?

21      A    I first became aware of Anthony Miller's case, I

22 would say, a year and a half ago.  A good friend and colleague

23 of mine, Rob Bell, who writes for the U.S.A. Today --

24                MS. CHRISTIE:  Objection; relevance and hearsay.

25                THE COURT:  Response?
```

1          MR. SHIELDS:  Your Honor, this goes to potential

2     bias that we anticipate the State arguing.

3          THE COURT:  All right.  I'll overrule.

4          THE WITNESS:  Robert Bell, a columnist with the

5     U.S.A. today and Democrat and Chronicle approached me

6     about Anthony's, I guess, want to potentially make a

7     documentary about his experiences in life, and it was

8     something I was very, very interested in.  But due to

9     client work and other things, I wasn't able to follow up

10    on it.  And that was the first time that I learned about

11    his experience.

12 EXAMINATION BY MR. SHIELDS:

13    Q    Had you ever spoken with Anthony Miller?

14    A    No.  Unfortunately I wasn't able to reach out.

15    Q    So you never did any work or follow-up on actually

16 making that documentary?

17    A    No.  This is my first time that I've seen Anthony.

18    Q    And did you and I have any discussions about the

19 details of his case before you performed the run?

20    A    Briefly.  A brief overview.  You tried to convince me

21 to do it.

22    Q    Do you have any personal interest in the outcome of

23 this case?

24    A    I don't.

25          MR. SHIELDS:  Your Honor, based on the witness's

DeGUZMAN - CROSS - CHRISTIE                          373

1          testimony, I move to admit Exhibit 82 into evidence.

2                    MS. CHRISTIE:  Same objection that I made

3          earlier today and through the motion.

4                    THE COURT:  All right.  The Court will receive

5          it as demonstrative evidence.  We'll mark it as received.

6                    MR. SHIELDS:  Thank you, Your Honor.

7     (CLAIMANT'S EXHIBIT 82 WAS RECEIVED IN EVIDENCE.)

8                    MR. SHIELDS:  We have no further questions.

9                    THE COURT:  All right.  Ms. Christie?

10    CROSS-EXAMINATION BY MS. CHRISTIE:

11         Q     Good afternoon, Mr. DeGuzman.

12         A     Good afternoon.

13         Q     My name is Tamara Christie.  I just have a couple of

14    questions for you, sir.  You said in response to questioning by

15    Mr. Shields that I think your route was Roslyn Street, to

16    Genesee, to Sawyer, to Millbank, to Bradburn.  Is that right?

17         A     Yes.

18         Q     Who gave you that route?  Who told you to run that

19    route?

20         A     Google Maps and Elliot.

21         Q     Mr. Shields told you to run that?

22         A     Yes.  Yes.

23         Q     Did you create -- did you run any routes between 19

24    Roslyn and 22 Bradburn that included cutting through yards?

25         A     Other than avoiding the U-Haul and specifically the

DeGUZMAN - CROSS - CHRISTIE                    374

1  brown Buick, just a couple lawns I had to run over.

2      Q    Did you run any routes -- did you -- so you indicated

3  in response to questioning by Mr. Shields that you didn't run

4  any other routes, other than the one that was depicted in the

5  video, correct?

6      A    Yes.  Just that one.

7      Q    So you didn't do that run cutting through people's

8  backyards and jumping over fences, or anything like that?

9      A    No, I didn't.

10     Q    And did you run any routes that involved -- that

11  included you traveling at least partway by way of a motor

12  vehicle?

13     A    No.

14     Q    And did you run any routes or create any videos

15  between 19 Roslyn and Bradburn that included your traveling at

16  least partway by bicycle?

17     A    No.

18     Q    And you did not create any videos or run any routes

19  of all possible routes between 19 Roslyn and 22 Bradburn, is

20  that correct?

21           MR. SHIELDS:  Objection to form.  I was

22      confused.

23           THE COURT:  Overruled.

24           THE WITNESS:  Do you mind repeating that?

25  EXAMINATION BY MS. CHRISTIE:

1    Q    Sure.  Is it fair to say that you did not run any --

2  run -- let me ask you two questions.  Is it fair to say that

3  you did not run all possible routes between 19 Roslyn and 22

4  Bradburn?

5    A    Yes, I didn't.

6    Q    And of course, it's fair to say you didn't create any

7  videos of your runs between all possible -- of all possible

8  routes between 19 Roslyn and 22 Bradburn?

9    A    Yes.

10    MS. CHRISTIE:  Thank you, sir.  I have no

11    further questions.

12    THE WITNESS:  Thank you.

13    MR. SHIELDS:  No redirect, Your Honor.

14    THE COURT:  Mr. DeGuzman you are all set.  You

15    can step down.  Thank you.

16    THE WITNESS:  Thank you.

17    MS. CHRISTIE:  Thank you.

18    THE COURT:  Mr. Shields, you rest?

19    MR. SHIELDS:  Yes, Your Honor.

20    THE COURT:  All right.

21    MS. CHRISTIE:  Judge, I would just like to make

22    a 4401 motion, directed verdict, that the -- failure to

23    make a prima facie case of innocence in this case.

24    THE COURT:  All right.  I'll reserve on that.

25    In terms of closing comments?