FILED

OCT 0 1 2024

NYS COURT OF CLAIMS
ALBANY, N.Y.

STATE OF NEW YORK    COURT OF CLAIMS

ANTHONY MILLER,

                          Claimant,      DECISION

           -v-

STATE OF NEW YORK,                        Claim No.    135854

                          Defendant.

**BEFORE:**        HON. J. SCOTT ODORISI
                      Judge of the Court of Claims

**APPEARANCES:**   For Claimant:
                      ROTH & ROTH, LLP
                      By: Elliot D. Shields, Esq.

                      For Defendant:
                      LETITIA JAMES, ATTORNEY GENERAL
                      By: Tamara B. Christie, Assistant Attorney General

This is an unjust conviction and imprisonment Claim arising from an overturned robbery conviction. A unified trial was held at the Court of Claims in Rochester, New York on August 3-4, 2024. Based upon careful consideration of: the credible trial testimony; the admitted trial exhibits; and the controlling law, this Court hereby finds in Claimant's favor.

### FINDINGS OF FACT

Having reviewed the trial evidence presented and weighed the credible trial testimony given, and upon due deliberation, I now make the following Findings of Fact:[1]

---

[1] Citation to admitted trial exhibits may be in addition to the trial testimony.

Claim No. 135854                                                                        Page 2

On September 25, 2013, Claimant - a 21 year old - walked to a job interview as he was in the process of seeking new employment.[2] After returning back home to 607 Birr Street in the City of Rochester, Claimant submitted more job applications, and then later got his little sisters off of the school bus sometime between 4:00 and 5:00 p.m.. At about 6:00 p.m., Claimant received a text that his friend - Brooklyn Cromes ("Cromes") - was assaulted and in the hospital.[3] Very concerned for his friend's welfare, Claimant called his other friend Aaron Hinds ("Hinds") at 6:26 p.m. to find out what had happened, but Hinds did not answer. Claimant then decided to walk to Bradburn Street in the 19th Ward Neighborhood where Hinds lived at Number 31 and Cromes lived at Number 38 [Cla Ex. # 56]. Claimant rushed out of his house dressed in a red hoodie, black track pants, and unlaced Timberland boots, and then started the 4.6 mile walk to Hinds' house [Cla. Ex. #'s 5 & 6; Def. Ex. E]. Seeing the missed call, Hinds called Claimant's mother at about 6:38 p.m. and was informed by his brother - Jamaal Clark - that he had already left.[4] The long walk took Claimant about an hour and twenty minutes to complete - arriving at Hinds' house at about 7:15 p.m.. Upon his arrival, Claimant spoke with Hinds about Cromes outside on the front porch, never going inside Hinds' home. After about five minutes, the duo went across the street to 22 Bradburn Street where the Harris family lived to use their wifi signal from out front of the home [Cla. Ex. #'s 57-58]. Claimant then used Hinds' cell-phone to make three calls at about 7:38, 7:41, and 7:42 p.m. Claimant never left Bradburn Street after arriving there.

---

[2] Claimant's job history had mainly been through a temp agency in the warehouse or manufacturing industries making $15-17 an hour. Claimant was not sure of his income for 2013-2014.

[3] Claimant's own cell-phone worked only on a wifi network using a texting plus application. Claimant frequently used his mother's phone to communicate with friends.

[4] Hinds testified per a subpoena from Claimant's counsel, not voluntarily.

Claim No. 135854                                                                            Page 3

Unbeknownst to Claimant, and at about 8:00 p.m. - which was after Claimant arrived at Hinds' home - Jack Moseley ("Moseley") was outside 19 Roslyn Street when he was approached by an African-American man in a gray hoodie and jeans who put a gun to his head [Cla. Ex. #'s 26, 29, 34, 53-55; Def. Ex. B].[5] Moseley was robbed of his iPhone and other items. After a 911 call, and at 8:02 p.m., a police radio dispatch was made reporting the robbery and describing the suspect as 5'-7"-5'8", wearing a gray hoodie and jeans who ran towards Genesee Street [Cla. Ex. #'s 21, 24-25 & 52; Def. Exs. B & H-I].[6] Rochester Police Department ("RPD") Officer Jason Prinzi ("Prinzi") responded to the robbery scene [Def. Ex. I].

