```
STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE
_____
                                        :
THE PEOPLE OF THE STATE OF NEW YORK     :
                                        :
                                        :  INDICTMENT NO.
                -vs-                     :  2013-0954
                                        :
ANTHONY MILLER,                         :
                      Defendant.        :
_____
```

                                JURY TRIAL
                                Monroe County
                                Hall of Justice
                                Civic Center Plaza
                                Rochester, New York
                          November 18, 19, 20, 21, 2014

P r e s i d i n g:

                     HONORABLE THOMAS E. MORAN
                     SUPREME COURT JUSTICE

A p p e a r a n c e s:

                     SANDRA DOORLEY, ESQ.
                     Monroe County District Attorney
                     Appearing on behalf of the People
                     of the State of New York
                     BY:  MICHAEL HARRIGAN, ESQ.,
                          Assistant District Attorney

                     TIMOTHY DONAHER, ESQ.
                     Monroe County Public Defender
                     Appearing on behalf of the Defendant
                     BY:  JOSHUA STUBBE, ESQ.,
                          Assistant Public Defender

                     Defendant Present

R e p o r t e d  B y:

                     DEBBIE C. BERNSTEIN, CSR
                     Senior Court Reporter
                     Hall of Justice - Room 161B
                     Rochester, New York  14614
                     (585)371-3791

MILLER 000287

PEOPLE V. MILLER                          3

1                    I N D E X   T O   E X H I B I T S

2

PEOPLE'S
3    EXHIBIT NO.              DESCRIPTION            ID    REC'D

4      14          Consent to Search Form RPD
                   353 dated 9-25-13               265    265
5


6    DEFENDANT'S
     EXHIBIT NO.              DESCRIPTION            ID    REC'D
7
       A          911 CAD report                   233    --
8
       B          two-page Rochester Police
9                 Department Investigative Action
                  Report Case Update dated
10                September 27, 2013               308    --

11     C          two-page RPD canine Usage Log    319    --

12   COURT'S
     EXHIBIT NO.              DESCRIPTION            ID    REC'D
13
       1          Sidebar Waiver (previously
14                marked)                           --    --

15     2          Verdict Sheet                    396    --

16     3          jury note - permission to
                  deliberate                       397    --
17
       4          jury note - read-back request   397    --
18
       5          jury note - time frames         399    --
19
       6          jury note - read-back request   402    --
20
       7          jury note                       405    --
21
       8          jury note - read-back request   407    --
22
       9          jury note - Verdict             412    --
23

24                        * * * * * * *

25

1
2

                    I N D E X   T O   W I T N E S S E S

3  WITNESS                                              PAGES

4    JACK MOSELEY
       Direct-Examination by Mr. Harrigan          176 - 198
5      Cross-Examination by Mr. Stubbe             198 - 210
       Redirect-Examination by Mr. Harrigan        210 - 211
6
     DARYL HOGG
7      Direct-Examination by Mr. Harrigan          213 - 232
       Cross-Examination by Mr. Stubbe             233 - 242
8      Redirect-Examination by Mr. Harrigan        242 - 243
       Recross-Examination by Mr. Stubbe           243 - 244
9
     NOLAN WENGERT
10     Direct-Examination by Mr. Harrigan          244 - 279
       Cross-Examination by Mr. Stubbe             306 - 327
11     Redirect-Examination by Mr. Harrigan        327 - 331

12                          * * * * * *

13                 I N D E X   T O   E X H I B I T S

14 PEOPLE'S
   EXHIBIT NO.            DESCRIPTION           ID    REC'D
15
16   1 - 4                photographs          163    189

17    5                   photograph           163    194

18   6 - 8                photographs          163    226

19    9                   photograph           163    263

20   10                   photograph           163    230

21   11                   photograph           163    230

22   12                   Miranda card         163    271

23   13                   two-page Rochester
                          Police Department
                          Investigative Action
24                        Report Narrative Only
                          (Wengert)            252    ---
25

MILLER 000289

PEOPLE V. MILLER                4

1 (Whereupon the proceedings commenced at 10:02 a.m.)

2  THE COURT:  Mr. Harrigan, are you ready?

3  MR. HARRIGAN:  Yes, Your Honor.

4  THE COURT:  Mr. Stubbe, are you ready?

5  MR. STUBBE:  We are.

6  THE COURT:  Let's get them in, please.

7  MR. HARRIGAN:  Your Honor, just to be clear,

8 is One right here (indicating)?

9  THE COURT:  One's furthest away from me, no

10 matter which courtroom we are in.

11  MR. HARRIGAN:  Good.

12  MR. STUBBE:  Top row, or the bottom row?

13  THE COURT:  Top would be the furthest,

14 Mr. Stubbe.

15 (Whereupon the members of the prospective jury

16  panel entered the courtroom.)

17  THE COURT:  Mr. Curran, if you would,

18 please.

19 (Whereupon the members of the prospective jury

20  panel were sworn in by the court clerk.)

21  THE COURT:  It's been a long time since I've

22 seen so many smiling faces first thing in the

23 morning.  Good Lord.  It's a wonderful day.  I'm

24 sure you had joy coming here.

25  My name's Tom Moran, and I am going to be the

PEOPLE V. MILLER                                    175

1    say "Nope, he was wearing a red sweatshirt when

2    they got him, the call was for a gray sweatshirt;

3    that's my reason."  You don't have to agree on one

4    single reason, but in order to convict Mr. Miller,

5    you all must agree that there is no reasonable

6    doubt, and you are not going to be able to do that.

7         It's going to be a short trial, but it's a

8    very, very important trial for Mr. Miller.  I ask

9    that you give it your full attention.  Again, it

10   should be a brief amount of attention necessary,

11   but I ask that you give it your full attention; and

12   at the end of this trial, I'm going to ask each of

13   you to vote not guilty because Mr. Miller isn't and

14   the DA can't get over that burden.

15        Thank you all.

16        THE COURT:  Call your first witness.

17        MR. HARRIGAN:  The People call Jack Moseley.

18

19   J A C K   M O S E L E Y, called herein as a witness, having

20   first been duly sworn, was examined and testified as follows:

21        THE COURT:  Good morning.

22        THE WITNESS:  Good morning.

23        THE COURT:  If you'd stay really close to that

24   microphone, that would be good.  Thank you.

25

1  DIRECT-EXAMINATION

2  BY MR. HARRIGAN:

3      Q.   Good morning, Mr. Moseley.

4      A.   Good morning.

5      Q.   Can you tell the jury, how old are you?

6      A.   Twenty-seven.

7      Q.   Now, I am going to talk a lot about what happened

8  on September 25, 2013 at about 8:00 p.m. in the area of 19

9  Roslyn Street in the city of Rochester, but initially I want

10 to know what -- do you know where 19 Roslyn Street is in the

11 city?

12     A.   Right on the corner of Genesee and Roslyn Street.

13     Q.   And how are you familiar with that address?

14     A.   I resided there.

15     Q.   Are were you residing there back on September 25,

16 2103?

17     A.   I was.

18     Q.   How long had you lived there?

19     A.   At that point, about six months.

20     Q.   Now, at about eight o'clock, maybe a little bit

21 before then, where were you at; were you at home?

22     A.   Yeah.

23     Q.   And again, that's the city of Rochester, correct?

24     A.   Yes.

25     Q.   And what were you doing about that time?

1    A.    I was waiting to get picked up by a friend.

2    Q.    And where were you waiting at?

3    A.    On the front steps of the house.

4    Q.    Were you there with anyone else?

5    A.    No.

6    Q.    Now, do you know a person by the name of Stan

7    Lewis?

8    A.    I do.

9    Q.    How do you know Stan?

10   A.    His girlfriend lived in the house, and I had known

11   him from school and whatever else.

12   Q.    And was Stan there during that time?

13   A.    He was sitting in the driveway.

14   Q.    Could you see Stan from where you were sitting on

15   the steps?

16   A.    No.

17   Q.    Where were you -- You said you were waiting for a

18   friend to pick you up.  Where were you going to go?

19   A.    I was waiting to go to an AA meeting.

20   Q.    Well, let's talk about that.  Now, you have a

21   couple DWI convictions in your past, right?

22   A.    Yes.

23   Q.    And your last one I think was in 2011, would that

24   be right?

25   A.    I believe it was 2010.

MILLER 000463

MOSELEY - DX HARRIGAN                         178

1    Q.    Okay.  Did it end probably in 2011?

2    A.    Yeah.

3    Q.    The court -- Okay.  Now, after that last arrest,

4  did you do anything, did you go into any treatment or do

5  anything for that?

6    A.    I did.

7    Q.    What did you do?

8    A.    I went to a rehab facility and I completed that, and

9  I went to a residential center.  That is what the house I was

10  living at is.  I successfully completed there, and I was -- I

11  was and am still currently going to AA meetings on a regular

12  basis.

13    Q.    Okay.  And were you working back on September 25,

14  2013?

15    A.    I volunteered at the Boys and Girls Club on Genesee

16  Street.

17    Q.    Now, as of now, are you working?

18    A.    Yes.

19    Q.    And are you going to school?

20    A.    Yes.

21    Q.    And what do you want to do?

22    A.    I am going for social work.

23    Q.    And what do you want to do with that, if you know?

24    A.    As of right now, I'd like to help younger kids that

25  struggle, have family issues and drug problems and just have a

MOSELEY - DX HARRIGAN                179

1    tough time.

2         Q.   Now, I ask you about the AA specifically because I

3    want to know on this night, on September 25, 2013, at about

4    8:00, had you been drinking at all?

5         A.   No.

6         Q.   Had you been doing drugs or anything?

7         A.   No.

8         Q.   So were you of clear mind in your mind at the time?

9         A.   Yes.

10        Q.   And when you went out to your -- to the front

11   porch, can you describe the lighting at about that time?

12        A.   The sun was going down, and behind me in the

13   breezeway of the house, there was lights on and -- I mean, it

14   wasn't -- it wasn't that dark.

15        Q.   Okay.  Do you know, were there any streetlights

16   where you were?

17        A.   Yeah.

18        Q.   And when you were -- when you went out there, did

19   you notice any people?

20        A.   I did.  There was a gentleman standing at the corner

21   of Genesee and Roslyn.

22        Q.   And did you notice anyone on any bicycle?

23        A.   Yeah, there was a gentleman across the street at the

24   convenience store in the parking lot.

25        Q.   Now, the person that was on the corner of Genesee

MILLER 000465

MOSELEY - DX HARRIGAN    180

1    and Roslyn, what was that person doing?

2        A.    He was just standing at the corner.

3        Q.    And was he there when you came outside?

4        A.    Yeah.

5        Q.    Now, eventually did that person -- did you see that

6    person come closer to you?

7        A.    Yeah.

8        Q.    And when was the first time you saw the person or

9    how far was that person when you first saw that person closer

10   to you initially?

11       A.    Um, can I -- can you repeat that?

12       Q.    Sure.

13             Were you focusing in on that person there at the

14   corner, were you staring at him?

15       A.    No.

16       Q.    What were you doing at the time?

17       A.    I was on my phone.

18       Q.    Okay.  So would it be fair to say you had your head

19   down on the phone?

20       A.    Yeah.

21       Q.    Now, at some point, did you raise your head?

22       A.    Yeah.

23       Q.    And what did you see when you raised your head?

24       A.    He, the gentleman that was at the corner, was about,

25   I don't know, two, three feet away from me at that point.

1    Q.    Was he -- Where was he; walking towards you, or

2    away from you?

3    A.    Towards me.

4    Q.    And at that time, was there -- did you see anyone

5    else around?

6    A.    No.

7    Q.    And about how long were you sitting on your front

8    steps before that person approached you between two to three

9    feet away from you?

10    A.    It was probably between ten and fifteen minutes.

11    Q.    Had you ever in your mind -- had you ever seen that

12    person before?

13    A.    No.

14    Q.    Did you know who that person was?

15    A.    No.

16    Q.    No relationship whatsoever to that person?

17    A.    No.

18    Q.    Now, when you raised your head and saw that person

19    two to three feet from you, what happened?

20    A.    He approached me and he pulled a gun out and put it

21    to my head.

22    Q.    Where did he put the gun?  You said to your head.

23    Where at on your head?

24    A.    On the left side of my head (witness indicating).

25    Q.    And you are kind of pointing to your temple, is

MOSELEY - DX HARRIGAN                    182

1  that fair?

2       A.    Yeah.

3       Q.    And this may seem stupid, but what end of the gun

4  did he put to your head?

5       A.    The barrel.

6       Q.    When that person put the gun to your head, what did

7  you do; did you do anything initially?

8       A.    Initially I hit his hand away.  I didn't realize what

9  was going on, and it was just kind of a knee-jerk reaction.

10      Q.    You said you hit his hand away.  Was that the hand

11 with the gun in it?

12      A.    Yes.

13      Q.    Did you touch the gun?

14      A.    I believe I hit his hand.  I mean, part of my hand

15 may have touched the gun, but I don't remember.

16      Q.    What I am getting at is, how did it feel when you

17 hit his hand, what was --

18      A.    It was heavy.

19      Q.    In your mind, was that a real gun?

20      A.    Yeah.

21      Q.    And once you hit this individual's hand away, what

22 happened then?

23      A.    He put the gun back to my head and he told me to give

24 him what I got.

25      Q.    And did he put it back in the same spot, on the

MOSELEY - DX HARRIGAN                          183

1    temple?

2         A.    Yeah.

3         Q.    And where was this person standing if he had the

4    gun to your temple; where was he, where was his face?

5         A.    Right in front of mine.

6         Q.    About how far?

7         A.    Not even a foot away.

8         Q.    Was he looking directly at your face?

9         A.    Yeah.

10        Q.    Were you looking at his face?

11        A.    Yeah.

12        Q.    And, I'm sorry, what did he say, if anything?

13        A.    He said "Give me what you got."

14        Q.    And did you say anything to him?

15        A.    I explained that I don't have anything.

16        Q.    And then what happened?

17        A.    He took the phone out of my hand, and then he went

18   into my pockets and he took my keys, a pack of cigarettes, and

19   I had two five-dollar bills in my pocket.

20        Q.    Did you fight him at all?

21        A.    After I hit his hand away, no.

22        Q.    Why not?

23        A.    'Cause I didn't have anything and I didn't want to

24   get shot.

25        Q.    Now, let me ask you about the gun.  What did it

MOSELEY - DX HARRIGAN
184

1     look like?

2         A.    It was a small black gun.  It looked like a police

3     officer's gun, but smaller.

4         Q.    Could you -- Do you know the difference between a

5     pistol and a revolver?

6         A.    Yeah.

7         Q.    Could you tell whether it was a pistol or a

8     revolver?

9         A.    Yeah.  It was a pistol.

10        Q.    Could you tell the color of it?

11        A.    It was black.

12        Q.    Now, are you familiar with guns?

13        A.    No.

14        Q.    Have you ever shot a gun?

15        A.    No.

16        Q.    You ever own a gun?

17        A.    No.

18        Q.    So did you give that individual any permission,

19    right or authority to take your phone, your money, your

20    cigarettes, your keys?

21        A.    No.

22        Q.    And once the person took your property, what did

23    that person do?

24        A.    He took off towards Genesee Street and ran toward

25    Brooks Ave.

MOSELEY - DX HARRIGAN                185

1    Q.   Now, we were talking about Stan.  Did Stan -- What

2    was Stan doing during -- Could you even see Stan during the

3    time --

4    A.   Not when it happened, no.

5    Q.   So when did you first see Stan; after the robbery,

6    or during the robbery?

7    A.   When I first saw Stan was when I came outside of the

8    house to go sit down at the front steps.

9    Q.   And then you said when you were sitting there

10   though you couldn't see Stan?

11   A.   Right.

12   Q.   So when did you -- did you have another interaction

13   with Stan again?

14   A.   Yeah.  After the incident, I walked back to where he

15   was before the incident, and I explained to him that I had just

16   been robbed and to call 911.

17   Q.   As far as you know, did he do that?

18   A.   Yeah.

19   Q.   Now, what about this person on the bike; did you

20   see what happened with this person on the bike?

21   A.   Um, he took off in the same direction.  Me and Stan

22   walked back up to the corner while he was on the phone with

23   911.

24   Q.   When did he -- when you said "the same direction,"

25   the same direction as what?

1      A.    The gentleman that put the gun to my head.

2      Q.    And about how long after -- The person who put the

3   gun to your head, how long did that person on the bike

4   follow, how long after?

5      A.    A minute.

6      Q.    Did you try to stop that person or did Stan try to

7   stop that person?

8      A.    Stan did.

9      Q.    Did that person stop?

10     A.    No.

11     Q.    Did that person say anything to you?

12     A.    No.

13     Q.    Did you know that person at all?

14     A.    No.

15     Q.    Now, the person that put the gun to your head and

16   took your property, everything you had on you, if you saw him

17   again, would you be able to recognize him?

18     A.    Yeah.

19     Q.    What I am going to ask you to do is look around the

20   courtroom and let me know if you see that person who put that

21   gun to your head in the courtroom.

22     A.    It's the gentleman right there (indicating).

23     Q.    Could you just tell me something -- I know you

24   pointed.  Could you tell me something he might be wearing?

25     A.    Right now?

MILLER 000472

MOSELEY - DX HARRIGAN                    187

1      Q.   Yes, right now.

2      A.   Blue and white striped shirt.

3      Q.   Okay.

4                MR. HARRIGAN:  Your Honor, please let the

5           record reflect the witness has identified the

6           defendant.

7                THE COURT:  So ordered.

8                MR. HARRIGAN:  Thank you.

9      Q.   I am going to show you what I have marked for

10   identification first as People's Exhibit Number 1, Mr.

11   Moseley, and could you tell the jury if you know what is

12   this?

13              (Witness examining exhibit.)

14     A.   That's the house where the incident happened where I

15   lived.

16     Q.   Okay.  And is this a fair and accurate -- Well, let

17   me ask you this:  Has anything changed from this house

18   from -- back from September 25, 2013 from what's in this

19   picture?

20     A.   Yeah.  The steps are re-done.

21     Q.   Okay.  So other than those steps being re-done, is

22   it fair to say it's a fair and accurate depiction of how it

23   looked back on September 25, 2013?

24     A.   Yes.

25     Q.   Any other changes that you can see other than the

MOSELEY - DX HARRIGAN                 188

1   steps?

2        A.   No.

3        Q.   I am going to show you People's Exhibit Number 2.

4   Can you tell the Grand Jury -- or, excuse me, the jury,

5   excuse me, what that is, if you know.

6             (Witness examining exhibit.)

7        A.   The house where I lived.

8        Q.   And we are talking, just as in People's Exhibit

9   Number 1, this is 19 Roslyn Street, is that right?

10       A.   Yeah.

11       Q.   Is it fair to say this is just a photograph of a

12  different angle of it?

13       A.   Yes.

14       Q.   And again, other than the steps, is there anything

15  else that's changed, added or deleted from how it looked back

16  on September 25, 2013?

17       A.   No.

18       Q.   I am going to show you People's Exhibit Number 3.

19  Can you tell the jury what this is, if you know?

20             (Witness examining exhibit.)

21       A.   That's the corner where the house is on.

22       Q.   Okay.  And would that be the corner of Roslyn and

23  Genesee?

24       A.   Yeah.

25       Q.   And is this a fair and accurate depiction of that

MOSELEY - DX HARRIGAN

189

1    corner, how it looked back on September 25, 2013?

2        A.    Yes.

3        Q.    Any additions or deletions to this photograph?

4        A.    No.

5        Q.    Finally, I am going to show you People's Exhibit

6    Number 4.  Can you tell the jury what that is, if you know?

7        A.    The corner of Roslyn and Genesee where I lived.

8        Q.    Just a different angle?

9        A.    Yeah.

10       Q.    And is that a fair and accurate depiction of how it

11   looked back on September 25, 2013?

12       A.    Yes.

13       Q.    Any additions or deletions to this photograph?

14       A.    No.

15             MR. HARRIGAN:  Your Honor, at this time, the

16             People would offer People's Exhibits 1 through 4

17             into evidence.

18             THE COURT:  Mr. Stubbe?

19             MR. STUBBE:  No objection.

20             THE COURT:  Mark 1 through 4 received, please.

21             (Whereupon PEOPLE'S EXHIBITS 1 through 4 WERE

22             RECEIVED INTO EVIDENCE.)

23             MR. HARRIGAN:  Your Honor, may I ask if the

24             witness can come down?

25             THE COURT:  Certainly.

MOSELEY - DX HARRIGAN                190

1              You may step down.

2       Q.    Mr. Moseley, if you could come to the visualizer

3    here.

4              (Whereupon the witness descended the witness

5              stand.)

6       Q.    Okay.  I am going to put People's Exhibit Number 1

7    on the visualizer, and I think you testified this is where

8    you lived.  This is 19 Roslyn Street, is that right?

9              (Witness examining exhibit.)

10      A.    Yes.

11      Q.    Can you with a pen kind of just point to the area

12   where you were sitting when the defendant approached you with

13   the gun?

14      A.    (Witness indicating.)

15      Q.    So do you know approximately what step it was?

16      A.    I was probably on the third step.

17      Q.    And these steps are a little different.  What were

18   they back then?

19      A.    Bricks.

20      Q.    Okay.  Now, I am going to put up on the visualizer

21   People's Exhibit Number 2.  Again, this is just another angle

22   of 19 Roslyn Street, right?

23             (Witness examining exhibit.)

24      A.    Yes.

25      Q.    Does this show the -- this still shows the front,

MILLER 000476

MOSELEY - DX HARRIGAN                    191

1   right?

2        A.   Yes.

3        Q.   Does this show where Stan was when this happened?

4        A.   Yes.

5        Q.   Can you point to the area where Stan was when the

6   defendant put the gun to your head?

7        A.   (Witness indicating.)

8        Q.   So that's on -- And you pointed -- There's a garage

9   there, and it's basically two bays, and you are pointing to

10  the one that's on the left, correct?

11       A.   Yes.

12       Q.   That would be on the -- That would be on the west

13  side of the house, correct?

14       A.   Yes.

15       Q.   Now, I am going to put People's Exhibit Number 3 on

16  the visualizer; and again, I think you testified this is the

17  corner there of Roslyn and Genesee Street?

18            (Witness examining exhibit.)

19       A.   Yes.

20       Q.   Does this show in this picture where that

21  individual was riding his bike?

22       A.   Yes.

23       Q.   Could you please point to it on this photo.

24       A.   (Witness indicating.)

25       Q.   Okay.  So you are pointing directly at the -- this

MOSELEY - DX HARRIGAN                         192

1   building that's -- This is a convenience store that's across

2   the street?

3       A.   Yes.

4       Q.   And you pointed -- There's a white car in this

5   photo, and you pointed towards the area in the front of that

6   car, correct?

7       A.   Yeah.

8       Q.   And finally, I am going to have you look at

9   People's Exhibit Number 4.   And I think you testified, again,

10  this is just a different angle, but this is the -- this shows

11  the corner of Roslyn and Genesee, right?

12      A.   Yes.

13      Q.   Does this show where the defendant was when you

14  first noticed him?

15      A.   Yes.

16      Q.   And can you point to that area on this photograph?

17      A.   (Witness indicating.)

18      Q.   So you are pointing -- There's a stop sign there,

19  correct?

20      A.   Yes.

21      Q.   And you are pointing to the -- basically to the

22  right of that stop sign in the middle of the sidewalk, would

23  that be fair to say?

24      A.   Yes.

25      Q.   And does this also show the -- I know they have

MOSELEY - DX HARRIGAN                    193

1    changed, but the steps that you were sitting on when this

2    happened?

