Report on the eyewitness identification issues in *Anthony Miller v. City of Rochester, et al*,

Case No. 22-cv-6069 (FPG)(MJP)

I, Charles Goodsell, received a Bachelor of Science in Psychology in 2002 from The

State University of New York, College at Cortland, a Master of Arts in Experimental Psychology

from The University of Alabama in Huntsville in 2006, and a Ph.D. in Psychology with a minor

in Quantitative Psychology from the University of Oklahoma in 2010.

I am currently a college professor in the Department of Psychology at Canisius

University, where I am a memory researcher, with expertise on eyewitness memory and decision

making. I have published several scientific journal articles, book chapters, and presented at

numerous national and international scientific conferences on the topic of eyewitness memory

and identification issues. My research has been funded by the National Science Foundation. I

have qualified as an expert witness in the areas of eyewitness memory and identification in the

State of New York. In addition, I have been qualified as an expert witness in the Courts of the

State of New York, and in seven other states/commonwealths and in federal and military courts.

I was retained by Anthony Miller to review the evidence and provide my expert opinion

regarding (1) Jack Mosely's identification of Mr. Miller as the perpetrator of the robbery (2) the

showup identification procedures employed by the Rochester Police Department ("RPD")

officers, and, (3) the role that confirmation bias played in the actions of the RPD officers and

investigators. Mr. Miller's attorney has provided me with the various case materials, which are

identified in Appendix A.

In summary, as detailed below, my review of the evidence reveals that Jack Moseley's

identification of Mr. Miller as the perpetrator of the robbery was unreliable because he did not

get a good look at the robber under the circumstances to make a positive identification of the

Miller 001757

person who robbed him. The evidence also reveals that the showup identification in this case was particularly flawed and unduly suggestive. Lastly, the evidence shows that Investigator Nolan Wengert's actions could have been influenced by confirmation bias, as he had arrested Mr. Miller for two cell phone thefts in 2010 (three years before this incident), which may have influenced him to ignore exculpatory evidence in this case.

My opinions in this case are based on my examination of the evidence and the current state of psychological knowledge on memory, identification, and confirmation bias issues. Below are the issues I see as relevant to Jack Moseley's positive identification of Mr. Miller as the perpetrator of the robbery. I begin with an overview of memory, followed by a discussion of factors that affect eyewitness memory and identification, and then address what specific elements of these two topics pertain to Miller's case. Lastly, I provide an overview of confirmation bias, and how that could have played a role in the investigation and identification in this case.

**Known Data Regarding Eyewitness Identifications**

Research demonstrates that eyewitness testimony is a powerful form of evidence considered by jurors (e.g., Cutler, Penrod, & Dexter, 1990; Schweitzer & Nuñez, 2018), however it has also been shown that it can be unreliable (e.g., Wells & Olson, 2003). Outside the lab, DNA exoneration cases tracked by the Innocence Project demonstrate that eyewitness error is the leading cause for wrongful convictions. From 1989-2020, 69% of the 375 cases tracked by the Innocence Project in which a wrongful conviction was overturned by DNA evidence, mistaken eyewitness identification evidence played a role in the underlying conviction (https://innocenceproject.org/dna-exonerations-in-the-united-states/ retrieved April 2, 2024). Furthermore, the National Registry of Exonerations reports that 955 of 3494 (27%) exonerations

Miller 001758

involved mistaken witness identification

(https://www.law.umich.edu/special/exoneration/Pages/ExonerationsContribFactorsByCrime.aspx, retrieved April 2, 2024).

To facilitate a more specific discussion of how eyewitness errors can occur, as well as the specific elements of this case, it is necessary that I provide a brief overview of the scientific view on how memory works. This overview will describe the three phases of memory, *encoding, storage,* and *retrieval*. Following this overview, I will address what I see to be the relevant factors regarding the eyewitness identification in this case.

**Memory**

The generally accepted view of memory can be related to the "modal model" of memory (Atkinson & Shiffrin, 1968; Wixted, 2024) whereby information comes into the system, is processed (encoding) into a long-term store (storage) and can be later activated for use (retrieval). Memory for any event is dependent on each of these three stages and research has highlighted some important issues relevant to each stage.

***Encoding***

The first phase involves allocation attention to incoming information. The level of attention given to incoming stimuli influences how well that individual will be able to recall it later (e.g., Craik et al., 1996). Even when a person is directing their attention to some event, the encoding of that event is not complete. We cannot encode everything we encounter due to the limitations of our cognitive system (Engle, Kane, & Tuholski, 1999). Rather, we integrate fragments of a new experience into memory by combining it with what we already know or what we are expecting in a situation. For example, you probably did not encode every aspect of the last time you witnessed a child's birthday party, because you already know what balloons and

Miller 001759

birthday cake looks like. Instead, you may have encoded who was there and pieces of relevant information (e.g., the cake tasted good).

Relevant factors that have been demonstrated to affect encoding include the state of the observer and the state of the environment. The ability for an observer to encode an accurate memory includes their emotional or physical state, such as stress or intoxication, frame of reference and diverted attention. Stress, intoxication, and poor attention have all been shown to negatively affect memory performance. Environmental factors such as poor lighting, obstructed view, or long distance between the witness and the subject and/or event can negatively impact memory performance. Finally, it is important to note that a person cannot remember what they did not encode (i.e., if you weren't listening when you were being spoken to) or did not encode well (i.e., details of a face that you did not see due to poor lighting conditions).

