1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------x
ANTHONY MILLER,

           Plaintiff,

                                Index No.
  - against -                  22-cv-6069


CITY OF ROCHESTER, MARYROSE M. WENGERT
and EARL G. WENGERT, as Co-Executors of
the Estate of Nolan Wengert (deceased),
DARYL HOGG, JASON PRINZI, DANIEL WATSON,
JOHN DOES RPD OFFICERS 1-10, MARYROSE M.
WENGERT and EARL WENGERT,

           Defendants.
------------------------------------------x
    (CAPTION CONTINUED ON FOLLOWING PAGE)


                Zoom Recorded Videoconference
                May 15, 2023
                10:04 a.m.


     RECORDED VIA ZOOM - EXAMINATION BEFORE
TRIAL of JASON R. PRINZI, Defendant, pursuant
to Article 31 of the Civil Practice Law
and Rules of Testimony, and Order, held at
the above-noted time and place, before
Michelle Conero, a Stenotype Reporter and
Notary Public within and for the State of
New York.


Enright Court Reporting    (631) 589-7788

2

```
 1
 2   STATE OF NEW YORK
     COURT OF CLAIMS
 3   ------------------------------------------x
 4   ANTHONY MILLER,
 5                Claimant,
 6                                      Claim No.
                                         1358854
 7    - against -
                                         OAG No.
 8                                       21-005334-L1
 9   THE STATE OF NEW YORK,
10                Respondent.
11   ------------------------------------------x
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                            3
 1
 2    A P P E A R A N C E S:
 3
 4    ROTH & ROTH, LLP
           Attorneys for Plaintiff
 5         192 Lexington Avenue, Suite 802
           New York, New York  10016
 6         Phone:  212-425-1020
           E-mail:  eshields@rothandrothlaw.com
 7    BY: ELIOT DOLBY SHIELDS, ESQ.
 8
 9
10    CITY OF ROCHESTER LAW DEPARTMENT
           Attorneys for Defendants in the Federal
11             case
           City Hall
12         30 Church Street, Room 400A
           Rochester, New York  14614
13         Phone:  585-428-7600.
           E-mail:  patrick.naylon@cityofrochester.gov
14    BY: PATRICK B. NAYLON, ESQ.
15
16
17    LETITIA JAMES
      ATTORNEY GENERAL OF THE STATE OF NEW YORK
18         Attorney for the Defendant in the
               Court of Claims case
19         144 Exchange Boulevard, Second Floor
           Rochester, New York  14614
20         Phone:  585-428-7600
           E-mail:  tamara.christie@ag.ny.gov
21    BY: TAMARA CHRISTIE, ESQ.
22
23
24
25
```

4

```
 1
 2                S T I P U L A T I O N S
 3
 4              IT IS HEREBY STIPULATED AND AGREED
 5   by and between the parties hereto that all
 6   rights provided by the F.R.C.P. including the
 7   right to object to any question except as to
 8   the form, or to move to strike any testimony
 9   at this examination, are reserved, and, in
10   addition, the failure to object to any
11   question or move to strike any testimony at
12   this examination shall not be a bar or waiver
13   to make such a motion, and is reserved for
14   the trial of the action;
15              It is further stipulated and
16   agreed that this examination may be sworn to
17   by the witness being examined before a notary
18   public other than the notary public before
19   whom this examination was begun;
20              It is further stipulated and
21   agreed that the filing and certification of
22   the original of this examination are waived.
23
24                    * * * * * *
25
```

1
2  THE REPORTER:
3
4          The attorneys participating in
5  this deposition acknowledge that I am not physically
6  present in the deposition room and that I will be
7  reporting this deposition remotely.
8          They further acknowledge that, in
9  lieu of an oath administered in person, I will
10 administer the oath remotely.
11         The parties and their counsel
12 consent to this arrangement and waive any objections
13 to this manner of reporting.
14
15
16
17
18
19
20
21
22
23
24
25

6

1
2  J A S O N   R   P R I N Z I,
3       Defendant, having first been duly sworn
4       by the Notary Public, was examined and
5       testified as follows:
6            THE REPORTER:  If you would state
7       your full name, please.
8            THE WITNESS:  Jason R. Prinzi,
9       P-R-I-N-Z-I.
10           THE REPORTER:  Do we want to do
11      business address or --
12           THE WITNESS:  1099 Jay Street,
13      Rochester, New York.
14            THE REPORTER:  The time I have on
15      the screen is 10:04 a.m.
16 EXAMINATION BY
17 MR. SHIELDS:
18      Q    Good morning.  My name is Eliot
19 Shields.  I represent Anthony Miller who was
20 wrongfully convicted and spent six years in
21 jail before his conviction was reversed, and
22 I'm going to ask you some questions today.
23           MS. CHRISTIE:  I'm going to object
24      to the characterization, Eliot.  There's
25      been no finding of wrongful conviction.

81

1
2   every one year.  It was just when I had a
3   handful of them, I would destroy them.
4       Q     So if I wanted to ask you to go
5   look for the notepad for the date of this
6   incident, how would you go about trying to do
7   that?
8       A     Right now in my possession I have
9   zero notepads from work.
10      Q     Could you reach out to the RPD to
11  see if they have possession of any of your
12  notepads?
13      A     They wouldn't have any of my
14  personal property.  I cleaned my locker out
15  myself.
16      Q     Okay.  So you consider the notepads
17  your personal property and not RPD records?
18      A     I don't know if I consider them
19  that.  They were just my notepads.  I don't
20  know.
21      Q     So there's no RPD rule that said
22  notes that you take during your shift while
23  you're working as an RPD officer are official
24  RPD records, not your own personal records?
25      A     Not that I'm aware of.

