```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE  :  CRIMINAL TERM
-----------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK  :  INDMT. #2013-0954

             versus                  :  NYSID #00071860J

ANTHONY MILLER,                      :  Robbery 1st

             Defendant.              :
-----------------------------------x  HEARINGS
                        Monroe County
                        Hall of Justice
                        Rochester, New York
                        February 14, 2014

B e f o r e:
                   HONORABLE THOMAS E. MORAN
                       Supreme Court Justice

A p p e a r a n c e s:

          SANDRA DOORLEY, ESQ.
             District Attorney - Monroe County
             47 South Fitzhugh Street
             Rochester, New York  14614
          By:  DAVID DYS, ESQ.
             Assistant District Attorney

          TIMOTHY P. DONAHER, ESQ.
             Public Defender - Monroe County
             10 North Fitzhugh Street
             Rochester, New York  14614
          By:  JOSHUA STUBBE, ESQ.
             Assistant Public Defender

          Defendant present


REPORTED BY:
                              LORI A. P. HEALY, CSR
                              Senior Court Reporter
```

1                     INDEX TO WITNESSES
2
3  Witness            Attorney        DX    CX    REDX   RECX
4  Daryl Hogg         Mr. Dys          6
5                     Mr. Stubbe            25
6  Nolan Wengert      Mr. Dys         33
7                     Mr. Stubbe            55
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MILLER 000181

```
1                        INDEX TO EXHIBITS
2
3                                        Identification      Evidence
4   For the People
5   1    Miranda Card                          4              50
6   2    Map                                   4              13
7   3    Photograph                            4              54
8   4    Photograph                            4              54
9   5    Photograph                            4              54
10  6    Photograph                            4              54
11  7    Custody Log                          11
12  For the Defendant
13  A    Job Card                             29
14
15
...
25
```

MILLER 000182

```
 1   (People's Exhibit 1 - WAS MARKED FOR IDENTIFICATION.)
 2   (People's Exhibit 2 - WAS MARKED FOR IDENTIFICATION.)
 3   (People's Exhibit 3 - WAS MARKED FOR IDENTIFICATION.)
 4   (People's Exhibit 4 - WAS MARKED FOR IDENTIFICATION.)
 5   (People's Exhibit 5 - WAS MARKED FOR IDENTIFICATION.)
 6   (People's Exhibit 6 - WAS MARKED FOR IDENTIFICATION.)
 7                THE COURT:  Are you Anthony Miller?
 8                THE DEFENDANT:  Yes.
 9                THE COURT:  You appear here today with your
10   attorney, Mr. Stubbe?
11                THE DEFENDANT:  Yes.
12                THE COURT:  Mr. Dys on behalf of the People.
13                We are here for the purposes of a Huntley and
14   Wade Hearing.
15                People ready?
16                MR. DYS:  Judge, I have -- we are ready.
17                The officer, I am told, is going to be here any
18   minute.
19                MR. STUBBE:  Judge, I was under the impression
20   this was also for a Probable Cause Hearing.
21                THE COURT:  It is.
22                MR. STUBBE:  Okay.  Thank you.
23                THE COURT:  So, you are really not ready?
24                MR. DYS:  Your Honor, Officer -- Investigator
25   Wengert is subpoenaed in County Court.  He is here and
```

1    Q    Once the show-up was complete, what, if anything,
2  did you do with the defendant?
3    A    I walked him back to Officer Watson's car and had
4  him sit in the back until I heard further information from
5  Investigator Wengert.
6    Q    And what, if anything, did you do regarding the
7  defendant Anthony Miller in this investigation?
8    A    Uhm -- after that, we ended up taking him out of
9  Officer Watson's car and putting him in my car.  Then I
10 transported him to the Public Safety Building to the fourth
11 floor, interview room.
12   Q    Other than yourself and the defendant, was there
13 anyone else in your vehicle during that transport?
14   A    No, sir.
15   Q    Did you interview or speak -- or -- ask the
16 defendant questions about this investigation during that
17 transport?
18   A    No, sir.
19   Q    Did you learn that an interview was later conducted
20 at the West Side -- or -- you said the West Side?
21   A    The Public Safety Building.
22   Q    The Public Safety Building.
23        Did you play any role in that interview?
24   A    No.
25   Q    During the transporting that you did of the

