```
- - - - - - - - - - - - - - - - - - - - - - - - - -
In the Matter of the Claim of

ANTHONY MILLER,

          Claimant,

v.

CITY OF ROCHESTER,

          Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - -

Remote 50-h Hearing in the Above-Titled Matter:

Sworn Testimony of:

              Anthony Derrick Miller




Date:         May 26, 2021



Time:         10:00 a.m.



Reported By:  TAMMY B. FIGLER

              Alliance Court Reporting, Inc.

              109 South Union Street, Suite 400

              Rochester, New York 14607
```



585.546.4920    ■    www.alliancecourtreporting.net    ■    800.724.0836

MILLER 000023

```
                                                              2

 1
 2                      A P P E A R A N C E S
 3    Appearing remotely on Behalf of Claimant:
 4    Elliot D. Shields, Esq.
 5        Roth & Roth LLP
 6        192 Lexington Avenue, Suite 802
 7        New York, New York  10016
 8        eshields@rothandrothlaw.com
 9
10
11    Appearing remotely on Behalf of Respondent:
12    Patrick Beath, Esq.
13        City of Rochester
14        Department of Law
15        30 Church Street, Room 400A
16        Rochester, New York  14614-1224
17        beathp@cityofrochester.gov
18
19
20                        *     *     *
21
22
23
24
25
```



MILLER 000024

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2   WEDNESDAY, MAY 26, 2021;
 3            (Proceedings in the above-titled matter
 4            commencing at 10:00 a.m.)
 5                     *    *    *
 6   ANTHONY DERRICK MILLER,
 7            called herein as a witness, first being sworn,
 8            testified as follows:
 9            EXAMINATION BY MR. BEATH:
10        Q.  Good morning, Mr. Miller.  My name is
11   Patrick Beath.  I'm an attorney for the City of
12   Rochester, and we're here today to take what's called
13   your 50-h Examination about the claim that you filed
14   against the city.
15            You understand that is the purpose for our
16   meeting today?
17        A.  Yes.
18        Q.  Before we get to the examination proper
19   where I ask you questions and you give me answers
20   about the incident, I'm going to review with you some
21   of the rules of the 50-h Examination.
22            Do you understand?
23        A.  Okay.
24        Q.  The first and most important rule is that
25   everything that we're saying today is being taken down
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000025

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2       Q.   Can you give me a description of that
 3  officer?
 4       A.   Not that good.  Back then, you know, slick
 5  hair, oily hair, something like that.  Heavyset.  Not
 6  heavyset but, you know, built.
 7       Q.   White guy?
 8       A.   Yes.
 9       Q.   Do you remember height?
10       A.   No.
11       Q.   Do you know if he was shorter or taller
12  than you?
13       A.   He was taller than me.
14       Q.   How tall are you?
15       A.   5'5".
16       Q.   So you said that he grabbed Aaron and
17  started searching him.
18            Can you describe in a little more detail
19  what you saw him doing to Aaron?
20       A.   He was, you know, searching his pockets,
21  patting around him, you know.
22       Q.   Did he say anything, this officer, to
23  either you or to Aaron?
24       A.   He just told us don't move, and you
25  know...
```

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2        Q.   And he was the only officer in that car
 3   from what you could see?
 4        A.   Yes.
 5        Q.   What were you doing as this Officer Hoag
 6   was searching Aaron?
 7        A.   I had my hands in the air.  He told me to
 8   put my hands up, show my hands.
 9        Q.   Do you remember him saying show me your
10   hands?  Do you remember him saying put your hands up,
11   or both?
12        A.   Something to that.  "Let me see your
13   hands."
14        Q.   Did you have your phone in your hand at
15   that time or was your phone elsewhere?
16        A.   It was in my pocket.
17        Q.   Apart from the phone, your phone, did you
18   have anything else with you when you left Birr to head
19   over to Bradburn?
20        A.   My MP3 player.  That's it.  That's what I
21   can recall.
22        Q.   And when you say "MP3 player," do you know
23   what kind it was?  Was it an iPod?  Was it something
24   else?
25        A.   No.  It wasn't no iPod.  It was a cheap
```



