1  S T A T E   O F   N E W   Y O R K
   COURT OF CLAIMS
2  -------------------------------------------x
   ANTHONY MILLER,

3
                                Claimant,
4
   -against-                    CLAIM NO.:135854
5
   THE STATE OF NEW YORK,
6
                                Respondent.
7  -------------------------------------------x
   SEPARATE ACTION
8  -------------------------------------------x

9  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF NEW YORK
10 -------------------------------------------x
   ANTHONY MILLER,
11
                                Plaintiff,
12
   vs.                    CIVIL ACTION NO. 22-CV-6069
13
   THE CITY OF ROCHESTER, ET AL.,
14
                                Defendants.
15 -------------------------------------------x

16

17      Deposition of Anthony Miller, held on

18 July 13, 2022, commencing at 9:12 a.m., at New York

19 State Office of the Attorney General, 144 Exchange

20 Boulevard, Suite 200, Rochester, New York 14614, before

21 Ashley N. Castrejon, Registered Professional Reporter,

22 and Notary Public in and for the State of New York.

23

24

25

```
 1                      A P P E A R A N C E S

 2    For Plaintiff:     ROTH & ROTH, LLP,
                         Attorneys at Law
 3                       192 Lexington Avenue, Suite 802
                         New York, New York 10016
 4                          BY:  ELLIOT SHIELDS, ESQ.
                                 eshields@rothandrothlaw.com
 5
      For Defendants:    ASSISTANT ATTORNEY GENERAL
 6    (The State of      OFFICE of the ATTORNEY GENERAL
       New York)         144 Exchange Boulevard., Second Floor
 7                       Rochester, New York 14614
                            BY:  TAMARA B. CHRISTIE, ESQ.
 8                               tamara.christie@ag.ny.gov

 9    For Defendants:    DEPUTY CORPORATION COUNSEL
      (The City of       CITY of ROCHESTER- LAW DEPARTMENT
10     Rochester)        30 Church Street, Room 400A
                         Rochester, New York 14614
11                          BY:  PATRICK BEATH, ESQ.
                                 Patrick.Beath@cityofrochester.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X   O F   T E S T I M O N Y

 2    EXAMINATION OF ANTHONY MILLER                Pages

 3        By Ms. Christie:                      6      62

 4        By Mr. Beath:                        62     100

 5        By Ms. Christie:                    100     104

 6        By Mr. Shields:                     104     106

 7        By Mr. Beath:                       106     107

 8        By Ms. Christie:                    107     109

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              I N D E X   O F   E X H I B I T S

 2                                         Page          Page
                                           Marked        ID'd
 3

 4    Exhibit No. A                         34            34
      (Google Maps)
 5

 6    Exhibits Nos. B, C, D, and E                        46
      (Photographs)
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        STIPULATIONS

 2

 3             IT IS HEREBY STIPULATED, by and between the

 4    attorneys for the respective parties hereto, that:

 5             All rights provided by the CPLR, and Part 221

 6    of the Uniform Rules for the Conduct of Depositions,

 7    including the right to object to any question, except as

 8    to form, or to move to strike any testimony at this

 9    examination is reserved; and in addition, the failure to

10    object to any question or to move to strike any

11    testimony at this examination shall not be a bar or

12    waiver to make such motion at, and is reserved to, the

13    trial of this action.

14             This deposition may be sworn to by the witness

15    being examined before a Notary Public other than the

16    Notary Public before whom this examination was begun,

17    but the failure to do so or to return the original of

18    this deposition to counsel, shall not be deemed a waiver

19    of the rights provided by Rule 3116 of the CPLR, and

20    shall be controlled thereby.

21             The filing of the original of this deposition

22    is waived, and that the witness shall read and sign the

23    original deposition transcript within 60 days upon

24    receipt.

25
```

```
 1                    A N T H O N Y   M I L L E R, called as a

 2    witness and being duly sworn, testifies as follows:

 3                    EXAMINATION BY MS. CHRISTIE:

 4         Q    Good morning.  I see you're wearing a

 5    mask, feel free to keep it on.  You may remove it as

 6    well; however, you feel most comfortable.  My name is

 7    Tamara Christie.  I briefly introduced myself to you

 8    earlier this morning.  I am an Assistant AG in the

 9    Rochester Office of the Attorney General's Office.

10                    I'll be asking you several questions

11    about your conviction that resulted from your 09/25/13

12    arrest for robbery in the City of Rochester.  If at any

13    point you need to take a break, let me know.  I would be

14    happy to give you a break as long as there's no question

15    pending at the time.

16         A    Okay.

17         Q    If at any point you don't understand a

18    question that I ask you, please let me know.  I would be

19    happy to rephrase it.  If you answer it, I will assume

20    that you understood.  Fair enough?

21         A    Okay.

22         Q    Did you review -- did you look at

23    anything in preparation for your testimony today?

24         A    No.  I just talked to my attorney.

25         Q    With the mask on, sir, just keep your
```