At about 8:07 p.m., RPD Officer Daryl Hogg ("Hogg") spotted Claimant - who was 5'5" - and Hinds still in front of 22 Bradburn Street [Cla. Ex. #'s 21, 26, 29 & 76; Def. Exs. D & H].[7] Claimant was not sweating or out of breath at the initial interaction with Hogg. RPD Officer Dan Watson ("Watson") arrived shortly after Hogg [Cla. Ex. # 21]. The officers detained and frisked the men - neither pat-down revealing any proceeds of the robbery or a gun [Cla. Ex. # 21]. Awhile later, and after dark, both Claimant and Hinds were then transported to the corner of Roslyn Street and Genesee Street for show-up identification procedures [Cla. Ex. # 21; Def. Exs. C & I]. Neither was initially identified as being the robber [Def. Ex. H].

---

[5] Rosalyn Street and Bradburn Street are both off of Genesee Street, about five blocks away from each other [Def. Ex. D]. Moseley saw another African American man near his location on a bike during the robbery [Cla. Ex. # 29].

[6] No description of the robber's facial hair was given in the initial 911 call, but was added later as being a "chin strap beard" [Cla. Ex. #'s 21 & 25; Def. Ex. B]. Claimant wore such a beard. Also, the original dispatch was for a single suspect, not two people, but the information about a second person came later [Cla. Ex. #'s 21 & 24-25].

[7] Hogg stated at his deposition that Prinzi directed him to Bradburn Street due to the assault earlier that day on Cromes - which both officers were assigned to investigate [Def. Ex. H].

Claim No. 135854                                                                                                    Page 4

At some point, RPD Investigator Nolan Wengert ("Wengert") became involved in the robbery investigation, and saw that Claimant was in the back of a police cruiser during the show-up process [Cla. Ex. #'s 21, 24 & 29; Def. Exs. C & I].[8] Wengert had arrested Claimant in 2010 for three cell-phone robberies - to which Claimant accepted responsibility by pleading guilty [Cla. Ex. #'s 10-11 & 29].[9] It was Claimant's allegation at trial that this prior interaction predisposed Wengert to believing that Claimant was the robber. Claimant also testified at trial that Wengert, Hogg, and Prinzi all harassed him when he visited his friends in the Bradburn Street area, including one incident in the Spring of 2013 - just a few months before the subject robbery. Claimant stated at trial that he felted targeted, so he no longer went to Bradburn Street as often as he used to do to visit his friends.

Although he was told that he was not identified as the robber, Claimant was not released, although Hinds was released. After some additional time passed, Claimant was advised that Moseley identified him as the robber - albeit in changed clothes [Cla. Ex. #'s 24, 26 & 34; Def. Exs. B & I].[10] Another part of the police investigation was a search of Hinds' home [Cla. Ex. #'s 16 & 29; Def. Ex. C]. That too did not reveal the fruits of the robbery, a bicycle, or clothes matching the description of the robber's clothing[11] Claimant was taken to the Public Safety Building for questioning [Cla. Ex. #'s 20-21 & 24; Def. Ex. C]. After waiving his Miranda rights, and when Wengert interrogated him, Claimant said that he was not the robber and that explained the situation with Cromes as the reason

---

[8] Hogg testified at this deposition that he communicated with Wengert about the investigation [Def. Ex. H].

[9] For this conviction, Claimant served thirty days in the Monroe County Jail, and then three years of probation. Claimant did have one violation of probation that sent him back to jail for fifteen days.

[10] Hogg said at his deposition that Moseley was in Wengert's police car during the show-ups [Def. Ex. H].

[11] Moseley testified at the criminal trial that he identified Hinds was the look out guy on the bicycle; however, Hinds was never charged with any crime [Cla. Ex. # 29; Def. Ex. B].

why he was in the area [Cla. Ex. # 29; Def. Ex. C]. Claimant also asked Wengert to check the city cameras to confirm his walking route from his home to Hinds' house, which Wengert did not do. Claimant was eventually booked into the Monroe County Jail. After Claimant had been in jail for two days, Wengert used an GPS application to locate Moseley's iPhone, and found it with a large group of people two blocks from the robbery site [Cla. Ex. #s 30 & 38; Def. Ex. C].