3         A.    Yes.

4         Q.    Okay.  Could you point to those again?

5         A.    (Witness indicating.)

6         Q.    And again, those are the steps in the middle of the

7    photograph on the right-hand side, correct?

8         A.    Yes.

9         Q.    All right, thank you.

10              (Whereupon the witness resumed the witness stand.)

11        Q.    Now, I am going to show you People's Exhibit Number

12   5, and just let me know if this looks familiar to you.

13              (Witness examining exhibit.)

14        A.    Yeah.

15        Q.    And what is this?

16        A.    It's a picture of Genesee Street and the blocks

17   surrounding.

18        Q.    Okay.  Are you -- When you lived there and

19   everything, were you familiar with this area?

20        A.    Somewhat, yes.

21        Q.    All right.  Is this a -- This is a map of that

22   area, would that be fair to say?

23        A.    Yes.

24        Q.    Is this a fair and accurate depiction of how it

25   looked and the streets looked back on September 25, 2013?

1    A.    Yes.

2    Q.    Can you see anything in this photograph that has

3    been changed since then?

4    A.    No.

5         (Whereupon the witness resumed the witness stand.)

6              MR. HARRIGAN:  Your Honor, at this time, the

7              People would offer People's Exhibit Number 5 into

8              evidence.

9              MR. STUBBE:  No objection.

10              THE COURT:  Mark 5 received, please.

11              (Whereupon PEOPLE'S EXHIBITS 5 WAS RECEIVED INTO

12              EVIDENCE.)

13    Q.    Now, I am going to ask you probably to get up one

14    more time, if that's all right, Mr. Moseley.

15         (Whereupon the witness descended the witness

16          stand.)

17    Q.    I am going to display People's Exhibit Number 5 to

18    the jury, and if you could just -- if -- do you see where 19

19    Roslyn Street is on this map?

20         (Witness examining exhibit.)

21    A.    Right here (witness indicating).

22    Q.    Okay.  And that's the house that's actually

23    identified as 19, correct?

24    A.    Yes.

25    Q.    All right.  Now, you talked about the defendant

MOSELEY - DX HARRIGAN                      195

1    going down I think you said Genesee Street towards Brooks

2    Avenue.  Can you just show the jury the direction that the

3    defendant -- you saw the defendant travel?

4        A.    Down this way (witness indicating).

5        Q.    Okay.  So what your finger was showing is on the

6    road marked "Genesee Street" basically from Roslyn, and you

7    showed directly south, correct?

8        A.    Yes.

9        Q.    Okay.  Did you see if the defendant went on any

10   side streets; did you see where he went?

11       A.    No.

12       Q.    Okay.  And which way did the person on the bike

13   went -- go?  Excuse me.

14       A.    This way (indicating).

15       Q.    So again, you are showing the same way down Genesee

16   Street south, correct?

17       A.    Yes.

18       Q.    All right.  Thank you, Mr. Moseley.

19             (Whereupon the witness resumed the witness stand.)

20       Q.    Now, at some point, did you give a description of

21   any facial features to -- Well, let me ask you this.

22             MR. HARRIGAN:  Strike that.

23       Q.    Eventually did the police arrive?

24       A.    Yes.

25       Q.    And do you remember talking to an individual by the

MILLER 000481

1   name of Nolan Wengert, Investigator Wengert?

2        A.   Yes.

3        Q.   And did you tell Investigator Wengert about any

4   facial features that you noticed of the person who robbed

5   you?

6        A.   He had a chin strap beard.

7        Q.   Okay.  Did you tell that to Investigator Wengert?

8        A.   Yes.

9        Q.   Now, eventually did they bring anybody back, did

10  the police bring anybody back to have you look at them?

11       A.   Yes.

12       Q.   How many people did they bring back?

13       A.   Two.

14       Q.   Did you say -- Before they -- Now, was Investigator

15  Wengert with you during that time?

16       A.   Yes.

17       Q.   Did you say anything to Investigator Wengert before

18  they showed you these people or as they were starting to show

19  you these people?

20       A.   I explained that I wanted to make sure that they had

21  the right person.

22       Q.   Okay.  And why is that?

23       A.   I didn't want someone who didn't do something wrong

24  to get in trouble.

25       Q.   Okay.  Now, when they showed you the first person,

MOSELEY - DX HARRIGAN

197

1     did you recognize that person?

2          A.     Yes.

3          Q.     Who was the first person?

4          A.     The gentleman that was on the bike.

5          Q.     And then they showed you the second person?

6          A.     Yes.

7          Q.     And they showed you one at a time, right?

8          A.     Yeah.

9          Q.     Okay.  So the second person, did you recognize the

10    second person?

11         A.     It was the gentleman that robbed me.

12         Q.     Okay.  And was it the defendant that they showed

13    you?

14         A.     Yes.

15         Q.     Did you say anything -- Did you notice anything

16    about his clothes that were -- that -- with regard to when

17    they showed him to you versus when you saw him back on

18    Roslyn Street at the time of the robbery?

19         A.     They were different.

20         Q.     Anything that was the same that you noticed?

21         A.     His shoes.

22         Q.     Okay.  And what were -- what were unique about his

23    shoes?

24         A.     They were a tan pair of Timberlands.

25         Q.     Did you ever get any of your property back?

MOSELEY - DX HARRIGAN                    198

1    A.    No.

2    Q.    Did you change anything with regards to your phone

3  or phone number or anything?  What did you do with that?

4    A.    A friend of mine had let me borrow a phone of his,

5  and I turned that phone on with the same phone number.

6    Q.    So you kept the same number, but changed phones?

7    A.    Correct.

8    Q.    Now, during that time, could you tell -- could you

9  do anything with regards to -- did you get anything with

10  regards to your old phone, did you get any e-mails, anything

11  like that?

12    A.    Yeah.

13    Q.    Okay.  How did that come in, do you know?  If you

14  know.

15    A.    Well, on my phone there's an ap, it's Find my iPhone,

16  and I had received three e-mails from Apple.

17    Q.    All right.  And when you received those, did you

18  tell anybody?

19    A.    I let Detective Wengert know.

20        MR. HARRIGAN:  Thank you, Mr. Moseley.

21        THE COURT:  Mr. Stubbe.

22

23  CROSS-EXAMINATION

24  BY MR. STUBBE:

25    Q.    When the 911 call was made, Mr. Moseley, did you

MOSELEY - CX STUBBE                    199

1    get on the phone, or did you simply let Mr. Lewis do it?

2         A.    He had initially called, and then I did get on the

3    phone.

4         Q.    Okay.  When you spoke with the 911 operator, did

5    they ask you to give a description of the suspect?

6         A.    Yeah.

7         Q.    And the description you gave was that he was maybe

8    five-seven or -eight, thin build, black male?

9         A.    Right.

10        Q.    You thought that he was wearing a gray hoodie, is

11   that right?

12        A.    Mm-hmm.

13        Q.    That's a "Yes"?

14              THE COURT:  Is that a "Yes"?

15        A.    Yes.

16        Q.    And that he had on blue jeans.

17        A.    Yes.

18        Q.    As you look at Mr. Miller today, is there anything

19   unique about his facial appearance?

20        A.    No.

21        Q.    You don't find the chin strap beard that he has to

22   be a unique feature?

23        A.    I can't see his chin from here; the computer's in the

24   way.

25        Q.    I'm sorry.

MILLER 000485

MOSELEY - CX STUBBE                    200

1          At this point, do you see the chin strap beard that

2     Mr. Miller has?

3          A.    It's still tough to see his chin from here.

4               MR. STUBBE:  Judge, may I have Mr. Miller

5          approach?

6               THE COURT:  You can have Mr. Miller stand up.

7               MR. STUBBE:  Would you stand up, please,

8          Anthony, maybe turn to the side, if you would.

9               (Whereupon Defendant Miller complied with Mr.

10         Stubbe's request.)

11         Q.    Is it easier for you now to see the chin strap

12    beard that Mr. Miller has?

13         A.    I can see some of it, yes.

14         Q.    Suffice it to say on September 25th, you were much

15    closer than that.  At this point, we are probably 30 feet

16    away, would that be about right?

17         A.    Yes.

18         Q.    And you stated that he was within a foot of you on

19    September 25th?

20         A.    Yes.

21         Q.    And when the 911 operator called you and asked --

22    or when you called them and they asked you for a description,

23    you gave a height, a weight, an age, you said he was about

24    nineteen years of age, you gave a description of the clothing

25    he was wearing on the top and a description of the clothing

1   he was wearing on his body, right?

2       A.   Yes.

3       Q.   You made no mention of a chin strap beard when you

4   spoke to the 911 operator, correct?

5       A.   No.

6                MR. HARRIGAN:  Objection.  Improper

7            impeachment.

8                THE COURT:  Sustained.

9       Q.   When you spoke to the 911 operator, did you tell

10  him -- tell the operator, rather, that the suspect had a chin

11  strap beard?

12      A.   Not that I can remember.

13      Q.   How long had Mr. Lewis spoken to the 911 operator

14  before you got on the phone?

15      A.   Maybe about a minute.

16      Q.   Did you tell the 911 operator that the suspect was

17  wearing tan Timberland boots?

18      A.   I cannot recall.

19      Q.   While you were sitting on your steps -- And, now,

20  again, the steps that have now been shown in People's

21  Exhibits 1 -- sorry, 1 and 2 that both show what are concrete

22  steps now, those are not the steps you were sitting on.

23      A.   No.

24      Q.   And you said that the steps you were sitting on

25  were actually brick steps, right?

MOSELEY - CX STUBBE                      202

1       A.    Yes.

2       Q.    It had a little landing at the door, didn't it?

3       A.    Yes.

4       Q.    So it didn't -- it wasn't like these -- these steps

5    go -- the final step is the same width, goes straight up to

6    the door, right?

7       A.    Yes.

8       Q.    But those steps, the brick steps had a little

9    landing on the top.

10      A.    Yes.

11      Q.    And you were sitting on those steps looking down

12   toward Genesee Street.

13      A.    I was on my phone --

14      Q.    Okay.  At some point --

15      A.    -- looking at my phone.

16      Q.    But at some point, you had noticed that there was

17   somebody standing on the corner of Genesee Street?

18      A.    Yes.

19      Q.    And when that person approached you, you stated

20   they were two or three feet away.

21      A.    Yes.

22      Q.    And that's when you first saw them.

23      A.    No.

24      Q.    Other than standing on the corner.

25      A.    Yes.

MILLER 000488

MOSELEY - CX STUBBE                    203

```
 1        Q.   So they got from the corner to two or three feet
 2   from you before you noticed them?
 3        A.   Yes.
 4        Q.   And how quickly upon them being two or three feet
 5   away was the gun produced?
 6        A.   Fairly quickly.
 7        Q.   Immediately?
 8        A.   Yeah.
 9        Q.   And the gun was on your temple almost immediately.
10        A.   Yes.
11        Q.   Now, you gave the description of the gun as a black
12   gun, I believe that you said it's -- it looks like a police
13   officer's gun, right?
14        A.   Yes.
15        Q.   So it clearly was not a revolver.
16        A.   No.
17        Q.   And it was black, it didn't have any other colors
18   on it?
19        A.   No.
20        Q.   And you said it was a small gun.
21        A.   Yes.
22        Q.   Can you tell us anything else about the gun?
23        A.   That was it.
24        Q.   Could you tell if it was wooden or metal?
25        A.   It was metal.
```

MOSELEY - CX STUBBE                    204

1    Q.   Could you tell if it was made out of one piece or

2    several pieces?

3    A.   No.

4    Q.   Could you tell if it had a trigger?

5    A.   Yeah.

6    Q.   Yes.  And yes, it did have a trigger?

7    A.   Yeah.

8    Q.   Could you tell if the person's finger was on the

9    trigger?

10   A.   Yes.

11   Q.   And was the person's finger on the trigger?

12   A.   Yes.

13   Q.   During the entirety of the time this person

14   approached you and was with you, from them being two or three

15   steps away until them walking away from you, how much time do

16   you suppose passed?

17   A.   Thirty to forty-five seconds.

18   Q.   And probably a maximum of 30 or 45 seconds, right?

19   A.   Yeah.

20   Q.   And you hit the gun away, the gun gets pointed back

21   at your head, the person says "Give me what you got" --

22   A.   Yes.

23   Q.   -- right?

24        You don't do anything, and he takes the phone?

25   A.   Yes.

1    Q.   And then he goes in each of your pockets.  Just

2    your two pants pockets?

3    A.   Yes.

4    Q.   He didn't take his time going through your pocket

5    or anything; just reached in and grabbed, right?

6    A.   Yes.

7    Q.   Okay.  So probably, to be fair, a maximum of 30

8    seconds.

9    A.   Thirty to forty-five seconds, yes.

10   Q.   And he goes down to the corner of Genesee and

11   Roslyn, right, and you are watching him?

12   A.   Yes.

13   Q.   At what point do you then go back to see Mr. Lewis?

14   A.   When he took a right on Genesee and ran towards

15   Brooks Avenue is when I turned around and went back to where

16   Stan was.

17   Q.   Okay.  And Stan was sitting in his vehicle at the

18   time?

19   A.   No.

20   Q.   Where was he?

21   A.   He was sitting in a chair in the driveway.

22   Q.   Okay.  And again, I'm sorry, I'm not real good with

23   east and west.  He was sitting in a chair in the driveway,

24   and that chair you indicated was next to the smaller of the

25   two garages?

1       A.   Yes.

2       Q.   And as we look at it then, that's on the left-hand

3    side?

4       A.   Yes.

5       Q.   And approximately how far from the garage door was

6    he?

7       A.   Maybe five feet.

8       Q.   Five feet toward the street?

9       A.   Yes.

10      Q.   He wasn't sitting in the garage?

11      A.   No.

12      Q.   And with regard to the door itself, was he -- would

13   he have been basically in the middle of the door, toward one

14   side or the other?

15      A.   Generally in the middle.

16      Q.   And after you approached him, you asked him to call

17   911?

18      A.   Yes.

19      Q.   And you did call 911 immediately -- or he called

20   911, rather, immediately, right?

21      A.   Yes.

22      Q.   Between -- Did you then, you and he, start walking

23   to the corner of Genesee and Roslyn?

24      A.   Yes.

25      Q.   And as the picture shows, that's no more than a

MILLER 000492

MOSELEY - CX STUBBE                        207

1    hundred feet.

2         A.    Correct.

3         Q.    At -- Did you get to the corner of Genesee and

4    Roslyn before you had the phone, or did you have the phone

5    after you got to that part?

6         A.    We were at the corner already.

7         Q.    And you had the phone and you were speaking to the

8    911 operator?

9         A.    We had gotten to the corner, and Stan was still on

10   the phone, and then he gave me the phone.

11        Q.    Okay.  Was that quickly after you reached the

12   corner of Genesee and Roslyn?

13        A.    It wasn't long after.

14        Q.    Okay.  And so at that point, you spoke to the 911

15   operator and told them that you saw the people going

16   southbound toward Brooks.

17        A.    Yes.

18        Q.    How long did you stand on the corner watching them

19   go southbound toward Brooks?

20        A.    We were on the corner until the police arrived.

21        Q.    And you said you never saw them go off onto a side

22   street at all.

23        A.    I wasn't on the corner when the defendant was running

24   down Genesee Street.

25        Q.    Okay.

MILLER 000493

1    A.    He had already been gone.  The gentleman on the bike

2    took off towards Brooks Avenue, and I believe it was the second

3    street that he took a right onto.

4         Q.    Okay.  Did you tell that to the 911 operator?

5         A.    I can't recall.

6         Q.    So when the officers arrive, it's not Investigator

7    Wengert who originally arrived to the corner of Genesee and

8    Roslyn, was it?

9         A.    Can you say that again?  I'm sorry.

10        Q.    It wasn't Investigator Wengert who originally

11   arrived to the corner of Genesee and Roslyn to speak to you,

12   was it?

13        A.    No.

14        Q.    It was an Officer Prinzi; sound right?

15        A.    Yeah.

16        Q.    And when he arrived, did he ask you to give him a

17   description again?

18        A.    Yeah.

19        Q.    And when you gave him the description, you didn't

20   describe to him the chin strap beard, did you?

21        A.    Not that I can recall.

22        Q.    And, sorry, the description you gave him was,

23   again, gray hoodie, blue jeans, height, weight, five-seven or

24   so and slim build, right?

25        A.    Yes.

MOSELEY - CX STUBBE                           209

1      Q.    Prior to today, have you spoken with the District

2   Attorney about your testimony?

3      A.    Yes.

4      Q.    Approximately how many times?

5      A.    Twice.

6      Q.    Twice prior?

7      A.    Yes.

8      Q.    Ever see any pictures other than the few that

9   you've identified?

10     A.    Pictures of?

11     Q.    Anything.

12     A.    No.

13     Q.    So only those four pictures that you identified,

14  those are the only ones that you saw?

15     A.    And the map of --

16     Q.    And the map?

17     A.    Yes.

18     Q.    Sorry.

19           When you -- When Mr. Miller was brought back to you

20  and you identified him, you said the only thing you noticed

21  that were the same was the boots.  Now, the DA -- And he may

22  not have meant to, but he said did you notice -- or he said

23  did you find anything unique about the boots, and you said

24  they were tan Timberland boots.  Was there anything unique

25  about that style of tan Timberland boots that he was wearing?

MILLER 000495

1    A.    No.

2    Q.    They didn't have gold paint or anything on them,

3    right?

4    A.    No.

5    Q.    They were just kind of your standard issue tan

6    Timberland boot that a lot of people wear.

7    A.    Yes.

8              MR. STUBBE:  May I have just a moment, Judge?

9              THE COURT:  Certainly.

10             (Whereupon there was a brief pause in the

11              proceedings.)

12             MR. STUBBE:  Nothing further then, Judge.

13             THE COURT:  Redirect?

14             MR. HARRIGAN:  Briefly, yes, Your Honor, thank

15             you.

16

17   REDIRECT-EXAMINATION

18   BY MR. HARRIGAN:

19   Q.    Mr. Moseley, Mr. Stubbe talked to you about your

20   observations going down the street after it occurred.  I'm

21   going to put the -- display People's Exhibit 5.  And can you

22   see that from where you are sitting?

23   A.    Yes.

24   Q.    Okay.  So where you were talking earlier from 19

25   Roslyn Street, you were talking -- you pointed south on

MOSELEY - REDX HARRIGAN                    211

1    Genesee, right?

2        A.   Yes.

3        Q.   And you said I believe -- Tell me if I am wrong --

4    you said that by the time you got to the corner, you didn't

5    see the defendant again, is that fair?

6        A.   Yes.

7        Q.   And the person on the bike, you said you thought it

8    was maybe like he turned maybe two streets down or something?

9        A.   Yes.

10       Q.   As I'm looking at it here, would that have been two

11   streets south on the left of Genesee, or two streets south on

12   the right of Genesee?

13       A.   The left.

14       Q.   Okay.  So just to be clear -- And I am not saying

15   which street 'cause there's one, two, three, four streets --

16   actually, five streets on this map, you thought it was two

17   streets south of Roslyn?

18       A.   Yes.

19       Q.   And on this map, is that labeled as West High

20   Terrace?

21       A.   Yes.

22       Q.   All right.  Thank you, sir.

23            MR. HARRIGAN:  Nothing further, Your Honor.

24            THE COURT:  Mr. Stubbe?

25            MR. STUBBE:  Nothing.

```
 1              THE COURT:  Thank you, Mr. Moseley.

 2     (Whereupon the witness was excused.)

 3              THE COURT:  Call your next witness.

 4              MR. HARRIGAN:  Your Honor, could I just have

 5     one minute to see who I have out here?

 6              THE COURT:  Very good.

 7              MR. HARRIGAN:  Thank you.

 8     (Whereupon Mr. Harrigan exited the courtroom and

 9      there was a pause in the proceedings.)

10              MR. STUBBE:  Your Honor, when Mr. Harrigan

11     comes back in, can we approach briefly on

12     scheduling?

13              THE COURT:  Sure.

14     (Whereupon Mr. Harrigan entered the courtroom.)

15              THE COURT:  Mr. Harrigan, would you approach

16     the bench, please.

17              MR. HARRIGAN:  Yes, Your Honor.

18              THE COURT:  Off the record.

19     (Whereupon a discussion off the record was held at

20      the bench between the Court, Mr. Harrigan and Mr.

21      Stubbe, out of the hearing of the court reporter

22      and the defendant.)

23     (Whereupon the discussion off the record at the

24      bench between the Court and counsel concluded.)

25              MR. STUBBE:  Thank you, Judge.
```

MILLER 000498

1          THE COURT:  Officer, step right up.

2

3     D A R Y L   H O G G, called herein as a witness, having first

4     been duly sworn, was examined and testified as follows:

5               THE COURT:  Good morning.

6               THE WITNESS:  Good morning.

7               THE COURT:  If you keep close to that

8          microphone, we will be better off, okay?

9               THE WITNESS:  That sounds good.

10               THE COURT:  Thank you.

11

12   DIRECT-EXAMINATION

13   BY MR. HARRIGAN:

14        Q.   Good morning, sir.

15        A.   Good morning, sir.

16        Q.   Could you please again tell the jury your name?

17        A.   My name is Daryl Hogg.

18        Q.   And where do you work?

19        A.   I'm a police officer for the Rochester Police

20   Department.

21        Q.   And approximately how long have you worked for

22   Rochester Police Department?

23        A.   About six and a half years.

24        Q.   Any other prior law enforcement experience?

25        A.   No, sir.

MILLER 000499

1    Q.   And what are -- I am going to be directing your

2    attention to September 25, 2013.  On that date, what were

3    some of your duties as a police officer?

4    A.   I work in the Patrol West Division, so I take calls

5    for service from 911 people call in.  We also do some

6    pro-active things such as traffic stops, clearing corners, we

7    help out Major Crimes when they are needed.

8    Q.   And was there a specific area that you were

9    assigned to back on September 25, 2013?

10   A.   Yes.  I'm in what the City calls the Genesee Section,

11   which is the Genesee Street area.  I have been there since

12   2008, December of 2008.

13   Q.   And do you currently work in that same capacity

14   right now?

15   A.   Yes, sir, I do.

16   Q.   All right.  What is -- Back on September 25, 2013,

17   do you remember what your shift was?

18   A.   Yes.  I worked 2:45 p.m. till 11:00 p.m.

19   Q.   So were you working then around 8:00 p.m. or a

20   little bit thereafter?

21   A.   Yes, sir, I was.

22   Q.   And do you recall receiving a call at about that

23   time on that date?

24   A.   Yes, I do.

25   Q.   And what was the call for?

1      A.    Call was for a gunpoint robbery.

2      Q.    Do you know the approximate time when you got the

3  call?

4      A.    I believe it was around 8:00, a couple minutes after

5  8:00 p.m.

6      Q.    And what were you doing at the time, if you know?

7      A.    At that point in time, I was just on patrol driving

8  around at the time.

9      Q.    Were you in uniform?

10     A.    Yes, I was.

11     Q.    Were you in a marked patrol car?

12     A.    Yes, I was.

13     Q.    Were you working with any partners, or by yourself?

14     A.    I was by myself in the car.

15     Q.    And did you respond immediately?

16     A.    Yes.

17     Q.    Where did you respond to?

18     A.    At the time of the call, I was on Brooks Avenue,

19  which is one of your most southern east-west streets in the

20  city in that area, and I was on Brooks Avenue.  I continued to

21  drive eastbound towards Genesee Street, and then I went up to a

22  street called Millbank, which runs north and south, runs

23  parallel with Genesee Street, to the area of Bradburn Street,

24  which is -- which goes east-west parallel with Brooks Avenue.