### *Storage and Retrieval*

Storage (maintenance) and retrieval are processes that are influenced by each other, so they will be discussed together. Storage refers to holding information in memory to be accessed later and retrieval refers to how we regain access to those memories. An observer who allocates attention to some event processes that information (to some varying degree) for storage. Once this happens, it must be maintained through a retention interval. Two primary changes happen to an event during this period. First is that the encoded event weakens; memory does not improve over time. The second is that the memory for the original event is not fixed and can be modified. A suggestion by another person (e.g., another witness, the police, or the media), or an inference made by the witness, can modify or influence a memory (see Schacter, 1999, 2002). There are countless studies that demonstrate this phenomenon (e.g., Loftus, 1997; Loftus & Ketcham, 1994; Loftus & Palmer, 1974). As mentioned above encoding a new event involves integration

4

Miller 001760

with existing knowledge. Most do not realize that memories are the result of a constructive process whereby we combine specific elements we can recall from an event, along with general knowledge and assumptions or expectations of what should have happened. Each time you recall (think about) some memory, that memory is altered. There is opportunity to add, change, or omit elements of that memory as you store that latest instance of the memory. New information that is received or belief about what probably happened can be added in, or information that now doesn't seem consistent or accurate can be omitted or changed. In short, the memory possessed by the witness at some later point (e.g., when the witness testifies in court) can be quite different from the memory he or she formed at the time of the event. Longer retention intervals (the time between witnessing and recall of an event), result in a greater likelihood of forgetting and incorporation of inaccurate information. This new, but inaccurate, information can get incorporated into the person's memory of the original event, thereby increasing memory distortion.

Based on this background overview on the scientific view of memory, I will expand this discussion to eyewitness memory. Rather than cover a broad range of topics on eyewitness memory, I will focus on factors that will be relevant to this case.

**Eyewitness Memory**

The importance of understanding eyewitness identification has grown dramatically in the wake of the increasing number of DNA exonerations (mentioned above). It is clear that even honest, well-intending witnesses make mistakes. Witnesses in those cases were not lying – their memory had led them to the wrong conclusion. Next, I review eyewitness memory topics relevant to this case.

Miller 001761

*Factors Affecting Memory*

Any factor that reduces the quality of the information coming into the senses can have an adverse effect on the quality of the memory formed. This includes factors related to the witness's ability to attend to a person/event (e.g., distraction, multiple perpetrators) and factors related to the quality of the information (e.g., visual, auditory) itself (e.g., viewing distance, lighting, viewing angle, and amount of time to observe).

**Exposure duration.** As mentioned above, you cannot remember something if you do not attend to it or if you do not have sufficient time to attend to it. Unsurprisingly, witnesses who have longer exposures to criminals are better able to identify them later on. For example, Memon, Hope, & Bull (2003) found poor identification performance for witnesses who were exposed to a perpetrator for 12 seconds (29% correctly identified him) compared to those given 45 seconds (95% correctly identified him).

**Weapon Focus.** As mentioned above, you cannot remember something if you do not, or cannot attend it. Moreover, if your attention to something is reduced, memory suffers. There are plenty of research studies demonstrating that the presence of a gun at the scene of a crime reduces the eyewitness's ability to correctly remember aspects of the crime (i.e., the perpetrator's face, clothes) because the weapon draws their attention (see meta-analysis by Steblay, 1992). Thus, if a witness is devoting their attention to items other than the perpetrator, their memory for him could be weak. Carlson and Carlson (2014) found that presence of a weapon reduces discriminability – the ability to differentiate between guilty and innocent suspects. This effect was driven by the false identification rate. That is, presence of a weapon put the innocent suspect at greater risk.

Miller 001762

**Stress.** One criticism of laboratory-based eyewitness research is that it under-estimates the effects of stress on memory performance because a true crime involves real fear / anxiety. Of the research attempting to better study this phenomenon, evidence shows a negative effect on eyewitness performance (Deffenbacher et al., 2004). For example, Morgan et al. (2004) showed that soldiers participating in POW training were less able to recognize their interrogator in high-stress conditions compared to low-stress ones. These results are consistent with Valentine and Mesout (2009) who showed that people experiencing a high state of anxiety (by touring the "Horror Labyrinth" of the London Dungeon) were less able to report accurate details about a person they encountered, as well as correctly identify them later, compared to people not under a high state of anxiety.

**Cross-Race Identification.** A cross-race identification is when a witness or a victim to a crime is attempting to recall someone of a different race than himself or herself. A recent examination of the exoneration cases (mentioned above) found that of 190 misidentifications, 49% of them were due to a cross-race misidentification (Garrett, 2011). A meta-analysis on this topic revealed that own-race faces were more likely to be correctly identified when the witness was viewing a perpetrator present lineup and less likely to falsely identify an innocent suspect when viewing a perpetrator absent lineup compared to other-race faces (Meissner & Brigham, 2001).

**Distance.** Increasing distance between an observer and an individual makes it more difficult to encode fine grain details (Loftus & Harley, 2005). Research illustrates that as distance between an observer and a target increases, the proportion of correct identifications decrease and the proportion of incorrect (false) identifications increase (Lampinen et al., 2014). For example, Lockamyeir et al. (2020) tested eyewitness identification accuracy for witnesses who observed a

Miller 001763

mock crime at 3, 10, or 20 meters (9.84, 32.8, 65.62 feet) away and found identification accuracy to get worse as distance increased. Specifically, they found accuracy to be near chance at 20 meters (that is, a similar rate of guilty suspect identifications and innocent suspect identifications).

**Identification Issues**

An identification of a suspect can be affected by many factors related to memory (described above) as well as factors about the identification task itself (e.g., construction of a lineup, instructions given to the witness). The relevant factors in this case are discussed below.