1
2        Q    If you take notes that are
3   pertinent to an investigation, are those
4   required to be copied or turned over as part of
5   the investigation?
6             MR. NAYLON:  Object to the form.
7        You can answer.
8        A    I don't believe I've ever turned my
9   notes over in any case.  I don't know what the
10  rule or the law is on that.  I know I've never
11  been asked.  If I had, I would certainly turn
12  them over without any problem.  I've just never
13  been asked to supply my own personal notes to
14  any cases yet.
15       Q    In your entire time working from
16  2008 or '09 until approximately 2017, you never
17  disclosed any of your notes to the prosecutor
18  in any case?
19       A    I don't recall ever turning in my
20  notepad or any notes, no.  I don't recall ever
21  doing that.
22            MR. SHIELDS:  Okay.  So I want to
23       turn -- this will be Exhibit -- what are
24       we up to?  Or is it 3?  This will be 4
25       for this deposition.  It's going to just

```
 1
 2        be the radio calls from this incident.
 3              (Whereupon, Plaintiff's Exhibit 4
 4        was marked for identification as of this
 5        date.)
 6        Q    I'm going to play them through for
 7   about three minutes and then I'll pause it and
 8   ask you some questions.  Okay?
 9        A    Okay.
10        Q    Sometimes there's a lag if I play
11   audio from my computer, so I'm going to stop
12   talking for a second and then I'm going to hit
13   play, and then after that I'll play it through
14   and ask you some questions.
15              I'm sorry. I didn't start it right
16   at the very beginning.  Let me rewind it to the
17   very beginning.
18              (Audio played.)
19        Q    I'm going to ask you, did you hear
20   yourself there say 5313?
21        A    And I have 5323 with me.  I believe
22   that was me.
23        Q    Okay.
24              (Audio played.)
25        Q    Okay.  Did you hear that last part
```

84

1
2  right there?
3       A    Which part?  The last statement?
4  The last --
5       Q    So the last two statements.  So the
6  very last one, it was 5323, so that would have
7  been Hogg.  Right?
8       A    Correct.  Yup.
9       Q    He said I'm in that area now?
10      A    He's in the area.  I don't know the
11 area -- how close he was in the area.  He did
12 say he was in the area.  I don't know if he's
13 on scene or a block away.  I don't know.
14      Q    Okay.  So immediately before that
15 did you hear yourself make a statement?
16      A    I couldn't tell.  I was trying to
17 listen.  It's hard to listen to that.  It's
18 hard to hear.  It's not very clear.  I couldn't
19 tell.  Sometimes it's 5013 or 5313.
20      Q    Sure.  We listened to it a few
21 times with Officer Hogg, and what he testified
22 to was that that was you speaking.  We'll play
23 it again for you.  We listened to it a few
24 times with Officer Hogg and he said, you know,
25 what he heard was you say -- you asked for

                                                              85

1
2    someone to go to the area of Millbank and
3    Bradburn because it could be one of the C-set
4    kids and it matched the description from
5    earlier.
6         A    That just came through?  Those
7    words just came through on what I just listened
8    to?
9         Q    Correct.  So let me rewind that.
10   We're paused at 2 minutes and 25 seconds into
11   the recording.  I'm going to rewind it to about
12   2 minutes and 12 seconds, replay it and pause
13   it again and just ask you if you recognize that
14   to be your voice and what you hear.  Okay?
15        A    Okay.
16        Q    I'm rewinding.  It's paused at 2:09
17   and then I'm going to hit play.
18             (Audio played.)
19        Q    Okay.  Were you able to hear --
20        A    Yes, but to me that sounds like
21   5213.  That doesn't sound like my voice, to the
22   best of my recollection.  So, I mean, if you
23   listen to that carefully, I believe it says
24   5213.
25        Q    Okay.

86

1
2      A      If you look at the job card, it
3   could say 5313.  Dispatch could have typed that
4   wrong, too.  That doesn't sound like me.  I'm
5   pretty sure they said 5213.
6      Q      So one of the reasons that I want
7   to go over this carefully with you is because
8   this statement was not captured on the job
9   card.  So I guess my question is, you know, did
10  you hear, one, it said something about asking
11  someone to go to the area of Millbank and
12  Bradburn?  Did you hear that?
13     A      That part I heard.
14     Q      Okay.  And then did you hear it,
15  after that, say something about C-set kids and
16  a description from earlier?
17     A      I couldn't --
18            MS. CHRISTIE:  Objection to form.
19     Objection to form, but you may answer.
20     A      Okay.  I couldn't -- I couldn't get
21  clear what they were saying on that.  It just
22  sounded muddled to me.
23     Q      Sure.  Let's listen to that one
24  more time.  I rewound to 2 minutes and 11
25  seconds.  I'm going to hit play.

87

1
2                    (Audio played.)
3        Q     Okay.  What did you hear that time,
4    Officer Prinzi?
5        A     That time it sounded like 5313.
6        Q     Okay.  Anything else you were able
7    to hear that time?
8        A     What you had said earlier about
9    possibly C-set.
10       Q     Okay.  So it sounds like basically
11   either you or someone else is calling out to
12   ask for somebody to go over to the Millbank/
13   Bradburn area because there was -- the
14   description sounds like a C-set or something to
15   do with C-set and a description from earlier?
16   Is that --
17             MR. NAYLON:  Objection to form, but
18        you may answer.
19       A     I don't know if I was calling out
20   for them to go there or just the cars in the
21   area to be on the lookout for C-set or whatnot.
22       Q     Okay.  We had established that you
23   and Hogg had been over in the Millbank/Bradburn
24   area earlier that day.  Correct?
25       A     Correct.