HOGG - DIRECT                                          25

1  defendant, did you ever make any promises or threats to him in
2  an effort to get him to speak with you or any other officers?
3      A    No.  No.
4      Q    Did there ever come a time that he ever indicated he
5  wanted an attorney or a lawyer?
6      A    No.
7            MR. DYS:  If I could have just a moment, your
8      Honor.
9            THE COURT:  Certainly.
10 (A pause in the proceedings.)
11           MR. DYS:  Officer, thank you, sir.
12           That's the questions I have.
13           THE WITNESS:  Thank you, sir.
14           THE COURT:  Mr. Stubbe?
15           MR. STUBBE:  Judge.
16 CROSS EXAMINATION
17 BY MR. STUBBE:
18     Q    When you arrived on Bradburn Street and saw these
19 two individuals, did you call your location in to -- over the
20 air in some manner?
21     A    Yes.
22     Q    Okay; and how would you have done that?
23     A    My car number, 5323, and I would have said, 5323
24 stepping out with two individuals.  I don't recall the exact
25 location, but I would imagine it would have been Bradburn and

WENGERT - DIRECT                                           41

1  you recall it?

2     A    The visibility was good, but it was a very windy,
3  cold and damp evening.

4     Q    And did you make any observations or notations of
5  the defendant's clothing in relation to the weather
6  conditions?

7     A    Yes, I did. I thought it was bizarre that, number
8  one, the boots were unlaced. Also, the jacket was unzipped,
9  given the weather and the story he told me about where he was
10 coming from and where he was going to.

11    Q    And what, in sum and substance, did he tell you when
12 you spoke to him at Genesee and West High Terrace?

13    A    In sum and substance, he explained that he had
14 walked from his home, which was at 607 Birr Street, all the
15 way down to his friend's home, Mr. Hines' home, at 31
16 Bradburn, but they hung out outside the house the entire time,
17 never going in. Then they went over to 22 Bradburn Street to
18 attempt to retrieve a cell phone. I know that Birr Street is
19 quite a distance from Bradburn Street. I later used a Google
20 map to calculate about an hour and a half walk each way,
21 which, given the fact that his boots weren't laced, would
22 suggest that his story wasn't a hundred percent accurate.

23    Q    Now, you stated -- strike that.
24         Did there come a time that show-up identification
25 procedures were conducted?

MILLER 000220

WENGERT - DIRECT                                        42

1   A    Yes.

2   Q    And that was with whom, which particular witness?

3   A    It was with both. It was with Mr. Moseley with
4   Mr. Hines and Mr. Miller.

5   Q    And where was the show-up conducted in relation to
6   where the alleged crime took place?

7   A    At the exact scene of the crime.

8   Q    Approximately how much time had elapsed between the
9   alleged incident and when the show-ups were conducted?

10  A    Approximately -- it was less than an hour. It was
11  approximately fifty minutes.

12  Q    And what were your responsibilities during the
13  show-up procedures?

14  A    I was with Mr. Moseley. So, I was to give him
15  directions, instructions, record his responses.

16  Q    And where were the two of you when that was done?

17  A    We were in my unmarked patrol vehicle. He was
18  sitting in the back of my vehicle. There's no cage or
19  anything in it, and he had a clear, unobstructed view through
20  the middle of the seats out of the front windshield.