64

1        ANTHONY DERRICK MILLER - BY MR. BEATH
2   residence and asked to turn left or right, was Aaron
3   still sitting in the car?
4        A.   I believe so.  He wasn't in my sight, but
5   I'm assuming he still was there.
6        Q.   What happened after you went and turned
7   left and turned right as the officers instructed you?
8   What's the next thing that happened?
9        A.   They took me back to the car.
10       Q.   Were you in handcuffs at that point?
11       A.   No.
12       Q.   What happened after you got back to the
13   car?
14       A.   I asked was I free to leave now?  And I
15   know for certain I was talking to Officer Watson at
16   this point.
17            He told me they were trying to get one
18   more victim to participate in the identification
19   procedure, and that the first person didn't identify
20   me, so they was holding me to see if the second person
21   would identify me.
22       Q.   And so did you remain or go back inside
23   the police car?
24       A.   Yes.
25       Q.   And what's the next thing that happened



1           ANTHONY DERRICK MILLER - BY MR. BEATH
2    with you?
3           A.  As time was going by, a lot of time went
4    by, I'd say, and I began knocking on the window and
5    asking, "What's going on?  What is the holdup, because
6    you said I'm not identified, so why am I still in the
7    car?"
8               That's when they told me they was waiting
9    for the second victim to arrive at the scene.  And,
10   once again, I'm waiting longer.  I knock on the window
11   again.  Ask, "What's going on?"
12              And they say, "Oh.  Matter of fact, you
13   know, Wengert wanted to take you down to PSB.  He got
14   a couple questions for you."
15              And shortly after that I was placed in
16   handcuffs and put me in another car.
17          Q.  During the time that you were waiting, did
18   you see what if anything was happening with Aaron and
19   the car that he was in?
20          A.  I know his door opened again, and Wengert
21   and another officer, who was wearing a suit, was
22   talking to him.  So two officers out of uniform was
23   talking to Aaron at that point.
24          Q.  Do you know who the other officer was in a
25   suit?

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000087

1         ANTHONY DERRICK MILLER - BY MR. BEATH
2              A.   No, but I'm assuming he was, you know, an
3     investigator or something to that nature.
4              Q.   Did you have any idea -- well, did you
5     hear at all what that conversation with Aaron was?
6              A.   No.
7              Q.   And at any point since then have you
8     learned what they spoke to Aaron about?
9              A.   No, not at that point.
10             Q.   What about as of today, have you learned
11    what they spoke to him about?
12             A.   No.  I never knew what took place during
13    that conversation when we still was on Roslyn Street.
14                  Yes, I got discovery what took part later
15    on during the conversations, but I don't know what was
16    discussed at that moment.
17             Q.   So you were told that Wengert had some
18    questions for you.  Were you taken to PSB?
19             A.   Yes.
20             Q.   And you said it was at that point before
21    they drove you to the Public Safety Building that you
22    were placed in handcuffs?
23             A.   Yes.
24             Q.   Did the officers drive you directly to the
25    PSB at that point or did you stop anywhere else?

|   |   |
|---|---|
| 1 | ANTHONY DERRICK MILLER - BY MR. BEATH |
| 2 | A.  We drove directly to PSB. |
| 3 | Q.  What happened after you got to PSB? |
| 4 | A.  I believe I asked again -- well, no.  I |
| 5 | asked, "Why am I being taken to PSB," and, "Why am I |
| 6 | in handcuffs," and they told me it was for |
| 7 | precautions. |
| 8 | Q.  Who told you that? |
| 9 | A.  I believe it was Hoag or -- I believe it |
| 10 | was Hoag.  I believe I was with Hoag at that time. |
| 11 | Q.  Did that conversation take place in the |
| 12 | car as you were heading to PSB? |
| 13 | A.  I believe so. |
| 14 | Q.  So it's your recollection that Hoag is the |
| 15 | one that took you to PSB? |
| 16 | A.  Yes, I believe so. |
| 17 | Q.  Was it just you and Hoag in the car? |
| 18 | A.  I don't recall, because I know once we got |
| 19 | to PSB, another officer was there also shadowing me, |
| 20 | so I don't recall, but we did end up having two |
| 21 | officers present when we was at PSB. |
| 22 | Q.  What do you mean, "shadowing me"? |
| 23 | A.  Literally, Hoag was on one side and |
| 24 | another officer was on another side of me. |
| 25 | Q.  Okay.  So what happened after you got to |