1    weight were at that time?

2           A    5'5.  155.

3           Q    And did you have facial hair at that

4    time?

5           A    Yes.

6           Q    Can you describe the facial hair that you

7    had?

8           A    A beard.  A mustache.

9           Q    And would the facial hair be described as

10   a chinstrap beard or something else?

11          A    A chinstrap beard.

12          Q    Were you arrested at approximately

13   eight o'clock on September 25, 2013?

14          A    Yes.

15          Q    Where were you living at that time?

16          A    607 Birr Street.

17          Q    And what type of residence was that?  A

18   house?  An apartment?

19          A    A house.

20          Q    Who else lived with you at that address?

21          A    My parents and my siblings.

22          Q    And can you tell me your parents' names

23   and your siblings' names?

24          A    Anthony Miller Sr. and Nicole Miller.

25   Sibling is Ayla Miller, Aleah Miller and Jamaal Clark.

1          Q    And they were all living with you at 607

2    Birr on 9/25/2013?

3          A    Yes.

4          Q    Can you tell me as best you can what you

5    did, generally, earlier in the day from the time that

6    you got up until 8:00 p.m.?

7          A    I started my day off.  I put my little

8    sister on the bus -- put her on bus.  I had a job

9    interview about an hour or so later.  Walked to my job

10   interview and that went good.  I walked back home and my

11   father was home at the time, and I talked to him for a

12   little bit.

13              Then, I just chilled out for that day

14   until my sister got off the bus.  I got her off the bus,

15   and then I was probably playing a game an hour or so

16   later.  That's when I got a phone call about an incident

17   that took place.

18         Q    Let me just back up a little bit and ask

19   you a few follow-up questions.  Your sister, how old was

20   she?

21         A    At the time, I believe, she was ten.

22         Q    What is her name?

23         A    Ayla.

24         Q    So you put her on the bus in the morning?

25         A    Yes.

1    Q    And then you went for a job interview?

2    A    Yes.

3    Q    Where did you go?

4    A    It was somewhere of off St. Paul.  It was

5  a plastic molding place.

6    Q    Okay.  And you had the interview that

7  day?

8    A    Yes.

9    Q    How did you get there?

10    A    I walked.

11    Q    And after the interview you walked home?

12    A    Yes.

13    Q    And then when you got home, who was with

14  you when you got home?

15    A    My father was home at the time.

16    Q    Nobody else?

17    A    No.  Nobody else was home at the time.

18    Q    And then you stayed at home until at

19  least the time your sister got off the bus?  Is that a

20  yes?

21    A    Yes.

22    Q    So your sister got home off the bus.  I

23  take it you mean the school bus?