Claimant was later indicted for Robbery in the First Degree per Penal Law § 160.15 (4), and held in custody at the jail pending his trial [Cla. Ex. # 73].[12] Claimant was eventually able to bond out of jail after about three months. A trial was initially scheduled, but was adjourned due to the late disclosure of <u>Brady</u> material in the form of the iPhone search evidence [Cla. Ex. # 38]. A jury trial was finally held before Monroe County Supreme Court Justice Thomas Moran at which Moseley identified Claimant as the robber [Def. Ex. B].[13] The trial resulted in a guilty verdict on November 21, 2014 [Cla. Ex. # 75]. Claimant maintained his innocence during the Pre-Sentencing Investigation interview. At sentencing on January 5, 2015, Claimant also claimed his innocence, but was sentenced to 10 years in state prison [Cla. Ex. #'s 7, 67 & 77]. After sentencing, Claimant was transferred to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") [Cla. Ex. # 68].

Claimant was incarcerated at various correctional facilities, including some maximum security ones. Claimant described his time in prison as hard, and nothing like the Monroe County Jail. Claimant tried to get mental health help, and went to church, but he did not get the assistance

---

[12] Claimant did not testify at the Grand Jury upon his attorney's advice.

[13] After indicating that he wanted to testify at his trial, his lawyer advised against it and Claimant followed that advice.

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71
Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 6 of 20
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                                           Page 6

he needed. Claimant worked at the Wyoming Correctional Facility's law library and mess hall, and took business classes as well.[14] Claimant spent his time in custody focusing on getting his conviction expunged. Claimant wrote multiple times to the Monroe County District Attorney's Office's Conviction Integrity Unit in hopes of getting his conviction vacated, but that endeavor was not successful as his case was closed without him ever being interviewed. Claimant also wrote to the Innocence Project and Rochester City officials seeking help with his case, but those efforts also faltered.

Besides the letters, Claimant also pursued a formal appeal, having to be re-assigned a new appellate attorney due to a conflict.[15] Claimant secured a reversal on November 13, 2020, as the Fourth Department ruled that his robbery conviction was against the weight of the evidence [Cla. Ex. # 76]. See also People v Miller, 191 AD3d 111 (4th Dept 2020).[16] In particular, the Fourth Department decreed that:

> . . . It has long been understood that "the **frequent untrustworthiness of eyewitness** identification testimony" poses an "**unusual threat to the truth-seeking process**" because "juries unfortunately are often unduly receptive to such evidence" . . . the Court of Appeals, relying on empirical evidence collected as a result of DNA exonerations, has recognized that "[m]istaken **eyewitness identifications** are 'the **single greatest cause of wrongful convictions in this country**,' 'responsible for more . . . wrongful convictions than all other causes combined'" . . .

---

[14] Claimant had some disciplinary history while incarcerated, including infractions related to a fight and marijuana use. Claimant stated that his marijuana use increased while in prison.

[15] Claimant argued on appeal that his assigned trial attorney was ineffective.

[16] The Fourth Department noted that "Defendant's height, which the jury was able to observe at trial, was listed in the presentence report as five feet, five inches." Id. at 113.

Several factors call the reliability of this particular identification into question. One such factor is that showup identifications are **inherently suggestive** . . . Additionally, the **reliability of an identification is affected where, as here, a gun is displayed, there is a high level of stress, the incident is brief, and the lighting is dim** . . .

On the other hand, **there is considerable objective evidence supporting defendant's innocence.** Defendant was found standing in a driveway half a mile from the crime scene only seven minutes after it occurred, **wearing clothing different from the clothing worn by the gunman. He was not in possession of the fruits of the crime or of a firearm.** There was **no testimony that he was out of breath or that he displayed other signs of having recently run a distance.** To the contrary, his boots were not even laced. The **possibility that he changed clothes and hid the items in his companion's residence across the street was questionable** in the first instance given the timing of the events, and was **severely undercut by the fact that the police obtained permission to search the residence and did so without finding anything linking defendant to the crime.** Furthermore, the police investigation established that a **person other than defendant possessed the fruits of the robbery,** particularly the victim's cell phone, and that person's act in fleeing from the police when the phone alarm sounded was indicative of consciousness of guilt . . . . Other objective evidence, particularly the **dog tracking, established that the gunman never turned west off of Genesee Street toward the place where defendant was found,** but continued to run down Genesee Street in a southerly direction.

In sum, viewing the evidence in light of the elements of the crime as charged to the jury . . . we conclude that the jury "failed to give the evidence the weight it should be accorded" . . . Accordingly, we conclude that the judgment should be reversed and the indictment dismissed . . .