25     Q.    And about how long did it take for you from the

HOGG - DX HARRIGAN                          216

1   time when you got the call till the time you arrived on

2   Bradburn Street?

3        A.   Five minutes, a little over five minutes.

4        Q.   I am going to put this -- display People's Exhibit

5   Number 5, and first I will just show you.  Do you recognize

6   what this is?

7             (Witness examining exhibit.)

8        A.   Yes.  That would be a partial city map of the patrol

9   area that I work in.

10       Q.   Okay.  And if you could step down off the stand

11   briefly.

12            (Whereupon the witness descended the witness

13             stand.)

14       Q.   And could you -- does this display the area in

15   which you traveled to get to Bradburn Street, partially at

16   least?

17       A.   Partially.

18       Q.   Okay.

19       A.   The only thing that would be missing would be Brooks

20   Avenue, which is down here (indicating).

21       Q.   And when you say "down here," you are kind of off

22   the map at the bottom, correct?

23       A.   Yes, sir.

24       Q.   And you were going kind of left to right, is that

25   right?

MILLER 000502

1    A.    Yes, sir.

2    Q.    So could you just show the jury I guess with your

3    finger where you came up to get to Bradburn Street?

4    A.    Okay, so I was on Brooks Avenue, in that (indicating)

5    area, and I drove eastbound, and then I turned northbound onto

6    Millbank Street, I drove up Millbank Street to the intersection

7    of Millbank and Bradburn, so right about here (indicating).

8    Q.    And when you got to that location, did you -- did

9    anybody come to your attention?

10    A.    Yes.  I saw two males standing a couple houses down

11    in a westbound direction.

12    Q.    And do you know the address on Bradburn where they

13    were standing?

14    A.    Yes.  It was 22 Bradburn Street.

15    Q.    And is that depicted on this map?

16    A.    Yes.  It's right here (indicating) in the yellow or

17    green writing.

18    Q.    And that's actually displayed with the number "22,"

19    would that be correct?

20    A.    Yes, correct.

21    Q.    All right, thank you.  You can take a seat.

22    (Whereupon the witness resumed witness stand.)

23    Q.    Now, when you came up from Brooks, did you know --

24    I mean did you have any description of who you were looking

25    for, any suspects?

HOGG - DX HARRIGAN

218

1    A.    Yes.  The initial radio call came out that there was

2    two suspects, both male blacks, one wearing a red hoodie, the

3    other one with a gray hoodie, gave a description of one

4    approximately five foot-eight, maybe five foot-nine, medium

5    build.

6    Q.    And you said you knew it was a -- or you learned

7    that it was a gunpoint robbery, right?

8    A.    Yes.

9    Q.    Did you learn where it was at?

10    A.    Yes.  19 Roslyn Street.

11    Q.    And are you familiar with that -- 19 Roslyn Street,

12    that area?

13    A.    Yes.  That's also in my patrol area.

14    Q.    About -- Do you know, about how far is 19 Roslyn

15    Street from 22 Bradburn Street, if you know?

16    A.    I would say it's about three, maybe four city blocks.

17    Q.    Okay.  Now, why did you go up the area you did, you

18    said Millbank until you got to Bradburn, and that's when you

19    noticed somebody; why did you go up Millbank?

20    A.    When the initial call came in, it said both suspects

21    had fled southbound on Genesee Street.  Being that I was south

22    of Roslyn and I know my area, there's a lot of side streets, so

23    at any point in time, they could have gone down any one of the

24    side streets.  So with my training and experience, knowing that

25    that happens, they are not going to stay on a main road such as

1    Genesee Street, I took some side streets.  Millbank would have

2    been the first one that connected around that area.

3        Q.    And from the time when you got the call, you said

4    it was about five minutes, till you got to 22 Bradburn

5    Street, did you see anyone else in that -- on your way, did

6    you see any other people?

7        A.    No, I did not.

8        Q.    Okay.  Anyone else matching the description at all?

9        A.    No.

10       Q.    So when you got to 22 -- where you got to Bradburn

11   and Millbank Street, that's the first time you actually saw

12   people, would that be fair to say?

13       A.    Yes, correct.

14       Q.    And that was two people you saw?

15       A.    Correct.

16       Q.    And they were male blacks?

17       A.    Yes, sir.

18       Q.    When you made that observation of those people

19   outside of 22 Bradburn Street, what did you do, if anything?

20       A.    As soon as I saw them, I called out on the radio that

21   I was stopping with two males that potentially might be

22   suspects, and I think I called out at the intersection of

23   Millbank and Bradburn 'cause that's where I happened to be when

24   I was pulling up.

25       Q.    Why did you do that, why did you call out?

MILLER 000505

1     A.   I always call out my location.  It's kind of an

2 officer safety factor, so that if something goes wrong, other

3 officers know where to find me.  And, you know, we are supposed

4 to let everyone know where we are anyways.

5     Q.   So after you did that, what, if anything, did you

6 do?

7     A.   After I did that, I pulled my car down in front of

8 the two males and I stepped out with them.  I spoke to the two

9 of them.  There was two gentlemen there.  I grabbed one of 'em.

10 Knowing that it was a gunpoint robbery, I wanted to do a

11 pat-frisk to make sure there was no weapons on either one of

12 them prior to me continuing my investigation.

13     Q.   And did you find any weapons?

14     A.   No, I did not.

15     Q.   The -- When you got there and you stepped out --

16 When you say "step out," what does that mean?

17     A.   It just means get out of my car.

18     Q.   When you stepped out with these individuals, were

19 you the only law enforcement officer there at the time?

20     A.   Yes, sir.

21     Q.   And what -- Did you learn either of those

22 individuals' names?

23     A.   Yes.

24     Q.   What were their names, if you know?

25     A.   The first person that I spoke with was Aaron Hinds,

MILLER 000506

HOGG - DX HARRIGAN                    221

1    and the other male was Anthony Miller.

2        Q.    And the person that you said was Anthony Miller, do

3    you see him in the courtroom today?

4        A.    Yes, I do.

5        Q.    Could you please just identify an article of

6    clothing he's wearing and point to him?

7        A.    Blue and white striped shirt, I'm sorry, there

8    (indicating.)

9        Q.    Thank you.

10            MR. HARRIGAN:  Your Honor, please let the

11            record reflect the witness identified the

12            defendant.

13            THE COURT:  So ordered.

14            MR. HARRIGAN:  Thank you, Your Honor.

15        Q.    And so did any other officers respond once you

16    arrived and stepped out with the defendant and Aaron Hinds?

17        A.    Yes.  I was pat-frisking Aaron Hinds at the time, and

18    one of my other partners, Dan Watson, showed up within probably

19    a minute or two of me calling out with that.

20        Q.    Now, specifically did you ask the defendant any

21    questions or did the defendant make any statements regarding

22    what they were doing there?

23        A.    Yeah.  I asked both of them while I was pat-frisking

24    them what they were doing there, what was the reason for being

25    out there.

HOGG - DX HARRIGAN

1    Q.    And what did the defendant say?

2              MR. STUBBE:  Objection, Judge.  Hearsay.

3              THE COURT:  Overruled.

4    A.    They told me they were going to 22 Bradburn Street to

5    retrieve an mp3 player.

6    Q.    Whose mp3 player; did they say?

7    A.    Mr. Miller's.

8    Q.    That would be the defendant's?

9    A.    Yes, sir.

10   Q.    Did they say whether anyone was home at 22 Bradburn

11   Street?

12   A.    They had told me that there was nobody home there.

13             MR. STUBBE:  Objection again, Judge, hearsay

14             to all of this.

15             THE COURT:  Overruled.

16   Q.    Now, at some point, did you observe Mr. Miller

17   being pat-frisked?

18   A.    Yes, Officer Watson pat-frisked him.

19   Q.    And did you make any observations of anything that

20   Officer Watson got off of the defendant?

21   A.    Yes, I did.

22   Q.    What did he get from the defendant?

23   A.    He had a black mp3 player with ear buds in his

24   pocket.

25   Q.    Okay.  And was that after they told you that they

1    were going to get an mp3 player but no one was home?

2        A.    Yes.

3        Q.    So what, if anything, did that tell you?

4        A.    Just made my suspicions rise a little bit more.

5              MR. STUBBE:  Objection.

6              THE COURT:  Sustained.

7              MR. HARRIGAN:  I'm sorry, Your Honor, I didn't

8        hearing the ruling.

9              THE COURT:  Sustained.

10       Q.    So what, if anything, did you do at that point?

11       A.    After the pat-frisk, both males were placed in the

12   back seats of the police cars unhandcuffed, and we were

13   basically trying to get pedigree information, which would be

14   the names, dates of birth, addresses.

15       Q.    Now, at some point, did Investigator Wengert call

16   you and ask you a question?

17       A.    Yes, he did.

18       Q.    All right.  And without getting into what

19   Investigator Wengert said, what did you say back to him, if

20   anything?

21       A.    I said "Yes" to his question.

22       Q.    All right.  And after that, did you transport the

23   defendant and Aaron Hinds anywhere?

24       A.    Yes.  I transported Mr. Hinds, and Officer Watson

25   transported the defendant, to the area of Genesee Street and

1  West High Terrace.

2       Q.   And why did you do that?

3       A.   We were gonna go there for -- Investigator Wengert

4  was going to do a show-up.

5       Q.   What's a show-up?

6       A.   A show-up is where the investigator sits with the

7  victim and the victim tries to depict whether or not they can

8  recognize the potential suspects.

9       Q.   Did you know what happened to that mp3 player the

10  defendant had on him?

11       A.   I believe it was turned in to City Property Clerk.

12       Q.   Do you know that for sure, or --

13       A.   I'm not positive.

14       Q.   Okay.  You didn't do it, right?

15       A.   I don't believe so, no.

16       Q.   Okay.  I am going to show you what's been marked

17  for identification as People's Exhibit Number 6.  Do you know

18  what that is that I'm showing you?

19            (Witness examining exhibit.)

20       A.   Yes.  It would be a picture of I believe 22 Bradburn.

21       Q.   Is that a fair and accurate depiction of how it

22  looked back on September 25, 2013?

23       A.   Yes, with the exception of it being a little bit

24  darker, starting to rain a little bit.

25       Q.   So there's no -- other than that, the weather

HOGG - DX HARRIGAN
225

1    conditions, no other additions or deletions to that?

2        A.    Correct.

3        Q.    And I am going to show you People's Exhibit Number

4    7.  Can you tell me what that is, if you know?

5        A.    That's just a closer view of the same residence.

6        Q.    Okay.  Is that a fair and accurate depiction of how

7    it looked back on September 25, 2013, without the lighting

8    and the weather factors we talked about?

9        A.    Yes, sir.

10        Q.    Any additions or deletions to that photograph?

11        A.    No, sir.

12        Q.    And finally, what I am going to do is show you

13    People's Exhibit Number 8.  Are you familiar with what I am

14    showing you there?

15              (Witness examining exhibit.)

16        A.    Yes.  That's Bradburn Street.

17        Q.    Okay.

18        A.    It would be in the westbound direction.

19        Q.    All right.  Is that a fair and accurate depiction

20    of how it looked back on September 25, 2013?

21        A.    Yes, sir, it is.

22        Q.    Any additions or deletions obviously other than the

23    lighting and weather factors?

24        A.    No, sir.

25        Q.    Thank you.

HOGG - DX HARRIGAN

1              MR. HARRIGAN:  Your Honor, at this time, the

2         People would offer People's Exhibits 6, 7 and 8

3         into evidence.

4              MR. STUBBE:  No objection.

5              THE COURT:  Would you mark 6, 7 and 8

6         received.

7              (Whereupon PEOPLE'S EXHIBITS 6, 7 and 8 WERE

8         RECEIVED INTO EVIDENCE.)

9    Q.   Officer Hogg, if you would, I'd like to have you

10   come to the visualizer.

11             (Whereupon the witness descended the witness

12        stand.)

13   Q.   I am going to -- For the record, I am going to put

14   People's Exhibit Number 6 on the visualizer.

15             Now, we talked about this is the area in which you

16   saw the defendant and Aaron Hinds, is that correct?

17             (Witness examining exhibit.)

18   A.   Yes, sir, it is.

19   Q.   Can you please -- with the pen, can you just point

20   to where -- the proximity of where you initially saw them.

21   A.   It was right in about there, this area (indicating),

22   which would be in between the sidewalk and road and the

23   driveway, in this (indicating) area.

24   Q.   And basically it's the left side of it as we are

25   looking at it, would that be fair to say?

HOGG - DX HARRIGAN                    227

1       A.    Yes.

2       Q.    Were they standing next to each other?  Where were

3   they at, next to -- compared to each other I guess.

4       A.    They were standing just about the distance we are

5   together.

6       Q.    So maybe a foot to maybe at the most two feet

7   apart, would that be fair?

8       A.    Correct.

9       Q.    Were they facing the same direction, if you recall?

10      A.    Yes, they were, they were facing the street kind of

11  looking at each other.

12      Q.    So their backs were to 22 Bradburn?

13      A.    Yes, sir.

14      Q.    All right, thank you, sir.

15            (Whereupon the witness resumed the witness stand.)

16      Q.    So, now, the show-up procedures, were they

17  conducted?

18      A.    Yes, sir, they were.

19      Q.    And were they done one at a time as far as you

20  know?

21      A.    Yes, sir.

22      Q.    All right.  And did you assist with that show-up

23  procedure?

24      A.    I did.

25      Q.    Who did you assist with; Mr. Hinds, or the

MILLER 000513

1  defendant?

2      A.   I actually assisted with both.

3      Q.   Okay.  And what did you do with regard to

4  assisting?

5      A.   I took Mr. Hinds out of the car and walked him up to

6  the area where we were doing the show-up, which would have been

7  in the proximity of 19 Roslyn Street.  I probably walked within

8  a couple feet of him, behind him, to his right side; explained

9  to him that when we got up there, I was going to give him some

10  directions how to turn and then we were going to go back to the

11  car afterwards.

12      Q.   And did you do anything different with regards to

13  the defendant?

14      A.   I did not.

15      Q.   Okay.  So you did the procedure the same way?

16      A.   Yes, I did.

17      Q.   Now, after the show-ups were completed, do you know

18  what happened to Mr. Hinds?

19      A.   Yes.  Mr. Hinds was placed in the back seat of

20  Officer Watson's car.

21      Q.   And do you know if he was taken anywhere initially,

22  if you know?

23      A.   Offhand, no.

24      Q.   So you didn't have anymore contact with Mr. Hinds

25  after that?

1      A.    I did not.

2      Q.    Okay.  Did you have further contact with the

3  defendant?

4      A.    Yes.  The defendant was put in the back seat of my

5  car, and then I drove him to the Public Safety Building fourth

6  floor.

7      Q.    And why did you do that?

8      A.    He was going there to be interviewed by our

9  investigators.

10      Q.    Okay.  I am going to show you People's Exhibit

11  Number 10.  Can you tell the jury what that is, if you know?

12            (Witness examining exhibit.)

13      A.    That would be a picture of the defendant in the

14  interview room.

15      Q.    And is that a fair and accurate depiction of how he

16  looked when you had contact with him on September 25, 2013?

17      A.    For the most part.

18      Q.    And that would be different why?

19      A.    The only thing that would be different would be his

20  boots were unlaced when I saw him originally.

21      Q.    So other than that, is that a fair and accurate

22  depiction?

23      A.    Yes, it is.

24      Q.    And any additions or deletions to that?

25      A.    No, sir.

MILLER 000515

HOGG - DX HARRIGAN                          230

1    Q.    And I am going to show you People's Exhibit Number

2    11.  Can you tell me what that is, if you know?

3           (Witness examining exhibit.)

4    A.    That's a close facial view of him.

5    Q.    When you say "him," is that the defendant?

6    A.    I'm sorry, the defendant, yes.

7    Q.    Is that a fair and accurate depiction of how he

8    looked back on September 25, 2013?

9    A.    Yes, sir.

10   Q.    Any additions or deletions that you see?

11   A.    No.

12          MR. HARRIGAN:  Your Honor, at this time, the

13          People offer People's Exhibits 10 and 11 into

14          evidence.

15          MR. STUBBE:  No objection.

16          THE COURT:  Mark 10 and 11 received, please.

17          (Whereupon PEOPLE'S EXHIBITS 10 and 11 WERE

18          RECEIVED INTO EVIDENCE.)

19   Q.    I am just going to put initially People's Exhibit

20   Number 10 on the visualizer.

21          Okay.  This is the front photo that you saw of the

22   defendant, is that fair to say?

23   A.    Yes, sir.

24   Q.    All right.  And you talked about when you saw the

25   defendant, as far as you know, these were the -- these are

HOGG - DX HARRIGAN                    231

1    the boots he had on when you saw him?

2         A.    Correct.

3         Q.    And you recall that he had unlaced boots, correct?

4         A.    Yes, sir.

5         Q.    And at this point, would it be fair to say -- And I

6    will give it to you again, People's Exhibit Number 10 -- can

7    you see both the laces on both boots?

8         A.    I cannot.  I can only see them on the -- it would be

9    the right side.

10        Q.    Okay.  And that one as you are looking at it now,

11   that's -- you are saying that's not how it was initially?

12        A.    Correct.

13        Q.    And do you know when this photo was taken?

14        A.    I don't know the exact time.  I know it was in the

15   interview room; I can tell by the picture.

16        Q.    So it was after he had left I guess your custody,

17   for lack of a better term, would that be fair to say?

18        A.    Yes.

19        Q.    Okay.  Would the defendant have had time to lace

20   his shoes, his boots?

21        A.    Oh, certainly.

22        Q.    And where would that have been, if you know?

23        A.    That could have been in the police car, it could have

24   been in the room, anywhere during the transport.

25        Q.    And finally, People's Exhibit Number 11, I'm --

MILLER 000517

HOGG - DX HARRIGAN

232

1  that's what you identified as how the defendant looked back

2  on -- his face, how he looked back on September 25, 2013?

3      A.    Yes, sir.

4              MR. HARRIGAN:  Thank you, sir.

5              THE WITNESS:  You are welcome.

6              THE COURT:  Ladies and gentlemen, it's an

7          appropriate time to take a short break.  It is now

8          11:12.  We will break until 11:28.

9              Please understand the admonishments.  Don't

10         converse amongst yourselves or with anyone else

11         about anything related to the case.  You can tell

12         the people with whom you live and where you work

13         where you are; just don't tell them what's going

14         on.  Don't visit or view the scene either in person

15         or by any other means.  If you encounter anyone

16         associated with this case, do not talk to them, and

17         they have been instructed not to talk to you.  If

18         you see anything amiss, somebody tries to talk to

19         you that shouldn't -- anything, quite honestly,

20         that troubles you, get to one of the deputies, they

21         will get to me, I will take care of it.  Don't

22         request, accept, agree to accept or otherwise

23         engage in any conversation whatsoever about the

24         receipt of any benefit whatsoever for providing

25         information about this trial.  And lastly, do not

MILLER 000518

1          research in any form or fashion any issue, law or

2          fact or person related to this case by any means,

3          including the Internet.

4               See you at 11:28.

5          (Whereupon the proceedings adjourned at 11:12 a.m.)

6          (Whereupon the proceedings reconvened at 11:28

7           a.m.)

8          (Whereupon the witness resumed the witness stand.)

9               MR. STUBBE:  Can you mark that, please.

10              (Whereupon DEFENDANT'S EXHIBIT A - 911 CAD

11         report - WAS MARKED FOR IDENTIFICATION.)

12

13   CROSS-EXAMINATION

14   BY MR. STUBBE:

15     Q.    Officer Hogg, you stated that the original call

16   came in and that it was for a gunpoint robbery involving two

17   suspects.

18     A.    Yes, sir.

19     Q.    You were responding to a 911 call, right?

20     A.    Correct.

21     Q.    And the manner in which you responded was by going

22   through the -- or you heard it over the air --

23     A.    Correct.

24     Q.    -- right?

25          And what time did you respond?

HOGG - CX STUBBE                        234

1          A.    I believe I responded at around eight minutes after

2     8:00.

3          Q.    Would looking at the -- what's colloquially called

4     a CAD report refresh your recollection as to exactly what

5     time you responded?

6          A.    Yes, sir.

7          Q.    I am showing you what's been marked as Defendant's

8     Exhibit A.  Would looking at that refresh your recollection

9     as to the exact time you responded?

10         A.    Yes, it would.

11         Q.    Take a look at that, if you would, then.

12               (Witness examining exhibit.)

13         Q.    Just let me know when your recollection has been

14    refreshed.

15               (Witness examining exhibit.)

16         A.    Okay.

17         Q.    And what time did you actually respond?

18         A.    I was on the scene at two -- I'm sorry 8:07 p.m.

19         Q.    8:07, all right.

20               And do you remember exactly what the trans -- or

21    the call that went out over the radio was to which you

22    responded?

23         A.    I don't remember exactly.  I recall it being a

24    gunpoint robbery.

25         Q.    And again, would looking at the CAD report tell you

HOGG - CX STUBBE                    235

1    or refresh your recollection as to exactly what you were

2    responding to?

3         A.   Yes.  I actually just looked at it, and it said

4    "robbery at gunpoint."

5         Q.   And actually, only one suspect was the original

6    call, isn't that correct?

7         A.   That, I don't recall.

8         Q.   Again, you can refresh your recollection.  I will

9    let you look at that.

10             (Whereupon the exhibit was handed to the witness.)

11        Q.   Tell me if that does refresh your recollection as

12   to whether the original call was that there was one or two

13   people involved.

14             (Witness examining exhibit.)

15        Q.   Does that refresh your recollection?

16        A.   Yes, sir.  The initial call stated there was one male

17   suspect.

18        Q.   Okay.  And that was at -- sorry, at 8:02 p.m.,

19   right?  Again, I will let you --

20             (Witness examining exhibit.)

21        A.   Yes, 8:02 p.m., yes.

22        Q.   8:02 p.m.?

23        A.   Yes.

24        Q.   And when you responded, it was at 8:07 p.m.?

25        A.   Correct.

MILLER 000521

HOGG - CX STUBBE                                        236

1        Q.   And as you looked -- another updated call came out

2   at some point, is that right?

3        A.   Correct.

4        Q.   And that came out at 8:07 p.m., correct?

5        A.   Yes, sir.

6        Q.   And that was just after you had said you were on

7   scene, right?

8        A.   Correct, within -- it's in the same minute, yes.

9        Q.   But it's listed after.

10       A.   Right.

11       Q.   So it came after you said you were on scene.  And

12   when you say you were on scene, you were on the corner of

13   Millbank and Bradburn?

14       A.   Correct.

15       Q.   And at that point, you had seen or you were

16   stepping out with two males.

17       A.   Correct.

18       Q.   And when you stepped out with the two males, this

19   is what one of the males was wearing, right?

20            (Witness examining exhibit.)

21       A.   Correct.

22       Q.   And approximately how tall is Mr. Miller?

23       A.   Approximately five-eight, five-nine.

24       Q.   And the other gentleman he was with, Aaron Hinds,

25   approximately how tall was Aaron Hinds?

HOGG - CX STUBBE                    237

1    A.    I believed him to be around six foot, maybe six foot-

2    one.

3    Q.    How big is Aaron Hinds?

4    A.    He is a bigger guy.  I'd say he is probably a little

5    bit bigger than I am.

6    Q.    Would you identify him as a big build, medium

7    build, small build?

8    A.    I would go more a bigger build.

9    Q.    Certainly much bigger than Mr. Miller.

10    A.    Yes, sir.

11    Q.    And again, by your estimation, four or five inches

12    taller than Mr. Miller?

13    A.    Roughly, yes.

14    Q.    And what was Mr. Hinds wearing when you approached,

15    if you remember?

16    A.    My recollection, he had a gray sweatshirt on, and I

17    don't recall the pants offhand.