***Showup Identifications***

Presentation of a single suspect to a witness is known as a showup identification. In the landmark case on showups, the U.S. Supreme Court opined that showups are suggestive and should be restricted to cases of emergency (Stoval v. Denno, 1967). Showups, unlike lineups, offer no protection against a witness who feels pressured to choose. For example, a witness who views a single suspect in police custody may feel that the police must have found the perpetrator and decide to identify them even if the match to their memory is weak (Goodsell, Wetmore, Neuschatz, & Gronlund, 2013). Additionally, showups communicate to the witness who the suspect is. In fair lineups, the suspect is unknown and if a witness with poor memory for a perpetrator is highly willing to choose, the lineup fillers offer protection to an innocent suspect. To date, research on identification performance in showups versus lineups show a clear disadvantage for showups (Neuschatz et al., 2016).

**Clothing bias in showups.** Because showups are often conducted within a relatively short time period after the crime has occurred, clothing can be a key feature a witness relies on when making an identification decision. In 1998, a man wearing a Los Angeles Lakers hat

Miller 001764

robbed a juice bar. Arthur Carmona was detained and brought to witnesses for a showup. These four witnesses did not make a positive identification until police placed the hat (found in the getaway car) on his head. Carmona was exonerated two years later after witnesses expressed doubt in their identifications and the prosecution agreed to vacate the conviction and drop the charges (see https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3089, retrieved April 2, 2024). Wetmore et al. (2015) investigated the issue of clothing in showup identifications. In their study, participants who got a good view of the perpetrator attempted to make an identification from a showup where the suspect was either wearing the same clothes, some of the same clothes, or different clothes. Results showed that witnesses were best able to discriminate between the guilty and innocent suspect when the clothes matched. Wetmore et al. stated that when a witness can make an ensemble memory (e.g., memory for the face and other factors like clothes) the clothes helped with decision making. However, they point out that if a witness has a poor memory, clothing could bias a witness (like in the Carmona case described above).

### Confirmation Bias

Confirmation bias, in general terms, refers to the tendency of individuals to favor information that confirms their preexisting beliefs or hypotheses, regardless of whether the information is true. For example, Charman et al., (2009) showed that participants who believed a suspect was guilty gave higher similarity ratings of the suspect's face to a facial composite sketch compared to those who believed they were innocent. In the context of eyewitness identification, this bias can manifest in both the investigators and the witness. First, if investigators believe that their suspect is guilty, they can interpret other evidence to confirm this belief (see Kassin et al., 2013). Once this belief is established, it is likely they will have the

Miller 001765

witness attempt to identify them. That is, if police officers have a suspect in mind, they might unconsciously lead witnesses during identification procedures, in a way that confirms their initial suspicion. Research shows that suspects – guilty or innocent – are more likely to be identified when the administrator of the identification procedure knows who the suspect is (Kovera & Evelo, 2017). In fact, even seemingly innocuous suggestions from the lineup administrator such as "take your time," "look at each photograph carefully," and "there's no rush," can influence a witness to identify someone, and witnesses can be unaware of this influence (Clark, Marshall, & Rosenthal, 2009).

Second, witnesses who believe they are likely to be viewing a guilty suspect are more likely to identify that suspect (Clark, 2005). This bias can also influence a witness's confidence in their decision (Charman, Carol, & Schwartz, 2018). Unfortunately, witnesses are not able to accurately assess what affect these biasing influences have on their own decision making (Charman & Wells, 2008; Clark., 2005). Ideally, an identification decision should be made based on the witness's own memory and decision processes, and not external factors.

**Best practices**

Best practice recommendations state that a witness should make an identification based on his or her memory of the perpetrator, not other external factors. Identifications should be via a lineup or photo array with the witness, since showups are inherently suggestive and biased.

> Showups should be avoided whenever it is possible to conduct a lineup (e.g., if probable cause exists to arrest the person then a showup should not be conducted.). Cases in which it is necessary to conduct a showup should use the procedural safeguards that are recommended for lineups, including the elimination of suggestive cues, a warning that the detained person might not be the culprit, video-recording the procedure, and securing a confidence statement. (Wells et al., 2020, p. 24)

Lineups are better than showups because there are many safeguards that can be built into the procedure to make it more neutral and less suggestive. Specifically, lineups can easily be

Miller 001766

administered according to the following best practices and safeguards (see National Research

Council, 2014; Wells et al., 2020):

- Double-blind administration: neither the lineup administrator or the witness knows which lineup member is the suspect. This protects against any influence – intentional or unintentional – the administrator has on the identification.
- Unbiased instructions: Witnesses should understand that the person they witnessed may or may not be present in the lineup. If the witness believes it is his job to choose from the lineup, as opposed to indicate if they see the perpetrator is present, an innocent suspect is at greater risk.
- Fair lineup construction: arrays should be constructed where the fillers (known innocent lineup members) match the description of the suspect given by the witness. Lineups that are biased towards a suspect – where the suspect is the only plausible or one of a few plausible choices – place an innocent suspect at greater risk.
- One test of memory: Witnesses should not be shown multiple arrays including the same suspect. Viewing multiple arrays results in less-reliable identifications (Wixted et al., 2021).
- Immediate assessment of confidence: lineup administrators should get an assessment of confidence immediately after making an identification because retrospective confidence can change over time.

## Analysis of the Identification Factors in the Current Case

This final section will tie the overview on memory, eyewitness memory, and

identification procedures with my review of the eyewitness evidence in this case.