21  Q    Now, where were you when this was done in relation
22  to Genesee Street as you were on Roslyn?

23  A    We were west of Genesee Street, about two houses in.

24  Q    And when the -- how many individuals were ultimately
25  displayed to Mr. Moseley?

MILLER 000221

WENGERT - DIRECT                                                  43

1    A    Two.

2    Q    And would you have looked westbound or eastbound to
3　make those observations?

4    A    Eastbound.

5    Q    So, you are facing Genesee Street?

6    A    Correct.

7    Q    Describe the manner -- well, strike that.

8         The two individuals shown were Mr. Hines and the
9　defendant, correct?

10   A    Correct.

11   Q    And what was the order?

12   A    In that order, Mr. Hines first, followed by
13　Mr. Miller.

14   Q    And were the procedures that were used to display
15　both individuals, were those the same procedures?

16   A    Yes, they were.

17   Q    Okay.  Describe how the show-up with the defendant
18　was conducted?

19   A    The victim and I were in my car on the south side of
20　Roslyn Street facing eastbound.  When the crime occurred, the
21　victim was seated on a brick front porch of 19 Roslyn Street.
22　I was in communication with Officer Hogg via the scene channel
23　again.  Once we were set up and ready to go, I gave
24　Mr. Moseley instructions.  I said, I'd like to show him two
25　people that may or may not have been involved in any of the

WENGERT - DIRECT                                              44

1  crime, and I'd like him to tell me if he recognized them, and
2  if, indeed, he did recognize them, where he recognized them
3  from.

4            I then had Officer Hogg first walk Mr. Hines
5  unhandcuffed to approximately twenty feet of the brick
6  staircase where the crime had occurred.  Mr. Moseley viewed
7  him, identified him as the individual he had seen in the area
8  on the bike.  We then repeated this procedure with Mr. Miller.
9  Officer Hogg escorted him over unhandcuffed to about twenty
10 feet of the porch.  Mr. Moseley viewed him and says, that's
11 him, he just changed his clothes.
12      Q    Okay.  So, there was not an additional set of
13 instructions between when Mr. Hines and then the defendant
14 were shown to him?
15      A    No, just that one set of instructions.
16      Q    And you stated the approximate distance between
17 where Mr. Moseley was in the procedure and the persons in the
18 show-up was how -- how -- how far?
19      A    It was about twenty feet.
20      Q    Describe the lighting condition?
21      A    It was a fairly well lit area.  There are street
22 lights present on the street.  There -- there is also a
23 business across the street, which shines extra light across
24 the intersection.
25      Q    Did you yourself have any difficulty seeing what was

MILLER 000223

1  going on?

2      A    No, I did not.

3      Q    What, if any, police cars or other vehicles were in
4  the area during the show-up?

5      A    There was no police cars in the area on the street
6  at all.  I had moved them out prior to the show-up procedures.

7      Q    Were any spot lights or other illumination used
8  during this procedure on the suspects?

9      A    No.

10     Q    Do you recall whether or not the defendant Anthony
11 Miller was handcuffed during the show-up procedure?

12     A    He was not handcuffed.

13     Q    And he was with -- fair to say the defendant was
14 escorted by a police officer; is that correct?

15     A    Yes, he was.

16     Q    And who was that?

17     A    It was just Officer Hogg.  He was about ten feet
18 away from him.

19     Q    So, there was just one officer?

20     A    Correct.

21     Q    And was he uniformed or plain clothes?

22     A    He was uniformed.

23     Q    Was the doors to your -- doors and windows for your
24 car, were they opened or closed?

25     A    The doors are closed and the windows were closed.

MILLER 000224

WENGERT - CROSS                                               57

1  Street.
2      Q    Sorry for that, but you knew that they had stepped
3  out already?
4      A    Yes.
5      Q    And when you approached Mr. Moseley, had -- were
6  there other officers around?
7      A    There was officers on the scene before I had
8  arrived, and they just gave a -- a brief conversation with
9  him, just enough to broadcast the information, because I
10 believe it was Officer Klein was the first officer on scene,
11 if I recall correctly.
12     Q    And had you been following closely enough to know
13 exactly what description had been broadcast?
14     A    Specifically, I recall the broadcast.  It was a male
15 black in a gray hoodie.  Then I arrived and I got more
16 detailed information.
17     Q    Okay; and no other officers had broadcast any
18 further description until you arrived?
19     A    They may have.  I don't specifically recall.
20     Q    To your recollection, do you remember hearing chin
21 strap beard ever broadcast before you arrived?
22     A    No, not before I relayed that information.
23     Q    Now, again, you -- you don't know which officer
24 actually broadcast the first description or called in the
25 first description?