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000089

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2    PSB?
 3            A.   I sat -- well, they called me in and put
 4    me in a room and said they was waiting on Wengert.
 5            Q.   Was anyone else in the room with you at
 6    that point?
 7            A.   No.
 8            Q.   Were you still in handcuffs then?
 9            A.   I believe so, yes.
10            Q.   What's the next thing that happened?
11            A.   I just sat there and waited for Wengert to
12    arrive.
13            Q.   Do you have an idea of how long you
14    waited?
15            A.   It was quite a while, but I can't give you
16    an exact time.
17            Q.   And did Wengert eventually arrive?
18            A.   Yes.
19            Q.   What happened after he arrived?
20            A.   He just sat down and informed me that I
21    was identified by two people.
22            Q.   Okay.  Identified.  Did he say anything
23    else?
24            A.   He said two people accused me of pointing
25    a gun at them and taking their property.
```



ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000090

```
 1         ANTHONY DERRICK MILLER - BY MR. BEATH
 2         Q.  And was there any further conversation
 3    between you and Wengert?
 4         A.  I just explained to him, you know, my
 5    alibi, the reason I was present over on Bradburn and,
 6    you know, I offered him a phone, you know, to confirm,
 7    you know, that I wasn't present on Roslyn.  But, you
 8    know, he didn't care too much about that.
 9         Q.  What do you mean when you say "he didn't
10    care too much about that"?
11         A.  Well, the things that I was telling him
12    that would exonerate me, he literally say he checked
13    my cell phone and, you know, he said, "Fuck your cell
14    phone.  Have your lawyer investigate that."  Although
15    he took my phone out of the room, and I am assuming he
16    looked at it and did his investigation.  But like I
17    say, he said, "Fuck your cell phone.  Have your lawyer
18    investigate it."
19         Q.  So at that point did you have your cell
20    phone and MP3 player back or had police hung onto
21    that?
22         A.  I believe the police hung onto it.
23         Q.  Okay.  So you had this conversation with
24    Wengert, and you encouraged him to check your phone.
25             Did you say that he did check your phone?
```



MILLER 000091

```
 1          ANTHONY DERRICK MILLER - BY MR. BEATH
 2          A.   I'm assuming he did.  He left the room
 3   after I requested that.  Then he came back and he told
 4   me, you know, "F your phone.  Have your lawyer
 5   investigate it."
 6          Q.   Okay.  Before Wengert started talking to
 7   you about the -- about the robbery, did he ask your
 8   permission to talk about the robbery?
 9          A.   Yes.
10          Q.   Can you tell me what that conversation
11   was?
12          A.   About asking me permission?
13          Q.   Yes.
14          A.   I don't know.  He just asked my name,
15   furthest level education I completed, do I speak
16   English, and am I willing to speak to him about what's
17   going on.
18          Q.   And you agreed to speak with him?
19          A.   Of course.
20          Q.   Did he have you sign anything indicating
21   that you agreed to speak with him?
22          A.   I don't recall.  I'm not sure.
23          Q.   You've told me about some of the
24   conversations that you had with Wengert about your
25   phone, and about Wengert telling you that you'd been
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000092

```
 1           ANTHONY DERRICK MILLER - BY MR. BEATH
 2        Q.   Yeah.  Patio Solutions.
 3             Are you working for them directly or is
 4   that a temp job?
 5        A.   Directly.
 6        Q.   And does that job provide any kind of
 7   health insurance, medical coverage?
 8        A.   Yes, after 90 days.
 9        Q.   Okay.  And you said you've been working
10   there for how long now?
11        A.   About three weeks -- two, three weeks.
12        Q.   Got it.  Have you suffered any financial
13   injuries as a result of your arrest and incarceration
14   that's at issue in this suit?
15        A.   I'm assuming I'd have been grossing income
16   if I was never incarcerated.
17        Q.   Do you know from, let's take the year
18   before you were incarcerated, for instance.  Do you
19   know how much money you made that year?
20        A.   No, I don't recall.
21        Q.   Okay.  Do you know an approximate amount?
22        A.   No.  I couldn't tell you to be honest.
23        Q.   Do you know how much money you've, you
24   know, you've earned from when you got out in November
25   of last year until now?
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000137