24    A    The school bus, yes.

25    Q    Approximately what time was that?

```
1              A    It had to be around three or four
2   o'clock.
3              Q    At that point, you said you got a phone
4   call?
5              A    Yes.  I was playing a game and got a
6   phone call.
7              Q    You were playing a video game?
8              A    Yes.
9              Q    From whom did you get a phone call?
10             A    Armekco Austin.  A friend of mine.
11             Q    Could you spell that for me?
12             A    A-R-M-E-K-C-O, Austin.
13             Q    A-U-S-T-I-N?
14             A    Yes.
15             Q    And what did Mr. Austin tell you?
16             A    He informed me that a mutual friend of
17  ours was attacked and currently in the hospital.
18             Q    And who was the friend that was attacked?
19             A    Brooklyn Cromes.
20             Q    What did you do after receiving that
21  phone call?
22             A    After receiving that phone call, I
23  attempted to call a friend for a ride.  I didn't have a
24  vehicle at the time.  I attempted Shequan Williams.  He
25  wasn't able to give me a ride.  Then, I called another
```

1    on Genesee Street.

2             Q     Thank you.  What was the weather like

3    that day?

4             A     I believe it was in the 60s.

5             Q     Let me be more specific.  What was the

6    weather like during the time you were walked from Birr

7    Street to Bradburn?

8             A     Sixties probably.

9             Q     What were you wearing when you left Birr

10   Street?

11            A     A hoodie, sweat pants, and a pair of tan

12   Timberlands.

13            Q     What color was the hoodie if you

14   remember?

15            A     A red hoodie.

16            Q     What color were the sweat pants?

17            A     Blue with white pinstripes on the side.

18            Q     And you said -- what was on your feet?

19            A     Tan Timberlands.  Tan boots.

20            Q     Thank you.  Was anyone else at Birr

21   Street -- 607 Birr Street when you left on foot?

22            A     My little sister was there.  My brother

23   was there and my mother was there.

24            Q     And tell me which brother?

25            A     Jamaal Clark.

```
 1              Q    Did you have a cell phone on you when you

 2    left 607 Birr?

 3              A    Yes.

 4              Q    What was the number for that cell phone?

 5              A    I can't recall the number offhand.

 6              Q    Did you have any other electronic

 7    devices, pages, or anything on you --

 8              A    Yes.

 9              Q    Let me just finish the question.  Did you

10    have any other electronic devices like MP3 players,

11    pagers, or anything else when you left on foot from 607

12    Birr?

13              A    An MP3 player.

14              Q    Did you pick up any other electronic

15    devices, by any means, between 607 Birr and 22 Bradburn?

16              A    No.

17              Q    Did you make any stops along the way

18    between 607 Birr and Bradburn?

19              A    No.

20              Q    Did you interact with anyone either in

21    person or on the phone or anything between 607 Birr and

22    Bradburn?

23              A    No.

24              Q    No texts?

25              A    No.
```

```
 1          Q    No calls?

 2          A    No.

 3          Q    You didn't talk to anybody in person?

 4          A    No.

 5          Q    No emails?

 6          A    No.

 7          Q    When you got to Bradburn, where did you

 8    go?

 9          A    I immediately went across the street.  I

10    went to the Aaron Hinds's house.

11          Q    And Aaron Hinds was at 22 Bradburn?

12          A    No.  He was at his home.  I'm not sure of

13    the address, but it was across the street.

14          Q    But it is on Bradburn?

15          A    Yes.

16          Q    So when you got to the vicinity of the

17    street of Bradburn, the first place you went was Aaron

18    Hinds's house?

19          A    Yes.

20          Q    And you don't remember the address, but

21    it was on Bradburn Street?

22          A    Yes.

23          Q    Approximately what time did you arrive at

24    Mr. Hinds's house?

25          A    I would say after seven.
```

```
1    cell phone records back in the time of the criminal

2    trial and you said it was the wrong cell phone number?

3              A    I didn't see him until after conviction.

4    When I reviewed all of the stuff that he put in, it had

5    the wrong date.

6              Q    What do you mean it had the wrong date?

7              A    He was requesting for a number that

8    didn't exist at the time.

9              Q    You don't remember what your cell phone

10   number was?

11             A    No.

12             Q    At any point, did you try to get any GPS

13   or cell phone record proof that could show your

14   whereabouts on September 25, 2013?

15             A    Yes.  I was in contact with the company.

16   As far as the cell phone, it had to be utilized with an

17   App.  I didn't have a regular carrier like Verizon or

18   T-mobile.  So in order to use the cell phone, I had to

19   be under Wi-Fi connection.  That was my biggest thing in

20   this case.

21                  In order for me to utilize the cell

22   phone, I had to be on Wi-Fi.  There's not Wi-Fi in these

23   places that you are saying where I was at.  I would

24   think it would be as simple as they look at my cell

25   phone and see that I'm making calls and texting.  I have
```