. . . the court failed to give adequate consideration to the difference between the location where the dispatcher stated that the suspect[ ] had been observed running from the crime scene . . . and the location where the officer stopped defendant" . . . The testimony of the officer who initiated this street encounter established that he explored only "one of" several side streets in a residential neighborhood and **seized**

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71
Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 8 of 20
RECEIVED NYSCEF: 10/01/2024
CLAIM NO. 135854

Claim No. 135854                                                                    Page 8

> **the first young black man in a hooded sweatshirt who he found.**
> It must be plainly stated—the law does not allow the police to stop and frisk any young black man within a half-mile radius of an armed robbery based solely upon a general description.

[Cla. Ex. # 76]. See also Miller, 191 AD3d at 115-118 (emphasis added and internal citations omitted).

Claimant was released from DOCCS' custody on November 17, 2020 - just days shy of the six year mark after originally being imprisoned [Cla. Ex. # 77]. After his release, Claimant's initial elation and sense of great relief was then followed by struggles to re-adjust to life outside of confinement. In particular, Claimant had difficulty re-connecting with his family. Although Claimant had a romantic relationship with Tanisha Jones ("Jones"), and had a daughter with her, their relationship soured over time. In fact, disputes between the couple led to protective orders and contempt charges against Claimant. Claimant described himself as having anger issues and being anti-social, and used alcohol as a coping mechanism. Claimant denied being a drinker before prison, but after his release his alcohol use grew to starting every morning. He also developed a gambling habit - something he started in prison. Claimant sought help through therapists at Strong Hospital, Rochester Regional Health, and Catholic Charities, but without much luck in curbing his problems [Cla. Ex. # 72]. Claimant was diagnosed with anxiety, depression, and PTSD [Cla. Ex. # 72]. Additionally, Claimant indicated that it was difficult for him to keep a job given his "dark moods," and problems with authority figures from his time in prison.[17] Family and Cromes confirmed that Claimant was not the same person he was before he was convicted and sent to prison.

---

[17] Unless indicated otherwise, quotations are from the Court's own notes.

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71

Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 9 of 20

CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                                                            Page 9

In addition to the contempt charges, Claimant was also charged with attempted assault on a police officer in February of 2022. Claimant explained that this police interaction was triggering for him given his negative history with law enforcement. Furthermore, Claimant was charged with Driving While Intoxicated ("DWI") that Spring - for which he was also held per for observation per the Mental Hygiene Law. Six months later, Claimant committed another DWI. Claimant's varied legal troubles led to him going back into DOCCS custody in December of 2023 on a two to four year prison sentence.[18]

At trial, Dr. Trica L. Peterson ("Peterson") - a licensed forensic psychologist - testified that Claimant's conviction had a substantial negative impact on his mental health and psychological/social skills. For example, Peterson explained that Claimant had problems connecting with people as he withdrew from society, and this tainted his relationship with Jones. Also, authority figures were viewed as threats, and Claimant's personal development was stunted as his life shifted to learning how to be a prisoner. Peterson confirmed Claimant's PTSD and alcohol misuse diagnoses, which included anger management, occupational retention problems, nightmares, and reckless behavior in the form of drinking and gambling. Peterson further tied in Claimant's mental health issues with his post-release legal troubles. Peterson stated that the prognosis for Claimant's recovery was guarded, and indicated that his conditions were permanent. Peterson recommended medications and therapy as a way to reduce Claimant's symptoms.

Also at trial was Dr. Charles Goodsell ("Goodsell") - a professor of psychology - who testified concerning his expertise in eyewitness identifications. Goodsell explained the three stages

---

[18] Claimant is eligible for parole in June of 2025.

Claim No. 135854                                                                Page 10