18    Q.    Okay.  And so you stepped out to these two

19    individuals, you immediately went to Mr. Hinds and did a

20    pat-frisk of him.

21    A.    Yes.

22    Q.    Now, how long does a pat-frisk take?

23    A.    A good pat-frisk, probably a minute.

24    Q.    Did you do a good pat-frisk, or was this a

25    relatively quick one?

MILLER 000523

1    A.   No, it was a good pat-frisk because there was a

2    potential gun involved and I wanted to make sure it wasn't

3    secreted somewhere.

4    Q.   And it was while you were doing that that Officer

5    Watson showed up?

6    A.   Correct.

7    Q.   Now, in terms of time, how much time do you think

8    passed between when you stepped out and when Mr. -- or

9    Officer Watson showed up?

10    A.   I have no idea.

11    Q.   Less than a minute?

12    A.   It seemed pretty quick.  I -- Again, I have no idea.

13    Q.   How far into your pat-frisk do you think you were?

14    A.   Around the waist area.

15    Q.   So halfway?

16    A.   Maybe halfway.

17    Q.   So certainly you would say -- or I mean not

18    certainly, but within about 30 seconds he shows up.

19    A.   I -- I guess.  I don't know for sure.

20    Q.   Now, in this instance, you weren't showing up to

21    speak with a victim; you stepped out with potential suspects,

22    right?

23    A.   Correct.

24    Q.   You have had cases in the past where you have shown

25    up to speak with the victim, correct?

HOGG - CX STUBBE                    239

1    A.    Correct.

2    Q.    When you do that general practice is to ask if they

3    have other details that they may not have broadcast over the

4    radio, right?

5    A.    Correct.

6    Q.    And if there are details that a victim can provide,

7    you would broadcast those out over the radio.

8    A.    Correct.

9    Q.    So anything in addition to what has already been

10   broadcast you would then yourself broadcast?

11   A.    Correct.

12   Q.    Now, the call again to which you were responding,

13   the only information that was transmitted at that point was a

14   gray hoodie, a black male, jeans, and approximately nineteen

15   years of age, right, as far as a physical description?

16   A.    The original -- The original call, yes.

17   Q.    And it was based on that original call that you

18   stepped out with Mr. Hinds and Mr. Miller?

19   A.    Correct.

20   Q.    And before you took custody of the two of them, no

21   additional outside -- I'm sorry, another call saying a second

22   person may be involved was broadcast, right?

23   A.    Correct.

24   Q.    But at no point did that second broadcast mention

25   anything about a chin strap beard, did it?

MILLER 000525

HOGG - CX STUBBE                           240

1    A.    No.

2    Q.    Did any subsequent broadcast, that second broadcast

3    certainly, mention Timberland boots?

4    A.    No.

5    Q.    Are Timberland boots an uncommon thing to see on

6    younger black men in your patrol section?

7    A.    Absolutely not.

8    Q.    And -- Sorry.  To make that more clear, those are

9    very common?

10   A.    Yes, they are.

11   Q.    You said that when you were driving from the

12   original location and you went up Millbank eventually

13   after -- Sorry.  After you took custody, you went to the

14   corner you said of Genesee and West High Terrace?

15   A.    Correct.

16   Q.    Were there people out on Genesee Street at that

17   time?

18   A.    Yes, there was other officers on the scene area.  I

19   don't recall if there was people walking the street.  There is

20   a store across the street from the location, so I do know there

21   was people going in and out of there.

22   Q.    Okay.  And this is eight o'clock -- or maybe, by

23   the time the show-up was done, around 8:30.  Is it uncommon

24   for people to be walking in that neighborhood, especially on

25   Genesee Street, at that time of night?

HOGG - CX STUBBE                          241

1      A.    No; very common.

2                  MR. STUBBE:  Just a moment, Judge.

3                  THE COURT:  Sure.

4            (Whereupon there was a brief pause in the

5            proceedings.)

6      Q.    Sorry, Officer Hogg.

7            Do you know what time Officer Prinzi arrived to

8      speak to the victim in this case?

9      A.    I do not know the exact time.  It was within that

10     couple of minutes of the original call.

11     Q.    Would looking again at the CAD print-out tell you

12     when he arrived?

13     A.    It would show me when he was on scene, yes.

14     Q.    Showing you again what's been marked as Defendant's

15     Exhibit A, tell me if that refreshes your recollection.

16           (Witness examining exhibit.)

17     A.    Yes, it does.

18     Q.    And what time does it state he arrived on scene?

19     A.    It shows him on scene at 8:06.

20     Q.    And you had -- you got no further information from

21     Officer Prinzi prior to your arrival on Millbank and Bradburn

22     at 8:07?

23     A.    Correct.

24     Q.    Showing you what's been received as People's

25     Exhibit 11, you said that was taken at some point that same

1    night?

2        A.    Yes, it was.

3        Q.    And that's what Mr. Miller looked like when you

4    approached him at Millbank and -- or at 22 Bradburn?

5        A.    For the most part, yes.

6                MR. STUBBE:  I have nothing further, Judge.

7                THE COURT:  Redirect?

8                MR. HARRIGAN:  Yes, Your Honor, thank you.

9

10   REDIRECT-EXAMINATION

11   BY MR. HARRIGAN:

12       Q.    Officer Hogg, Mr. Stubbe showed you that Defense

13   Exhibit A, that CAD report.  Is that a -- Is that produced by

14   the police department?

15       A.    No.

16       Q.    Okay.  So that's produced by 911, correct?

17       A.    Yes, the 911 center.

18       Q.    So it's nothing that you do or anybody from RPD

19   that actually develops that sheet, correct?

20       A.    Correct.

21       Q.    And when it says an officer's on scene, how do they

22   know when an officer's on scene; what is done?

23       A.    When we arrive on scene, for instance, I would call

24   out of my car number, which would be 5323, and I would say

25   "5323 on scene."  911 center has a button, they hit the button,

HOGG - RECX STUBBE

243

1    and it says "on scene."

2        Q.   So all of that factors in, when you say "on scene"

3    at the time when you are on scene and whether the person hits

4    the button when it happens, those all factor into what that

5    report prints out, would that be correct?

6        A.   Correct.

7        Q.   All right.

8            Did you do -- Were you -- You took the defendant,

9    you and Officer Watson took the defendant and Mr. Hinds into

10   custody, correct?

11       A.   Correct.

12       Q.   You detained them for the show-ups?

13       A.   We detained them, yes.

14       Q.   You didn't do any search of any of the property or

15   any of the of the yards in that area where they were, did

16   you?

17       A.   No, I did not.

18            MR. HARRIGAN:  All right.  Thank you, sir.

19

20   RECROSS-EXAMINATION

21   BY MR. STUBBE:

22       Q.   Are you aware of a search having been conducted of

23   the yard in the area where you took custody -- or detained

24   Mr. Miller?

25       A.   I recall somebody stating that officers went back to

1    that area, but I am not positive on what they did though.

2                    MR. STUBBE:  Nothing further.

3                    MR. HARRIGAN:  Nothing, Your Honor.

4                    THE COURT:  Thank you.

5                    THE WITNESS:  Thank you, sir.

6              (Whereupon the witness was excused.)

7                    THE COURT:  Call your next witness.

8                    MR. HARRIGAN:  The People call Investigator

9              Nolan Wengert.

10

11   N O L A N   W E N G E R T, called herein as a witness, having

12   first been duly sworn, was examined and testified as follows:

13                    THE COURT:  Good morning.

14                    THE WITNESS:  Good morning, sir.

15                    THE COURT:  The closer to the microphone you

16              are, the better off we are.

17              Thank you.

18                    THE WITNESS:  You're welcome.

19                    THE COURT:  Go ahead.

20                    MR. HARRIGAN:  Thank you, Your Honor.

21

22   DIRECT-EXAMINATION

23   BY MR. HARRIGAN:

24        Q.   Sir, could you please again tell the jury your

25   name?

1    A.   My name's Investigator Nolan Wengert.

2    Q.   And as an investigator, what does that mean; what

3  do you do?

4    A.   Essentially I work for the Rochester Police

5  Department.  I handle felony cases that occur on the west side

6  of the city generally, so things like robberies, rapes,

7  starting points of homicides, things of that nature.

8    Q.   Now, how long have you been an investigator with

9  the City of Rochester?

10   A.   About a year and a half now.

11   Q.   And how long have you worked in law enforcement for

12  the City of Rochester?

13   A.   Almost nine years.

14   Q.   And the approximately seven and a half years prior

15  to becoming an investigator, what were some of your duties?

16   A.   I was a police sergeant for approximately a year and

17  a half; and prior to that, I was a police officer.

18   Q.   Do you have any other prior law enforcement

19  experience other than with RPD?

20   A.   Nothing, no.

21   Q.   Now, I am going to direct your attention to

22  September 25, 2013, at a little after 8:00 p.m.  Were you

23  working?

24   A.   Yes, I was.

25   Q.   And did you respond to a scene?

MILLER 000531

WENGERT - DX HARRIGAN                    246

1    A.    Yes, I did.

2    Q.    And what -- where did you respond to I guess?

3    A.    To 19 Roslyn Street.

4    Q.    Why did you respond there?

5    A.    I was notified by Officer Hogg and Dispatch that

6    there was a robbery that had occurred there.

7    Q.    Can you tell the jury, how does it come into -- how

8    does it happen where, you know, officers respond and an

9    investigator gets called in?  What situations is an

10   investigator called, if at all?

11   A.    Essentially in a serious case where follow-up is

12   needed and to assist the officer with I guess a higher level

13   criminal investigation.

14   Q.    So on this night when you responded, did you

15   respond with any other investigators, or just yourself?

16   A.    Myself.

17   Q.    And when you respond, are you in uniform, or how

18   are you dressed?

19   A.    I am wearing plainclothes with my gun and badge

20   visible.

21   Q.    Now, did you -- did you talk -- when you got to 19

22   Roslyn Street, who was there; do you recall?

23   A.    There was officers there, and then the individual

24   that had reported the crime.

25   Q.    Okay.  And what was that individual's name, if you

WENGERT - DX HARRIGAN                247

1    recall?

2        A.    Mr. Moseley.

3        Q.    Now, what are some of the things you did when you

4    arrived on scene at 19 Roslyn Street?

5        A.    I spoke with the individual who reported the matter

6    and tried to get a clearer understanding of what had happened,

7    and then I was communicating back and forth with Officer Hogg,

8    as he had informed me that he had stopped some people relative

9    to this.

10       Q.    Did you ask Officer Hogg any question about any

11   particular feature of the suspect?

12       A.    Yes.

13       Q.    What did you ask Officer Hogg?

14       A.    Specifically facial hair features.

15       Q.    And what did you ask him; anything specific about

16   facial hair?

17       A.    Yes, what I guess could best be described -- I don't

18   know what the technical term would be for it, but a chin strap

19   beard.

20       Q.    And why did you ask Officer Hogg that?

21       A.    Because the victim of this incident had told me

22   specifically that the suspect involved had that type of facial

23   hair.

24       Q.    Now, did you stay at 19 Roslyn Street, or did you

25   relocate anywhere?

1    A.    I relocated.

2    Q.    And where did you relocate to?

3    A.    Just around the corner on Genesee Street out of view

4  of where Roslyn Street was.

5    Q.    Did you -- At any point, did you come in contact

6  with any suspects that were being detained?

7    A.    Yes.

8    Q.    And where was that at?

9    A.    That was a couple streets down on Genesee Street away

10 from 19 Roslyn Street, I believe it was Genesee and West High.

11   Q.    At that point, was the victim with you, or did the

12 victim remain at 19 Roslyn Street?

13   A.    The victim remained at 19 Roslyn Street.

14   Q.    Was there -- Where did you -- How did you come in

15 contact with these suspects; where were they at?

16   A.    They were in the back of patrol vehicles.  They were

17 transported from where other officers had stopped them to

18 around the corner so I could assess whether we had enough to

19 conduct what we call a show-up procedure.

20   Q.    And were they in separate -- Were there more than

21 one suspect?

22   A.    Yes.  There was two individuals, and there was two

23 patrol vehicles.

24   Q.    And did you learn their names, the suspects?

25   A.    Yes.

MILLER 000534

WENGERT - DX HARRIGAN

249

1    Q.    And what were their names?

2    A.    Aaron Hinds and Anthony Miller.

3    Q.    Now, did you talk to Aaron Hinds?

4    A.    Yes.

5    Q.    And then did you talk to Anthony Miller?

6    A.    Yes.

7    Q.    And the person that is Anthony Miller, do you see

8    him in court today?

9    A.    Yes, I do.

10    Q.    Please just point to him and identify an article of

11    clothing he is wearing.

12    A.    He is the gentleman seated over there (indicating) in

13    the striped shirt.

14              MR. HARRIGAN:  Please let the record reflect

15              the witness has identified the defendant.

16              THE COURT:  So ordered.

17    Q.    And 19 Roslyn Street, that's in the city of

18    Rochester, county of Monroe, state of New York, correct?

19    A.    Yes, it is.

20    Q.    Now, did you -- when you talked to Mr. Miller,

21    could you describe, what was his demeanor, how was he acting

22    when you initially talked to him?

23    A.    He appeared to me to be visibly nervous, he was

24    shaking a little bit.  Other than that, there was nothing of

25    note.

MILLER 000535

WENGERT - DX HARRIGAN

250

1      Q.   And did you talk to the defendant at all there on

2    Genesee?

3      A.   Yes, very briefly.

4      Q.   And what was the nature of that conversation?

5      A.   Just to kind of find out some basic information,

6    where he was coming from, where he was going to, to either rule

7    him out of the incident or have him become involved in the

8    incident.

9      Q.   And what, if anything, did the defendant say to

10   you?

11     A.   Essentially --

12          MR. STUBBE:  Objection, Judge, hearsay.

13          May we approach?

14          THE COURT:  Certainly.  On, or off?

15          MR. STUBBE:  On, please.

16     (Whereupon the following discussion was held at the

17      bench between the Court and counsel, out of the

18      hearing of the members of the jury:)

19          MR. STUBBE:  Judge, I don't believe any of the

20      statements that will be elicited will be

21      inculpatory in any manner of Mr. Miller.

22      Therefore, they don't meet any hearsay exceptions.

23      It's simply going to be what he said, where he was

24      coming from, things like that.  I don't see how

25      those get by hearsay.

MILLER 000536

1          MR. HARRIGAN:  In, my mind, they are

2     inculpatory.  They are certainly statements in the

3     defendant's interest.

4          MR. STUBBE:  Which interest?

5          MR. HARRIGAN:  They define that they actually

6     are in direct contrast to what he's already told

7     Officer Hogg.  With regards to what he told Officer

8     Hogg, I believe it will give -- it's kind of

9     contradicting each other, so I think they

10    definitely are inculpatory.

11         MR. STUBBE:  How is giving two contradicting

12    statements to a police officer against somebody's

13    penal interest at the time they were given?  These

14    aren't sworn statements; he's not doing perjury.

15         THE COURT:  Overruled.

16         MR. STUBBE:  And would those only be with

17    regard to statements he made that are contradicting

18    Officer Hogg's testimony, 'cause my guess is that

19    the DA's going to elicit testimony about where my

20    client said he came from, the manner in which he

21    got there; and again, none of that contradicts

22    anything Officer Hogg said, and I don't see, again,

23    how that is against his penal interest at the time

24    it's made, and therefore, if it's not, how it could

25    possibly be anything other than hearsay?

MILLER 000537

1           THE COURT:  The ruling of the Court is any of

2       the information you just discussed is admissible.

3       Your objection is overruled.  I note your

4       exception.

5           MR. STUBBE:  Okay.

6       (Whereupon the discussion at the bench between the

7        Court and counsel concluded.)

8           MR. STUBBE:  Just a moment, Judge, if I may.

9           THE COURT:  Certainly.

10      (Whereupon there was a brief pause in the

11       proceedings.)

12          MR. STUBBE:  Thank you, Judge.

13          THE COURT:  Thank you.

14

15  CONTINUED DIRECT-EXAMINATION

16  BY MR. HARRIGAN:

17      Q.  So, Investigator Wengert, what did the defendant

18  say during that conversation with him on Genesee Street?

19      A.  I can tell you specifically if I may review my report

20  to refresh my recollection.

21          (Whereupon PEOPLE'S EXHIBIT 13 - two-page

22          Rochester Police Department Investigative Action

23          Report Narrative Only (Wengert) - WAS MARKED FOR

24          IDENTIFICATION.)

25      Q.  Investigator Wengert, I am going to show you what's

MILLER 000538

WENGERT - DX HARRIGAN

253

1    been marked for identification as People's Exhibit Number 13.

2    Can you tell the jury what that is, if you know?

3              (Witness examining exhibit.)

4       A.    That's my two-page Investigative Action Report, the

5    initial one I prepared on this.

6       Q.    If you could just look that over and then hand it

7    back to me when you're done.

8       A.    Certainly.

9              (Witness examining exhibit.)

10             (Whereupon the witness handed People's Exhibit 13

11               was handed to Mr. Harrigan.)

12      Q.    Now, does that -- after looking at People's Exhibit

13   Number 13, does that help refresh your recollection?

14      A.    Yes.

15      Q.    And what did the defendant say to you there on

16   Genesee Street?

17      A.    He explained to me that he walked over to his

18   friend's house, which was Aaron Hinds, the gentleman that was

19   with him over at 31 Bradburn Street, and then he went over to

20   22 Bradburn Street, which was the home of James Harris, to

21   retrieve his cell phone.

22      Q.    Okay.  Did he say phone, or mp3 player?

23      A.    I believe it was phone.

24      Q.    Okay.  Now, when you were talking to the defendant,

25   could you see the victim; was the victim anywhere in sight?

WENGERT - DX HARRIGAN                254

```
 1        A.   No.  The victim was a ways away, completely out of
 2   sight.
 3        Q.   And about how long was that conversation with the
 4   defendant there on Genesee Street?
 5        A.   It was a very short conversation, no more than five
 6   minutes.
 7        Q.   Can you describe, what was the weather like that
 8   night?
 9        A.   It was cold and it was very damp.  I don't know if it
10   was maybe light rain earlier in the night, but it was very,
11   very damp, misty.
12        Q.   And after you talked to the defendant, did you go
13   anywhere after that?
14        A.   I returned back to 19 Roslyn Street where the victim
15   was.
16        Q.   Why did you do that?
17        A.   I wanted to talk to the victim again and eventually
18   conduct the show-up procedures.
19        Q.   And what's a show-up procedure?
20        A.   Essentially, if a crime occurs or if someone's
21   stopped in relation to a crime within two hours after the crime
22   occurred, you bring the person back to the scene of the crime,
23   you give the victim some simple instructions and essentially
24   just ask the victim if they recognize the person they are
25   showing you, and if they do, where they recognize them from.
```

WENGERT - DX HARRIGAN                    255

1    Q.   Now, did you conduct this show-up procedure with

2    both Aaron Hinds and the defendant?

3    A.   Yes, I did.

4    Q.   And did you conduct it with the victim as well?

5    A.   Yes.

6    Q.   Did you give the victim any instructions before you

7    performed the show-up procedure?

8    A.   Yes, I did.

9    Q.   And in sum and substance, what were those

10   instructions?

11   A.   I told him I was going to show him a couple of people

12   that may or may not have been involved in this incident and I

13   just wanted him to tell me if he recognized the people or not;

14   if he does recognize them, where he recognized them from.

15   Q.   Okay.  Prior to September 25th, had you ever met

16   Mr. Moseley before?

17   A.   No, I hadn't.

18   Q.   And other than the two people that you showed to

19   Mr. Moseley, did you show him any other people?

20   A.   No.

21   Q.   Did you show him any other pictures or photographs

22   of any other people?

23   A.   No.

24   Q.   How did the -- Who was the -- Do you know, what

25   show-up procedure did you conduct first; the one with

WENGERT - DX HARRIGAN                    256

1   Mr. Hinds, or the one with the defendant?

2       A.    May I review my report?

3       Q.    Sure.   Again I will provide you People's Exhibit

4   Number 13.

5            (Whereupon the exhibit was handed to the witness.)

6       Q.    Give it back to me when you're done.

7            (Witness examining exhibit.)

8            (Whereupon the witness handed People's Exhibit 13

9             to Mr. Harrigan.)

10      A.    It would have been with Mr. Hinds.

11      Q.    Okay.   So how was the -- how was the procedure

12  conducted with Mr. Hinds?

13      A.    Essentially the cars were parked out of view on

14  Genesee Street around the corner, Roslyn Street, just

15  essentially the first house or second house from the corner of

16  Genesee Street.   So Mr. Moseley was placed in my unmarked

17  police vehicle.   Looking at 19 Roslyn Street, there's like a

18  brick stairway where this was alleged to have occurred.   One of

19  the officers would walk the individuals from around the corner

20  at Genesee Street, they were unhandcuffed, and walked them to

21  about maybe 20 feet away from where the stairway was where this

22  happened.

23      Q.    And describe the lighting there in that area where

24  it was being conducted.

25      A.    It was a pretty well-lit street.

MILLER 000542

WENGERT - DX HARRIGAN                                    257

1      Q.   Was there -- Were there street lamps there?

2      A.   Yes, and then there was additional light coming in

3  from Genesee Street as well.

4      Q.   Now, you said -- I believe you said they were

5  unhandcuffed when they were shown to Mr. Moseley.

6      A.   Yes.

7      Q.   And you said "cars" initially.  Would that be

8  police cars?

9      A.   Yes, it was police cars.

10     Q.   So it was marked police cars, they were around the

11  corner?

12     A.   They were around the corner out of sight.  All of the

13  marked vehicles were out of sight for the actual show-up

14  procedure at that time.

15     Q.   And about what time -- And you gave the

16  instruction -- excuse me, you gave the instructions to Mr.

17  Moseley, and then how did you direct the procedure to begin I

18  guess?

19     A.   We have a secure radio channel so I could communicate

20  directly with the officers involved, so I would communicate

21  with them via the radio.

22     Q.   And about what time did the show-up procedure --

23  was the show-up procedure conducted with Mr. Hinds?

24     A.   I could give you the exact time from my report.

25     Q.   Again providing you People's Exhibit Number 13.

MILLER 000543

WENGERT - DX HARRIGAN                258

1          (Witness examining exhibit.)

2          (Whereupon the witness handed People's Exhibit 13

3              to Mr. Harrigan.)

4      A.    It would have been 8:50 p.m. and that I concluded at

5   8:51 p.m.

6      Q.    And when the procedure -- Do you recall, did you

7   give any instructions to have Mr. Hinds moved in any way or

8   did he say anything, or what was -- how was it done?

9      A.    Essentially whenever I do a show-up procedure, I try

10  to give people the opportunity to view everyone that they see

11  from every different angle, so we will have them do quarter

12  turns.  So essentially they will stand facing forward for ten,

13  fifteen seconds, and then they will turn the other direction,

14  stand that way for ten or fifteen seconds, and so forth, so

15  they can see the person from every angle, and then I try to

16  accommodate any specific requests that the victim makes.

17     Q.    Now, what happened -- once the procedure was done

18  with Mr. Hinds, what happened at that point; what did you

19  direct, if anything?

20     A.    Can I review my actual report?

21     Q.    Sure.  Again, People's Exhibit Number 13.

22          (Witness examining exhibit.)

23     A.    I directed the officers just to hold onto Mr. Hinds,

24  as the victim had stated --

25     Q.    I don't want you to say --

MILLER 000544

1    A.    Okay.

2    Q.    -- what anyone said, okay?

3    A.    Okay.

4    Q.    So you held Mr. Hinds, but did you have him -- did

5    he go back to a police car that was around the corner out of

6    sight?

7    A.    Correct, he went out of view back to where he had

8    originally started from.