**Memory Factors**

According to the Rochester Police Incident Report, on September 25, 2013, the victim

was approached by a Black man wearing a grey hoodie who stated, "Gimmie your shit." (Bates

No. MCDA 369). He brandished a handgun, pointed it at the victim's head and stole a phone,

cash, keys, and a pack of cigarettes. The victim, testified at trial that the entire interaction lasted

30-45 seconds (Trial Transcript, p. 204, line 18; Bates No Miller 490).

Miller 001767

*Lighting*

The crime occurred at approximately 8:00 p.m. on September 25, 2013. Sunset on that day was at 8:05 p.m.,[1] meaning lighting conditions were less optimal than midday full-sun. It is known that as viewing conditions decrease, the ability to encode detailed information decreases as well (see chapter 6, National Research Council, 2014).

*Exposure duration*

The assault occurred quickly (30 – 45 seconds) – the more time you have to view an event, the more opportunity you have to allocate attention and encode details into memory. Moreover, because there was more than one individual to be observed, this time had to be allocated between these two individuals.

*Weapon Focus*

This crime involved the use of a gun, which, as described above, can reduce attention to other details like the face of the perpetrator.

*Stress*

The victim described the event as stressful: "V stated he was afraid for his life" (Rochester Police Incident Report, p. 3; Bates No. MCDA 369). As described above, high stress can interfere with a witnesses' ability to accurately identify someone later.

*Cross-Race Identification*

The victim in this case is White and Mr. Miller is Black (Rochester Police Incident Report, p. 1; Bates No. MCDA 367). As mentioned above, research illustrates that it is more difficult for a witness to accurately identify a stranger who is a different race than themselves.

---

[1] https://www.timeanddate.com/sun/usa/rochester

Miller 001768

*Distance*

Although the crime occurred in close-proximity (at gunpoint), a second individual was allegedly observed fleeing in the same direction on a bicycle shortly after the perpetrator fled the scene. That individual was stated to be present in the parking lot of the convenience store on the other side of Genesee Street at the time of the crime. (Trail transcript pp. 179; Bates No. Miller 465)

**Identification Factors**

Aside from the factors that could have affected the ability to accurately encode the perpetrator into memory described above, the main concern centers around the identification of Mr. Miller via a showup procedure. As stated above, showup identifications are inherently suggestive as they do not protect a suspect from a witness who is simply willing to choose anyone or desires to help by identifying someone and feels pressured to agree with the police that the suspect being shown is the actual person who the witness may have seen. Mr. Miller was placed in the showup because, according to Officer Wengert, "…I noted that (S) Miller matched the precise physical description given to me by (V) but with the exception of the tan boots had a different clothing description. I know it is a common criminal practice to change clothing and secrete stolen items immediately after a robbery…" (Rochester Police Department Investigative Action Report, p. 1; Bates No. Miller 1043).

The conditions under which the showups were conducted were not ideal. It was 8:50 p.m. when Mr. Hinds' showup was conducted and 8:54 p.m. when Mr. Miller's showup was conducted—both after the sun had set and it was dark outside. The victim and Investigator Wengert were inside of his unmarked police car on Roslyn Street across the street from the brick stairs at 19 Roslyn Street where the victim was sitting when the robbery occurred. Mr. Hinds and

Miller 001769

Mr. Miller removed from RPD cars that were parked on Genesee Street, were walked by RPD officers to the corner of Roslyn Street, turned the corner onto Roslyn Street, and stopped approximately 20 feet from where the stairs were; they then turned around and walked back to Genesee Street. (Trail Transcript pp. 256-260 (Bates No Miller 542-546), 326 (Bates No. Miller 612). Under these conditions, it is highly unlikely that Mr. Mosely could see details of the suspects faces.

The victim was first shown another individual who was identified as the man who was with the perpetrator right after the crime. Aside from the factors discussed regarding the viewing of the perpetrator above (time, stress, weapon focus, cross-race), this additional person was allegedly located across Genesee Street in the parking lot of the convenience store—a distance of approximately 60-75 feet—making the reliability of the identification questionable. (Trial Transcript p. 179; Bates No. Miller 465; see also pictures Bates No. MCDA 594, 596). After this positive showup identification, Mr. Miller was presented to the witness, who allegedly stated to Wengert, "That's him the guy that robbed me he just changed clothes." (Rochester Police Department Investigative Action Report, p. 2; Bates No. Miller 1044; see also Trial Transcript p. 197; Bates No. Miller 483). As stated earlier, a clothing mis-match could result in a less-reliable identification.

**Confirmation Bias Issues**

As stated above, confirmation bias results in focusing on evidence that favors a given hypothesis (e.g., the suspect is the perpetrator) and de-emphasizing evidence that does not support that hypothesis. In this case, Mr. Miller was stopped just five minutes after the robbery at 22 Bradburn Street, which is a half a mile from where the robbery occurred at 19 Roslyn Street. Mr. Miller did not possess a gun or any of the items stolen from Mr. Moseley. Thus, in five

Miller 001770

minutes, Mr. Miller would have had to run a half mile wearing unlaced Timberland boots, dispose of the gun and stolen items, and change clothes. When officers Hogg and Watson stopped Mr. Miller and Mr. Hinds, there was no indication in their reports or testimony that they had just run a half mile.