1   A   No, I don't.

2   Q   Now, looking at the size of the two people that
3   ultimately did show-up identification procedures with the
4   first being Aaron Hines, can you describe, again, his physical
5   characteristics?

6   A   He was about six four and heavy build.

7   Q   Okay; and Mr. Miller, how would you describe him?

8   A   About seven five with a thin to medium build.

9   Q   Now, you've stated, when looking at the pictures
10  marked 3 -- People's Exhibits 3 through 6 that have been
11  entered into evidence, that the clothing that Mr. Miller was
12  wearing was oversized; is that right?

13  A   Specifically the pants, yes.

14  Q   Okay.  Is it common for younger black men in the
15  Bradburn Street area to wear oversized pants?

16  A   Yes, it is.

17  Q   So, these weren't so oversized that they were
18  different than what is common for most young black males?

19          MR. DYS:  Objection, Judge.

20  A   I would say slightly --

21          MR. DYS:  Objection.

22          THE COURT:  Grounds?

23          MR. DYS:  Relevance.

24          THE COURT:  Overruled.

25  Q   You can answer.

WENGERT - CROSS                                                59

1    A    In my opinion, they were slightly more oversized
2  than would be the fashionable style in that area.
3    Q    There were other pants on underneath those; is that
4  right?
5    A    I believe so, or, shorts.
6    Q    Okay; and is that, again, common of this style of
7  clothing worn by young black males in that area generally?
8    A    I would say so.
9    Q    And you've repeated that one of the identifying
10 characteristics was that he had Timberland boots that were
11 unlaced.  Again, is that not something that's characteristic
12 of young black males in that area?
13   A    Well, the observations were the -- from the victim
14 were the tan Timberland boots.  The victim said nothing about
15 them being unlaced.  I observed they were unlaced.
16   Q    Exactly; but that's, again, a common manner of
17 wearing Timberland boots in that area; is that right?
18   A    No, I don't believe so.  It's not -- not to walk
19 around with tan Timberland boots unlaced.
20   Q    What about Timberland boots other than tan?
21   A    Yes -- well, people wear Timberland boots commonly,
22 but I have never seen anyone just walking around with -- with
23 the boots unlaced.
24   Q    Now, moving forward a little bit to the
25 identification procedures, you said that you first did the

MILLER 000238

```
                    WENGERT - CROSS                       60
```

1  procedure with Mr. Hines, right?

2       A    Correct.

3       Q    Upon the completion of that, how much time elapsed
4  before Mr. Miller was brought out?

5       A    Approximately a minute to a minute and a half.

6       Q    And you said that no other vehicles were around
7  other than your unmarked police vehicle at that time?

8       A    That's correct.

9       Q    Where was -- where were they being brought from?

10      A    They were being walked up the sidewalk, the west
11 sidewalk, of Genesee Street from West High Terrace,
12 approximately half a block to three-quarters of a block south
13 of that intersection.

14      Q    And both of those -- both people were produced with
15 Officer Hogg following behind them?

16      A    About ten feet off to their side.

17      Q    And your car is not equipped with a spot light?

18      A    No, it is not.

19      Q    And when -- sorry.

20           When -- when he made the identification, do you
21 remember the exact words he used when he identified
22 Mr. Miller?

23      A    To my recollection, it was, that's him, he just
24 changed clothes.  I can give you the precise words if I can
25 review my narrative.