```
 1           ANTHONY DERRICK MILLER - BY MR. BEATH
 2           A.   Well, I literally just started working
 3   three weeks ago.  So like I make $18.50 an hour, and I
 4   average between 42 to 50 hours a week.  So...
 5           Q.   Does Patio Solutions, do they operate --
 6   are they a seasonal company, so mostly like spring,
 7   summer, fall?
 8           A.   All seasons.
 9           Q.   Great.  How about any legal fees?  Have
10   you had to pay any legal fees connected to your arrest
11   and incarceration?
12           A.   No.  Just the bond.  That's just to be
13   bonded out.  That's it.
14           Q.   Did your family get that money back?
15           A.   No.
16           Q.   Okay.  Was that your money, or was that
17   your family's money?
18           A.   My family's money.
19           Q.   Have you been injured as a result of the
20   incident alleged in your claim in any manner that we
21   have not already discussed?
22           A.   Like I said, just mental.
23           Q.   Okay.  And we talked through some of the
24   mental injuries.
25                Is there anything on the mental front that
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000138

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2    we have not talked about?
 3            A.   To be honest, I'd be lying if I told you
 4    it seems like I find out every week, you know, take
 5    every week that I find out something.  I can't just
 6    give you, you know, no list.  Seems like there's
 7    something appearing every week that is associated with
 8    it -- prison.
 9            Q.   Give me some examples from like the last
10    couple of weeks.  What else that we have not
11    discussed.  Anything?
12            A.   It could be even just when I'm like, you
13    know, I'm spending time with loved ones.  You know,
14    I'm just extra vigilant and, you know, just cautious.
15    You know, just law enforcement and, you know, steady,
16    you know, looking over my shoulder, in my rearview.
17    So it's just moments, you know, that I have that, you
18    know, is a flashback even.  You know, just dreaming
19    about prison, you know, waking up in the middle of the
20    night in a puddle.  You know, you have a flashback of
21    prison.
22            Q.   Okay.  Got it.
23                 Great.  Unless there's anything else that
24    you think I should know, I think I'm all set.
25            A.   Well, like to be honest, nobody been
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000139

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2     listening for the last eight years when I say this,
 3     but, you know, I believe wholeheartedly that my
 4     conviction is because of Investigator Wengert.
 5                   You know, I'm not sure what he was going
 6     through at the time, but, you know, I believe he was
 7     on drugs at the time, you know.  And it's what other
 8     people believe also, was he ultimately passed away due
 9     to drugs, illegal narcotics.
10                   So, you know, that's just something I hope
11     won't fall on deaf ears.  I'm quite sure I'm not the
12     only victim of him.
13            Q.    Do you believe that Investigator Wengert
14     was on drugs at the time of your presentation?
15            A.    Yes, I believe so.  You know, it's sad to
16     say, you know, I dealt with and conversed and, you
17     know, dealt with people on drugs before.  And he
18     exhibited every sign of being someone under the
19     influence at that time.
20            Q.    What signs did you see him exhibit that he
21     was under the influence?
22            A.    Like I said, glossy eyes.  Just even the
23     mannerisms.  The way he was talking.  Like he just
24     didn't seem right.
25                   And I dealt with this guy on previous
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920    ■    www.alliancecourtreporting.net    ■    800.724.0836