1    been pleading this whole time.  I wrote the company.

2    They are not responding.  They don't respond to me.  I

3    went down literally every channel to get cell phone

4    records.

5              Q    Let me just understand what you are

6    saying.  So first you're saying if the records showed

7    that you were on Wi-Fi, then if there's no Wi-Fi at the

8    location of the robbery, then you must have been on

9    Wi-Fi at some other location?

10             A    Yes.

11             Q    But you were never able to get the

12   records?

13             A    No.  My attorney wasn't.

14             Q    Who did you reach out to to try and get

15   the records?

16             A    The actual company Text Plus.  They are

17   located in California.

18             Q    T-E-X-T Plus?

19             A    Yes.

20             Q    Does that company still exist?

21             A    I believe it does.

22             Q    Was that the name of the app?  Was it

23   another app?

24             A    That was the name of the app.

25             Q    At that time, you were able to use a cell

1    phone, but only on Wi-Fi?

2           A    Yes.

3           Q    You didn't have a cellular plan?

4           A    No.

5           Q    Did you ever attempt -- you personally.

6    Did you personally ever attempt to obtain the cell phone

7    records of Mr. Hinds's whereabouts?

8           A    During the time of the case, he turned

9    over his T-mobile phone records, but they were never

10   forensically examined.

11          Q    When you say Mr. Hinds turned over his

12   T-mobile phone records, to whom did he give them, if you

13   know?

14          A    He gave them to me, and then I gave them

15   to my attorney Mr. Stubbe.

16          Q    All right.  You mentioned when I asked if

17   you had any other evidence to prove that you did not

18   commit this crime, you mentioned the K9 Track.  Tell me

19   about that.

20          A    The K9 Track went past the location where

21   I needed to, you know, turn to be found where I was

22   found out.

23          Q    And anything else that you can think of

24   that would help prove that you did commit this crime?

25          A    Not specifically.  I would just suggest

1   to look at the whole case.  It needs to be looked at

2   under neutral eyes.  Everything needs to be looked at, I

3   feel.

4           Q    Understood.  What about the GPS records

5   for the MP3 player would something like that exist?

6           A    No, I don't believe so.

7           Q    Mr. Miller, when was the last time you

8   had any mental health treatment approximately?

9           A    Probably six or seven months ago.

10          Q    Which provider was that?

11          A    I believe Strong Health.

12          Q    In the Bill of Particulars provided by

13  Mr. Shields dated June 23, 2022, it states in paragraph

14  2 that "Claimant states that he is constantly angry,

15  anxious, and depressed which makes all of his

16  relationships more difficult."  Can you tell me about

17  that?

18          A    Just, you know, I find it difficult that,

19  you know, sometimes to maintain relationships with

20  people.  I know it stems from what I went through.

21  Certain thoughts and, you know, patterns and stuff.  It

22  was just anxiety and mistrust, I guess.

23          Q    Okay.  That Bill of Particulars also

24  states in paragraph 22 "Claimant is always anxious in

25  public places particularly where police officers are or

1    may be present."  Can you tell me about that?