of memory: encoding; storing; and, retrieving - and how various factors could affect each stage and thus the accuracy of memory. For example: the duration of an encounter; stress; lighting; and, the presence of a weapon can all impact encoding. The passage of time can affect storage, and retrieval can be tainted by assumptions added from prior re-telling of the same event. Goodsell stated that eyewitness identifications are fallible. As a statistical example, the Innocence Project found that, of about 350 exonerations, 70% of the wrongful convictions were due to erroneous eyewitness identifications. As to show-up identifications, Goodsell explained that they are infirm as they are not accompanied by many protections other identification procedures are afforded, such as: not using fillers; having suspects near police cars or officers; and, not advising the complainant that the suspect may not be present. As to the subject show-up, Goodsell stated that it lacked some of the best practices safeguards, and was further done in bad lighting too far away from Moseley. Also, Goodsell concluded that Moseley's memory of the robber was impacted by low lighting; the brevity of the encounter [20-30 seconds]; the use of a gun; and, a cross-racial identification. Due to this, Goodsell opined that the positive show-up identification of Claimant was unduly suggestive, especially due to the police presence around Claimant which suggested to Moseley that the suspect had been apprehended. Goodsell went on to articulate the theory of police confirmation bias and how it played a role in the Claimant's arrest despite other factors supporting Claimant's innocence, namely that his clothes did not match the robber's; he was not winded when stopped; and, no evidence of the robbery was found on Claimant. Most importantly, Goodsell emphasized Wengert's prior arrests of Claimant as a prime source for confirmation bias.

The final key piece of evidence from the trial was a video of Reynaldo DeGuzman ("DeGuzman") running at a fast pace from 19 Roslyn Street to 22 Bradburn Street - which was a half

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71

Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 11 of 20

CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                                Page 11

of a mile - and then changing clothes in just about 6 and a half minutes [Cla. Ex. # 82]. DeGuzman was winded, breathing hard, and sweating after his run.

### CONCLUSIONS OF LAW

This Court concludes that Claimant proved his entitlement to recover against Defendant for an unjust conviction and imprisonment. See e.g. Gristwood v State of New York, 119 AD3d 1414 (4th Dept 2014) (affirming trial judgment in the claimant's favor for an unjust conviction).

### *Liability*

The starting place for analyzing the case is the threshold liability prong. This must begin with the legal framework of the Court of Claims Act, which was revised in 1984 to add a section for unjust conviction and imprisonment. In adding this new provision, the Legislature decreed that:

> **innocent persons** who have been wrongly convicted of crimes and subsequently imprisoned have been frustrated in seeking legal redress due to a variety of substantive and technical obstacles in the law and that such persons should have an available avenue of redress over and above the existing tort remedies to seek compensation for damages. The legislature intends by enactment of the provisions of this section that those **innocent persons** who can demonstrate by **clear and convincing evidence** that they were **unjustly convicted and imprisoned** be able to recover damages against the state . . .

Court of Claims Act § 8-b (1) (emphasis added). See also Ortiz v State of New York, 203 AD3d 1731, 1732 (4th Dept 2022), lv denied, 38 NY3d 911 (2022); Jones v State of New York, 67 Misc 3d 1201(A) *1 (Ct Cl 2020).

The "'linchpin' of the statute is innocence." Ivey v State of New York, 80 NY2d 474, 479 (1992). See also Scheidelman v State of New York, 151 AD3d 1691, 1693 (4th Dept 2017). In setting this high standard, "the Legislature sought to strike a balance between the goals of compensating **innocent** individuals who had been unjustly convicted and imprisoned, and

foreclosing frivolous suits against the State." Long v State of New York, 7 NY3d 269, 274 (2006) (emphasis added). See also Isaac v State of New York, 78 Misc 3d 473, 479 (Ct Cl 2023).

The standard of proof at trial is clear and convincing evidence of the following:

> (a) he has been **convicted** of one or more felonies or misdemeanors against the state and subsequently **sentenced** to a term of imprisonment, and has **served all or any part** of the sentence; and
>
> (b) (i) he has been pardoned upon the ground of innocence of the crime or crimes for which he was sentenced and which are the grounds for the complaint; or (ii) his judgment of **conviction was reversed or vacated, and the accusatory instrument dismissed** . . . ; and
>
> (c) he **did not commit any of the acts charged** in the accusatory instrument or his acts or omissions charged in the accusatory instrument did not constitute a felony or misdemeanor against the state; and
>
> (d) he did not by his own conduct cause or **bring about his conviction**.

Court of Claims Act § 8-b (5) (emphasis added).