9    Q.    And then did you conduct a show-up procedure with

10   the defendant?

11   A.    Yes, I did.

12   Q.    Did you conduct it in the same manner that you had

13   just testified to that you conducted with Mr. Hinds?

14   A.    Yes.

15   Q.    Did you give the same instructions to Mr. Moseley?

16   A.    Yes.

17   Q.    And were the police cars in the same positions when

18   you did the procedure with the defendant?

19   A.    Yes.  It just happened two or three minutes after the

20   procedure with Mr. Hinds.

21   Q.    And was the defendant also unhandcuffed when the

22   procedure was going forward?

23   A.    Yes.

24   Q.    And were the officers kind of -- I think you said

25   they were standing back a ways from Mr. Hinds?

1    A.    Yes, a reasonable distance away, so they weren't

2    directly next to him, but they were within ten or fifteen feet

3    so if something happened, they would be able to respond to it.

4        Q.    And was that done in that same -- in that manner to

5    the defendant?

6        A.    Yes.

7        Q.    And when the show-up procedure was done for the

8    defendant, you said that was about a couple of minutes after

9    Mr. Hinds concluded?

10       A.    Correct, it was at 8:54 p.m.

11       Q.    Was Mr. Hinds -- When the show-up procedure was

12   done, was Mr. Hinds already out of sight when the procedure

13   was being done with the defendant?

14       A.    Yes.   It was strictly one at a time, so he was out of

15   sight and I am presuming placed back in the patrol car by that

16   time.

17       Q.    And did you ask -- have the defendant do the

18   same -- the turns that you talked about already?

19       A.    Yes.

20       Q.    Now, when you were done conducting the show-up

21   procedures, did you relocate to 22 Bradburn Street?

22       A.    Yes.

23       Q.    And why did you do that?

24       A.    Essentially, I was trying to follow up on

25   information.  I know that was where Mr. Miller had been

WENGERT - DX HARRIGAN                    261

1    initially spotted by officers, and I wanted to follow up with

2    that location as well as the house of Mr. Hinds on 31 Bradburn

3    Street.

4         Q.   I am just going to show you what's been entered

5    into evidence as People's Exhibit Number 7.  Do you recognize

6    that?

7              (Witness examining exhibit.)

8         A.   Yes, I do.

9         Q.   What is that?

10        A.   That is 22 Bradburn Street.

11        Q.   Okay.  And then People's Exhibit Number 6, do you

12   recognize that?

13             (Witness examining exhibit.)

14        A.   Yes.

15        Q.   And what is that?

16        A.   That's another photo of that same 22 Bradburn Street.

17        Q.   Okay, so I am going to put People's Exhibit Number

18   6 on the visualizer.

19             When you approached that house, did you approach

20   with any other officers, or by yourself?

21        A.   I was with another officer, and I think there was

22   another investigator on scene as well.

23        Q.   And what did you do, if anything, in relation to

24   this house?

25        A.   I went up to the side door of the house and then the

WENGERT - DX HARRIGAN                      262

1    front door of the house, I knocked on the door, rang the

2    doorbell.  There was lights on inside the house.  It appeared

3    to me that there was likely people in the house, but after

4    several minutes, probably ten or fifteen minutes, nobody would

5    come to the door.

6         Q.   Now, you talked about Mr. Hinds' home.  What -- Do

7    you know the address of that house?

8         A.   My recollection was it was 31 Bradburn Street,

9    basically right across the street.

10        Q.   Right across the street from 22 Bradburn Street?

11        A.   Yeah.

12        Q.   I'm sorry, "Yes"?

13        A.   Yes.

14        Q.   I am going to show you People's Exhibit Number 9

15   for identification.  If you know, can you tell the jury what

16   that is?

17             (Witness examining exhibit.)

18        A.   That's a picture of 31 Bradburn Street.

19        Q.   And is that a fair and accurate depiction of how it

20   looked back on September 25, 2013?

21        A.   Yes.

22        Q.   And as far as you can see, have there been any

23   additions or deletions to that photograph?

24        A.   I didn't take the photograph, so -- It represents

25   what I saw that night.

MILLER 000548

WENGERT - DX HARRIGAN                263

1      Q.    Okay.   So there's nothing -- What I am asking I

2   guess is is there any trees that have been added, any houses

3   that have been added, anything that's been added to that from

4   how it appeared back on September 25, 2013?

5      A.    No.

6                  MR. HARRIGAN:   At this time, the People would

7             offer People's Exhibit Number 9 into evidence.

8                  MR. STUBBE:   No objection.

9                  THE COURT:   Mark 9 received, please.

10                  (Whereupon PEOPLE'S EXHIBIT 9 WAS RECEIVED INTO

11             EVIDENCE.)

12      Q.    Now, let me ask you, with regards to -- before I

13   get to 31 Bradburn Street, with regards to 22 Bradburn Street

14   and the area surrounding it, did you -- would it be fair to

15   say you were the lead investigator on the scene?

16      A.    Yes.

17      Q.    Did you yourself or did you have anyone else -- did

18   you direct anyone to search any yards or any areas at that

19   time of night?

20      A.    At a different location, yes, I did --

21      Q.    Okay.

22      A.    -- in regards to a K-9 track.

23      Q.    Okay, but what about regarding 22 Bradburn Street?

24      A.    Just the plain view areas around the house that you

25   could see.

1    Q.   Well, what exactly did you do or what exactly did

2  you have people do?

3    A.   I walked up the driveway, keeping my eyes open for

4  any obvious property or anything that might be related to this.

5  I walked up to the porch doing the same thing and again pounded

6  on the door, rang the doorbell several times for about ten,

7  fifteen minutes to try to get the occupants to answer the door

8  so that I could talk to them.

9    Q.   Okay.  So obviously you didn't go in the house.

10    A.   No.

11    Q.   Did you go around the backyard at all?

12    A.   No.

13    Q.   Were you lifting anything up or doing anything like

14  that?

15    A.   No.

16    Q.   All right.  Did you observe any other officers or

17  investigators do that?

18    A.   No, I didn't.

19    Q.   All right.  Now, with regard to 31 Bradburn

20  Street -- Again I am going to put that up on the

21  visualizer -- what did you do with regard to this house?

22    A.   I had spoke with Mr. Hinds.  I explained the

23  situation.  He gave me consent to search the house for any

24  things that might be related to this incident, and I did a

25  very, very cursory search of the inside of that house.

WENGERT - DX HARRIGAN                265

1          MR. HARRIGAN:  Would you mark that.

2          (Whereupon PEOPLE'S EXHIBIT 14 - Consent to

3     Search Form RPD 353 dated 9-25-13 - WAS MARKED FOR

4     IDENTIFICATION.)

5     Q.   Investigator, I am going to show you what's been

6     marked for identification as People's Exhibit Number 14.  Do

7     you know -- Can you tell the jury what that is, if you know?

8          (Witness examining exhibit.)

9     A.   That's our consent form that I filled out that night

10    with Mr. Hinds.

11    Q.   And other than that exhibit sticker, is that a fair

12    and accurate depiction of how -- Well, let me ask you, is

13    that the original?

14    A.   Yes.

15    Q.   And other than that exhibit sticker, is that a fair

16    and accurate depiction of how it looked back when it was

17    signed on September 25, 2013?

18    A.   Yes.

19    Q.   Anything added or deleted?

20    A.   Other than the sticker, no.

21          MR. HARRIGAN:  Your Honor, at this time, the

22     People would offer People's Exhibit Number 14.

23          MR. STUBBE:  No objection.

24          THE COURT:  Mark 14 received.

25          (Whereupon PEOPLE'S EXHIBIT 14 WAS RECEIVED INTO

WENGERT - DX HARRIGAN                    266

1          EVIDENCE.)

2     Q.   So you talked about doing a cursory search.  What

3  do you mean by that?

4     A.   Essentially Mr. Hinds had given me permission to

5  search the house, but he wasn't the only person that lived in

6  the house.  What I did was I did kind of a search of what was

7  obviously his room and of the living room out of respect for

8  the rights of the other people in the house that weren't there

9  and that he obviously wouldn't have authority to consent to the

10 search of, you know, their rooms or things of that nature.

11          MR. STUBBE:  Objection, Judge.

12          THE COURT:  Sustained.

13    Q.   So you searched his -- what you -- Did he tell you

14 what was his room?

15    A.   Well, through conversations later, yes.

16    Q.   So he told you whatever you identified as his room

17 and you had searched a living room, is that fair?

18    A.   Yes, the plain view areas of the actual living room.

19    Q.   And so obviously there was probably other rooms.

20 There was I would assume a kitchen.

21    A.   Yes.

22    Q.   And other bedrooms?

23    A.   (Nodding.)

24    Q.   And you didn't search those areas?

25    A.   No.

MILLER 000552

1      Q.    Okay.  And when you say you searched those areas,

2   did you -- what did you do to search the areas?

3      A.    The bedroom itself, there wasn't very much in the way

4   of furnishings or anything in there.  I kind of looked in the

5   cabinets and I looked under the bed, and as far as the living

6   room, I just looked in the plain view areas.

7      Q.    So you didn't lift any couches up or move any

8   objects?

9      A.    No.

10      Q.    Did you look in the outside of that 31 Bradburn

11   Street though?

12      A.    Yes, in the front.

13      Q.    Okay.  Did you go to the back at all?

14      A.    I don't recall specifically going to the back.

15      Q.    Did you observe any other officers -- what we are

16   describing here as what happened at 31 Bradburn, did you see

17   any other officers/investigators go beyond what you are

18   describing?

19      A.    No.

20      Q.    Okay.  And when you say you searched the front,

21   what did you do to search the front of the house?

22      A.    As I walked around the front of the house and walked

23   in the door, I visually looked to see if there was anything of

24   note.

25      Q.    Now, did you direct to have anyone taken down to

WENGERT - DX HARRIGAN                    268

 1   the -- I think we were talking about Mr. Hinds and the

 2   defendant.  Did you direct to have either one of them or both

 3   of them transported to the Public Safety Building?

 4        A.   I directed Mr. Miller to be transported there.

 5        Q.   Okay.  What did you do with Mr. Hinds?

 6        A.   Mr. Hinds I interviewed at the scene, I went over

 7   some information with him, and then he was released without

 8   charge.

 9        Q.   Okay.  Why did you do that?

10        A.   Essentially the information that I learned through

11   the investigation, I didn't feel comfortable arresting

12   Mr. Hinds due to what the victim had told me about what was

13   alleged to be his involvement.  I didn't think -- At that point

14   in time, I didn't think I had enough information to really link

15   him as a criminal actor in that incident.

16        Q.   Now, before you get to the Public Safety Building,

17   I think we talked about you were the investigator in charge.

18   Did you relay or did any other officers check to see if there

19   were any other cameras in the area of that 19 Roslyn Street

20   where it was said to happen?

21        A.   Yes.

22        Q.   And what did you do with regard to that?

23        A.   I directed Officer Kline to check the cameras over at

24   I believe it's the corner store of Genesee and Magnolia, which

25   is essentially right across from that intersection, which he

MILLER 000554

WENGERT - DX HARRIGAN                    269

1    did.  He said there was no footage.

2                    MR. STUBBE:  Objection.  Hearsay.

3                    THE COURT:  Sustained.

4        Q.   Are you aware of any footage that was recovered of

5    this incident or any video of this incident --

6        A.   No.

7        Q.   -- or that had any relevance to this incident?

8        A.   No.  I did have additional cameras checked as well.

9        Q.   Well, was that -- did you have them done there, or

10   when you got back to the Public Safety Building?

11       A.   I had actually called from the scene there.

12       Q.   Okay.  Well, which of those cameras did you ask to

13   be checked?

14       A.   There's a City camera, a City observation camera

15   that's owned and operated by the City of Genesee and Sawyer.  I

16   directed the people that operate that camera to check that as

17   well.

18       Q.   And was there any video of this incident or

19   anything related to this incident recovered from that camera?

20       A.   No.

21       Q.   All right.  So as far as you were aware, there was

22   no video of the incident or the flight therefrom or anything

23   like that.

24       A.   Correct.

25       Q.   All right.  Did you direct anyone to collect any

MILLER 000555

1    potential DNA?

2        A.    No.

3        Q.    Okay.  Why not?

4        A.    'Cause there was nothing that I noticed that would

5    have DNA involved in it.

6        Q.    Okay.  Did you direct anyone to attempt to collect

7    any fingerprints?

8        A.    No.

9        Q.    Why not?

10        A.    'Cause there was nothing eligible for fingerprints to

11    be collected from.

12        Q.    So you went -- did you go back then to the fourth

13    floor of the Public Safety Building?

14        A.    Yes.

15        Q.    All right.  And where did you go when you went back

16    to the Public Safety Building?

17        A.    To the interview room where Mr. Miller had been

18    placed in.

19        Q.    Was he -- When you entered there, was there any

20    other officers or investigators in the room?

21        A.    No.

22        Q.    Was he handcuffed or unhandcuffed?

23        A.    Unhandcuffed.

24        Q.    And did you eventually talk to Mr. Miller?

25        A.    Yes.

MILLER 000556

WENGERT - DX HARRIGAN                      271

1    Q.   And before you spoke to him, did you read him any

2  rights or warnings?

3    A.   I did.

4    Q.   What rights or warnings were those?

5    A.   I read his standard Miranda rights off of our

6  standard RPD form.

7    Q.   I am going to provide you People's Exhibit Number

8  12.  Can you tell the jury what that is, if you know?

9          (Witness examining exhibit.)

10    A.   That's the original rights form that I prepared on

11  this incident.

12    Q.   Okay.  And is that in substantially the same

13  condition, other than that exhibit sticker, of how it was

14  when you filled it out back on September 25, 2013?

15    A.   Yes.

16    Q.   Anything added or deleted other than that exhibit

17  sticker?

18    A.   No.

19          MR. HARRIGAN:  Your Honor, at this time, the

20          People would offer People's Exhibit Number 12 into

21          evidence.

22          MR. STUBBE:  No objection.

23          THE COURT:  Mark 12 received, please.

24          (Whereupon PEOPLE'S EXHIBIT 12 WAS RECEIVED

25          INTO EVIDENCE.)

WENGERT - DX HARRIGAN

272

1    Q.    Now, I am going to give you People's Exhibit Number

2    12 back, Investigator Wengert, and I am going to ask you, did

3    you read those warnings word-for-word as they appear on that

4    sheet of paper to Mr. Miller?

5    A.    Yes, I did.

6    Q.    Okay.  And did you do that before you had any

7    conversation with him?

8    A.    Yes.

9    Q.    And what's the time in which it says you read those

10    rights to him?

11    A.    11:29 p.m.

12    Q.    Now, before you -- before you started talking to

13    him, did you make any observations of him whether he was

14    under the influence of anything, drugs, alcohol or anything?

15    A.    He didn't appear to be.

16    Q.    Did he appear to understand the English language

17    when you were talking to him?

18    A.    Yes.

19    Q.    Did you -- When you were having a conversation with

20    him, what was the tone of the conversation initially?

21    A.    Initially it was normal, there was nothing of note

22    about it.  He was responding to my questions that I was asking

23    him.

24    Q.    And did he seem to respond to your questions in an

25    appropriate manner?

MILLER 000558

WENGERT - DX HARRIGAN                    273

1        A.    Yes.

2        Q.    Did you ever ask him to repeat himself because you

3   didn't understand something he was saying?

4        A.    No.

5        Q.    Did he -- Do you recall any time that he asked you

6   to repeat yourself 'cause he didn't -- couldn't understand

7   you?

8        A.    No.

9        Q.    All right.  So can you read those warnings as they

10  appear on that card, could you read them to the jury as you

11  read them to the defendant that night?

12       A.    Certainly.

13            "You have the right to remain silent.  You do not

14  have to say anything if you don't want to.  Anything you do

15  say can be used against you in a court of law.  You have the

16  right to talk to a lawyer before answering any questions and

17  have him here with you if you want.  If you can't pay for a

18  lawyer, one will be given to you before any questioning, if

19  you wish.  If you do wish to talk with me, you can stop at

20  any time."

21       Q.    And then did you ask him any questions after that?

22       A.    Yes, I did.

23       Q.    What were those questions?

24       A.    First one was "Do you understand what I have just

25  said to you."

MILLER 000559

WENGERT - DX HARRIGAN                274

1    Q.    And what did he say?

2    A.    He said "Yes."

3    Q.    And what was the second question?

4    A.    "With these rights in mind, do you agree to talk with

5    me now."

6    Q.    And what did he say?

7    A.    "Yeah."

8    Q.    Okay.  And let me ask you, I'm sorry, one other

9    thing.  Did you ask him his level of education?

10    A.    I did.

11    Q.    And what did he say in relation to that?

12    A.    He stated he completed the twelfth grade.

13    Q.    So then after you read him those rights and

14    warnings and he agreed to talk to you, did you have a

15    conversation with him?

16    A.    Yes, I did.

17    Q.    And what did he say to you?

18    A.    If I could just review my report.

19    Q.    I will provide you People's Exhibit Number 13.

20          (Witness examining exhibit.)

21          (Whereupon there was a brief pause in the

22          proceedings.)

23              THE COURT:  Mr. Harrigan?

24              MR. HARRIGAN:  Thank you.

25    Q.    So, Investigator, after you had an opportunity to

MILLER 000560

1  review that, do you recall what he -- what the defendant said

2  to you that night?

3      A.   Yes.

4      Q.   What did he say?

5      A.   He explained to me that he had walked from his house

6  over at 607 Birr Street down to Mr. Hinds' house on Bradburn,

7  he got there about two hours before he had been stopped by the

8  police, he hung outside the house, and then he was using his

9  deactivated cell phone, he was just using the wireless feature

10 of it to access the wireless Internet at 22 Bradburn Street

11 outside 22 Bradburn Street.

12     Q.   Did you ask him anything about the -- You said 607

13 Birr Street is where he walked from.  Did you ask him

14 anything with regards to that?

15     A.   Yes.

16     Q.   What did you ask him; and what, if anything, did he

17 say?

18     A.   Essentially I asked him -- Given that his boots were

19 unlaced and everything, I asked him -- it was a pretty

20 extensive distance to walk and if he could retrace his route to

21 the best of his ability for me.

22     Q.   And could he do that?

23     A.   He had told me that he had walked on unknown side

24 streets from Birr Street all the way down, he couldn't recall

25 the exact streets that he had walked.  He made reference to

1    something about being near Orange Street until he came out on

2    Genesee Street, and then he stated he took Genesee Street all

3    the way down to where his friend lives.

4         Q.   And that was about -- what he said, about two hours

5    before he was stopped?

6         A.   Correct.

7         Q.   And do you -- Are you familiar with 607 Birr Street

8    and 22 Bradburn Street or 31 Bradburn Street?

9         A.   Yes.

10         Q.   Okay.  Do you know, approximately what is the

11    approximate distance between 607 Birr Street and Bradburn

12    Street?

13         A.   It's quite a distance, and I did actually use Google

14    Maps to do a pedestrian time approximation, and it was 1.5

15    hours the most direct route to walk from there to Bradburn

16    Street.

17         Q.   Now, the -- I am going to put up on the visualizer

18    People's Exhibit Number 10.  Is that a fair and accurate

19    depiction of how the defendant looked when you were talking

20    to him that night on September 25th?

21              (Witness examining exhibit.)

22         A.   Yes.

23         Q.   And did you notice anything of note regarding his

24    clothes that kind of caused you to become aware of anything?

25         A.   Yeah.  I noticed that his boots or one of his boots

WENGERT - DX HARRIGAN    277

1    was unlaced like it was when he was initially stopped by the

2    police; also that the clothes appeared to be quite oversized,

3    the pants especially.  I described them as blue wind pants, but

4    there's no apparatus for a belt, there's no loops for a belt,

5    and they were very loose and didn't appear to me, in my

6    opinion, to be appropriate for the weather and the distance

7    that he reported walking.

8         Q.   What is the -- Now, you got a chance to look at

9    Mr. Hinds and the defendant, Mr. Miller.  Is there any

10   difference in the size between the two?

11        A.   Quite a bit of difference, yes.

12        Q.   What's the difference in size just generally?

13        A.   To my recollection, Mr. Hinds was about six-four with

14   a heavy build.  Mr. Miller was about I believe five-seven or

15   five-eight with a medium build.

16        Q.   Okay.  Did you ask him any further questions other

17   than what you had talked about or present him with any other

18   evidence in the interview room after you talked to him about

19   the distance that he traveled?

20        A.   I attempted to, yes.

21        Q.   And what did he say, if anything?

22        A.   Essentially he expressed to me that he didn't want to

23   talk to me anymore.

24        Q.   What did you say to him before he said that, do you

25   recall?

MILLER 000563

WENGERT - DX HARRIGAN                    278

1       A.    I explained to him the exact facts that I had

2  available at the time, which was that he had been identified in

3  a show-up procedure and I had probable cause to believe that he

4  was guilty of this robbery.

5       Q.    Okay.  And at that point, he said he didn't want to

6  talk to you?

7       A.    In sum and substance, yes.

8       Q.    So did you keep talking to him, or did you stop?

9       A.    I stopped.

10      Q.    And we are talking about the tone of the

11 conversation.  I don't want to get into any further things

12 that was said after that, but did the tone of the

13 conversation at some point change?

14      A.    Yes.

15      Q.    And when did that tone change?

16      A.    When I had informed him that he had been identified.

17      Q.    Okay.  And how did the tone change?

18      A.    He immediately became very angry and uncooperative

19 and started yelling profanity at me.

20      Q.    Did you ever yell at him or yell profanity or

21 anything at him?

22      A.    Other than "Stop yelling" long after the interview

23 was over, no.

24      Q.    Did you ever threaten, coerce him to get him to

25 talk to you?

MILLER 000564

PEOPLE V. MILLER                    279

1      A.   No.

2      Q.   Did you ever promise him anything in order to get

3  him to talk to you?

4      A.   No.

5      Q.   And when he asked you to stop talking to him, is

6  that when you stopped talking to him?

7      A.   Yes.

8      Q.   And --

9           THE COURT:  Mr. Harrigan?

10          MR. HARRIGAN:  Yes.

11          THE COURT:  How long?

12          MR. HARRIGAN:  Just -- I'm probably done.  I

13          want to look over everything.  I might be done

14          right now.

15          (Whereupon there was a brief pause in the

16          proceedings.)

17     Q.   Okay.  Thank you, Investigator.

18          MR. HARRIGAN:  Thank you, Your Honor.

19          THE COURT:  Ladies and gentlemen, we are going

20          to break for lunch.  We are going to leave now.  We

21          are going to be back at two o'clock.  If you could

22          be downstairs in Central Jury at about five minutes

23          before 2:00, one of the deputies will pick you up

24          and bring you back up.

25          Remember the admonitions:  Don't talk amongst

PEOPLE V. MILLER                    280

1    yourselves or with anyone else about anything

2    related to this case.  You can tell the people with

3    whom you live and where you work where you are;

4    just don't tell them what's going on.  Don't visit

5    or view the scene either in person or by any other

6    means.  If you see anyone connected with this case,

7    please don't converse with them, and they have been

8    ordered not to talk to you.  Do not request,

9    accept, agree to accept or otherwise engage in any

10   conversation whatsoever about the receipt of any

11   benefit whatsoever for providing information about

12   this trial.  Do not under any circumstances

13   research any issue related to this case, whether it

14   be the people, the law or the facts, by any means

15   at all.

16        See you back downstairs at -- Did I say five

17   of, or ten of?

18        THE COURT DEPUTY:  Five of.

19        THE COURT:  -- one of those two, in Central

20   Jury, and one of the deputies will go down and pick

21   you up.

22        Thank you very much.

23        If you all would stay right where you are for

24   just a second.