However, in his report, Investigator Wengert emphasized that when Mr. Miller was transported from Bradburn Street to Roslyn Street for the show up identification, that he recognized Mr. Miller from a prior interaction:

> "…I then spoke with (S) Miller and immediately recalled that he had confessed his involvement to me in several cell phone "Snatch and grab" thefts setup via craigslist in 2010 and I had charged him with four separate grand larceny 4th's and a petit larceny. I also recalled that some of these incidents had occurred in the Sawyer St and Brooks Ave areas which is the general area where the k-9 track ended at 873 Genesee St…" (Rochester Police Department Investigative Action Report, p. 1; Bates No. Miller 1043).

Thus, it is possible that this prior knowledge influenced the Investigator's belief that Mr. Miller was the perpetrator.

It is also possible that confirmation bias influenced Investigator Wengert's actions after the initial stop and arrest and throughout the prosecution. Specifically, on September 27, 2013, Investigator Wengert used the victim's Find My iPhone application to track the stolen iPhone to the possession of another individual in the vicinity of West High Terrace and Genesee Street. He activated the phone's alarm and numerous individuals who were congregated on the street corner scattered. The phone was tracked to a location on Stratford Park and then powered down, and so officers were unable to locate the phone. At the time, Mr. Miller was in custody at the Monroe County Jail.

Finally, in addition to how Mr. Miller became a suspect, confirmation bias could have influenced the witness to choose him from the showup because Mr. Miller was presented after

15

the victim had just made a positive identification of an alleged accomplice, Mr. Hinds. It is reasonable to assume that the victim would be more willing to make another positive identification given that the police were presenting two individuals to him (presumably both brought in for the same reason).

**Best Practice Issues**

The identification procedures in this case were not in line with best practice guidelines. A showup, by definition, is a presentation of the suspect. Thus, the officers involved, as well as the witnesses, were aware of this. There were no fillers to create a "fair" procedure (one where fillers protect against a witness who is simply choosing). There is no evidence that the standard instructions that the perpetrator may or may not be present were given.

**Description Issues**

The best assessment of memory is when it is fresh. The victim only provided the 911 dispatcher with a very general description of the perpetrator's appearance: a Black male, approximately 19 years old, wearing a gray hoodie and jeans with a slim build. However, he testified at trial that he first told Investigator Wengert that the perpetrator allegedly had a "chin strap beard" (a distinguishing facial feature of Mr. Miller), approximately 15 minutes after the initial 911 call (and approximately 8 minutes after Mr. Miller and Mr. Hinds were detained by RPD officers Hogg and Watson). It is unclear if this information was produced by the victim or that that information was shared with him by officers after Mr. Miller was detained. Similarly, the victim also did not inform the 911 dispatcher that there was a second person with the perpetrator, or that this second person acted as a lookout who was riding a bicycle. Instead, this fact was not reported until after Mr. Miller and Mr. Hinds were stopped by Officers Hogg and Watson. Because memory is a constructive process, it is plausible that these additional facts were

Miller 001772

incorporated into memory, however absent of direct evidence (e.g., initial recorded interview), there is no way to distinguish observed versus suggested details in memory.

**Other Issues**

Finally, it can be difficult for jurors and lay people to fully appreciate the subtle effects these factors have on memory and decision making. In my classes on cognition and memory, students typically view memory with the video camera analogy – that when we experience something we simply 'record' the event and when we want to think about it, we play it back. Clearly, this is not the case. Furthermore, traditional methods of instructing jurors (i.e., opening statements, cross examination, and judicial instructions) have not entirely been effective at educating jurors on what is otherwise counterintuitive and beyond the knowledge of lay people (Pezdek, 2007).

## Summary and Conclusion

It is my expert opinion, based on my review of the evidence, that the identifications in this case were problematic and unreliable. The witnessing conditions were poor as the crime occurred quickly at night. A gun was placed at the head of the victim, who reported he was scared for his life. This stress is known to negatively impact the ability to identify a stranger at a later time (Morgan et al., 2004). The perpetrator was also a different race than the victim, which also makes identification more difficult.

The identification of Mr. Miller was problematic for several key reasons. First, he became a suspect because he was the first young Black man wearing a hooded sweatshirt that the police encountered after the robbery, despite the fact that the clothing he was wearing did not match what the victim told the 911 dispatcher the perpetrator was wearing. The police also ignored several other non-incriminating factors. These included the lack of physical evidence

Miller 001773

from the crime and the fact that he would have had to run approximately one-half mile, changed clothing, and disposed of the stolen items in five minutes. Second, after the decision to conduct an identification was made, the victim was first presented a showup of the alleged accomplice. After making a positive identification of him, Mr. Miller was presented. It is quite possible this order unduly influenced the victim's decision-making process in his identification of Mr. Miller. Third, these identifications both came from showup procedures, conducted from a distance of approximately 20 feet, at night, as the victim sat inside of a vehicle and observed Mr. Hinds and Mr. Miller through the window. Showups have been demonstrated to be inferior to other forms of identifications (i.e., lineups and photo arrays, see Neuschatz et al., 2016) as they do not conform to best practice procedures (described above). It is my expert opinion that under the circumstances of this particular showup identification, the victim likely would have positively identified any man fitting the rough description of the perpetrator, as Mr. Miller did that night.

The opinions contained in this report are stated to a reasonable degree of psychological certainty, and are based upon the information I have reviewed to date. I reserve the right to modify my opinions should I receive new or additional information.

Charles A. Goodsell, Ph.D.                    Date

Miller 001774

References

Atkinson, R. C., & Shiffrin, R. M. (1968). Human memory: A proposed system and its control

    processes. In *The psychology of learning and motivation: II.* Oxford England: Academic

    Press.