MILLER 000140

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2     occasions, so I'm not unfamiliar with him.  I'm very
 3     familiar with him.
 4            So like I say, just the glossy eyes, just
 5     repeating himself, and just seeming lost at times.
 6         Q.   When in your interactions with him did you
 7     observe that he had glossy eyes?
 8         A.   When we sat down at PSB.
 9         Q.   Any other occasions that you interacted
10     with him that you saw he had glossy eyes?
11         A.   Never.  Like I say, yeah, he arrested me
12     one time, you know, on Petit Larceny, then Grand
13     Larceny.  But he harassed me a bunch of times in
14     between there.
15            Like I say, I never seen him with glossy
16     eyes.  I never knew him to stumble over his words and
17     repeat hisself, you know, like frequently, like he was
18     doing the night of.  So...
19         Q.   So give me an example.  How did he stumble
20     over his words when he was speaking to you at the PSB?
21         A.   Just saying things over and over and
22     pausing, and like just like a drug addict sitting in
23     front of you, like kind of nodding off in a sense,
24     losing his train of thought.  You literally just asked
25     me that question.  This wasn't a strategic thing like
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000141

```
 1        ANTHONY DERRICK MILLER - BY MR. BEATH
 2   trying to catch me in a lie.  No.  It was simple
 3   things as far as, you know, "Oh, where do you live
 4   at?"  Right back to the same question, and pause.  And
 5   like you are really flustered.  He was really stuck.
 6             Like I say, I'm from the City of
 7   Rochester.  You know, I have two uncles who dealt with
 8   drug struggles throughout my whole life.  You know,
 9   I've been in the county jail before.  You know, I know
10   the signs of somebody who's on drugs.
11        Q.   Did you say anything to Wengert at PSB
12   about that?
13        A.   Of course not.  What am I going to say to
14   him?  You should get some help?
15        Q.   Did Wengert testify at the Probable Cause
16   Hearing?
17        A.   Yes, he did.
18        Q.   Did he appear to be under the influence of
19   drugs at that point?
20        A.   To be honest, I don't really recall.  It
21   was nothing that stuck out that day.  You know, I
22   can't tell you if he had glossy eyes because, you
23   know, we was a distance from each other, but you
24   know...
25        Q.   During the Probable Cause Hearing, do you
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920   ■   www.alliancecourtreporting.net   ■   800.724.0836

MILLER 000142

```
 1            ANTHONY DERRICK MILLER - BY MR. BEATH
 2   know if your attorney cross-examined Wengert about
 3   whether he was intoxicated on drugs on the night that
 4   you were arrested?
 5          A.   No, he didn't.
 6          Q.   Okay.  Did you say that Wengert testified
 7   at your trial too?
 8          A.   Yes, he did.
 9          Q.   And was there any -- his testimony at your
10   trial, was there any indication that you picked up on
11   that he was under the influence at that point?
12          A.   Whether it comes down to him just, you
13   know, lying through his teeth, you know, I don't know
14   if that is a side effect also, you know.  Is that just
15   a bad cop or a drug addict?  He lied through all his
16   testimony.  So...
17          Q.   In your experience with your uncles and
18   the Monroe County Jail, and your other experiences
19   with people high on narcotics, has lying been a sign
20   or symptom in your experience?
21          A.   Yeah.  Very untruthful, you know.
22          Q.   During your trial, did your attorney
23   cross-examine Wengert on whether or not he had used
24   any narcotics or substances before testifying that
25   day?
```

ALLIANCE COURT REPORTING, INC.
Video Conferencing and Videography Center
585.546.4920    ■    www.alliancecourtreporting.net    ■    800.724.0836

MILLER 000143