2            A    No.  Just fair police, I guess.

3            Q    Do you have an understanding as to why

4    Mr. Hinds did not testify at your criminal trial?

5            A    At the last minute, from what I

6    overheard, he was saying that we didn't need him

7    anymore, and he was also saying that the judge was not

8    going to allow him to testify for whatever reason.  So

9    he told us that literally at the last minute.  He called

10   him an hour before he arrived and I guess the plans

11   changed.

12           Q    Now, Mr. Miller, I have completed my

13   questioning.  Is there anything else you would like to

14   tell me that maybe wasn't prompted by any of my

15   questions?

16           A    I don't know.  I just hope that ten years

17   or close to ten years after the fact that somebody

18   actually take an honest look into the case.  You know,

19   the officers and everything that took place.  I don't

20   think it should be too much contested that the original

21   investigation wasn't honest.  It wasn't a neutral

22   investigation.  I was targeted, you know, because of my

23   past -- crimes I committed in the past.

24                So if you want to call it human error,

25   and he had tunnel vision on me because I committed a

```
 1   similar crime when I was a youth.  I think everything

 2   pays down on was the tunnel vision.  It must be him.  He

 3   committed similar crimes before, so I would hope you

 4   take that away and just look at the evidence in this

 5   case.  That's all I hope and pray for.

 6                    MS. CHRISTIE:  I thank you very much

 7               for your time, and I wish you the best.

 8                    EXAMINATION BY MR. BEATH:

 9        Q    My name is Patrick Beath, and I represent

10   the City of Rochester.  I previously took a statement

11   from you at the DH examination if you recall that some

12   time ago.

13        A    Yes.

14        Q    So I'm not going to walk through all the

15   same things that you were just asked about.  I do have a

16   few questions around some of those topics.

17        A    Okay.

18        Q    And I have some other areas that I want

19   to acquire into.  If as we go through this, I ask you a

20   question that has already been asked, I apologize.  It

21   is not intentional.

22        A    Yes.

23        Q    You are still under oath and you still

24   have an obligation to answer my questions truthfully.

25   Do you understand that?
```

1           A    Yes.

2           Q    If you need a break at any time, just say

3    so, and we will take a break.  Do you have any questions

4    for me before I begin my questioning of you?

5           A    No.

6           Q    At the very beginning of your questioning

7    today, you were asked what you did to prepare for your

8    deposition and if you had seen any documents.  You

9    indicated you spoke with your attorney, did you speak

10   with anyone else in preparation for today's deposition?

11          A    No.

12          Q    Did you speak with Aaron Hinds at all in

13   preparation for this deposition?

14          A    No.

15          Q    Let's go to the date of the incident

16   September 25, 2013.  You indicated earlier that during

17   that day before the interaction with police you had gone

18   to a job interview; is that right?

19          A    Yes.

20          Q    Where was the job interview?

21          A    It was off of St. Paul Street.

22          Q    You told us what you were wearing at the

23   time of your arrest, and we saw some photographs of what

24   you were wearing.

25          A    Yes.

```
 1              Q    Did you wear that same clothing to the

 2    job interview?

 3              A    No.

 4              Q    Can you tell us what you wore to the job

 5    interview?

 6              A    I believe some khakis, a dress shirt, and

 7    I believe some work boots.  I had some work boots.  I

 8    probably had the same boots on.

 9              Q    The same Timberland boots?

10              A    Yes.

11              Q    Okay.  So the Timberland boots that are

12    in the photo, would you have had the boots laced up when

13    you went to the interview, or would they have been

14    unlaced?

15              A    Probably unlaced.  Like I said, when we

16    speak unlaced -- it is sad to say how the police put it.

17    Like, my shoe strings were dragging on the floor.

18    That's not how people wear their Timberlands.  When we

19    say unlaced, the shoe string is probably this much

20    hanging out (indicating).

21              Q    Okay.  So --

22                   MR. SHIELDS:  For the record, he put

23                   up his fingers.

24              A    Yeah.  The shoe string is not dragging on

25    the floor.  Nothing like that.
```