Clear and convincing evidence "is a higher, more demanding standard than the preponderance standard." Rossi v Hartford Fire Ins. Co., 103 AD2d 771, 771 (2d Dept 1984). "Clear and convincing evidence is evidence which satisfies the trier of fact that it is '**highly probable**' that what the party with such burden contends happened is what actually occurred." Morales v State of New York, 183 Misc 2d 839, 848 (Ct Cl 2000) (emphasis added and internal citation omitted), aff'd, 282 AD2d 245 (1st Dept 2001). See also Caruso v Russell P. LeFrois Bldrs., Inc., 217 AD2d 256, 258-259 (4th Dept 1995) (the term "clear and convincing proof" is synonymous with "reasonable certainty"). The clear and convincing burden "'forbids relief whenever the evidence is loose, equivocal or contradictory.'" George Backer Mgt. Corp. v Acme Quilting Co.,

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71
Case 6:22-cv-06069-MAV-MJP   Document 64-8   Filed 01/09/25   Page 13 of 20
CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                   Page 13

Inc., 46 NY2d 211, 220 (1978) (internal citation omitted). See also Matter of Monto v Zeigler, 183 AD3d 1294, 1295 (4th Dept 2020); Khatibi v State of New York, 35 Misc 3d 1211(A) *12 (Ct Cl 2012).

For subdivision (c), a reversal of a conviction is not "tantamount to being found innocent." Reed v State of New York, 78 NY2d 1, 8 (1991). See also Vasquez v State of New York, 263 AD2d 539, 539-540 (2d Dept 1999). As to subdivision (d), a "claimant's conduct bars recovery under the statute only if it was the 'proximate cause of conviction.'" Warney v State of New York, 16 NY3d 428, 437 (2011). See also Fortunato v State of New York, 42 Misc 3d 1202(A) *2 (Ct Cl 2013).

Here, this Court's careful consideration of all of the admitted exhibits and credible trial testimony results in the conclusion that clear and convincing proof exists for every Section 8-b element.

As to subdivisions (a) and (b), there is no dispute that: Claimant was convicted of robbery; sentenced to ten years in state prison; and, won a reversal along with dismissal of the indictment - but not before serving almost six years of that sentence [Cla. Ex. #'s 7, 67-68; 74-77]. See also Miller, 191 AD3d at 112.

In regard to innocence in subdivision (c), this Court recognizes that the Fourth Department's reversal - standing alone - does not equate to an exoneration [Cla. Ex. # 76]. See Reed, 78 NY2d at 8; Vasquez, 263 AD2d at 539-540. Nevertheless, the Fourth Department's decision assailed the show-up identification procedure. See Miller, 191 AD3d at 116. It further noted key exonerating facts that qualified as **"considerable objective evidence supporting defendant's innocence."** Id. Claimant's trial proof confirmed those appellate observations.

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71
Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 14 of 20
CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                                                                    Page 14

The first part of this Court's determination of the actual innocence factor is Claimant's own testimony. The Court finds Claimant to be highly credible based upon his demeanor on the stand. Also bolstering his veracity is the fact that Claimant took responsibility for his violations of the law, while earnestly maintaining his innocence of the subject robbery.[19] There is no indication that Claimant was ever not honest with the police, or otherwise made any false statements, to undercut his veracity. Based upon the first-hand observation of Claimant's testimony, this Court fully credits his account of the subject day which negates him as being the robber. The Court believes Claimant that he was present with Hinds on Bradburn Street when the robbery took place.

This Court's determination is not solely premised on Claimant's version of events, as his testimony was corroborated by other evidence. In particular, Claimant was not wearing the same clothes as the robber was reported to be wearing, he had no signs of having run a half of a mile when approached by Hogg, and was never found to possess a gun or any robbery proceeds. The DeGuzman video reinforced the implausibility of Claimant having run from Roslyn Street to Bradburn Street and changed clothes before being spotted by Hogg. It is also not logical that, having just committed a felony, that Claimant and Hinds would remain outside where they could be seen by police. The police investigation further provided some exculpatory proof in the form of the police dog tracking not leading to Bradburn Street, and Moseley's iPhone being located with other people very near the scene of the crime after Claimant was jailed. Moreover, Hinds - who was compelled to testify - buttressed Claimant's version of events, and provided an alibi for him. See e.g. Scott v State of New York, 11 Misc 3d 1059(A) *2 (Ct Cl 2006) (finding for the claimant on his unjust

---

[19] None of Claimant's convictions were for crimes involving dishonesty.

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71
Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 15 of 20
CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                                    Page 15

conviction claim as he provided an alibi witness). Claimant's brother and mother further supported Claimant's factual account.