25   (Whereupon the members of the jury began exiting

MILLER 000566

PEOPLE V. MILLER                    281

```
1        the courtroom.)

2             THE COURT:  Mr. Kelly, if you'd shut that door

3        for me, I'd appreciate it, on the way out, thank

4        you, sir.

5        (Whereupon the following discussion was had in open

6          court in the presence of the defendant, out of the

7          presence of the members of the jury.)

8             THE COURT:  Just to address the objection and

9        ruling from the bench made by Mr. Stubbe with

10       respect to the statements, admissions or

11       confessions made by the defendant to Investigator

12       Wengert, you objected on the grounds that they were

13       not against penal interest.  The prosecution has

14       indicated that they are, in fact, against penal

15       interest because there are three contradictory

16       statements:  The first was made to Officer Daryl

17       Hogg, wherein the defendant purportedly went to 22

18       Bradburn Street to get an mp3 player; second, there

19       was a comment made to Investigator Wengert that he

20       was visiting a friend at 31 Bradburn and walked

21       over to 22 Bradburn to get his phone; and the

22       third, during the course of the interview on the

23       fourth floor at the time at the PSB, that he was at

24       22 Bradburn for the purposes of using a Wi-Fi.  I

25       would submit that those contradictory statements
```

MILLER 000567

PEOPLE V. MILLER                    282

```
 1          are against penal interest, and hence, my ruling.

 2                We will see you back at two o'clock.

 3          (Whereupon the proceedings adjourned at 12:32 p.m.)

 4          (Whereupon the proceedings reconvened at 2:00 p.m.,

 5           out of the presence of the members of the jury.)

 6                THE COURT:  Come on up, gentlemen.

 7                This can be off the record at this point.

 8          (Whereupon a discussion off the record was held at

 9           the bench between the Court and counsel, out of

10           the hearing of the defendant and the court

11           reporter.)

12                THE COURT:  Go on the record.

13                Deputy Spano brought to my attention that one

14          juror has indicated that she overheard another

15          juror on a cell phone talking about the case,

16          although in non-script terms, basically saying that

17          this particular juror knew the area well, that the

18          DA kept repeating himself.  Other than that --

19                That's the extent of it?

20                THE COURT DEPUTY:  Yes, Judge, and something

21          about he knows the streets well --

22                THE COURT:  All right.

23                THE COURT DEPUTY:  -- the area well.

24                THE COURT:  And, counsel, your request?

25                MR. HARRIGAN:  Addressing me first, Your
```

MILLER 000568

PEOPLE V. MILLER                    283

1    Honor?

2         THE COURT:  Oh, yes, sure.

3         MR. HARRIGAN:  Well, my request is that I

4    think we need to at a minimum voir dire those two

5    individuals, and in particular, we need to know if

6    anybody else heard this and if it affected them and

7    if they could continue to be fair and impartial.  I

8    know we were at the bench and Mr. Stubbe indicated

9    it may be necessary to voir dire all 14 jurors.  I

10   am fine with that as well.  I just think there

11   needs to be something done to make sure that this

12   didn't affect the impartiality of the jury.

13        THE COURT:  Okay.

14        Mr. Stubbe, do you want all 14 voir-dired?

15        MR. STUBBE:  Judge, I think we either do zero,

16   or fourteen.

17        THE COURT:  So you want fourteen?

18        MR. STUBBE:  I think we have to.

19        THE COURT:  Unfortunately, Mr. Stubbe, I agree

20   with you.

21        And we have sequestered our witnesses, right?

22        MR. STUBBE:  In what -- Yes.

23        THE COURT:  Okay.  Mr. Hinds isn't sitting

24   behind you, is he?

25        MR. STUBBE:  No.

PEOPLE V. MILLER                        284

1      THE COURT:  Okay, let's go one at a time.

2      Start with Number One, please.

3  (Whereupon Juror Number One entered the courtroom.)

4      THE COURT:  Anywhere.

5      Mr. Kelly, how are you?

6      JUROR NUMBER ONE:  Okay.

7      THE COURT:  Mr. Kelly, it's come to my

8  attention that there may have been an anomaly over

9  the lunch hour, so I am going to ask each and every

10  one of the jurors a couple of questions.

11  Specifically, have you talked to anyone about this

12  case in any form or fashion?

13      JUROR NUMBER ONE:  I just told my wife that I

14  was down here and I'd see her over the weekend, and

15  I asked one other fella what time we're going to

16  get out 'cause I have to work tonight.

17      THE COURT:  So you didn't talk to anybody

18  about anything related to this case?

19      JUROR NUMBER ONE:  No.

20      THE COURT:  Okay.  You just told your wife you

21  were here and doing --

22      JUROR NUMBER ONE:  I'd see her over the

23  weekend.

24      THE COURT:  Okay.

25      MR. HARRIGAN:  Just to follow up -- I know you

PEOPLE V. MILLER                    285

1    just said that, but just to follow up, you didn't

2    talk to anyone with regards to any knowledge you

3    may have about the area or any familiarity you have

4    with the area or how the case is going or anything

5    like that?

6        JUROR NUMBER ONE:  Nope.

7        MR. HARRIGAN:  All right.  I am satisfied,

8    Your Honor.

9        THE COURT:  Mr. Stubbe?

10       MR. STUBBE:  No questions.

11       THE COURT:  Mr. Kelly, we will send you back

12   to the jury room.  If you'd be so kind as to not

13   repeat anything we have just discussed with you,

14   okay?

15       JUROR NUMBER ONE:  No problem.

16       THE COURT:  Thank you, sir.

17   (Whereupon Juror Number One exited the courtroom.)

18   (Whereupon Juror Number Two entered the courtroom.)

19       THE COURT:  Mr. Bocianski?

20       JUROR NUMBER TWO:  Yes.

21       THE COURT:  Mr. Bocianski, I got it once.  I

22   don't think I can do it twice in a row.  Do you?

23   (Juror Number Two shaking head.)

24       THE COURT:  You don't.

25       It's come to my attention that over the lunch

PEOPLE V. MILLER                    286

1    hour, or maybe even a little before that, one or

2    more of the jurors was engaged in conversations

3    with others about what was actually going on in the

4    trial.  Do you have any knowledge of anything like

5    that?

6              JUROR NUMBER TWO:  No.  I was actually in my

7    vehicle.  I was -- I ate my lunch in the vehicle.

8              THE COURT:  Okay.  Have you overheard anybody

9    else talking about the case?

10             JUROR NUMBER TWO:  No.

11             THE COURT:  All right.

12             JUROR NUMBER TWO:  Right when I left from

13   here, I went straight to the vehicle and I sat

14   there until I came back up.

15             THE COURT:  Okay.

16             Mr. Harrigan?

17             MR. HARRIGAN:  No questions.

18             THE COURT:  Mr. Stubbe?

19             MR. STUBBE:  None.

20             THE COURT:  Thank you, sir.  If you'd just be

21   so kind as to not repeat anything I have said back

22   there, I'd appreciate it.

23             JUROR NUMBER TWO:  I won't.

24             THE COURT:  Thank you.

25             JUROR NUMBER TWO:  Thank you.

PEOPLE V. MILLER                    287

1        (Whereupon Juror Number Two exited the courtroom.)

2        (Whereupon Juror Number Three entered the

3         courtroom.)

4              THE COURT:  Hi.

5              JUROR NUMBER THREE:  Hi.

6              THE COURT:  How are you?

7              JUROR NUMBER THREE:  Good.  How are you?

8              THE COURT:  Good.

9         Ms. Berger, it's come to my attention that

10   maybe over the lunch hour, maybe even a little

11   before, one of the jurors was engaged in

12   conversation with another party concerning what was

13   actually going on in the case versus how long you

14   had to be here.  Were you privy to any of that

15   information; did you hear anything like that?

16             JUROR NUMBER THREE:  No, I did not.

17             THE COURT:  Have you spoken to anybody

18   yourself about anything related to the case?

19             JUROR NUMBER THREE:  No, I have not.

20             THE COURT:  Very good.

21             MR. HARRIGAN:  Nope.

22             MR. STUBBE:  Nope.

23             THE COURT:  Just do me a favor, don't say

24   anything about what we just discussed here when you

25   go back in the room.

MILLER 000573

PEOPLE V. MILLER                    288

1          JUROR NUMBER THREE:  Okay.  Thank you.

2          THE COURT:  Thanks.

3     (Whereupon Juror Number Three exited the

4      courtroom.)

5     (Whereupon Juror Number Four entered the

6      courtroom.)

7          THE COURT:  Hi.

8          JUROR NUMBER FOUR:  Hi.

9          THE COURT:  How are you?

10         JUROR NUMBER FOUR:  Good.  How are you?

11         THE COURT:  Good.

12         You can sit down over there is fine.

13         JUROR NUMBER FOUR:  Okay.

14         THE COURT:  You don't have to go in the --

15    Anywhere you want.

16         So it's come to my attention that sometime

17    today, maybe over the lunch hour, maybe before, one

18    of the jurors was engaged in a conversation with a

19    third party talking about what was going on in

20    here.  Did you overhear anything like that?

21         JUROR NUMBER FOUR:  No.

22         THE COURT:  Have you seen anybody doing

23    anything inappropriate?

24         JUROR NUMBER FOUR:  No.

25         THE COURT:  And you haven't told anybody about

289

1      anything what's going on in here, right?

2                JUROR NUMBER FOUR:  No.

3                MR. HARRIGAN:  No.

4                MR. STUBBE:  No.

5                THE COURT:  So we are going to send you back

6      to the jury room, but you have got to promise not

7      to tell anything that we just talked about --

8                JUROR NUMBER FOUR:  Absolutely.

9                THE COURT:  -- which was pretty quick.

10               Thank you.

11               JUROR NUMBER FOUR:  Thank you.

12     (Whereupon Juror Number Four exited the courtroom.)

13     (Whereupon Juror Number Five entered the

14      courtroom.)

15               THE COURT:  Ms. Reap, how are you?

16               JUROR NUMBER FIVE:  I'm good.  How are you?

17               THE COURT:  Oh, my God, you are happy.

18               JUROR NUMBER FIVE:  I had a lot of coffee.

19               THE COURT:  It's come to my attention that

20     maybe sometime today, maybe over the lunch hour,

21     one of the jurors engaged in a conversation with a

22     third party about what was taking place in the

23     trial.  Are you privy to any of that information?

24               JUROR NUMBER FIVE:  I'm not.

25               THE COURT:  Did you see anybody doing anything

PEOPLE V. MILLER                    290

1        like that?

2                JUROR NUMBER FIVE:  No.

3                THE COURT:  Okay.

4                MR. HARRIGAN:  No.

5                MR. STUBBE:  No.

6                THE COURT:  So we are going to send you back

7        to the jury room.  I would just ask you to promise

8        not to talk about anything --

9                JUROR NUMBER FIVE:  Sure.

10               THE COURT:  -- that we talked about.

11               JUROR NUMBER FIVE:  Sure.

12               THE COURT:  Okay.

13       (Whereupon Juror Number Five exited the courtroom.)

14       (Whereupon Juror Number Six entered the courtroom.)

15               THE COURT:  Okay, Mr. Rowe, how are you?

16               JUROR NUMBER SIX:  Very good, thank you.

17               THE COURT:  So it's come to my attention that

18       sometime today, maybe over the lunch hour, one of

19       the jurors may have been engaged in a conversation

20       with a third party concerning what was taking

21       place.  Are you privy to any of that information;

22       did you see anything like that?

23               JUROR NUMBER SIX:  No, I didn't.

24               THE COURT:  You yourself haven't engaged in a

25       conversation with anyone about what's going on?

PEOPLE V. MILLER                    291

1          JUROR NUMBER SIX:  No.

2          THE COURT:  Okay.

3          MR. HARRIGAN:  No.

4          MR. STUBBE:  No.

5          THE COURT:  So we are going to send you back

6     to the jury room.  Please don't tell the other

7     jurors what we just did.

8          JUROR NUMBER SIX:  Yes, sir.

9     (Whereupon Juror Number Six exited the courtroom.).

10    (Whereupon Juror Number Seven entered the

11     courtroom.)

12          THE COURT:  Ms. Seuss.

13          JUROR NUMBER SEVEN:  Yes.

14          THE COURT:  It's come to my attention that

15    sometime today, maybe over the lunch hour, one of

16    the jurors engaged in a conversation with a third

17    party about what was taking place here.  You are

18    not privy to any of that information, are you?

19          JUROR NUMBER SEVEN:  No.

20          THE COURT:  You haven't talked about what's

21    going on with anybody, have you?

22          JUROR NUMBER SEVEN:  Absolutely not.

23          THE COURT:  Okay.

24          MR. HARRIGAN:  No.

25          MR. STUBBE:  No.

MILLER 000577

PEOPLE V. MILLER                    292

1          THE COURT:  Thanks.  Do me a favor, don't

2     repeat or don't relay anything what just took place

3     with any of the other jurors.

4          JUROR NUMBER SEVEN:  Absolutely.

5          THE COURT:  Okay, thanks.

6          JUROR NUMBER SEVEN:  You are welcome.

7     (Whereupon Juror Number Seven exited the

8      courtroom.)

9     (Whereupon Juror Number Eight entered the

10     courtroom.)

11         THE COURT:  Mr. Turner, how are you?

12         JUROR NUMBER EIGHT:  Good.

13         THE COURT:  Mr. Turner, it's come to my

14     attention that maybe either this morning or over

15     the lunch hour, one of the jurors engaged in a

16     conversation with a third party, indicating to the

17     third party some of what was taking place in the

18     trial, as opposed to simply telling them when they

19     had to be here, et cetera.  Are you privy to any of

20     that information; did you see anybody doing

21     anything like that?

22         JUROR NUMBER EIGHT:  No.

23         THE COURT:  And obviously you yourself have

24     not done anything along those lines.

25         JUROR NUMBER EIGHT:  Nope.

PEOPLE V. MILLER                    293

1          MR. HARRIGAN:  No.

2          MR. STUBBE:  No.

3          THE COURT:  We are going to send you back into

4     the jury room.  If you would be kind enough not to

5     repeat anything that we just discussed, okay?

6          JUROR NUMBER EIGHT:  Okay.

7          THE COURT:  Thank you.

8     (Whereupon Juror Number Eight exited the

9      courtroom.)

10    (Whereupon Juror Number Nine entered the

11     courtroom.)

12         THE COURT:  Mr. Finnity, it's come to my

13    attention that sometime today, maybe over the lunch

14    hour, one of the jurors engaged in a conversation

15    with a third party about what was actually taking

16    place in the trial.  You see anything like that?

17         JUROR NUMBER NINE:  (Shaking head.)

18         THE COURT:  "No"?

19         JUROR NUMBER NINE:  No.

20         THE COURT:  Overhear anybody talking like

21    that?

22         JUROR NUMBER NINE:  I did not.

23         THE COURT:  And you yourself haven't done

24    anything like that?

25         JUROR NUMBER NINE:  I have not.

MILLER 000579

PEOPLE V. MILLER                    294

1          MR. HARRIGAN:  No.

2          MR. STUBBE:  No.

3          THE COURT:  Thank you.  If -- Shawn, if you

4     would be kind enough when you go back not to repeat

5     anything we just said here.

6          JUROR NUMBER NINE:  Yes, sir.

7          THE COURT:  Thank you, and I apologize for

8     using the first name.

9          JUROR NUMBER NINE:  No problem.

10    (Whereupon Juror Number Nine exited the courtroom.)

11    (Whereupon Juror Number Ten entered the courtroom.)

12         THE COURT:  Mr. Cashen, how are you doing?

13         JUROR NUMBER TEN:  Good.

14         THE COURT:  It's come to my attention that

15    either earlier today or over the lunch hour, one of

16    the jurors engaged in a conversation about what was

17    taking place in the trial with a third party.  Did

18    you hear anybody do that?

19         JUROR NUMBER TEN:  No.  I wasn't paying

20    attention.

21         THE COURT:  You didn't see anybody -- You

22    haven't seen anything that would trouble you I

23    guess is the question.

24         JUROR NUMBER TEN:  I was reading, Your Honor,

25    really.

PEOPLE V. MILLER                    295

```
 1              THE COURT:  Okay.

 2              JUROR NUMBER TEN:  I was pretty much focused

 3      on the magazine.

 4              THE COURT:  All right.

 5              MR. HARRIGAN:  No.

 6              MR. STUBBE:  No.

 7              THE COURT:  Fine.  If you'd head back for us.

 8      Just don't tell anybody what we did here.

 9              JUROR NUMBER TEN:  Okay.

10      (Whereupon Juror Number Ten exited the courtroom.)

11      (Whereupon Juror Number Eleven entered the

12       courtroom.)

13              THE COURT:  Hello, Mr. Roselli.

14              JUROR NUMBER ELEVEN:  Yes.

15              THE COURT:  How are you?

16              JUROR NUMBER ELEVEN:  Good.

17              THE COURT:  Mr. Roselli, it's come to my

18      attention that either earlier today or maybe over

19      the lunch hour, one of the jurors may have engaged

20      in a conversation with a third party and told them

21      what was going on at the trial.  You didn't hear

22      anything like that, did you?

23              JUROR NUMBER ELEVEN:  No.

24              THE COURT:  And you -- obviously you haven't

25      done anything like that.
```

PEOPLE V. MILLER                    296

1          JUROR NUMBER ELEVEN:  No.

2          THE COURT:  And again, you haven't seen

3     anything any of the other jurors have done that

4     would trouble you?

5          JUROR NUMBER ELEVEN:  Absolutely not.

6          MR. HARRIGAN:  No.

7          MR. STUBBE:  No questions.

8          THE COURT:  Mr. Roselli, thank you very much.

9     If you wouldn't tell what we just did to the other

10    jurors, I'd appreciate it.

11         JUROR NUMBER ELEVEN:  No problem.

12         THE COURT:  Thank you, sir.

13    (Whereupon Juror Number Eleven exited the

14     courtroom.)

15    (Whereupon Juror Number Twelve entered the

16     courtroom.)

17         THE COURT:  So tell me what you overheard.

18         JUROR NUMBER TWELVE:  Well, I didn't stay for

19    the whole conversation.  I was very surprised

20    'cause you told us so many times not to talk about

21    what we heard, but it was a telephone conversation

22    critical of -- Well, just it started -- Do you want

23    me to tell you all of it what I did hear?

24         THE COURT:  Yes.

25         JUROR NUMBER TWELVE:  It started out about how

MILLER 000582

PEOPLE V. MILLER
297

```
 1    boring it is and how the same things are being said

 2    repeatedly mostly by Mr. Harrigan, and then he

 3    started talking about the streets and his knowledge

 4    of this neighborhood.  I did not hear the specific

 5    thing -- piece of testimony he mentioned, but he

 6    said "I only know that because I know this area,"

 7    And that's when I got up and left.

 8         THE COURT:  Okay.  Has that affected you in

 9    any way?

10         JUROR NUMBER TWELVE:  No.

11         THE COURT:  I mean your impartiality.

12         JUROR NUMBER TWELVE:  No, no, but I asked the

13    gentleman in the jury room if I should say

14    something, and he said yes, so --

15         THE COURT:  Okay.  You mean Deputy Spano?

16         JUROR NUMBER TWELVE:  Oh, no.  The, you

17    know -- Not the commissioner; it's the --

18         THE COURT DEPUTY:  Scott.

19         THE COURT:  Oh, okay, the Assistant Deputy

20    Commissioner, or whatever.

21         JUROR NUMBER TWELVE:  Yeah.

22         THE COURT:  You did absolutely the right

23    thing, there's no issue about that, but obviously

24    now we have to go through this process, and we

25    can't single anybody out, so we have to bring all
```

PEOPLE V. MILLER

1     14 of you out and do this so there's blatant

2     honesty and nobody knows who said what to whom.

3          MR. HARRIGAN:  Did you -- First off, did

4     you -- Who said this?

5          JUROR NUMBER TWELVE:  It was Juror Number One.

6          MR. HARRIGAN:  Juror Number One.  And when did

7     it occur?  Was it after the break for lunch?

8          JUROR NUMBER TWELVE:  It was during the break

9     for lunch.

10         MR. HARRIGAN:  During the break for lunch.

11         JUROR NUMBER TWELVE:  About 1:30 I guess.

12         MR. HARRIGAN:  Was there anyone else other

13     than yourself in the area where this happened?

14         JUROR NUMBER TWELVE:  I mean, when you go from

15     the main jury room and go left or right, most of

16     the people were on the right.  I was sitting on the

17     left back by a window.  There was one juror sitting

18     up at a table in front of me, and I think she was

19     the only other one on that side.  He got up from

20     the other side where most of the people were and

21     went back in the farther corner to talk, but it

22     wasn't quiet conversation.

23         MR. HARRIGAN:  Okay.  And the other juror, do

24     you know what juror that it was?

25         JUROR NUMBER TWELVE:  The one woman that sits

PEOPLE V. MILLER

1    here (indicating) that sits next to me, Number

2    Thirteen.

3        MR. HARRIGAN:  Number Thirteen.

4        THE COURT:  Nadia?

5        JUROR NUMBER TWELVE:  Nadia.

6        MR. HARRIGAN:  And --

7        JUROR NUMBER TWELVE:  But I don't know if

8    she -- She was reading.  I have no idea if she

9    heard or not.

10        MR. HARRIGAN:  Fair enough.

11        Did you tell -- Other than the Deputy

12    Commissioner, did you tell anyone else about what

13    you had heard?

14        JUROR NUMBER TWELVE:  Only that I asked one

15    other woman that walked out when I did if she had

16    heard the conversation, and she said no, but I

17    didn't talk about the details of the conversation.

18        MR. HARRIGAN:  That was another juror?

19        JUROR NUMBER TWELVE:  Yes.

20        MR. HARRIGAN:  Who was that that you asked; do

21    you remember?

22        JUROR NUMBER TWELVE:  Oh, dear, I don't know

23    her name.  I'm sorry, I don't know her name.  She

24    has long blond hair, a newborn child.

25        MR. HARRIGAN:  But she says she didn't hear?

PEOPLE V. MILLER

300

1    JUROR NUMBER TWELVE:  She didn't hear.

2    MR. HARRIGAN:  Thank you, ma'am.

3    MR. STUBBE:  No questions.

4    THE COURT:  Thank you.  And if you'd be kind

5    enough not to repeat anything you said or any part

6    of this discussion, I'd appreciate it.

7    JUROR NUMBER TWELVE:  I will do that.

8    THE COURT:  Thank you.

9    Hey, just so you know, you did exactly what

10   you were supposed to do, so --

11   JUROR NUMBER TWELVE:  Well, I kind of thought

12   that's what you had told us, but --

13   THE COURT:  Yes, you did fine.

14   JUROR NUMBER TWELVE:  -- I also didn't feel

15   good about being a tattletale.

16   THE COURT:  That's why we are calling all 14

17   of you back.  Nobody will know.

18   (Whereupon Juror Number Twelve exited the

19    courtroom.)

20   (Whereupon Juror Number Thirteen entered the

21    courtroom.)

22   THE COURT:  Hi.

23   JUROR NUMBER THIRTEEN:  Hello.

24   THE COURT:  How are you?

25   JUROR THIRTEEN:  I'm well, thank you.  How are

PEOPLE V. MILLER                    301

1      you?

2              THE COURT:  Tolerable.

3              Over the lunch hour or maybe a little before,

4      did you overhear any other juror having a

5      conversation with a third party about what was

6      going on here?

7              JUROR NUMBER THIRTEEN:  (Witness shaking

8      head.)

9              THE COURT:  Is that a "No"?

10             JUROR NUMBER THIRTEEN:  No, sir.  I mean yes,

11     it's a "No."