Carlson, C. A., & Carlson, M. A. (2014). An evaluation of lineup presentation, weapon presence,

    and a distinctive feature using ROC analysis. *Journal of Applied Research in Memory*

    *and Cognition*, *3*(2), 45–53. https://doi.org/10.1016/j.jarmac.2014.03.004

Charman, S. D., Carol, R. N., & Schwartz, S. L. (2018). The effect of biased lineup instructions

    on eyewitness identification confidence. *Applied Cognitive Psychology*, *32*(3), 287–297.

    https://doi.org/10.1002/acp.3401

Charman, S. D., Gregory, A. H., & Carlucci, M. (2009). Exploring the diagnostic utility of facial

    composites: Beliefs of guilt can bias perceived similarity between composite and suspect.

    *Journal of Experimental Psychology: Applied*, *15*(1), 76–90.

    https://doi.org/10.1037/a0014682

Charman, S. D., & Wells, G. L. (2008). Can eyewitnesses correct for external influences on their

    lineup identifications? The actual/counterfactual assessment paradigm. *Journal of*

    *Experimental Psychology: Applied*, *14*(1), 5–20. https://doi.org/10.1037/1076-

    898X.14.1.5

Clark, S. E. (2005). A re-examination of the effects of biased lineup instructions in eyewitness

    identification. *Law and Human Behavior*, *29*(5), 575–604.

    https://doi.org/10.1007/s10979-005-7121-1

Craik, F. I. M., Govoni, R., Naveh-Benjamin, M., & Anderson, N. D. (1996). The effects of

    divided attention on encoding and retrieval processes in human memory. *Journal of*

Miller 001775

*Experimental Psychology: General*, *125*(2), 159–180. http://doi.org/10.1037/0096-3445.125.2.159

Deffenbacher, K. A., Bornstein, B. H., Penrod, S. D., & McGorty, E. K. (2004). A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory. *Law and Human Behavior*, *28*(6), 687–706. https://doi.org/10.1007/s10979-004-0565-x

Engle, R. W., Kane, M. J., & Tuholski, S. W. (1999). Individual differences in working memory capacity and what they tell us about controlled attention, general fluid intelligence, and functions of the prefrontal cortex. In A. Miyake & P. Shah (Eds.), *Models of working memory: Mechanisms of active maintenance and executive control.* (pp. 102–134). New York, NY US: Cambridge University Press.

Goodsell, C. A., Wetmore, S. A., Neuschatz, J. S., & Gronlund, S. D. (2013). Showups. In B. L. Cutler (Ed.), *Reform of eyewitness identification procedures.* (pp. 45–63). American Psychological Association.

Kovera, M. B., & Evelo, A. J. (2017). The case for double-blind lineup administration. *Psychology, Public Policy, and Law*, *23*(4), 421–437. https://doi.org/10.1037/law0000139

Loftus, E. F. (1997). Memories for a past that never was. *Current Directions in Psychological Science*, *6*(3), 60–65. http://doi.org/10.1111/1467-8721.ep11512654

Loftus, E. F., & Ketcham, K. (1994). *The myth of repressed memory: false memories and allegations of sexual abuse*. New York: St. Martin's Press.

Loftus, E. F., & Palmer, J. C. (1974). Reconstruction of automobile destruction: An example of the interaction between language and memory. *Journal of Verbal Learning & Verbal Behavior*, *13*(5), 585–589. http://doi.org/10.1016/S0022-5371(74)80011-3

Miller 001776

Loftus, G. R., & Harley, E. M. (2005). Why is it easier to identify someone close than far away? *Psychonomic Bulletin & Review*, *12*(1), 43–65. https://doi.org/10.3758/BF03196348

Morgan, C. A., Hazlett, G., Doran, A., Garrett, S., Hoyt, G., Thomas, P., … Southwick, S. M. (2004). Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress. *International Journal of Law and Psychiatry, 27(3),* 265–279. https://doi.org/10.1016/j.ijlp.2004.03.004

National Research Council. (2014). *Identifying the Culprit: Assessing Eyewitness Identification*. Washington, D. C.: National Academies Press. doi: 10.17226/18891

Neuschatz, J. S., Wetmore, S. A., Key, K. N., Cash, D. K., Gronlund, S. D., & Goodsell, C. A. (2016). A Comprehensive Evaluation of Showups. In M. K. Miller & B. H. Bornstein (Eds.), *Advances in Psychology and Law: Volume 1* (pp. 43–69). Springer International Publishing. https://doi.org/10.1007/978-3-319-29406-3_2

Schacter, D. L. (1999). The seven sins of memory: Insights from psychology and cognitive neuroscience. *American Psychologist*, *54*(3), 182–203. http://doi.org/10.1037/0003-066X.54.3.182

Schacter, D. L. (2001). *The seven sins of memory: How the mind forgets and remembers.* Boston, MA: Houghton, Mifflin and Company.

Schweitzer, K. & Nuñez, N. (2018) What evidence matters to jurors? The prevalence and importance of different homicide trial evidence to mock jurors, *Psychiatry, Psychology and Law, 25:3*, 437-451, DOI: 10.1080/13218719.2018.1437666

Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law and Human Behavior*, *16*(4), 413–424. http://doi.org/10.1007/BF02352267

Miller 001777

Technical Working Group for Eyewitness Evidence. (1999). *Eyewitness Evidence: A Guide for Law Enforcement*. Washington, DC: US Department of Justice, Office of Justice Programs.