Weighed against all of the above is only Moseley's positive identification of Claimant via the show-up. The Court disregards the same, as did the Fourth Department. See Miller, 191 AD3d at 116. It is well-established that "[s]howup identifications are disfavored, since they are **suggestive by their very nature.**" People v Ortiz, 90 NY2d 533, 537 (1997) (emphasis added). See also People v Sweeney, 90 AD3d 1572, 1573 (4th Dept 2011). This axiomatic legal principle was reinforced at trial by the compelling expert testimony of Goodsell who opined that the show-up lacked complete best practices, and was indeed duly suggestive given the police presence around Claimant. Goodsell also assailed Moseley's memory due to various factors, such as: bad lighting; the short duration of the encounter; the use of a gun; and, the cross-racial compensation of the people involved. Goodsell's explanation of police confirmation bias was also a compelling criteria in finding Claimant innocent.

On this point, which is certainly not of least importance, is Wengert's involvement in the case. Wengert had arrested Claimant before for robberies, and Hogg and Prinzi worked with Wengert. In fact, the trio had encounters with Claimant, some not too long before the subject robbery. Claimant described this as targeting. Very unfortunately, it appears that Claimant was simply in the same general area of the robbery and was spotted by, or interacted with, police who knew of his stolen cell phone criminal history.

Taken as a whole, Claimant's trial proof clearly and convincingly disproved Claimant's responsibility for the robbery. See e.g. Kotler v State of New York, 255 AD2d 429, 430 (2d Dept

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71
Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 16 of 20
CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                    Page 16

1998) (finding that the claimant met his burden of proving his innocence by clear and convincing evidence). Defendant's trial proof in no manner refuted that.

Next, and for subdivision (d), the trial proof was wholly bereft of any evidence that Claimant contributed to his conviction. None of the examples articulated in Scott, 11 Misc 3d 1059(A) at *4 are present in the case at hand. To the contrary, Claimant protested his innocence all along and followed his criminal defense attorney's legal instructions [Cla. Ex. # 7].

In all, Claimant satisfied his heavy trial burden to impose liability on Defendant for an unjust robbery conviction and subsequent imprisonment.

### *Damages*

Having found against Defendant on liability, the Court must next fix damages to wholly compensate Claimant.

On this final element, the Court of Claims Act provides that:

> 6. If the court finds that the claimant is entitled to a judgment, it shall award damages in such sum of money as the court determines will **fairly and reasonably** compensate him.

Court of Claims Act § 8-b (6) (emphasis added). See also Carter v State of New York, 139 Misc 2d 423, 426 (Ct Cl 1988), aff'd, 154 AD2d 642 (2d Dept 1989).

In Carter, the court noted that "[t]he Law Revision Commission Report, on which Court of Claims Act § 8-b was largely based, indicates only that it was felt **no statutory restrictions should be imposed on the amount or type of damages recoverable under Court of Claims Act § 8-b.**" Id. at 426 (emphasis added). "The Law Revision Report indicates that both pecuniary [for example lost wages] and nonpecuniary [for example emotional distress] damages should be potentially

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71
Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 17 of 20
CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Claim No. 135854                                                                    Page 17

recoverable under Court of Claims Act § 8-b." Id. at 429. On this topic, the Fourth Department has decreed that:

> Although the statute provides little in the way of specifics, we note that the amount of any such award should be determined in accordance with "traditional tort and other common-law principles" . . . We decline to adopt any formulaic standard for the assessment of nonpecuniary damages . . . "Guiding this Court in its determination of the elements of and amount for non-pecuniary damages is the body of case law that eloquently addresses the **grievous suffering, mental anguish, loss of liberty, degradation, loss of reputation, humiliation and other injuries** of those unjustly convicted and imprison[ed]" . . .

Gristwood, 119 AD3d at 1417 (emphasis added and internal citation omitted).

In Gristwood, the appellate court recognized the "catastrophic impact on [the claimant's] personal and family life during the period of incarceration and continuing thereafter," which included his chronic PTSD and chronic depressive and anxiety disorders all stemming from his unjust conviction, and sustained the $5,485,394 judgment. Id. at 1418.

The starting point for imposing damages is the date of the criminal conviction. Id. at 1417. The Criminal Procedure Law ("CPL") defines a "conviction" as "a verdict of guilty upon, an accusatory instrument . . . ." CPL 1.20 (13). Thus, any pre-verdict damages are not recoverable - such as Claimant's time at the Monroe County Jail before he bonded out pre-trial. As to future damages, Claimant has to "prove his entitlement to such damages 'by a **reasonable certainty**.'" Baba-Ali v State of New York, 19 NY3d 627, 641 (2012) (citing Shubbuck v Conners, 15 NY3d 871, 872 (2010)) (emphasis added). See also Gristwood, 119 AD3d at 1417.