12             THE COURT:  Okay.  You didn't see anybody on

13     the phone talking in the jury room or overhear any

14     conversation?

15             JUROR NUMBER THIRTEEN:  I was actually on the

16     phone myself with my husband about a credit card

17     matter, and I sat over by the window to charge my

18     phone, so I really --

19             THE COURT:  -- didn't hear anything.

20             JUROR NUMBER THIRTEEN:  No.

21             THE COURT:  You haven't seen anything that

22     would trouble you or you would think would be

23     inappropriate?

24             JUROR NUMBER THIRTEEN:  No.  And actually, the

25     members of our jury were on the other side of the

PEOPLE V. MILLER                    302

1    jury room, so I was off by myself.

2            THE COURT:  Okay.

3            MR. HARRIGAN:  No.

4            MR. STUBBE:  No questions.

5            THE COURT:  If you'd head back and not repeat

6    anything we said, I'd appreciate it.

7            JUROR NUMBER THIRTEEN:  Promise.  Thank you.

8            THE COURT:  Thank you.

9    (Whereupon Juror Number Thirteen exited the

10    courtroom.)

11    (Whereupon Juror Number Fourteen entered the

12    courtroom.)

13            THE COURT:  Hello, Mr. Morriss.

14            JUROR NUMBER FOURTEEN:  Your Honor, how are we

15    doing?

16            THE COURT:  I'm good.  How are you?

17            JUROR NUMBER FOURTEEN:  Better, now that I had

18    lunch.

19            THE COURT:  Mr. Morriss, it's come to my

20    attention that maybe one of the jurors either

21    earlier this morning or over the lunch hour engaged

22    in a conversation with a third party about what was

23    taking place here at trial.  Did you see anything

24    like that or hear anything like that?

25            JUROR NUMBER FOURTEEN:  No, Your Honor, I did

1     not.

2         THE COURT:  Okay.  And you haven't spoken to

3     anybody about anything connected with this trial

4     other than when you have to be here?

5         JUROR NUMBER FOURTEEN:  That's it.

6         THE COURT:  Okay.

7         MR. HARRIGAN:  No.

8         MR. STUBBE:  No questions.

9         THE COURT:  All right, Mr. Morriss, if you'd

10    head back to the jury room.  Just don't tell

11    anybody what we just talked about; I'd appreciate

12    it.

13        JUROR NUMBER FOURTEEN:  No.

14        THE COURT:  Thank you.

15    (Whereupon Juror Number Fourteen exited the

16     courtroom and following discussion was had in open

17     court in the presence of the defendant:)

18        THE COURT:  Mr. Stubbe, your thoughts?

19        MR. STUBBE:  The testimony from Juror Number

20    One and Juror Number Twelve seem --

21        THE COURT:  -- irreconcilable.

22        MR. STUBBE:  That was the word I was looking

23    for.

24        THE COURT:  What do you want to do?  If you

25    ask me to disqualify him, I will.

PEOPLE V. MILLER

1      MR. STUBBE:  I think we need to disqualify

2  Juror Number One.

3      MR. HARRIGAN:  I would agree.

4      THE COURT:  Okay.  We will just move everybody

5  up one; we won't replace Number One with Thirteen,

6  right?

7      MR. STUBBE:  Correct.

8      THE COURT:  Number Two will be Number One now;

9  agreed?

10     MR. STUBBE:  Correct.

11     MR. HARRIGAN:  Agreed.

12     THE COURT:  Agreed.

13     How do you want me to dismiss Mr. Kelly; do

14  you want me to just have him called out in the

15  hallway and you want me to do it alone, or do you

16  want me to do it out here?  What do you want me to

17  do?

18     MR. STUBBE:  I don't care.

19     MR. HARRIGAN:  I don't have a preference.

20  Obviously it's on the record now what we are going

21  to be doing, so --

22     THE COURT:  Yes.  The only reason I say it is

23  it might ensure -- He is going to be -- get

24  embarrassed.  It might be a little more tolerable

25  if I just told him in the hallway "See you later.

PEOPLE V. MILLER

1    Have a nice day.  Goodbye."

2         MR. STUBBE:  That's fine; I have no problem.

3         THE COURT:  Central Jury?

4         THE CLERK:  I will send them a note that he is

5    being sent down and he is being dismissed.

6         THE COURT:  Would you get him out in the

7    hallway, and then I will come out.

8    (Whereupon Justice Moran exited the courtroom and

9     dismissed Juror Number One off the record in the

10     hallway and there was a pause in the proceedings.)

11    (Whereupon Justice Moran re-entered the courtroom

12     and the proceedings resumed.)

13         THE COURT:  All-righty.  Are we ready?

14         MR. STUBBE:  Yes.

15         THE COURT:  Would you get the investigator

16    back there for us please, Joe.

17         THE COURT DEPUTY:  Sure.

18         THE COURT:  Let's get the jury, and we will

19    keep going.

20    (Whereupon the members of the jury entered the

21     courtroom.)

22         THE COURT:  As you see, we are missing a

23    juror.  You are not under any circumstances to

24    speculate why that juror is no longer with us.

25    Quite honestly, it has nothing to do with your

```
 1              obligation as a juror, which is to determine what

 2              the facts are and apply those facts to the law.  So

 3              please understand, the fact that Juror Number One

 4              is no longer here is, quite honestly, of no concern

 5              to you as it relates to this case.

 6                   Mr. Stubbe?

 7                   MR. STUBBE:  Thank you, Judge.

 8

 9   CROSS-EXAMINATION

10   BY MR. STUBBE:

11        Q.   Investigator Wengert, I'd like to direct your

12   attention to September 27, 2013, which is two days after this

13   robbery is alleged to have occurred, right?

14        A.   Correct.

15        Q.   Did you continue to have conversations with Jack

16   Moseley after the night of the incident?

17        A.   Yes.

18        Q.   And at some point, he gave you the information

19   necessary to track the phone that he reported stolen using

20   the Find My iPhone app, right?

21        A.   Yes, he did.

22        Q.   And on September 27, 2013, again, two days after

23   the robbery, at approximately 5:00 p.m., did you attempt to

24   use that app and track that iPhone?

25        A.   I did, yes.
```

MILLER 000592

WENGERT - CX STUBBE

307

1    Q.   And what did you find?

2    A.   Essentially I had one investigator back in the office

3  monitoring the iPhone app via the computer while I was on a

4  secure radio channel.  The GPS on the phone activated I believe

5  in the area of Genesee and Sawyer, so I responded out there

6  with a couple of marked units, and I observed a group of

7  people, about 15 to 30 people.  I placed them under

8  surveillance.  Marked cars were in the area.  I directed the

9  investigator at the office to hit the alarm function.  When you

10  hit the alarm function, the phone will make a very, very loud

11  beeping noise.  When they did that, everyone in the group

12  scattered, so it was impossible to determine who exactly had

13  the phone, and everyone ran away.

14    Q.   You said Genesee and Sawyer.  Is that close to

15  where Genesee and West High Terrace are?

16    A.   It's a few streets south, yes.

17    Q.   All right.  And are you sure it was Genesee and

18  Sawyer?

19    A.   It was in that general area.  If I could review my

20  report.

21          MR. STUBBE:  I need to have this marked.

22       Sorry.

23          THE COURT:  It's already marked as 13.

24          MR. STUBBE:  This is an additional report that

25       he created a few days later.  Sorry.

MILLER 000593

WENGERT - CX STUBBE

1          THE COURT:  Oh.

2                (Whereupon DEFENDANT'S EXHIBIT B - two-page

3          Rochester Police Department Investigative Action

4          Report Case Update dated September 27, 2013 - WAS

5          MARKED FOR IDENTIFICATION.)

6      Q.   And showing you what's been marked as Defendant's

7  Exhibit B, you asked for your report.  Is that the report you

8  were looking for?

9                (Witness examining exhibit.)

10     A.   Yes, it is.

11     Q.   And what date is that, just for record purposes?

12     A.   September 27, 2013, and I actually authored it and

13 submitted it on September 28, 2013.

14     Q.   Taking a look at that, does that refresh your

15 recollection as to the location of the group of people when

16 you -- or that you were surveilling to use the iPhone app?

17     A.   Yes.  It was at Genesee and West High Terrace.

18     Q.   Prior to having the other officer at the office

19 ping the phone or set the alarm for the phone, were you

20 taking pictures of the group of people that were around at

21 that time?

22     A.   Could you repeat the question.

23     Q.   Did you take any pictures of the group -- You said

24 there were 15 to 30 people?

25     A.   Yes.

WENGERT - CX STUBBE    309

```
 1      Q.   Did you take pictures of those people?

 2      A.   No.

 3      Q.   How many officers did you have available for this

 4  detail?

 5      A.   Three officers.

 6      Q.   Three officers.  And again, there were 15 or 30

 7  people.

 8      A.   Yes.

 9      Q.   Somewhere in that neighborhood.

10      A.   Correct.

11      Q.   How long had the Find My iPhone app been tracking

12  that phone, if you know?

13      A.   I don't recall the exact amount of time that day, but

14  it was a couple hours that day that I had been trying to pin

15  this down as it was moving in that general area.

16      Q.   Okay.  And were you -- were you using this on --

17  did you have access to the location as it was being relayed

18  on your own phone, or were you doing this all through

19  somebody at the office?

20      A.   I was doing it all through someone on a computer at

21  the office, and they would update me via radio.  There is a

22  slight delay in the report of the GPS to the software.

23      Q.   Generally that's between 30 seconds and a minute,

24  is that right?

25      A.   Yes, about, to my knowledge.
```

1    Q.   And you said you had been tracking this for some

2  time?

3    A.   About an hour or two I believe.

4    Q.   About an hour or two.  And had you found any person

5  that you saw at more than one location?

6    A.   No.

7    Q.   When you were looking, were you able to see people

8  at each of the locations your fellow officer indicated you

9  should be looking at?

10    A.   No, unfortunately not.

11    Q.   And so the first time you -- or, I'm sorry, was the

12  first time you had the ability to set the alarm on this when

13  there were between 15 and 30 people around?

14    A.   Yes, and it was the only time.

15    Q.   You didn't want to wait until there were fewer

16  people around?

17    A.   No.  That was the only time I had resources available

18  for me to actually stop these people, so --

19    Q.   And the resources is there's three officers for 30

20  people?

21    A.   Unfortunately, yes.

22    Q.   Now, the alarm that gets set, that's a sonar ping,

23  right?

24    A.   It's an audible alarm that goes off --

25    Q.   Yes, and it's --

MILLER 000596

WENGERT - CX STUBBE

1      A.    -- yes.

2      Q.    And it's in the fashion of a sonar ping.  It's not

3   a siren, it's not a phone ringing; it's a sonar ping, right?

4      A.    To my recollection, it was -- actually sounded like

5   an alarm, 'cause I could actually hear it going off, so -- I

6   don't know what a sonar ping going off sounds like.

7      Q.    When you --

8      A.    Like an alarm clock, a loud beeping like a burglar

9   alarm going off in a house or a car alarm going off on the

10  street.

11     Q.    Okay.  So upon that sound going off, you said the

12  people who were in that group, they dispersed?

13     A.    They all scattered and ran away, yes.

14     Q.    Is that at the same time the uniformed officers

15  showed up?

16     A.    Almost the exact same time.  I also exited my car as

17  I directed the officers to converge on it, I started walking

18  towards the group.

19     Q.    And were you -- were you in uniform, or were you

20  wearing a suit?

21     A.    Just like this (indicating).

22     Q.    And allowing for the slight delay, did the officer

23  on the computer give you an idea of which direction the phone

24  began to head?

25     A.    No.  You couldn't differentiate exactly where it

 1  went.  I don't know if someone turned it off.  I don't know how

 2  accurate the GPS is as far as distance, but unfortunately, not

 3  after that.

 4      Q.    Did you see people going in their pockets to try to

 5  turn off a phone?

 6      A.    I saw numerous people going in their pockets and

 7  running.  I was trying to do my best to kind of try to figure

 8  out where the sound's coming from.

 9      Q.    Now, going back a couple days before that then --

10  And again, sorry, that was two days after the incident --

11      A.    Yes.

12      Q.    -- right?

13            And at that time, you knew my client to be at the

14  Monroe County Jail, right?

15      A.    Yes.

16      Q.    So quite clearly he wasn't the person who had the

17  phone two days later.

18      A.    Correct.

19      Q.    Going back to the night of the incident, you said

20  that you did what you called a cursory search of 22 Bradburn

21  Street.

22      A.    Yes -- or, excuse me, it was not 22 Bradburn Street;

23  it was 31.

24      Q.    Or, I'm sorry, 31, you're right.  I apologize.  31

25  Bradburn Street.  And at that time, had you made the

1    determination that you would not be charging Aaron Hinds in

2    this case?

3         A.   I don't recall specifically when that decision was

4    made.  It was around that time, either before or after.

5         Q.   Is part of the reason you may not have charged him

6    because you didn't find anything at his house?

7         A.   No.

8         Q.   No?  Okay.

9              What kind of things were you looking for at the

10   house?

11        A.   Specifically, I was looking for the stolen property,

12   the phone.

13        Q.   What about the bike?

14        A.   The bike, I was not looking for.

15        Q.   You weren't looking for the bike?

16        A.   No.

17        Q.   Not to have Mr. Moseley possibly identify that this

18   is the bike that the bigger of the two individuals was

19   riding?

20        A.   The way the conversation that I had with him --

21        Q.   With whom?  Sorry.

22        A.   With Mr. Moseley.

23        Q.   Okay.

24        A.   -- went, I didn't feel that he really would be able

25   to identify the bike.  He wasn't able to really specifically

MILLER 000599

1    give a detailed description of the bike.

2         Q.    Okay.  So the only things you were searching for

3    would be the phone, two five-dollar bills, a pack of

4    cigarettes and a set of keys?

5         A.    Mainly the phone, but yes, those other things as

6    well.

7         Q.    Now, he -- when you were searching the house, you

8    said, again, you did a cursory search.  At that time, you had

9    a signed consent from Aaron Hinds, right?

10        A.    Yes.

11        Q.    Aaron Hinds is a full grown man, right?

12        A.    Yes.

13        Q.    He was not a renter of a room at that house, was

14   he?

15        A.    I presume not.  I don't know specifically.

16        Q.    Did you ask him?

17        A.    I asked him if he lived there, and he said he did.

18        Q.    And did you ask him if he was specifically barred

19   from any areas of that house?

20        A.    No.

21        Q.    Did you ask him if he has the ability to go in and

22   out of any room of that house?

23        A.    No, I didn't.

24        Q.    The only thing you asked him was where his room

25   was?

MILLER 000600

1    A.    Correct.

2    Q.    And the only thing you searched was his room and

3    then kind of the general open living space?

4    A.    Yes.

5    Q.    Search the bathroom?

6    A.    No, I did not.

7    Q.    Search the kitchen?

8    A.    I glanced through the kitchen.

9    Q.    You didn't open drawers, anything like that?

10    A.    No, I did not.

11    Q.    Could you fit a phone in a drawer?

12    A.    You could fit a phone in a drawer.

13    Q.    Fit keys in a drawer?

14    A.    Sure.

15    Q.    A couple of five-dollar bills?

16    A.    Yes.

17    Q.    When you did this search of 31 Bradburn, you found

18    nothing, none of that property?

19    A.    No.

20    Q.    Were you looking for a pair of jeans that might fit

21    my client?

22    A.    I did have that in mind, yes.

23    Q.    When you looked, did you look in cabinets for a

24    pair of jeans?

25    A.    I looked in the room upstairs for a pair of jeans.

1    Q.    And that's in Aaron Hinds' room?

2    A.    What I believed to be his room.

3    Q.    What he says was his room?

4    A.    Right.

5    Q.    Didn't look in the rest of the house for a pair of

6    jeans?

7    A.    Just in the common area of the living room.

8    Q.    Didn't look in any of the bathrooms?

9    A.    No.

10   Q.    Didn't look in any of the other rooms?

11   A.    No.

12   Q.    Was anybody else at the house at that time?

13   A.    No.

14   Q.    Mr. Hinds' mother wasn't around?

15   A.    No, she wasn't.

16   Q.    If one person gives you consent to search the

17   house, it's not a rooming house, it's a general single-family

18   house, and -- Sorry.  31 Bradburn is a single-family house,

19   right?

20   A.    As far as I know, yes.

21   Q.    One person gives you the consent to search, you

22   have the right to search throughout the house, right?

23   A.    I would have the right to search the areas that they

24   have authority over, as well as the common areas of the home.

25   Q.    But you didn't ask Mr. Hinds what areas of the

MILLER 000602

WENGERT - CX STUBBE                                317

1    house he has authority over?

2        A.    Not specifically, 'cause I thought it was obvious.

3        Q.    By saying you have authority, it means you are not

4    specifically precluded from entering that area, right?

5        A.    Either -- You could have many different opinions on

6    that.  I would believe that if it's a bedroom and if it's

7    someone's bedroom that's not your bedroom, for instance, your

8    mother or father, the child, the adult child living in the

9    house wouldn't have authority to grant someone else, the

10   police, the ability to search that room.

11       Q.    That's your belief, really.

12       A.    Yes.

13       Q.    How many rooms did you exclude from your search

14   based on your belief that having a consent from an adult who

15   lives there because you didn't think you had the ability to

16   do it?

17       A.    Could you restate that question for me?

18       Q.    How many rooms did you not search because you

19   didn't feel Aaron Hinds' signature or consent that he gave

20   based on that card was enough?

21       A.    Well, that wasn't the sole reason, but I would

22   estimate that there was two to three rooms additionally

23   upstairs, and I think the -- I think, to my recollection, the

24   downstairs was the kitchen and the living room.

25       Q.    With regard to 22 Bradburn, now going across the

MILLER 000603

1  street, your information from Officer Hogg was that they,

2  Mr. Miller and Mr. Hinds, were found in the driveway, is that

3  right?

4       A.   That's a portion of the information, yes.

5       Q.   And when they were there, did you direct other

6  officers to search the area of 22 Bradburn?

7       A.   I directed them to keep their eyes open when we

8  walked up the driveway in the front porch area.

9       Q.   Similar to the manner in which you kept your eyes

10 open as you walked to the front porch and front door of 31

11 Bradburn?

12      A.   Yes.

13      Q.   You said you looked from side to side to see if

14 anything was there?

15      A.   Correct, I was aware.

16      Q.   You didn't look under any furniture or didn't ask

17 them to look under any furniture?

18      A.   No, I didn't.  Actually, I did look under the bed,

19 so --

20      Q.   Okay.

21      A.   -- the bed would be furniture.

22      Q.   During the time this was all happening, again, you

23 were the case coordinator, right?

24      A.   Yes.

25      Q.   You had -- A K-9 track was instigated during the

WENGERT - CX STUBBE                    319

1    course of this, right?

2        A.    Yes.

3        Q.    And that K-9 track ended fruitlessly, right?

4        A.    The information provided to me, yes.

5        Q.    Are you aware of where that K-9 track ended?

6        A.    I believe -- If I could reference the original

7    report, I can give you the exact address.

8        Q.    Handing you what's been marked as People's Exhibit

9    13, is that the one you wanted to look at?

10            (Witness examining exhibit.)

11       A.    I may have -- may also have notated in here

12   (indicating), but I was looking more for the original crime

13   report done by the other officers.

14            (Witness examining document.)

15       A.    Yeah, I would need the original Crime Report; that's

16   what would have been documented by them.

17                (Whereupon DEFENDANT'S EXHIBIT C - two-page RPD

18                canine Usage Log - WAS MARKED FOR IDENTIFICATION.)

19       Q.    I am showing you Defendant's Exhibit C.  Would that

20   document help you refresh your recollection as to where the

21   canine track ended?

22            (Witness examining exhibit.)

23       A.    Yes.

24       Q.    And where did it end?

25       A.    873 Genesee Street.

1    Q.   And 873 Genesee Street is approximately Barton

2   Street around Genesee Street, is that correct?

3    A.   That general area, yes.

4    Q.   And taking a look at People's Exhibit 5 that's been

5   entered into evidence, can you see that?

6    A.   Somewhat, yes.

7    Q.   Okay.  It's not labeled, but this (indicating)

8   would be Barton Street, is that correct?

9    A.   That's a portion of Barton Street.  It goes both

10   ways, both west and east.

11    Q.   Sorry.

12        And the intersection of Genesee and Barton Street

13   is approximately 873 Genesee Street, right?

14    A.   That general area to my recollection, yes.

15    Q.   And just looking at the rest of the map, that

16   happens to be approximately five or six blocks south of

17   Roslyn Street?

18    A.   Yes.

19    Q.   But again, that track ended without the -- they

20   lost the trail basically, right?

21    A.   Yes, it ran out.

22    Q.   And at any time, did you direct the canine handler,

23   once you had Mr. Miller in custody, to get the trail from

24   Mr. Miller and kind of backtrack?

25    A.   As far as I know, that wouldn't be possible, so no.

MILLER 000606

321

1    Q.    Okay.  Where that canine track ended, did you

2  direct officers to search that area?

3    A.    Yes, in the same manner.

4    Q.    In the same manner.  You didn't have them more

5  thoroughly search that area?

6    A.    Correct.

7    Q.    Just walk around and take a look?

8    A.    Yes.

9    Q.    Now, when you originally responded to this call,

10  you had heard two separate dispatches, is that right, from --

11  sorry, from the 911 Center?

12    A.    I would say that I heard one dispatch from the 911

13  Center, and I had a later conversation with Officer Hogg via

14  the radio.

15    Q.    The dispatch you heard was that there was one male

16  black involved wearing a gray hoodie, blue jeans,

17  approximately nineteen years old, is that about right?

18    A.    I don't specifically recall what was -- Some of it

19  was reflected on the job card, some of it was reflected via the

20  audio.

21    Q.    Is that something you are looking at in real time?

22    A.    Unfortunately, I am not because we don't have the

23  computer equipped in the investigators' vehicles.

24    Q.    Suffice it to say you don't remember exactly what

25  the call was that you responded to?

1        A.    I remember that it was a robbery.  What I am saying

2   is I don't remember what the exact audio was.

3        Q.    Okay.  Do you remember if you were responding for

4   one or two people?

5        A.    What I based my information on was my conversation

6   with Mr. Moseley after I got to the scene.  Essentially I come

7   after an incident's already begun, so I am not super-focused on

8   the radio.

9        Q.    Okay.  Did you institute a call between you and

10  Officer Hogg prior to you arriving to see Mr. Moseley --

11       A.    We --

12       Q.    -- or after?

13       A.    We spoke on the radio.  I don't specifically recall

14  when it was.  I believe it was after I had spoke to Mr.

15  Moseley.

16       Q.    And that's when you had asked Investigator Hogg to

17  go to an unrecorded channel, a secure channel?

18       A.    I don't recall if I asked him to go to 4 or if I

19  asked him to go to "scene" channel.  One's recorded; one's not

20  recorded.

21       Q.    Sorry to jump around here.  I'm just looking at my

22  notes.

23             With regard to the search you did at 22 Bradburn

24  Street, again, this was a cursory type of search.  Did you

25  ever make an application for a search warrant for 22

1    Bradburn?

2         A.    Absolutely not.

3         Q.    The prosecutor asked you about cameras that you

4    instructed Officer -- possibly Investigator Kline to go take

5    a look at.

6         A.    It was Officer Kline.

7         Q.    Officer Kline, sorry.

8         A.    Yes.

9         Q.    When he looked at those, you said that the results

10   were negative?

11        A.    That's what was reported to me.

12        Q.    Did you have Officer Kline look at the cameras for

13   the 15 or 20 minutes preceding the robbery?

14        A.    I didn't specifically instruct him what time period

15   to look at, but it would be my understanding that he would do

16   that.