Valentine, T., & Mesout, J. (2009). Eyewitness identification under stress in the London Dungeon. *Applied Cognitive Psychology, 23(2),* 151–161. https://doi.org/10.1002/acp.1463

Wells, G. L., Kovera, M. B., Douglass, A. B., Brewer, N., Meissner, C. A., & Wixted, J. T. (2020). Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence. *Law and Human Behavior, 44*(1), 3-36. http://dx.doi.org/10.1037/lhb0000359

Wetmore, S. A., Neuschatz, J. S., Gronlund, S. D., Key, K. N., & Goodsell, C. A. (2015). Do the clothes make the criminal? The influence of clothing match on identification accuracy in showups. *Journal of Applied Research in Memory and Cognition*, *4*(1), 36–42. https://doi.org/10.1016/j.jarmac.2014.12.003

Wixted, J. T. (2024). Atkinson and Shiffrin's (1968) influential model overshadowed their contemporary theory of human memory. *Journal of Memory and Language*, *136*, 104471. https://doi.org/10.1016/j.jml.2023.104471

Miller 001778

## Appendix A: Materials Provided / Reviewed:

Deposition Transcript of Daryl Hogg

Radio Call Report from Brooklyn Cromes Incident, Bates No. Miller 974-977

Radio Calls Report, Bates No. MCDA 643-647

Audio of Radio Calls, Bates No. Miller 1385

Prinzi Incident Report, Bates No. MCDA 367-370

Picture of 22 Bradburn Street, Bates No. Miller 905

Hogg Incident Report, Bates No. MCDA 246-248

CIU Update, Bates No MCDA 245

Google Maps route from 19 Roslyn Street to 22 Bradburn Street, Exhibit 8 From Hogg
Deposition

RPD Pictures of Anthony Miller from night of the arrest, Bates No. MCDA 1156-1162

Wengert Investigative Action Report, Bates No. Miller 1043-1044

Fourth Department Decision in People v Miller, 2020 N.Y. Slip Op 06667 (Nov. 13, 2020)

Custody Log, Bates No. MCDA 995

Picture of corner of Roslyn and Genesee Streets, Bates No. MCDA 594

 Picture of corner of Roslyn and Genesee Streets, Bates No. MCDA 596

Deposition Transcript of Jason Prinzi

Hospital Records for Brooklyn Cromes, Bates No. MCDA 472-511

Deposition Transcript of RPD Officer Daniel Watson

Deposition Transcript of Anthony Miller

Deposition Transcript of Aaron Hinds

Miller 1-3 - Indictment October 4 2013.pdf

Miller 4-11 - Sentencing Transcript.pdf

Miller 001779

Miller 12-15 - Jury Verdict.pdf

Miller 16-20 - Fourth Dept decision.pdf

Miller 21 - Certificate of Incarceration.pdf

Miller 22-152 (50h Transcript Miller v City of Rochester).pdf

Miller 153-156 (Hines Affidavit).pdf

Miller 157 to 244 (criminal hearing transcripts).pdf

Miller 245 to 338 (criminal hearing and trial transcripts).pdf

Miller 339 to 425 (criminal trail transcripts).pdf

Miller 426-509 (criminal trial transcripts).pdf

Miller 510-592 (criminal trial transcripts).pdf

Miller 593-710 (criminal trial and sentencing transcripts).pdf

Miller 711-1375 (DA File produced in FOIL).pdf

Miller 1376-1378 (Doc showing time sentenced to and time in MCJ).pdf

Miller 1379-1383 (Anthony-15B0216 printout of time in state custody).pdf

Miller 1384 (911 call).mp3

Miller 1385 (Radio calls).mp3

Miller 1386-1399 (University of Rochester Medical Center - Strong Memorial).pdf

Miller 1417 to 1507 (DOCCS Meds).pdf

Miller 1508 to 1533 (ATT Subpoena response).pdf

Miller 1534 to 1537 (Boost Mobile Response for miller records).pdf

Miller 1538 to 1541 (Text Plus Subpoena response).pdf

Miller 1542 to 1546 (T-mobile subpoena response - Hinds).pdf

Miller 1547 to 1551 (Verizon Subpoena Response).pdf

MILLER 1590-1601 (Pre Sentence Investigation).pdf

MILLER 1602-1614 (Rochester Regional records).pdf

Miller 001780

**Appendix B:**

April 2024

# Charles A. Goodsell          Curriculum Vitae

Department of Psychology
Canisius University
2001 Main St.
Buffalo, NY 14208

Email: goodselc@canisius.edu
Phone: (716) 888-2527

## Professional Experience

| | |
|---|---|
| 2018-present | Chair, Department of Psychology, Canisius University |
| 2018-2024 | Faculty Associate Dean, College of Arts & Sciences, Canisius University |
| 2016-present | Associate Professor of Psychology, Canisius University |
| 2010-2016 | Assistant Professor of Psychology, Canisius University |

## Education

2006-2010    Ph.D., University of Oklahoma, Cognitive Psychology, minor in Quantitative Psychology
> Dissertation - *Contributions of Memory and Decision Processes to Lineup Identifications Following Mugshot Exposure*, Advisor, S. D. Gronlund
> Supported by: National Science Foundation: SES Doctoral Dissertation Research Improvement Grant: Law and Social Sciences

2004-2006    M.A., The University of Alabama in Huntsville, Experimental Psychology
> Thesis - *Mugshot Exposure Prior to Lineup Identification: Age, Familiarity, and Commitment Effects*, Advisor, J. S. Neuschatz

1999-2002    B.S., State University of New York, College at Cortland, Psychology

## Publications: Last 10 Years

Carlson, C. A, Jones, A. R, **Goodsell, C. A**, Carlson, M. A., Weatherford, D. R., Whittington, J. E., & Lockamyeir R. F. (2019). A method for increasing empirical discriminability and eliminating top-row preference in photo arrays. *Applied Cognitive Psychol*ogy, *33,* 1091-1102. doi: 10.1002/acp.3551

Mickes, L., Seale-Carlisle, T. M., Wetmore, S. A., Gronlund, S. D., Clark, S., Carlson, C. A., **Goodsell, C. A.,** Weatherford, D., & Wixted, J. T. (2017). ROCs in eyewitness identification: Instructions vs. confidence ratings. *Applied Cognitive Psychology, 31,* 467–477. doi: 10.1002/acp.3344.