With the foregoing in mind, the Court starts by addressing Claimant's past damages that accrued post-conviction and while in prison. The Court cannot underscore enough the gravity of

FILED: NYS COURT OF CLAIMS 10/01/2024 02:58 PM
NYSCEF DOC. NO. 71

CLAIM NO. 135854
RECEIVED NYSCEF: 10/01/2024

Case 6:22-cv-06069-MAV-MJP    Document 64-8    Filed 01/09/25    Page 18 of 20

Claim No. 135854

Page 18

Claimant's lost liberty owing to a crime that he did not commit. Claimant expressed his years long frustration with his pleas for help going unanswered. Claimant detailed how hard prison life was for him, including time in maximum security facilities, and the emotional toll it took on him. Not only was Claimant deprived of his own freedom, but also of time with family and friends. During time in prison, Claimant's grandmother died and he was unable to grieve with his family. Although some family called and/or visited Claimant, that stream of contact seemed to trail off as time went on. Claimant was able to start a romantic connection with Jones while he was incarcerated, but that is not the same as an in-person relationship. Taking everything into consideration, and for this damages category, the Court sets this recovery figure at $1,650,000.[20]

For Claimant's proffered future damages, those fall into two categories - mental health harm and also lost job earnings.

First, and as to Claimant's mental anguish, it is profound and lasting. As Claimant outlined, he suffers from depression, anxiety, and PTSD which manifests itself in the form of: anger; withdrawal from society; alcohol abuse; gambling; and, authority issues. These have affected Claimant's relations with his family, including Jones and his daughter, and his ability to hold a job. They also likely helped contribute to his new legal troubles. These diagnoses and symptoms were substantiated by medical records and Dr. Peterson who also opined that they were permanent, so Claimant will be dealing with the same on an ongoing basis [Cla. Ex. # 72].[21] At the time of this

---

[20] The Court does not fix a separate amount for any loss of reputation as Claimant has both prior and new criminal convictions.

[21] Although permanent, and Dr. Peterson recommended future treatments, no projected cost of the same was entered into the record to permit the Court to assign a separate amount for such items.

civil trial, Claimant was 32 years old and has a life expectancy of 46.6 years. See PJI 2:281, Appendix A. Given this time-frame, the Court sets $1,398,000 for future mental distress damages.

Second, and in regard to the requested lost wages, the Court declines to set a monetary figure for that discrete damages category. More specifically, Claimant's pre-conviction employment history was sporadic, and usually in the labor field on an hourly basis. In fact, Claimant was not employed at the time of the incident, nor was there any trial proof that he was at the time of his conviction. Claimant did not testify about his average annual income, no such documentary proof was submitted, and no economic expert was presented. Given this, the required reasonable certainty is lacking on which to premise a monetary award for lost future income - or for that matter even past lost income. See e.g. Coakley v State of New York, 225 AD2d 477, 478 (1st Dept 1996) (Court of Claims properly denied the claimant recovery for lost wages as the request was "both vague and undocumented"). See also Garcia v New York City Hous. Auth., 302 AD2d 250 (1st Dept 2003) (as the plaintiff did not detail "the compensation she received at a number of different short-term jobs prior to her accident," there was an insufficient basis "to establish her past and future lost earnings with any reasonable degree of certainty").

In sum, Claimant is awarded a favorable decision in the total amount of $3,048,000. See Hoffner v State of New York, 207 Misc 1070, 1072 (Ct Cl 1955) ("money is the apologetic gesture of a penitent society").

## CONCLUSION

Based upon all of the foregoing, it is this Court's Decision that Claim Number 135854 is **GRANTED**, and Claimant is awarded $3,048,000, with interest from the date of this Decision until

the entry of judgment. Additionally, to the extent Claimant paid a filing fee, it may be recovered pursuant to Court of Claims Act § 11–a (2).

Any and all other motions on which the Court may have previously reserved, or which were not previously determined, are hereby DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Rochester, New York
September 10, 2024

_____
J. SCOTT ODORISI
Judge of the Court of Claims