17        Q.    But you didn't direct him to do so?

18        A.    I didn't feel that I had to.

19        Q.    And did you ever look at the video yourself?

20        A.    No.

21        Q.    Did you secure the video in any way?

22        A.    There was no evidence on it, so no.

23        Q.    And you said that you eventually had a lengthy

24   conversation with Mr. Miller back at the Public Safety

25   Building?

WENGERT - CX STUBBE

324

1      A.    I had a conversation with him, yes.

2      Q.    During that conversation, he described the route he

3  walked, to an extent anyway, from his house on Birr Street

4  down to Bradburn, is that right?

5      A.    Yes.

6      Q.    And you said he wasn't able to identify each and

7  every street that he took, is that right?

8      A.    He wasn't able to identify any streets until he got

9  to Genesee.

10     Q.    Did you provide him with a map to offer him the

11  ability to identify those streets?

12     A.    No, I did not.

13     Q.    Did you take a look at the RPD city cameras that

14  may have been along the route that he walked?

15     A.    I certainly wanted to do that.  However, with the

16  information that I had, I don't even know what street that he

17  took 'cause it wasn't provided to me.

18     Q.    He said he got to Genesee Street approximately

19  where?

20     A.    I believe it was at Genesee Street near West Main.

21     Q.    From West Main down to Bradburn Street, I'm just

22  guessing here, but that's probably a little over a mile,

23  about a mile?

24     A.    Yes.

25     Q.    Are you aware of any RPD video or RPD cameras in

MILLER 000610

WENGERT - CX STUBBE                    325

1    that area?

2         A.   Yes.

3         Q.   Did you check those cameras?

4         A.   The Genesee Street and Hawley Street camera was not

5    operable at the time.

6         Q.   Now, right on Genesee Street and Hawley Street,

7    there's also a health center, is that right?

8         A.   I believe it's a health center next to the Boys and

9    Girls Club.

10        Q.   Yes.

11        A.   Yes.

12        Q.   They have cameras outside of that.  Did you take a

13   look at those cameras?

14        A.   No, I did not.

15        Q.   Walking from East Main -- West Main and Genesee

16   down, there's two high schools that you cross, right?

17        A.   Yes.

18        Q.   Did you take a look to see if they had any cameras?

19        A.   I know that I don't have access to any camera they

20   have; and to my recollection, from working down there for many

21   years, they don't have exterior cameras that would view just

22   the street.

23        Q.   So is that the extent of the cameras that you

24   looked at then?

25        A.   Correct, the three cameras.

326

1   Q.   And again going back, you didn't actually provide

2   him with a map to get an exact route that he took before --

3   going from Birr Street to East Main and Genesee to see if

4   there happened to be any other cameras along the route.

5   A.   Could you restate that question for me?

6   Q.   You didn't give him a map --

7   A.   No, I did not.

8   Q.   -- to have him go over his route with you?

9   A.   No.

10   Q.   And so you didn't have the ability to look to see

11   if there were any other RPD cameras along that route that he

12   took.

13   A.   No, I didn't.

14   Q.   When these show-up identification procedures were

15   conducted, obviously you were standing with Mr. Moseley,

16   right?

17   A.   Well, I wasn't standing with him.  We were in the

18   vehicle together.

19   Q.   You were in the vehicle together?

20   A.   Yes.

21   Q.   Okay.  How many other officers were in the general

22   area?

23   A.   None until the individuals would walk, the potential

24   suspects, onto Roslyn Street.

25   Q.   You said you checked Google maps, checked their

WENGERT - REDX HARRIGAN                    327

1  walking feature, and it said it would take about an hour and

2  a half?

3      A.   Correct.

4      Q.   Did you ever ask Mr. Miller how long his walk took?

5      A.   Not specifically, no.

6      Q.   Generally did you?

7      A.   No.

8      Q.   So not in any way; not just specifically.

9      A.   Not to my recollection, no.

10             MR. STUBBE:  Judge, can I have just a minute?

11             THE COURT:  Certainly.

12             MR. STUBBE:  Thank you.

13         (Whereupon there was a brief pause in the

14             proceedings.)

15             MR. STUBBE:  Nothing further, Judge.  Thank

16         you.

17             MR. HARRIGAN:  If I may, Your Honor.

18             THE COURT:  Go ahead.

19             MR. HARRIGAN:  Thank you.

20

21  REDIRECT-EXAMINATION

22  BY MR. HARRIGAN:

23      Q.   Investigator Wengert, I am just going to touch on a

24  couple of things that Mr. Stubbe just went over on

25  cross-examination, trying to go in kind of the order that he

MILLER 000613

WENGERT - REDX HARRIGAN                                328

1    did.

2           Going to the Find My iPhone application, did it --

3    do you know that -- does it track when the phone's off, do

4    you know?

5        A.    If you power the phone off, no, it will not track

6    'cause it's -- 'cause -- No, it will not track because if it's

7    powered off, the GPS isn't functional, so --

8        Q.    After September 27, 2013, did you get any other

9    updates with regard to the tracking of that phone?

10       A.    No.  The last hit that I got was at an unknown

11   location on Stratford, and never moved from there, which is how

12   it's reflected after the phone's turned off.

13       Q.    Now, after that, did you go to check 22 Bradburn

14   Street again?

15       A.    Yes.

16       Q.    Okay.  And did you get anyone to open the door or

17   any luck with 22 Bradford?

18       A.    I went two more times, and nobody would come to the

19   door.

20       Q.    Now, with regard to the canine track, who was the

21   handler, do you know?

22       A.    I believe it was Officer Nowak.

23       Q.    And what is Officer Nowak's canine; do you know the

24   name?

25       A.    No, I don't know.

WENGERT - REDX HARRIGAN

1    Q.    And are you -- So are you familiar with Officer

2    Nowak's dog, canine?

3    A.    I am familiar with all the dogs at one point.

4    Q.    But I mean, is it something where when you say you

5    are familiar, you know who they are; would that be fair to

6    say?

7    A.    I don't know them by name, no.

8    Q.    But do you train with them?

9    A.    No, I don't.

10    Q.    Okay.  Do you know how each dog specifically

11    tracks?

12    A.    I would presume by smell.

13    Q.    Okay.  Well, I don't want you to presume.

14    A.    Well, that's my understanding from my training and

15    basic overview that I have had in the academy.

16    Q.    Okay.  But did you go through the canine training?

17    A.    Just a very brief canine training in the academy.

18    Q.    Okay, but not certainly something that probably

19    Officer Nowak went through, would that be correct?

20    A.    Oh, no.

21    Q.    And it's -- And are you familiar with when like,

22    for instance, Officer Nowak would have gotten her canine; is

23    it something where they get a new canine every year?

24    A.    Oh, no.  They have that partner for as long as the

25    dog's in service.

WENGERT - REDX HARRIGAN

330

1      Q.   So something that they would probably know the

2   mannerisms and the characteristics of each dog, just like --

3   each canine's just like a person as far as the mannerisms and

4   characteristics, correct?

5      A.   Absolutely.

6      Q.   So the track could be differing depending upon the

7   canine itself, would that be correct?

8      A.   Yes.

9      Q.   And do you know, does -- I know we see a lot of

10  DVD's and movies and everything.  Are you familiar with how a

11  canine tracks?  Is it something where you grab someone's

12  shirt or something and they track from there?

13                MR. STUBBE:  Objection, Judge.

14                THE COURT:  He just said "No."

15                MR. HARRIGAN:  Okay.

16     Q.   So you don't know what that canine track was on

17  September 25, 2013, you don't know who that canine was

18  tracking or where that canine was tracking to.

19     A.   Absolutely not.

20     Q.   Okay.  It could be a totally different person?

21     A.   Yes, absolutely.

22     Q.   All right.  Fair to say on -- that on Genesee, it's

23  a pretty busy street, a lot of traffic?

24     A.   There is a lot of pedestrian contamination.

25     Q.   Thank you.

331

1          And finally, we talked about the show-up procedure

2     with Mr. Moseley.  Did you come in contact with an individual

3     by the name of Stan Lewis?

4          A.   Yes, I did.

5          Q.   Okay.  And did you do any ID procedures with him?

6          A.   No, I did not.

7          Q.   Why not?

8          A.   Because he didn't really seem interested in

9     cooperating.

10          Q.   Okay.  And in your mind, was there any other

11    witnesses to the actual robbery itself that you felt that

12    needed an ID procedure done?

13          A.   We attempted to locate more, with no luck.

14          Q.   Okay.  Thank you, sir.

15          A.   You're welcome.

16               MR. STUBBE:  No redirect -- or recross.

17               THE COURT:  Thank you very much.

18               THE WITNESS:  Thank you, sir.

19          (Whereupon the witness was excused.)

20               THE COURT:  Mr. Harrigan?

21               MR. HARRIGAN:  Your Honor, the People rest.

22               THE COURT:  Ladies and gentlemen, at this

23          juncture, we have some legal issues to address,

24          which comes at a pretty good time.  We will take --

25          We are going to take about 20 minutes.  We will

MILLER 000617

PEOPLE V. MILLER                    412

1    (Whereupon the members of the jury panel

2     collectively responded "Good morning.")

3         THE COURT:  Thank you all very much for coming

4    back.

5         Court Exhibit 8:

6         "Can we hear what Jack said to the

7    investigator when he identified Miller at the

8    show-up?

9         "Can we also hear the testimony about both

10   show-ups?"

11   (Whereupon the requested portion of the record was

12    read back by the court reporter.)

13        THE COURT:  Thank you.

14   (Whereupon the members of the jury exited the

15    courtroom to resume deliberations.)

16   (Whereupon the proceedings adjourned at 10:02 a.m.)

17        (Whereupon COURT'S EXHIBIT 9 - jury note,

18   Verdict - WAS MARKED FOR IDENTIFICATION.)

19   (Whereupon the proceedings reconvened at 2:19 p.m.

20    in the presence of Defendant Miller, out of the

21    presence of the members of the jury panel.)

22        THE COURT:  Ladies and gentlemen, we have

23   reached a verdict, apparently.  Unless there's an

24   objection, we will call the jury in, we will get

25   the verdict, I will send them back out, address any

PEOPLE V. MILLER                413

1    post-trial matters, and then I will go back and

2    visit with them and give them their certificates.

3    Any objection?

4         MR. STUBBE:  None.

5         MR. HARRIGAN:  No.

6         THE COURT:  All right, let's go.

7    (Whereupon the members of the jury panel entered

8     the courtroom.)

9         THE COURT:  Ladies and gentlemen, I have

10   received a note from you marked Court Exhibit 9

11   that you have reached a verdict, and what we will

12   do is Mr. Curran will take your verdict.  After we

13   take your verdict, we will excuse you back to the

14   jury room, there will be a couple of matters that

15   we need to deal with, and then I will come back

16   with your excuses for work and your certificates.

17        Okay.

18        THE CLERK:  Will the foreperson please rise.

19        Has the jury reached a verdict?

20        THE FOREPERSON:  Yes, we have reached a

21   verdict.

22        THE CLERK:  In the matter of the People of the

23   State of New York versus Anthony Miller, how do you

24   find Anthony Miller with regard to Count One of the

25   indictment, the crime of Robbery in the First

PEOPLE V. MILLER

414

1    Degree, not guilty or guilty?

2         THE FOREPERSON:  Guilty.

3         THE CLERK:  Thank you.  You may be seated.

4         THE COURT:  Mr. Harrigan, pole the jurors?

5         MR. HARRIGAN:  No, thank you, Your Honor.

6         THE COURT:  Mr. Stubbe?

7         MR. STUBBE:  Yes, please.

8         THE CLERK:  Ladies and gentlemen of the jury,

9    you say you find the defendant, Anthony Miller,

10   guilty of Count One of the indictment, the crime of

11   Robbery in the First Degree.  Is this in all

12   respects your verdict, so say you all?

13   (Whereupon the members of the jury panel answered

14    collectively in the affirmative.)

15        THE CLERK:  Juror Number Two, is that in all

16   respects your verdict?

17        JUROR NUMBER TWO:  Yes.

18        THE CLERK:  Juror Number Three, is that in all

19   respects your verdict?

20        JUROR NUMBER THREE:  Yes.

21        THE CLERK:  Juror Number Four, is that in all

22   respects your verdict?

23        JUROR NUMBER FOUR: Yes.

24        THE CLERK:  Juror Number Five, is that in all

25   respects your verdict?

MILLER 000700

PEOPLE V. MILLER                      415

1        JUROR NUMBER FIVE:  Yes.

2        THE CLERK:  Juror Number Six, is that in all

3    respects your verdict?

4        JUROR NUMBER SIX:  Yes.

5        THE CLERK:  Juror Number Seven, is that in all

6    respects your verdict?

7        JUROR NUMBER SEVEN:  Yes.

8        THE CLERK:  Juror Number Eight, is that in all

9    respects your verdict?

10        JUROR NUMBER EIGHT:  Yes.

11        THE CLERK:  Juror Number Nine, is that in all

12    respects your verdict?

13        JUROR NUMBER NINE:  Yes.

14        THE CLERK:  Juror Number Ten, is that in all

15    respects your verdict?

16        JUROR NUMBER TEN:  Yes.

17        THE CLERK:  Juror Number Eleven, is that in

18    all respects your verdict?

19        JUROR NUMBER ELEVEN:  Yes.

20        THE CLERK:  Juror Number Twelve, is that in

21    all respects your verdict?

22        JUROR NUMBER TWELVE:  Yes.

23        THE CLERK:  And Juror Number Thirteen, is that

24    in all respects your verdict?

25        JUROR NUMBER THIRTEEN:  Yes.

MILLER 000701

PEOPLE V. MILLER                    416

1      THE CLERK:  It's unanimous, Your Honor.

2      THE COURT:  Thank you very much.

3      If you'd step back to the jury room, we will

4  be back shortly.

5  (Whereupon the members of the jury panel exited the

6    courtroom and the following discussion was had in

7    open court in the presence of the defendant:)

8      THE COURT:  Mr. Miller, you have been found

9  guilty by a jury of your peers on the sole and only

10  count of your indictment charging you with Robbery

11  in the First Degree.  You are remanded to the

12  custody of the sheriff pending sentence.

13      We are adjourned until January 5th at 9:30 in

14  the morning for sentencing, and we will order a

15  pre-sentence investigation.

16      Mr. Stubbe, do you wish any notes on the

17  request for probation?

18      MR. STUBBE:  Ask to be present.

19      THE COURT:  All right, thank you very much.

20      (Whereupon the proceedings concluded at 2:25 p.m.)

21  * * * CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT * * *

22

23  _____

24  Debbie C. Bernstein
    Senior Court Reporter

25

```
 1   STATE OF NEW YORK      :      COUNTY OF MONROE

 2   SUPREME COURT          :      CRIMINAL TERM

 3   ------------------------------------x   Ind.#2013-0954
                                             CJTN#66265754N
 4   THE PEOPLE OF THE STATE OF NEW YORK  x

 5             -vs-                        x   Robbery 1

 6   ANTHONY MILLER, NYSID No. 00071860J, x

 7                      Defendant.      x

 8   ------------------------------------x   Sentence

 9                                 Hall of Justice
                                   Rochester, New York 14614
10                                 January 5, 2015

11

12   P r e s i d i n g :

13         HONORABLE THOMAS E. MORAN,
                                 Supreme Court Justice
14

15   A p p e a r a n c e s :

16         SANDRA DOORLEY, ESQ.
           District Attorney, County of Monroe
17         BY:  MICHAEL J. HARRIGAN, ESQ.
           Assistant District Attorney
18
           TIMOTHY P. DONAHER, ESQ.
19         Monroe County Public Defender
           BY:  JOSHUA F. STUBBE, ESQ.
20         Assistant Public Defender
           Attorney for the Defendant
21
           Defendant Appears in Person
22

23

24   R e p o r t e d   B y :

25                            JANINE J. VASCUKYNAS, CSR.
                              Senior Court Reporter
```

MILLER 000703

PEOPLE -VS- ANTHONY MILLER                                    2

1                    THE DEPUTY:  Number 19 in custody,

2       Anthony Miller.

3                    MR. HARRIGAN:  Sir, you are Anthony

4       Miller.

5                    THE DEFENDANT:  Yes.

6                    MR. HARRIGAN:  You appear with your

7       attorney Mr. Stubbe?

8                    THE DEFENDANT:  Yes.

9                    MR. HARRIGAN:  Michael Harrigan for the

10      People, your Honor.  This is on for sentencing.

11      Would you like me to proceed?

12                   THE COURT:  I've got a notice that the

13      victim is going to speak?

14                   MR. HARRIGAN:  Yes, your Honor.  With

15      regard to that, Mr. Moseley, M-o-s-e-l-e-y, is not

16      present.  The Pre-Sentence Investigation also did

17      not list him as responding to that.  I can tell the

18      Court that I have had constant contact with

19      Mr. Moseley up until probably about the last week or

20      so, that's because I have been out of the office.

21      So I don't know why he's not present today.  But I

22      can tell you that he received a letter from

23      probation after the date in which it said to reply,

24      so he called me concerned that it was supposed to be

25      for December 5th, and I think he received it a

MILLER 000704

PEOPLE -VS- ANTHONY MILLER                    3

1    couple days after that.  I told him to still respond

2    and also give me a letter, respond to me as well.  I

3    never got that letter.  And since I have been out of

4    the office the last couple weeks, I haven't had a

5    chance to touch base with him, but I can tell the

6    Court that he was aware of the sentencing date and

7    he's not here today.

8                 THE COURT:  What do you have to say?

9                 MR. HARRIGAN:  Well, your Honor, I do

10   have to say that among what I will be requesting is

11   an Order of Protection.  I will provide that to the

12   Court at this time for Mr. Moseley.  I didn't date

13   it, your Honor, because obviously I don't know what

14   the sentence of the Court will be, but I would

15   request that it's 8 years past the maximum

16   expiration date that the Court is going to impose.

17                 The only thing -- I have had a chance to

18   review the Pre-Sentence Investigation.  The only

19   thing that I would like to note is the

20   recommendation of the violent felony override be

21   considered and ultimately recommended.

22                 Your Honor, this was a conviction after

23   jury trial.  The Court is well aware the defendant

24   is convicted of sticking a gun into the victim's

25   face and ultimately convicted of a B violent felony.

PEOPLE -VS- ANTHONY MILLER                                    4

```
 1    I just can't disagree more with the recommendation

 2    that a violent felony override is appropriate in

 3    this case, your Honor.  And defendant goes on to

 4    obviously still to maintain his innocence.  I would

 5    just note for the record obviously the jury found it

 6    differently.  They believed wholeheartedly the

 7    victim's identification, and since that the

 8    defendant is the one who stuck that gun in his face

 9    and took his phone and cigarettes and money and

10    keys, your Honor, based on the jury's verdict, I

11    would ask that the Court sentence the defendant to

12    15 years in the Department of Corrections, five

13    years post-release supervision.  Thank you.

14              THE COURT:  Mr. Stubbe?

15              MR. STUBBE:  Judge, as you are well

16    aware, Mr. Miller has very limited criminal

17    contacts.  It's a misdemeanor in the past.  Other

18    than that, nothing.  He was living a law-abiding

19    life for quite a time up until this point.  Both he

20    and I disagree obviously with the jury's verdict,

21    feel that that identification was suspect, to say

22    the least, and wrong to say more correctly we

23    believe.  That being the only evidence, I don't

24    believe that this is the strongest case in the

25    world.
```

MILLER 000706

1                    With that, along with my client's

2       criminal or lack of criminal history, I would ask

3       that you sentence him to the minimum sentence.  That

4       takes in all the factors that are in play here,

5       enhancement for use of a weapon, for the taking of

6       property, all of that is included as to what a

7       Robbery in the First Degree.  I don't believe that

8       there's any part of this that makes this Robbery 1st

9       anymore egregious than the most minimal level of a

10      Robbery 1st.  I don't think my client's history adds

11      to any part of that, and therefore I would ask that

12      you sentence him to the minimum sentence of five

13      years with five years post-release supervision.

14      Obviously we will be filing a Notice of Appeal

15      almost immediately.

16                    THE COURT:  Mr. Miller, you have the

17      opportunity to say something to me before your

18      sentence but not the obligation.  Is there anything

19      that you would like to say?

20                    THE DEFENDANT:  I'm just going to

21      maintain my innocence.  That's all I can do.

22                    THE COURT:  All right, Mr. Miller.

23                    Mr. Miller, you realize that you stand

24      before me convicted by a jury of twelve.  The

25      underlying crime was a crime of violence involving a

PEOPLE -VS- ANTHONY MILLER                                    6

1    handgun and a theft of property from an innocent

2    individual.  Very scary set of circumstances.  It

3    doesn't take much to look around the City of

4    Rochester and see how much we're all affected by

5    guns and the use of guns in illegal ways.

6          I sat through the trial.  The jury found

7    you guilty.  It's my responsibility now to sentence

8    you.  The maximum sentence under our law is 25 years

9    in prison.  I will not do that to you.  But nor do I

10   believe that five years, the minimum, is appropriate

11   as well.  Under the circumstances I am going to

12   sentence you to 10 years in state prison, five years

13   post-release supervision.  I will order that you pay

14   $375 as and for penalty assessment surcharge, et

15   cetera.  And I will issue an Order of Protection,

16   and I have done so.

17          And Mr. Harrigan, if you would serve the

18   defendant with that?

19          MR. HARRIGAN:  Yes, Judge.

20          Mr. Miller, I'm presenting you with the

21   Order of Protection that Justice Moran just

22   mentioned.  This indicates that you are to have no

23   contact whatsoever with Jack Moseley.  No contact

24   home, school, place of business, no third party

25   contact, and that's to remain in effect through

1    January 5th of 2033.  I'm asking you just to sign

2    the first two, the third copy is yours to keep.

3              I would just note that Mr. Miller has

4    signed the Order of Protection.

5              THE COURT:  Mr. Miller, you have 30 days

6    to file a Notice of Appeal.  Mr. Stubbe is well

7    familiar with that process, and as he's already

8    indicated, it's my understanding that he's going to

9    file a notice almost immediately on your behalf --

10              THE DEFENDANT:  Yes.

11              THE COURT:  -- to appeal your matter.  I

12    just want make sure you know that you have the right

13    to appeal, okay?

14              THE DEFENDANT:  All right.

15              THE COURT:  Thank you.

16              THE DEFENDANT:  You said I can ask for a

17    furlough?

18              MR. STUBBE:  Judge, I'm sorry.  I did

19    tell my client that -- he asked me to request a

20    furlough.  Again, based on the factors, my client

21    has no bench warrant in his history, no criminal

22    history to speak of other than a misdemeanor,

23    request that he be allowed to be released for a few

24    days up to a week.  He certainly faces a gigantic

25    enhancement if he were to fail to come back.  He

MILLER 000709

PEOPLE -VS- ANTHONY MILLER                                         8

1      asked me to do that, and I'm so asking you.

2                     THE COURT:  And I assume, Mr. Stubbe,

3      that you advised him of my history that I have?

4                     MR. STUBBE:  Told him the chances are

5      slim, Judge.

6                     THE COURT:  Maybe once.  And I think it

7      only had to do with somebody having to go to cancer

8      treatment.

9                     And Mr. Miller, I do that because it's

10     just too dangerous.  Too many bad things happen when

11     people --

12                    THE DEFENDANT:  I'm not a flight risk.

13                    THE COURT:  Mr. Miller, it's not going to

14     happen.  I will end it right there.

15                    THE DEFENDANT:  All right.  Thank you

16     anyway.

17     (Certified to be a true and accurate transcript of the

18     above proceeding.)

19     _____

20              Janine J. Vascukynas, CSR.
                Senior Court Reporter

21

22

23

24

25

MILLER 000710