Neuschatz, J. S., Wetmore, S. A., Key, K. N., Cash, D. K., Gronlund, S. D., & **Goodsell, C. A**. (2016). Comprehensive evaluation of showups. In M. Miller & B. Bornstein (Eds.), *Advances in Psychology and Law* (pp. 43 – 70). New York: Springer.
- Cited in National Academy of Sciences report on eyewitness identification

Miller 001781

Goodsell, C. A.

Lodi-Smith, J. & **Goodsell, C. A**. (2016). Autobiographical memory. In S.K. Whitbourne. (Ed.)
*Encyclopedia of Adulthood and Aging* (pp. 1-4)*.* Wiley-Blackwell.
doi: 10.1002/9781118521373.wbeaa321

**Goodsell, C. A.**, Gronlund, S. D., & Neuschatz, J. S. (2015). Investigating mugshot
commitment. *Psychology, Crime, and Law, 21,* 219-233.
doi:10.1080/1068316X.2014.951647

Wetmore, S. A., Neuschatz, J. S., Gronlund, S. D., Key, K. N., & **Goodsell, C. A.** (2015). Do the
clothes make the criminal? The influence of clothing match on identification accuracy in
showups. *Journal of Applied Research in Memory and Cognition, 4,* 36-42.
doi:10.1016/j.jarmac.2014.12.003

Wetmore, S. A., Neuschatz, J. S., Gronlund, S. D., Wooten, A., **Goodsell, C. A.**, & Carlson, C.
A. (2015). Effect of retention interval on showup and lineup performance. *Journal of
Applied Research in Memory and Cognition, 4,* 8-14. doi: 10.1016/j.jarmac.2014.07.003

**Expert Testimony: Last Four Years**

*State of New Hampshire v. Daniels,* Merrimack County Superior Court, Concord, NH, 7/28/23,
8/16/23

*State of Ohio v. Sapp,* Court of Common Pleas, Hamilton County, Cincinnati, OH, 1/10/23

*State of Ohio v. Crawford,* Clermont County Court of Common Pleas, Batavia, OH, 7/22/22

*State of Ohio v. Hall,* Cuyahoga County Court of Common Pleas, Cleveland, OH, 6/16/21

**Courses Taught**

- Cognitive Psychology
- Statistics for the Behavioral Sciences
- Research Methods
- Applying Research Methods in Psychology
- Psychology and Law
- Sensation and Perception
- Psychology of Memory
- Introductory Psychology
- Science and Pseudoscience in Psychology: Thinking Critically
- Career Decision Making

2

Miller 001782

Goodsell, C. A.

**Professional Service / Training**

2009-present   Ad-hoc reviewer, *Law and Human Behavior*

2012-present   Ad-hoc reviewer, *Psychology, Crime, and Law*

2016-present   Ad-hoc reviewer, *Applied Cognitive Psychology*

2011-2013      American Psychological Association Division 41 conference co-chair

2011-2014      American Psychology-Law Society Conference Advisory Committee

2011-2014      American Psychology-Law Society Committee on Early Career Psychologists and
               Professionals

2011           Specialty Review Panel: Witnesses and Memory, International Congress on
               Psychology and Law Conference

2009, 2012,    Reviewer, American Psychology-Law Society Conference
2016, 2019

2009           Professional Ethics Training/Responsible Conduct of Research Seminar,
               *University of Oklahoma Graduate College*

**Professional Affiliations**

- American Psychology - Law Society (APA Division 41), Member
- Psychonomic Society, Member
- Psi Chi, Member, Faculty Advisor
- Eastern Psychological Association, Member

3

Miller 001783

**Appendix C: Statement of Fees**                                    2024

Charles A. Goodsell, Ph.D.
Rates Consulting and Expert Testimony on the Psychology of Eyewitness Memory

<u>Rates</u>

*Professional Time* (review of discovery, consultation, expert testimony): $300 / hr
*Non-Professional* Time (travel, wait time): $150 / hr

<u>Billing</u>

*Overnight travel*:        billing cycle ends at 10:00 PM unless (later hours are requested)
                           and begins the next morning at 8:00 AM (unless earlier hours are
                           requested)

*Minimums*:                Reviewing discovery and oral report – 5 hours ($1500.00) *
                           Reviewing discovery and written report – 10 hours ($3000.00) *

                           Travel: transportation (flight or mileage), lodging, per diem meals

                           Reserving date for trial - $2500

*Estimates:*               Total estimates (including travel costs) for consultation and expert
                           testimony are $6,000 if travel and testimony involves one day and
                           $8,000 if one overnight stay is required. *

*\*Note: estimates should be adjusted accordingly for large amounts of discovery / significant
travel distance and/or length of time*

<u>Payment</u>

For private clients, travel expenses and fees are expected in advance.
When paid by the court system, a copy of the approved order for funds is required in
advance.

Discovery should be sent to:

Email:
cgoodsell80@gmail.com

or

Mail:
Charles A. Goodsell
2001 Main St.
Buffalo, NY  14208